UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————— X
                                              :
JOHNSON & JOHNSON, a New Jersey              :
Corporation,                                 :
                                              :
                    Plaintiffs,              :
                                              :
              - against -                     :
                                              :
GUIDANT CORPORATION, an Indiana              :
Corporation, BOSTON SCIENTIFIC              :
CORPORATION, a Delaware Corporation, and    :
ABBOTT LABORATORIES, an Illinois            :
Corporation,                                 :
                    Defendants.              :
——————————————————————— X



Civil Action No. ____

Complaint



Johnson & Johnson ("J&J"), by its attorneys, Kramer Levin Naftalis & Frankel

LLP, for its complaint against Guidant Corporation ("Guidant"), Boston Scientific Corporation

("Boston Scientific") and Abbott Laboratories ("Abbott"), alleges as follows:

## I.    Nature of the Action

1.    This action arises out of the highly publicized takeover battle between J&J

and Boston Scientific to acquire Guidant. While Boston Scientific ultimately succeeded in its

takeover bid for Guidant, it did so only because Guidant leaked confidential information to a

third party, Abbott, for the purpose of arranging a prepackaged divestiture of significant Guidant

businesses to Abbott. Based on these disclosures, which were in material breach of the terms of

Guidant's merger agreement with J&J, Abbott agreed to enter into a divestiture and financing

agreement with Boston Scientific, which allowed Boston Scientific to make an offer for Guidant

that would not require a lengthy and uncertain antitrust review. This, in turn, allowed Guidant to

accept Boston Scientific's offer as "superior" to J&J's offer and to terminate the agreement with

J&J. Thus, Guidant's breach of its agreement with J&J, and Boston Scientific's and Abbott's tortious interference with that agreement, deprived J&J of the benefit of the bargain of its merger with Guidant and caused it to suffer damages.

2.      In December 2004, J&J and Guidant entered into a merger agreement that provided that J&J would pay $25.4 billion to acquire Guidant, or $76 per Guidant share (the "Initial Merger Agreement").  Guidant's shareholders approved the merger.  The price was subsequently changed to $21.5 billion, or $63.08 per share, as a result of various product recalls and legal problems that surfaced at Guidant.  In this regard, the parties entered into an Amended and Restated Agreement and Plan of Merger dated November 14, 2005 (the "Merger Agreement").

3.      Like any large multi-national acquisition, the merger was subject to antitrust approval by U.S., European Union and other foreign regulators.  Over the following ten months, J&J reached an agreement with domestic and foreign regulators which, among other things, would grant a non-exclusive license for certain patents to Abbott to facilitate antitrust approval for the merger with Guidant.

4.      Pending the closing of the merger, Guidant was prohibited under the express terms of the Merger Agreement from soliciting alternative offers and had limited ability to respond to an unsolicited bid from another party.  Under the "No Solicitation" provision in the Merger Agreement — which was designed to prevent Guidant from using the Merger Agreement to solicit higher offers — Guidant was prohibited from providing confidential business information to any company, or its representatives, unless that company was making an unsolicited "Takeover Proposal" (i.e., a proposal to acquire 15% or more of Guidant) under

terms that were likely to result in a bid that constituted a "Superior Proposal" to the merger with J&J. Guidant also could not facilitate or cooperate with a Takeover Proposal other than through discussions with, and disclosures to, the person making such a Takeover Proposal. Under no circumstances could Guidant provide confidential business information to or discuss or negotiate with any third party that was not making a bona fide Takeover Proposal.

5.      In December 2005, just as the J&J/Guidant merger was about to close, Boston Scientific made a bid to acquire Guidant for $25 billion, or $72 per Guidant share. While nominally higher in price than the renegotiated deal with J&J, Boston Scientific's offer was fraught with uncertainty and timing issues that rendered its proposal patently inferior to the merger with J&J. For example, unlike J&J, which had spent much of the past year resolving potential antitrust issues by entering into a License Agreement with Abbott and a Consent Decree with the regulators, Boston Scientific had not even begun the pre-merger notification process, much less resolved its own antitrust issues, at the time of its announced bid.

6.      After receiving a Takeover Proposal from Boston Scientific, Guidant's management allowed Boston Scientific to perform limited due diligence. What Guidant did not disclose until after the fact, however, was that it simultaneously allowed Abbott — a third party with absolutely no right to receive any confidential information from Guidant under the No Solicitation provision and which had already agreed to facilitate J&J's bid — an even "deeper dive" into Guidant's confidential business information to determine whether Abbott would now be willing to enter into a pre-packaged divestiture agreement with Boston Scientific to clear any antitrust hurdles. In so doing, Guidant materially breached the No Solicitation provision of its Merger Agreement with J&J.

KL3:2519101.3

7.      Based on the information disclosed to it by Guidant, Abbott and Boston
Scientific entered into an agreement to divest Guidant's entire vascular intervention ("VI")
business and other assets and Boston Scientific then made a formal proposal to acquire Guidant
for $72 per share.  On January 25, 2006, after several counter-proposals from J&J and Boston
Scientific, Guidant announced that it was terminating the Merger Agreement with J&J and
entering into an acquisition agreement with Boston Scientific for $27 billion.

8.      Abbott would not have agreed to a pre-packaged divestiture without the
confidential information it received in violation of the "No–Solicitation" provision of J&J's
Merger Agreement with Guidant.   Without a pre-packaged divestiture agreement, Boston
Scientific could not have made a proposal that would have been acceptable to Guidant's Board
of Directors or shareholders, both because it would have been conditioned on reaching an
agreement with Abbott or some other party to resolve antitrust issues and would have entailed a
lengthy antitrust review, the outcome of which would have been uncertain.

9.      Guidant could have terminated its Merger Agreement with J&J and then
provided information to Abbott, but would then have lost the ability to keep J&J bound to a deal
if a transaction with Boston Scientific failed to materialize.  Guidant was also able to use its
agreement with J&J to better its negotiating position with Boston Scientific.  By keeping J&J
contractually bound while it facilitated what was ultimately declared a Superior Proposal from
Boston Scientific, Guidant acted in bad faith and in violation of its contractual restrictions
pending the closing of the Merger Agreement with J&J.

10.     Boston Scientific and Abbott were well aware that Guidant had entered
into the Merger Agreement with J&J; indeed, Abbott had agreed to facilitate consummation of

that transaction before it began dealing with Boston Scientific behind J&J's back.  By their actions, these defendants induced Guidant to breach that agreement by disclosing confidential information to Abbott with the goal of ensuring the success of Boston Scientific's Takeover Proposal.

11.    As a result of Guidant's willful and material breach, and the tortious interference by Boston Scientific and Abbott, J&J was deprived of the benefit of its merger agreement and suffered damages that it now seeks to recover through this action.

## II.    Jurisdiction and Venue

12.    The Court has diversity jurisdiction over the subject matter of this case, under 28 U.S.C. § 1332, because this case arises among citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

13.    The Court has jurisdiction over the parties, each of which is a corporation doing business in the State of New York, and jurisdiction to grant all the relief requested by J&J.

14.    Venue is proper in the Southern District of New York because one party, Guidant, is subject to and has consented to the jurisdiction of this Court and there is no other district in which this action may otherwise be brought.

## III.    The Parties

15.    J&J is a New Jersey corporation with its headquarters and principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey.  Through its operating subsidiaries, J&J is a multi-national manufacturer and distributor of health care, surgical, biotechnology, and personal hygiene products, as well as a provider of related services

for the consumer, pharmaceutical, medical devices, and diagnostics markets. J&J has more than 230 operating companies, which employ approximately 116,000 people in 57 countries and sell products in the United States and around the world.

16.    Guidant is an Indiana corporation having a principal place of business at 11 Monument Circle, Indianapolis, Indiana. It is now a wholly-owned subsidiary of Boston Scientific. Guidant designs, develops, and markets cardiovascular medical products, including pacemakers and implantable defibrillators.

17.    Boston Scientific is a Delaware corporation having a principal place of business at One Boston Scientific Place, Natick, Massachusetts. Boston Scientific develops, manufactures and markets a range of medical devices and procedures.

18.    Abbott is an Illinois corporation having a principal place of business at 100 Abbott Park Road, Abbott Park, Illinois. Abbott develops, manufactures, and markets pharmaceutical and nutritional products, as well as surgical and diagnostic devices.

IV.    Background Facts

(a)    J&J and Guidant Engage in Confidential Merger Discussions

19.    Among other products, J&J, through its subsidiary Cordis Corporation ("Cordis"), markets medical devices for the treatment of cardiovascular disorders, including a coronary stent known as the Cypher stent. A stent is a metallic device surgically inserted to keep arteries open after balloon angioplasty to clear blockages. The Cypher stent provides a mechanical scaffold to keep the vessel open while a drug is slowly released from the stent to

prevent the build-up of new tissue that re-clogs the artery.  Stents that work with drugs like this are known in the industry as drug-eluting stents ("DES").

20.     DES account for over 80% of the U.S. coronary stent market.  Aside from Cordis, Boston Scientific is the only other company that markets DES in the U.S., with Cordis having approximately a 45% market share and Boston Scientific approximately a 55% market share.  Guidant, Abbott and another company called Medtronic are all in the process of seeking, or undertaking the preparations necessary to seek, approval of the Food and Drug Administration to market DES in this country.

21.     During the fall 2004, J&J engaged in discussions with Guidant about the possibility of entering into a business transaction whereby J&J would acquire Guidant.  The acquisition of Guidant represented an opportunity for J&J to expand its business into the cardiac rhythm management market for implantable pacemakers and defibrillators.

22.     On or about August 4, 2004, J&J and Guidant entered into a Confidentiality Agreement that provided that information exchanged between J&J and Guidant would be used solely for the purpose of exploring a possible negotiated business arrangement and not for any other business or competitive purpose.

(b)     J&J and Guidant Enter into a Merger Agreement

23.     On December 15, 2004, J&J and Guidant entered into the Initial Merger Agreement pursuant to which J&J agreed to pay $25.4 billion in cash and stock or $76 per share to acquire Guidant.  The closing of the merger was conditioned on (i) approval of the deal by Guidant shareholders, (ii) approval for listing on the New York Stock Exchange of newly registered J&J stock for issuance to Guidant shareholders, (iii) regulatory approval of the

KL3:2519101.3

transaction, including any divestitures, from U.S. and European Commission antitrust authorities, and (iv) the accuracy of the representations and warranties set forth in the agreement.

24.     With Guidant's assistance, J&J prepared and filed with the Securities and Exchange Commission a Registration Statement on Form S-4 in connection with the issuance of J&J stock in the merger, as well as a Proxy Statement for the Merger that was included as a Prospectus.

25.     Guidant gave notice of, convened, and held a meeting of its shareholders solely for the purpose of obtaining shareholder approval of the merger.  On or about April 27, 2005, Guidant shareholders approved the merger.

26.     J&J also sought the necessary antitrust clearance for the merger in the United States, Europe, and Canada.  To this end, J&J filed a pre-merger notification under the Hart-Scott-Rodino Antitrust Act of 1976 with the Federal Trade Commission ("FTC") on January 18, 2005.

27.     In discussions with the FTC, the agency objected to the proposed transaction on the ground that a merger between one of two actual competitors in the DES market with one of the three potential competitors would lessen competition in that market.  On August 12, 2005, J&J and Abbott entered into a License Agreement whereby J&J granted Abbott a non-exclusive license to certain patents in the DES field in the event the transaction was consummated in order to increase the likelihood that Abbott would successfully enter the DES market.  After lengthy negotiations, and based in part on the agreement between J&J and Abbott, the FTC and J&J entered into a Consent Order on November 2, 2005 to resolve the FTC's antitrust concerns.

28.     In the meantime, numerous regulatory and legal problems surfaced involving Guidant products being recalled, lawsuits against Guidant being filed, and Guidant being investigated by the New York Attorney General.  On October 18, 2005, J&J announced that the company was considering alternatives to its proposed acquisition of Guidant and on November 7, Guidant sued J&J claiming a breach of the Initial Merger Agreement.  On November 14, Guidant accepted a revised offer of $21.5 billion, or $63.08 per Guidant share, the Merger Agreement was executed and the lawsuit was discontinued.

(c)     The Merger Agreement Contained Strict Limitations on Guidant's Ability to Solicit
        or Cooperate with Competing Bids, Designed to Protect the Benefit of J&J's Bargain

29.     Pursuant to the Merger Agreement, Guidant was prohibited from either (i) soliciting, initiating or knowingly encouraging, or taking any other action designed to, or which could reasonably be expected to, facilitate, any competing proposal to acquire Guidant or (ii) entering into, continuing or otherwise participating in any discussions or negotiations regarding, or furnishing to any person any information, or otherwise cooperating with any such proposal. These restrictions were designed to prevent Guidant from using the J&J offer as a means of obtaining higher bids for the company.

30.     In particular, Section 4.02 of the Merger Agreement, titled "No Solicitation," provided as follows:

> The Company [*i.e.*, Guidant] shall not, nor shall it authorize or
> permit any of its Subsidiaries or any of their respective directors,
> officers or employees or any investment banker, financial advisor,
> attorney, accountant or other advisor, agent or representative
> (collectively, "Representatives") retained by it or any of its
> Subsidiaries to, directly or indirectly through another person, *(i)
> solicit, initiate or knowingly encourage, or take any other action
> designed to, or which could reasonably be expected to, facilitate,
> any Takeover Proposal or (ii) enter into, continue or otherwise*

> *participate in any discussions or negotiations regarding, or furnish*
> *to any person any information, or otherwise cooperate in any way*
> *with, any Takeover Proposal.* (Emphasis added).

31.    Section 4.02 of the Merger Agreement defined a "Takeover Proposal" as

basically a bid for at least 15% of Guidant's assets or businesses:

> The term "Takeover Proposal" means any inquiry, proposal or
> offer from any person relating to, or that could reasonably be
> expected to lead to, any direct or indirect acquisition or purchase,
> in one transaction or a series of transactions, of assets (including
> equity securities of any Subsidiary of the Company) or businesses
> that constitute 15% or more of the revenues, net income or assets
> of the Company and its Subsidiaries, taken as a whole, or 15% or
> more of any class of equity securities of the Company, any tender
> offer or exchange offer that if consummated would result in any
> person beneficially owning 15% or more of any class of equity
> securities of the Company, or any merger, consolidation, business
> combination, recapitalization, liquidation, dissolution, joint
> venture, binding share exchange or similar transaction involving
> the Company or any of its Subsidiaries pursuant to which any
> person or the shareholders of any person would own 15% or more
> of any class of equity securities of the Company or of any resulting
> parent company of the Company, in each case other than the
> transactions contemplated by this Agreement.

32.    Notwithstanding these provisions, and in order to allow Guidant's

directors to meet their fiduciary obligations to Guidant's shareholders, the Merger Agreement

provided that if Guidant's Board of Directors, in consultation with outside legal counsel and a

qualified financial advisor, determined that an unsolicited Takeover Proposal constituted or was

reasonably likely to lead to a "Superior Proposal," as defined below, then, and only then,

Guidant could (i) provide information to the "person making such Takeover Proposal (and its

Representatives)," pursuant to an appropriate confidentiality agreement and as long as Guidant

simultaneously provided (or already had provided) the information to J&J, and/or (ii)

"participate in discussions or negotiations with the person making such Takeover Proposal (and

its Representatives)."

KL3:2519101.3

33.     In this regard, Section 4.02 provided as follows:

Notwithstanding the foregoing, at any time prior to obtaining the Shareholder Approval, in response to a bona fide written Takeover Proposal that the Board of Directors of the Company reasonably determines (after consultation with outside counsel and a financial advisor of nationally recognized reputation) constitutes or is reasonably likely to lead to a Superior Proposal, and which Takeover Proposal was not solicited after the date hereof and was made after the date hereof and did not otherwise result from a breach of this Section 4.02(a), the Company may, subject to compliance with Section 4.02(c), (x) furnish information with respect to the Company and its Subsidiaries to the person making such Takeover Proposal (and its Representatives) pursuant to a customary confidentiality agreement not less restrictive to such person than the confidentiality provisions of the Confidentiality Agreement, *provided* that all such information has previously been provided to Parent or is provided to Parent prior to or substantially concurrent with the time it is provided to such person, and (y) participate in discussions or negotiations with the person making such Takeover Proposal (and its Representatives) regarding such Takeover Proposal.

34.     As further defined in Section 4.02, "Representatives" of a person making a Takeover Proposal included only that person's "Subsidiaries or any of their respective directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative (collectively, 'Representatives')." Guidant was expressly prohibited from giving information to, or participating in discussions with, any other persons.

35.     Whether a Takeover Proposal constituted or likely would lead to a Superior Proposal was to be based not only on its financial terms, but also on whether it was "reasonably capable of being completed, taking into account all financial, legal, regulatory and other aspects of such proposal." Thus, under Section 4.02:

The term "Superior Proposal" means any bona fide offer made by a third party that if consummated would result in such person (or its shareholders) owning, directly or indirectly, more than 80% of

-11-

KL3:2519101.3

the shares of Company Common Stock then outstanding (or of the shares of the surviving entity in a merger or the direct or indirect parent of the surviving entity in a merger) or all or substantially all the assets of the Company, which the Board of Directors of the Company reasonably determines (after consultation with a financial advisor of nationally recognized reputation) to be (i) more favorable to the shareholders of the Company from a financial point of view than the Merger (taking into account all the terms and conditions of such proposal and this Agreement (including any changes to the financial terms of this Agreement proposed by Parent in response to such offer or otherwise)) and (ii) *reasonably capable of being completed, taking into account all financial, legal, regulatory and other aspects of such proposal.* [Emphasis added]

36.    In sum, under the Merger Agreement, Guidant could not solicit any Takeover Proposal from another person.  In the event that it received an unsolicited Takeover Proposal, which it determined upon consultation with its legal and financial advisors was or could become a Superior Proposal, Guidant could furnish information to, and conduct discussions with, only the person (or its Representatives) making such a Takeover Proposal.

37.    The Merger Agreement also provided that in the event Guidant's Board received a Superior Offer, Guidant was required to notify J&J of the terms of that offer and give J&J five business days to make a competing offer, which Guidant would be required to consider before it could terminate the Merger Agreement without a breach.

(d)    Boston Scientific Makes a Last-Minute Bid, and Guidant Breaches
the Merger Agreement to Facilitate Turning It into a Superior Proposal

38.    On December 5, 2005, before the merger between J&J and Guidant had closed, Boston Scientific announced a bid for Guidant, offering $25 billion, or $72 per share. While nominally higher in price than the J&J deal, Boston Scientific's offer was contingent upon, among other things, receiving regulatory approval and was therefore subject to uncertainty and delay.

39.     On January 8, 2006, Boston Scientific submitted a formal proposal to acquire Guidant for $72 per share.  As part of this formal offer, Boston Scientific also announced that it had entered into an agreement with Abbott to divest Guidant's VI and endovascular businesses to Abbott, as well as to share rights to Guidant's DES program, in order to facilitate prompt antitrust review and approval.  Abbott also agreed to provide a $700 million loan to Boston Scientific.

40.     Based on statements made in a January 9, 2006 conference call with analysts to discuss the Boston Scientific proposal, it became clear that Guidant had cooperated with and facilitated Boston Scientific's Takeover Proposal by impermissibly providing confidential information to Abbott. This in turn enabled Boston Scientific to enter into the agreement with Abbott, which was critical to Boston Scientific's ability to have its offer declared by Guidant as a Superior Proposal and thereby have it accepted in lieu of the J&J transaction.

41.     On the conference call, Larry Best, Chief Financial Officer for Boston Scientific, emphasized the importance of the agreement with Abbott to Boston Scientific's Takeover Proposal.  In Mr. Best's words, the Abbott agreement was "critically important not only for the quick completion of the Guidant acquisition but also for the business prospects of the combined company."  Mr. Best explained: "As we said when we announced our initial proposal our intention was to divest Guidant's vascular intervention and endovascular business in an effort to obtain rapid antitrust approval for the Guidant acquisition.  Therefore, we have executed a binding agreement with Abbott.  Abbott will buy Guidant's VI and endovascular businesses when we complete this transaction with Guidant."

KL3:2519101.3

42.     During the Q&A session at the end of the call, one analyst asked Boston Scientific's Chief Operating Officer, Paul LaViolette, whether Boston Scientific had "seen part of the [Guidant DES] data as a part of your due diligence and if not, is there some contingency that exists for Abbott should the [Guidant DES] data prove disappointing . . . ?"

43.     Electing to respond to this question himself, Mr. Best was quoted as saying:

> Let me explain the due diligence process.  As you can imagine, Guidant, you know was very protective of their program in terms of our doing due diligence. *We had the opportunity to do a certain level of due diligence.  Abbott had the opportunity to do a much deeper dive on due diligence.*  My understanding from their due diligence is that they were very impressed with the data and what they found, and that is how they came up with the valuation and the decision to move forward. (Emphasis added).

44.     Thus, at some point in time between Boston Scientific's announcement of its bid for Guidant on December 5, 2005, and Boston Scientific's submission of a formal proposal on January 8, 2006, Guidant not only allowed Boston Scientific to conduct due diligence on it businesses but also disclosed even more confidential business information to Abbott — which had no independent right to receive any information and was prohibited from receiving any information under the Merger Agreement — about its VI and endovascular businesses.

45.     As a result of the "deeper dive" it was permitted into Guidant's confidential business information, Abbott was able to make a "decision to move forward" and agree to acquire the entire VI business and other assets that Boston Scientific needed to divest to expedite antitrust regulatory approval of its proposed acquisition of Guidant.  Without these

KL3:2519101.3

agreements, Boston Scientific's Takeover Proposal would not have been viable, much less superior to J&J's.

(e)     Guidant's Impermissible Disclosures Constituted
        a Willful and Material Breach of the Merger Agreement

46.     Immediately upon learning that Guidant had divulged confidential business information to Abbott, in breach of the No Solicitation provision of the Merger Agreement, J&J's General Counsel raised the issue with Guidant's General Counsel.  In a follow-up letter dated January 23, 2006, J&J's General Counsel wrote to Guidant noting the apparent breach of Section 4.02 of their Merger Agreement and demanding an explanation.  In response, Guidant's General Counsel attempted to justify Guidant's actions by, among other things, claiming that "Boston Scientific brought Abbott into the transaction as part of Boston Scientific's 'Takeover Proposal'" and that Abbott was a "joint bidder" for Guidant along with Boston Scientific.  The matter remained unresolved.

47.     Abbott was not a "joint-bidder" for Guidant.  Abbott did not make a Takeover Proposal either on its own or in conjunction with Boston Scientific and, therefore, was not entitled to receive any confidential information from Guidant.  Nor was Abbott a "Representative" of Boston Scientific, as that term is defined in Section 4.02 of the Merger Agreement.  Rather, at all times Abbott was a third party divestiture candidate dealing at arms' length with Boston Scientific in negotiating the acquisition of certain businesses that would be divested in the event that Boston Scientific's Takeover Proposal was accepted.

48.     As Boston Scientific itself noted during the January 9 conference call, an executed agreement with Abbott was critically important both to rapid antitrust approval of a potential acquisition by Boston Scientific and to the perceived business prospects of the

-15-

combined company.  Just as J&J entered into a Licensing Agreement with Abbott in anticipation of closing its Merger Agreement with Guidant, Boston Scientific needed to enter into a much more extensive agreement with Abbott — divesting entire businesses — to ease antitrust approval of its own otherwise inferior proposal to acquire Guidant.  By leaking confidential information to Abbott, a third-party divestiture candidate, Guidant, in violation of the No Solicitation restrictions in its Merger Agreement with J&J, thus knowingly and willfully facilitated Boston Scientific's Takeover Proposal becoming a Superior Proposal.

(f)     Guidant Deems Boston Scientific's Offer to be a "Superior Proposal"

49.     On January 10, 2006, Guidant's Board of Directors met to consider whether Boston Scientific's offer was a "Superior Proposal."

50.     Faced with the prospect of losing the transaction that it had pursued for more than a year, J&J chose to reconsider the amount it was willing to offer for Guidant.  On January 11, J&J and Guidant announced a revised Merger Agreement, raising the price to $68.06 per Guidant share.  On the next day, however, Boston Scientific improved its own offer to $73 per Guidant share.  The following day, January 13, 2006, J&J and Guidant announced a further revision to their Merger Agreement, raising the acquisition price to $71 per share, but once again, on January 17, 2006, Boston Scientific raised its offer, this time to $80 per share.

51.     Later in the day on January 17, 2006, Guidant's Board announced that Boston's bid was deemed a "Superior Proposal" to the existing deal with J&J.  On January 25, 2006, Guidant announced that it was terminating the Merger Agreement with J&J, as it was entitled to do upon determining that there was a Superior Proposal, and entering into an acquisition agreement with Boston Scientific for $27 billion.  J&J ultimately received a $705

million "termination fee" under the terms of its Merger Agreement. However, as the Merger Agreement itself makes clear, "no such termination shall relieve any party hereto from any liability or damages resulting from the willful and material breach by a party of any of its representations, warranties, covenants or agreements set forth in this Agreement." (Merger Agreement at § 7.02).

52.     As a result of Guidant's willful and material breach of the No Solicitation provision of the Merger Agreement, which facilitated Boston Scientific's Takeover Proposal through the prohibited confidential disclosures to third-party divestiture candidate Abbott, J&J was wrongfully deprived of the full benefits of its bargain and suffered damages that it now seeks to recover.

V.     Claims for Relief

First Cause of Action
for Breach of Contract
(Against Defendant Guidant)

53.     J&J repeats and realleges the allegations of paragraphs 1 to 52.

54.     J&J entered into a valid, binding contract embodied in the Merger Agreement. A material term of the Merger Agreement was a "No Solicitation" clause, as set forth in Section 4.02 of the Merger Agreement. The No Solicitation clause was designed to protect the terms of the bargain that the parties struck, pending the closing of their transaction, while providing Guidant with the limited ability to receive and negotiate unsolicited alternative proposals.

KL3:2519101.3

55.    Assuming that Boston Scientific's December 5, 2005 bid could be viewed as reasonably likely to lead to a Superior Proposal, Guidant was only permitted to provide confidential information to Boston Scientific and its Representatives, as defined in the Merger Agreement.    Since Abbott was neither a person making a Takeover Proposal nor a Representative of Boston Scientific, but only a third-party divestiture candidate, permitting Abbott to take a "deeper dive" into Guidant's confidential information was a clear breach of the Merger Agreement.

56.    This breach went to the heart of J&J's bargain, facilitating a competing bid by providing confidential information to a person not entitled to receive such information under the No Solicitation clause.

57.    The breach was also material and harmed J&J.    Had Abbott not been provided with Guidant's confidential business information, Abbott would not have been able to enter into the divestiture agreement, which in turn facilitated and enabled Boston Scientific's Takeover Proposal to be viewed as a Superior Proposal.

58.    As a result of Guidant's willful and material breach, J&J was deprived of the benefit of its bargain under the Merger Agreement and suffered damages.

59.    J&J made reasonable and diligent attempts to mitigate its damages.

Second Cause of Action
for Breach of the Implied Duty of Good Faith and Fair Dealing
(Against Defendant Guidant)

60.    J&J repeats and realleges the allegations of paragraphs 1 to 52.

KL3:2519101.3

61.     As a matter of common law, as well as the law of the State of Indiana, every contract imposes on the parties thereto an implied duty of good faith and fair dealing.

62.     Defendant Guidant breached the implied duty of good faith and fair dealing by negotiating and facilitating a competing Takeover Proposal from another party, Boston Scientific, during the time that it was party to a binding Merger Agreement with J&J, in violation of the Merger Agreement.

63.     Guidant could have terminated the Merger Agreement with J&J, paid the termination fee, and assumed the risk of being able to negotiate and enter into an alternative deal with Boston Scientific, subject to the uncertainty of being able to consummate a divestiture and the inevitable delay and uncertainty of antitrust regulatory review.   Instead, Guidant surreptitiously facilitated an alternative proposal with Boston Scientific, through the prohibited disclosure of confidential information to Abbott, a third party divestiture candidate.   Guidant thus used the Merger Agreement to negotiate a better offer in breach of its implied duty of good faith and fair dealing.

64.     As a result of Guidant's breach of the implied duty of good faith and fair dealing, J&J was deprived of the benefit of its bargain under the Merger Agreement and suffered damages.

Third Cause of Action
For Tortious Interference with Contract
(Against Defendants Boston Scientific and Abbott)

65.     J&J repeats and realleges herein the allegations of paragraphs 1 to 52.

KL3:2519101.3

66.     Boston Scientific and Abbott were aware that J&J had entered into a binding Merger Agreement with Guidant and were aware that the Merger Agreement prohibited the disclosure of confidential information to third parties.

67.     Boston Scientific and Abbott intentionally induced Guidant to breach the Merger Agreement with J&J by disclosing confidential business information to Abbott.

68.     Boston Scientific and Abbott thus knowingly, intentionally, and maliciously interfered with J&J's binding contract to acquire Guidant under the terms of the Merger Agreement that was on the verge of closing.

69.     Abbott emerged from its prohibited due diligence review with a clear picture of Guidant's businesses that enabled it to proceed expeditiously with a divestiture agreement, which in turn facilitated Boston Scientific's ability to make a "Superior Proposal" to Guidant.

70.     As a result of Guidant's breaches and Boston Scientific's and Abbott's tortious interference with J&J's Merger Agreement and prospective business opportunity, J&J was damaged.

<u>Prayer for Relief</u>

Wherefore, Plaintiff J&J respectfully requests the following relief:

(i)     that the Court find that Guidant willfully and materially breached the Merger Agreement with J&J;

KL3:2519101.3

(ii)     that the Court find that Guidant breached the implied obligation of good

faith and fair dealing; and

(iii)    that the Court find that Boston Scientific and Abbott knowingly,

intentionally and tortiously interfered with, and induced Guidant to

breach, the Merger Agreement;

(iv)    that after making such determinations, the Court award Plaintiff

appropriate legal damages (general and special), in an amount to be

determined at trial, but in no event less than $5.5 billion; and

(v)     that the Court award such other necessary and proper relief, including,

without limitation, attorneys' fees, interest, costs, as the Court may deem

just and proper.

Dated:   New York, New York
         September 25, 2006

Kramer Levin Naftalis & Frankel LLP

By: _____
      Harold P Weinberger (HW3240)
      Timothy J. Helwick (TH5833)

1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9000

Attorneys for Plaintiff Johnson & Johnson

KL3:2519101.3