UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                    :

JOHNSON & JOHNSON, a New Jersey    :
Corporation,                            :
                                    :

          Plaintiff,           :
                                    :        06 Civ. 7685 (GEL)

         -v.-               :      **OPINION AND ORDER**
                                    :

GUIDANT CORPORATION, an Indiana   :
Corporation, BOSTON SCIENTIFIC    :
CORPORATION, a Delaware Corporation, and  :
ABBOTT LABORATORIES, an Illinois    :
Corporation,                           :
                                    :

         Defendants.         :
                                    :
------------------------------------------------------------x

Harold P. Weinberger and Timothy J. Helwick,
Kramer Levin Naftalis & Frankel LLP, New York,
NY, for plaintiff.

Stuart J. Baskin, John Gueli, Daniel Schimmel, and
Daniel M. Segal, Shearman & Sterling LLP, New
York, NY, for defendants Guidant Corporation and
Boston Scientific Corporation.

Cyrus R. Vance, Jr., and Stephen M. Juris,
Morvillo, Abramowitz, Grand, Iason, Anello &
Bohrer, P.C., New York, NY, and Jeffrey I.
Weinberger, Kelly M. Klaus, and Andrew M. Song,
Munger, Tolles & Olson LLP, Los Angeles, CA, for
defendant Abbott Laboratories.

GERARD E. LYNCH, District Judge:

       This case arises from a proposed merger that left plaintiff Johnson & Johnson ("J&J") with a

broken heart.  The object of J&J's affections, Guidant Corporation ("Guidant"), was instead

acquired by defendant Boston Scientific Corporation ("BSC"), except for a piece of Guidant's

business that was divested to defendant Abbott Laboratories ("Abbott").  J&J claims that a merger

agreement between it and Guidant was violated when Guidant provided certain due diligence

materials to Abbott.  This allegedly improper information-sharing was shortly followed by Abbott's

agreeing to purchase the portion of Guidant's business, which in turn cleared the way for BSC's

successful bid to take over Guidant.  J&J received a substantial termination fee when Guidant

terminated the merger agreement, but J&J claims that it is entitled to further damages from Guidant

(for providing the due diligence to Abbott) and from BSC and Abbott (for inducing it to do so).  All

three defendants move to dismiss.

The motion by defendant Abbott will be granted.  The motion by defendants BSC and

Guidant will be denied insofar as it seeks dismissal of the claim against Guidant for breach of

contract, but granted insofar as it seeks dismissal of the claim against BSC for tortious interference

with contract and the claim against Guidant for breach of an implied duty of good faith and fair

dealing.

## BACKGROUND

Guidant is an Indiana corporation that designs, develops and sells medical devices used in

cardiovascular treatment.  (Compl. ¶ 16.)  On November 14, 2005, J&J and Guidant entered into an

Amended and Restated Agreement and Plan of Merger (the "Agreement"[1]) under which J&J agreed

to acquire Guidant for $21.5 billion, revised from an earlier offer of $25.4 billion.[2]  (Id. ¶ 28.)

---

[1] The merger agreement was submitted as a separate appendix to the briefs in this case, because the package of materials in which it was originally submitted to the Court (Guidant/BSC Mot. Ex. 2) was missing several key pages.

[2] An earlier agreement, executed in December 2004, had provided for the higher acquisition price.  (Compl. ¶ 23.)  In light of "numerous regulatory and legal problems . . . involving Guidant products being recalled, lawsuits against Guidant being filed, and Guidant

The proposed merger gave rise to antitrust concerns.  At the time, only two companies in the United States marketed the device known as a known as a "drug-eluting stent."[3]  (Compl. ¶¶ 19, 20.)  Three other companies — Abbott, Guidant, and a third company, Medtronic — were in the process of seeking regulatory approval to market drug-eluting stents.  When J&J sought antitrust clearance with the Federal Trade Commission ("FTC"), the FTC expressed concern that a merger between J&J, one of the two actual competitors in the market, with Guidant, one of the three potential competitors, would lessen competition in the market.  (Compl. ¶ 27.)  To avoid regulatory problems, J&J involved Abbott in the proposed transaction.  Specifically, J&J and Abbott entered a license agreement, which provided that if J&J acquired Guidant, J&J would grant Abbott a non-exclusive license to certain patents relating to drug-eluting stents.  (Compl. ¶ 27.)

The Agreement contained a "No Solicitation" clause that is at the heart of this lawsuit.  The clause provides:

> [Guidant] shall not, nor shall it authorize or permit any of its Subsidiaries or any of their respective directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative (collectively, "Representatives") retained by it or any of its Subsidiaries to, directly or indirectly through another person, (i) solicit, initiate or knowingly encourage, or take any other action designed to, or

---

being investigated by the New York Attorney General," J&J announced on October 18, 2005, that it was considering "alternatives" to the acquisition of Guidant.  (Id. ¶ 28.)  Guidant sued in this Court for breach of the December 2004 agreement.  On November 14, that lawsuit was discontinued when the parties executed the $21.5 billion Agreement from which this lawsuit arises.  (Id.)

[3] A stent is a metallic or plastic device, usually tube-shaped, that is surgically inserted into an artery or other bodily conduit to keep the conduit from constricting.  A "drug-eluting stent" slowly releases a drug while holding open the blood vessel.  (Compl. ¶ 19.)

which could reasonably be expected to, facilitate, any Takeover Proposal or (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any person any information, or otherwise cooperate in any way with, any Takeover Proposal.

(Compl. ¶ 30; Agreement § 4.02(a).)

Importantly, the no-solicitation clause contained an exception that permitted Guidant to respond to an unsolicited takeover offer:

[A]t any time prior to obtaining . . . Shareholder Approval [of J&J's takeover proposal], in response to a bona fide written Takeover Proposal that the Board of Directors of the Company [Guidant] reasonably determines (after consultation with outside counsel and a financial advisor of nationally recognized reputation) constitutes or is reasonably likely to lead to a Superior Proposal, and which Takeover Proposal was not solicited after the date hereof and was made after the date hereof and did not otherwise result from a breach of this Section 4.02(a), the Company may . . . furnish information with respect to the Company and its Subsidiaries to the person making such Takeover Proposal (and its Representatives) . . .

(Compl. ¶ 33; Agreement § 4.02(a).)  The phrase "Superior Proposal" was defined in the same section as a "bona fide offer" by a third party that would be more financially favorable than J&J's offer, and that was "reasonably capable of being completed."  (Id.)  In short, the Agreement forbade Guidant to solicit a "Takeover Proposal," but allowed it to provide information to a third party making such a proposal, as long as the proposal was unsolicited.

"Takeover Proposal" is defined in the same section:

The term "Takeover Proposal" means *any inquiry, proposal or offer from any person relating to, or that could reasonably be expected to lead to, any direct or indirect acquisition or purchase* . . . of assets (including equity securities of any Subsidiary of the Company) or businesses that constitute 15% or more of the revenues, net income or assets of the Company and its Subsidiaries, taken as a whole . . .

4

(Compl. ¶ 31; Agreement § 4.02(a) (emphasis added).)  The parties agree that the portion of Guidant's business purchased by Abbott constituted more than 15% of Guidant's business. Abbott's prospective purchase, therefore, was sufficiently large to trigger the exemption, assuming the other conditions for the exemption were met.  (See Oral Argument Tr., Feb. 28, 2007 ("Tr.") at 7-12; Abbott Reply 1 n.1.)

On December 5, 2005, BSC announced a bid for Guidant, offering $25 billion. (Guidant/BSC Mot. Ex. 3.)  The December 2005 announcement mentioned BSC's intention to divest itself of a part of Guidant's operations, but did not identify any party to whom the businesses would be divested:

> We have conducted a review of the antitrust issues that will be raised by the proposed transaction, and we are confident that we will be able to address those issues quickly.  To that end, we are prepared to divest Guidant's vascular intervention and endovascular businesses, while retaining shared rights to Guidant's drug-eluting stent program.

(Guidant/BSC Mot. Ex. 3 at 4.)

On January 8, 2006, BSC submitted a formal proposal to acquire Guidant.  (Guidant/BSC Mot. Ex. 5; see Compl. ¶¶ 38-39.)  In the January 2006 proposal, the divestiture party was identified as Abbott.[4]  (Guidant/BSC Mot. Ex. 5 at 2; see Compl. ¶ 39.)  The complaint alleges that without the divestiture to Abbott, the proposal would not have been acceptable to Guidant's board of directors or shareholders.  (Compl. ¶ 8.)  The complaint also alleges that Abbott agreed to make a substantial loan of $700 million to BSC as part of the Guidant transaction.  (Id. ¶ 39.)

---

[4]According to defendants, the transaction was structured so that Abbott bought the portion of Guidant's business directly from Guidant, rather than BSC buying it and then divesting it to Abbott.  (Tr. 31.)

5

According to the complaint, in the course of a January 9, 2006 conference call with market analysts to discuss the BSC proposal, a representative of BSC made it clear that Guidant had provided certain information to Abbott.  Larry Best, the CFO of BSC, stated that the Abbott divestiture agreement was critical to the proposed BSC merger, and that "Abbott had the opportunity to do a much deeper dive on due diligence," meaning that Abbott had gotten more information from Guidant than BSC.  (Compl. ¶¶ 41-43.)

Later in January 2006, J&J wrote a letter to Guidant demanding to know how the provision of due diligence to Abbott could have been consistent with the Agreement. (Guidant/BSC Mot. Ex. 6.)  J&J did not, however, seek to terminate the Agreement.  Instead, it raised its offer, prompting a bidding war, which BSC eventually won with a $27 billion bid. (Compl. ¶¶ 50-51.)  On January 17, 2006, Guidant's board announced that BSC's bid was a "Superior Proposal," and that it was terminating the Agreement with J&J.  (Id. ¶ 51.)  As required by the Agreement, Guidant paid J&J a $705 million termination fee.  (Id.)  J&J brought this action in September of 2006, seeking at least $5.5 billion in damages for Guidant's breach of the no-solicitation clause and an implied obligation of good faith and fair dealing, and BSC and Abbott's alleged tortious interference with the Agreement.  (Compl. at 20-21.)

## DISCUSSION

The defendants' basic argument, which has a strong equitable appeal, is that there was no material breach in this case because each party involved was treated fairly and received a fair benefit from the transaction.  The agreement negotiated between J&J and Guidant explicitly recognized that the shareholders of Guidant should not be deprived of the benefit of a better bargain if one came along, but that if one did, J&J should receive compensation for its frustrated

efforts.  Consequently, the parties negotiated a provision that permitted Guidant to take a better

offer, and agreed upon a sum of $705 million as fair compensation for J&J in that event.  In

essence, events followed the sequence anticipated in the Agreement, and all parties benefitted, if

not to the extent they had hoped: the shareholders of Guidant got a higher price, BSC and Abbott

got businesses they wanted, antitrust problems were avoided, and J&J got the $705 million it had

negotiated as compensation.  Defendants argue that J&J suffered no fundamental wrong —

indeed, that it suffered no harm beyond that for which the Agreement provided an appropriate

negotiated remedy.

      If Abbott and BSC had made a joint bid or had each bid separately for complementary

portions of Guidant, Guidant would clearly have been entitled to provide due diligence materials

to Abbott.  Thus, defendants argue that J&J's claim is based on no more than a technicality, and

amounts to a bid to grab more compensation than the parties expressly provided was available.

There is considerable force to that argument.  The breach of contract claim survives, however,

because the Agreement makes clear that Guidant was not allowed to solicit bids.  It therefore

makes a difference of substance, and not merely of form, whether Guidant provoked Abbott to

get involved outside the conditions permitted by the contract.  The complaint alleges that

Guidant provided the due diligence without any inquiry from Abbott that permitted it to do so.

At this point it cannot be said as a matter of law that this is not what happened.   Accordingly,

Guidant's motion to dismiss must be denied, at this stage of the litigation.

      It is important to note, however, that this case may hinge on a factual question that the

parties can surely answer with little difficulty: whether Guidant, BSC or Abbott first made the

approach that resulted in Guidant's provision of due diligence information to Abbott.

Accordingly, discovery should focus on the timing and sequence of the bids by the various parties and Guidant's provision of due diligence, in light of the possibility that a clear picture of these events may quickly bring the case to a close.

## I.      Motion to Dismiss Standard

Under the notice pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure, complaints must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court recently reconsidered the standard for motions to dismiss in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007). In Twombly, the Court disavowed the well-known statement in Conley v. Gibson, 355 U.S. 41 (1957), referenced several times during the oral argument in this case, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46. The Twombly Court stated that this language "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 1969.[5]

---

[5] Conley's language, the Court explained, should be understood not to apply to the adequacy of pleadings, but to the question of proof later in the case. That is, the language from Conley "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival," Twombly, 127 S. Ct. at 1969, and should be understood only to stand for "the unobjectionable proposition that, when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." Id. at 1969 n.8.

In the wake of <u>Twombly</u>, courts are to apply "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." <u>Iqbal v. Hasty</u>, 490 F.3d 143, 158 (2d Cir. 2007).[6]  Under this standard, a complaint may be dismissed where it fails to plead "enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>, 127 S. Ct. at 1974.  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." <u>Id.</u> at 1965 (internal quotation marks omitted).  In order to state a claim, the factual allegations "must be enough to raise a right to relief above the speculative level." <u>Id</u>.  Where a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." <u>Id.</u> at 1974.  It remains true, however, that "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007) (internal alteration, citations and quotation marks omitted).

As always, the court must "accept[] all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, Nos. 05-5132-cv, 05-2593-cv, __ F.3d __, 2007 WL 1989336, at *5 (2d Cir. Jul. 11, 2007).  "In

---

[6] <u>Twombly</u> did not make clear whether its reformation of traditional pleading standards applies beyond the antitrust context, except insofar as it rejects the famous language from <u>Conley</u>.  The Second Circuit, however, has "declined to read <u>Twombly</u>'s flexible 'plausibility standard' as relating only to antitrust cases." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, Nos. 05-5132-cv, 05-2593-cv, __ F.3d __, 2007 WL 1989336, at *15 (2d Cir. Jul. 11, 2007), citing <u>Iqbal</u>, 490 F.3d at 157-58.  "Some of [<u>Twombly</u>'s] language relating generally to Rule 8 pleading standards seems to be so integral to the rationale of the Court's parallel conduct holding as to constitute a necessary part of that holding." <u>Iqbal</u>, 490 F.3d at 157.

addition, [courts] may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." Id.

## II.   **Breach of Contract**

The Agreement is governed by Indiana law.  (Agreement § 8.08.)  Under Indiana law, "the construction of an unambiguous written contract is a question of law for the court." Allen v. Cedar Real Estate Group, LLP, 236 F.3d 374, 380 (7th Cir. 2001) (citation omitted).  "A contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC, 870 N.E.2d 494, 501 (Ind. App. 2007).

"The contract is to be read as a whole when trying to ascertain the parties' intent, and we will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless." Id.  "The court must accept an interpretation of the contract that harmonizes its provisions, as opposed to one that causes the provisions to conflict." Id.

### A.     **Whether Abbott Was A "Representative" of BSC**

Defendants argue that plaintiff's breach of contract claim fails because Abbott was a "Representative" of BSC within the meaning of the Agreement.  As noted above, the Agreement allowed Guidant to provide due diligence to BSC and its "Representatives" once BSC's takeover proposal had been made, and so if Abbott was a representative of BSC, then Guidant committed no breach.  Guidant could not, however, solicit a bid from Abbott.

The relevant language in the no-solicitation clause defines the term "Representatives," with some circularity, as "any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative." (Compl. ¶ 30; Agreement § 4.02(a)). The exemption to the no-solicitation clause — in which the relevant use of the word "Representatives" appears — provides that Guidant may "furnish information with respect to the Company and its Subsidiaries to the person making such Takeover Proposal (and its Representatives)." (Compl. ¶ 33; Agreement § 4.02(a).)

Defendants argue that Abbott was a 'Representative' within the meaning of the exemption "because it was an 'investment banker,' 'financial advisor,' 'or other advisor [or] agent" of BSC in connection with BSC's Takeover Proposal. (Guidant/BSC Mem. 8 (alteration in original).) They make various arguments as to how the word "Representative" can be read to include Abbott, none of which are convincing. Defendants argue (1) that Abbott's role as a divestiture party qualifies it as an "other advisor [or] agent" within the meaning of the concluding catch-all, and (2) that the loan Abbott gave to BSC qualifies it as an 'investment banker,' 'financial advisor,' 'or other advisor [or] agent." This section will consider first whether Abbott fits within the broad catch-all terms "other advisor" and "agent," and then discuss the defendants' contention that Abbott's loan to BSC made it a "Representative."

The parties agree that the principle of *ejusdem generis* (literally, "of the same kind") applies here. That is, when confronted with a list ending with a ambiguous term, a court should interpret the term to be of the same kind as the terms that precede it. Thus, to determine whether Abbott was a "representative," the Court should interpret "representative" to be the same kind of term as the terms that precede it: "investment banker, financial advisor, attorney, accountant or

11

other advisor [or] agent." See Red Ball Leasing, Inc. v. Hartford Acc. & Indem. Co., 915 F.2d 306, 312 (7th Cir. 1990) (applying the *ejusdem generis* principle to an insurance contract under Indiana law). The parties disagree, however, on what the listed terms have in common.

Abbott argues that the common denominator of the listed terms is that "all are third parties whose participation is necessary to consummate the competing Takeover Proposal." (Abbott Mem. 13.) Thus, because Abbott's involvement was critical to the success of BSC's bid, Abbott falls within the definition. Nothing in the text supports this reading. Abbott's definition of "representative" is both overly broad — all sorts of parties are "necessary" to the transaction, from the FTC, which had to approve it, to the workers who maintained the phone lines over which it was negotiated — and unsupportably narrow. The Agreement does not limit "representatives" to those lawyers (for example) who are necessary to the transaction; each party can use as many lawyers as they wish (as indeed they have). It would be understandable if the parties had chosen to draft an agreement limiting disclosure to those third parties who are involved in the prospective transaction in some immediate and necessary way, but they did not do so.

Guidant and BSC note that some dictionary definitions of "representative" include language such as "one that in some respects stands for or in the place of another." (Guidant/BSC Mem. 8, citing Webster's Third New Int'l Dictionary of the Eng. Lang. 1927 (1966)). They argue that Abbott acquired Guidant's assets "in place of" BSC. This is creative, but wrong. There is a difference between *standing in place of* and *taking the place of*. A divestiture party does not represent the party whose place it takes, any more than a judge who recuses herself is represented by the judge who inherits the case in her stead. The point of divestiture is competition: the new

12

party is different than and independent of the former party.  The divestiture party *replaces*, rather than *represents*, the party whose place it takes.  Whatever else it is, a "Representative" is different than a substitute.

Each of the enumerated varieties of representative in the Agreement is defined by its relationship to the bidder: the bidder's investment banker, financial advisor, attorney, accountant and "other advisor [or] agent" are all parties who serve the bidder's interests in the transaction.  The divestiture party, on the other hand, is defined by its relationship to the target company and its *independence* from the bidder.  In this transaction, Abbott served only its own interests, not those of BSC, and engaged in an entirely arm's-length transaction with BSC.  Most of the enumerated categories, in contrast, are entities in a formal agency relationship with the bidder, who have fiduciary duties to it.  It is not necessary to hold that the term "Representatives" is limited to those in formal agency relationships with the bidder to say that a divestiture party is too unlike the enumerated "Representatives" to fall within any reasonable interpretation of that term.[7]

_____

[7] The no-solicitation clause provides that Guidant "shall not . . . authorize or permit . . . any . . . "Representatives" [ ] *retained by it*" to solicit a takeover proposal.  (§ 4.02(a) (emphasis added).  J&J argues that the phrase "retained by it" is part of the definition of Representative"; that is, that a Representative must be an entity "retained by" the party making the Takeover Proposal.  (Pl. Mem. 13.)  If this reading were correct, Abbott (which, so far as the record shows, was not "retained by" BSC) clearly would not be a "Representative."  J&J's reading, however, is not correct.

The words "retained by" are not part of the definition of Representative, but rather appear only in the substantive provision limiting the sorts of "Representatives" of Guidant who are bound by the obligation not to solicit bids.  Guidant and any Representative "retained by it" are so restricted.  The words do not appear in the exemption's list of the "Representatives" of a competing bidder to whom Guidant and its retained Representatives may provide information.  Thus, while Guidant's retained Representatives may not solicit bids, Guidant may share information with an unsolicited bidder's "Representatives" whether or not they are retained.  Nothing in the exemption to the no-solicitation clause requires that a "Representative" who receives due diligence first be retained.  At most, the phrase "retained by" casts some light on what the parties intended, by suggesting that a Representative is the sort of person or entity who

Defendants also argue that Abbott's role "was that of a lender, helping [BSC] to finance the acquisition." (Guidant/BSC Mem. 8, citing Compl. ¶ 39.) As noted above, the definition of "Representatives" includes "any investment banker, financial advisor, or other advisor [or] agent." (Compl. ¶ 30; Agreement § 4.02(a)). The complaint does allege that Abbott lent money to BSC to help finance the transaction. (Compl. ¶ 39) Defendants note that in the usual course of business, "a lender who has agreed to provide financing nevertheless will subject its commitment to, among other things, its ability to conduct due diligence." (Letter from Stuart J. Baskin, Esq., to the Court, dated Mar. 6, 2007.) Thus, they conclude, an entity that lends money to help with the takeover must be among those "Representatives" to whom due diligence may be provided.

Plaintiff contends, irrelevantly, that "whatever loan Abbott was making was not needed to consummate the transaction." (Letter from Harold P. Weinberger, Esq., to the Court, dated Mar. 5, 2007.) But as noted above, nothing in the Agreement limits the recipients of due diligence to those who are necessary to the transaction. Plaintiff also finds significance in its allegation — contested by defendants — that Abbott's lending commitment was made prior to its receipt of due diligence.[8]

---

is typically capable of being "retained." While hardly conclusive, this is consistent with the Court's reading of the term.

[8] The parties sent a series of letters to the Court on this issue after oral argument. (See Letter from Harold P. Weinberger, Esq., to the Court, dated Mar. 5, 2007; Letter from Stuart J. Baskin, Esq., to the Court, dated Mar. 6, 2007; Letter from Harold P. Weinberger, Esq., to the Court, dated Mar. 12, 2007; Letter from Stuart J. Baskin, Esq., to the Court, dated Mar. 12, 2007). Relatedly, the parties have also discussed (at oral argument and, when their epistolary fervor exhausted their arguments about Abbott's loan to BSC, in additional letters) whether Abbott was a joint bidder, and thus a permissible recipient of due diligence under the Agreement. (See Letter from Jeffrey I. Weinberger, Esq., to the Court, dated Mar. 13, 2007;

14

None of this is of consequence, however, since the Agreement does not include "lender" among the categories of representative to whom due diligence may be provided.  The Agreement allows the provision of due diligence to an "investment banker" or "financial advisor" or "accountant" (Agreement § 4.02(a)), but by the same principle of *ejusdem generis* discussed above, it would be a mistake to interpret "representative" to include any and all lenders. Investment bankers, financial advisors, and accountants provide services to the bidder to facilitate the transaction.  Lenders provide resources.  Moreover, defendants' argument would prove too much: under defendants' reading, if BSC's bid had indicated that it wished to buy only half of Guidant's business, Guidant could have gone shopping for a third party to purchase the other half, provided that third party lent some money to BSC as part of the deal.  This would surely be inconsistent with the intent of the parties as expressed in the no-solicitation clause. Abbott can no more be considered a representative by virtue of its loan to BSC than it can by virtue of its status as a divestiture party.

---

Letter from Harold P. Weinberger, Esq., to the Court, dated Mar. 14, 2007).  At this stage of the litigation, however, there is no basis for a conclusion that Abbott had made a bid at the time of the alleged breach, that is, at the time the due diligence was provided to them.  Neither the complaint nor the documents it references identify any offer or proposal *by Abbott* prior to the provision of due diligence.  There is no indication in the record at this point that Abbott made any bid, joint or independent, before it received the due diligence.  These arguments are therefore not supported by the allegations in the complaint.

    Of course, the facts as developed in discovery might establish that such a bid was made, in which case defendants could move for summary judgment on that ground.  At oral argument, the parties were unable to stipulate to the exact series of events leading up to Guidant's provision of due diligence to Abbott (Tr. 19), and although those facts can presumably be established with ease through discovery, there is no basis at this time to dismiss the complaint on the grounds that Abbott was a joint bidder.

### B.      Willfulness

Even if the complaint makes out a claim for breach of contract, defendants argue, the contract expressly bars the damages sought by J&J, by providing an exclusive remedy that J&J has already received.  The Agreement provides that in the event of termination, no party shall be liable beyond the specific liabilities imposed in the Agreement (i.e., the termination fee), except "that no such termination shall relieve any party . . . from any liability or damages resulting from the *wilful and material breach* . . . by a party of any of its representations, warranties, covenants or agreements set forth in this Agreement."  (Agreement § 7.02; emphasis added).  J&J argues that defendants' conduct was "wilful."  Whether a factfinder could so find depends on the meaning of that term as it is used in the Agreement.  While defendants argue that a breach is only willful if it is committed with malice or in bad faith, plaintiff contends that "wilful" merely means "intentional."

"Willful" is a notoriously ambiguous word, which can indicate any of a number of mental states.[9]  See 57A Am. Jur. 2d Negligence § 260 (updated 2007) (noting that "[g]enerally, no

_____

[9] Consider the following exchange between the two legendary legal thinkers, Judge Learned Hand and Professor Herbert Weschler, discussing the undesirability of using the word in the Model Penal Code, as quoted in United States v. Hayden, 64 F.3d 126 (3d Cir. 1994):

> JUDGE HAND:  Do you use . . . [wilfully] throughout? How often do you use it?  It's a very dreadful word.

> MR. WECHSLER:  We will never use it in the Code, but we are superimposing this on offenses outside the Code.  It was for that purpose that I thought that this was useful.  I would never use it.

> JUDGE HAND:  Maybe it is useful.  It's an awful word!  It is one of the most troublesome words in a statute that I know.  If I were to have the index purged, 'wilful' would lead all the rest in spite of its being at the end of the alphabet.

spirit of ill will or intentional misconduct is essential to prove willfulness, although the requisite

state of mind may approach intent to do harm. . . .  In some jurisdictions, however, willful

misconduct does involve the element of malice or ill will.").  Black's Law Dictionary gives two

definitions.[10]  The first is favored by plaintiff: "Proceeding from a conscious motion of the will;

voluntary; knowingly; deliberate.  Intending the result which actually comes to pass; designed;

intentional; purposeful; not accidental or involuntary."  Black's Law Dictionary 1599 (6th ed.

1990).  The second is the definition preferred by defendants: "Premeditated; malicious; done

with evil intent, or with a bad motive or purpose, or with indifference to the natural

consequences; unlawful; without legal justification."  Id.

    Neither Indiana law nor the contract itself provides a clear definition of willfulness.

There are few cases applying Indiana law to contracts that use the word "willful."  (This is

perhaps because most lawyers know better than to use the word "willful" in a contract without

defining it.)  Faced with this dearth of controlling authority, the parties have looked far and wide

for cases that might shed light on the meaning of "willful," but have found little of use.

---

> MR. WECHSLER:  I agree with you Judge Hand, and I promise
> you unequivocally that the word will never be used in the
> definition of any offense in the Code.  But because it is such a
> dreadful word and so common in the regulatory statutes, it seemed
> to me useful to superimpose some norm of meaning on it. . . .

Id. at 129 n.5 (alterations in original; citation omitted).  The parties here would have done well to
heed this advice in drafting the Agreement.

   [10] In addition to its multiple meanings, there are also two accepted spellings of "willful."
This opinion uses "willful" except when quoting the Agreement, which uses "wilful," or a court
case using the alternate spelling.

A number of Indiana cases on which plaintiff relies have used the term "willful" in a list of mental states not including "intentional" — which plaintiff interprets to mean that "willful" and "intentional" are synonymous.  (Pl. Mem. 18.)   See, e.g., Smith v. State Lottery Comm'n of Indiana, 812 N.E.2d 1066, 1073 (Ind. App. 2004) (not discussing the meaning of "willful", but listing "[t]he willful, negligent or innocent behavior of the party failing to perform" as a factor to be considered in analyzing whether there is a material breach); Frazier v. Mellowitz, 804 N.E.2d 796, 802 (Ind. App. 2004) (using the same formulation).

The formulation on which plaintiff relies ("willful, negligent or innocent") is drawn from the section of the 1932 Restatement dealing with the question of when a failure to perform discharged the counterparty's duty to perform.  See Restatement of Contracts, § 275 (1932). That section no more defines "willful" than do the Indiana cases that cite it.  Id.  Not much can be read into the fact that "willful" is used in a list of terms that does not include "intentional." The omission of "intentional" from the list could suggest that "willful" means "intentional," but the word "reckless," another common meaning of "willful," is also excluded.  The omission could thus imply that "willful" means "reckless," or that it means "reckless or intentional," or that it means "reckless, intentional, or malicious" — that is, "any mental state more culpable than negligence."  Without any discussion by the Indiana courts as to what "willful" actually means in this context, these cases have little relevance.

Plaintiff also relies on a case in which a good-faith dispute about the parties' legal obligations was held to demonstrate that the defendant's intent was not "willful."   Tomahawk Village Apartments v. Farren, 571 N.E.2d 1286, 1294 (Ind. App. 5th Dist. 1991).  In holding that the defendant's actions were not "willful or negligent," the court noted that the defendant "did

not engage in intentional misconduct," id., which plaintiff interprets as implying that "intentional" and "willful" have the same meaning.  Farren, however, contains no explicit discussion of the meaning of "willful."  A good-faith dispute would refute either a claim of intent or a claim of malice, so it is difficult to draw any meaningful inference from Farren's holding that a good-faith dispute refuted a claim of willfulness.  In any event, "while the decrees of lower state courts should be attributed some weight[,] the decision is not controlling where the highest court of the State has not spoken on the point."  Singleton v. City of New York, 632 F.2d 185, 199 (2d Cir. 1980) (internal alterations, citations and quotation marks omitted), citing King v. Order of United Commercial Travelers, 333 U.S. 153, 160-161 (1948).

Moreover, Farren did not analyze the meaning of "willful" as used in a particular contract.  Instead, it interpreted the line of cases above to determine whether a material breach excused a counterparty's performance.  As in a New York case discussed by the parties,

> The issue here is not how we and other courts have construed 'willful' in other contexts, such as in interpreting statutes using that term or in formulating or applying legal principles in tort or contract law.  Rather, the issue is what the parties intended by 'willful acts' as an exception to their contractual provision limiting defendant's liability for consequential damages arising from its 'non-performance under this agreement.'

Met. Life Ins. v. Noble Lowndes Int'l, Inc.  84 N.Y.2d 430, 435 (1994).  The question in this case is what the parties meant when they used "wilful" in the Agreement.  If Indiana cases provided a clear interpretation of the term, it might be appropriate to infer that the parties intended the same interpretation to govern the Agreement.  But the cases on which defendants rely do not provide a clear definition of "willful."

19

Defendants note that under Indiana law, punitive damages were once recoverable in contract cases where the breach was willful, and that those cases seemed to use "willful" as if it implied some sense of wrongdoing.[11]   See Patton v. Mid-Continent Sys., Inc., 841 F.2d 742, 751 (7th Cir. 1988) ("We find no evidence at all that Mid-Continent's action . . . was willful . . . . There is little enough evidence that Mid-Continent was in breach of the agreement; there is none that the breach was wrongful in the strong sense required for an award of punitive damages under Indiana law.").  Perhaps it could be shown to the satisfaction of the factfinder that the parties intended to model § 7.02's preservation of liability for certain breaches on the Indiana cases allowing punitive damages for particularly wrongful breaches.  At this point, however, the Court cannot say as a matter of law that this was their intent.  Section 7.02 does not pertain to punitive damages, but to ordinary contract damages that exceed the fixed termination fee established by the contract.  Moreover, the Indiana caselaw on which defendants rely is less than crystal clear as to the exact requirements for an award of punitive damages.[12]  While a factfinder might infer that the parties intended to adopt defendants' preferred meaning of "wilful," at this

---

[11] Whatever Indiana courts meant by "willful" in this context, the definition ceased to have legal significance in 1993, when the Indiana Supreme Court abolished punitive damages in contract cases.  See Miller Brewing Co. v. Best Beers of Bloomington, Inc., 608 N.E.2d 975 (Ind. 1993) (abolishing punitive damages for contract breach).

[12] For example, Peterson v. Culver Educational Foundation, 402 N.E.2d 448 (Ind. App. 1980), on which defendants rely (Guidant/BSC Mem. 11), does not use the word "willful" in describing the mental state required for the imposition of punitive damages.  Hibschman Pontiac, Inc. v. Batchelor, 266 Ind. 310 (1977), uses the word "willful" — once — as an apparent synonym for "fraud, malice, gross negligence or oppression," a list of terms that cannot easily be boiled down to a single meaning.  See id. at 314-15  ("Punitive damages may be awarded in addition to compensatory damages whenever the elements of fraud, malice, gross negligence or oppression mingle in the controversy. . . . [I]t is . . . reasonable to infer that Hibschman Pontiac acted tortiously and in willful disregard of the right of Batchelor.") (internal citations, alterations and quotation marks omitted).

stage the Court is required to draw all permissible inferences in plaintiff's favor.  The Indiana caselaw on which defendants rely is an inadequate basis on which to rest a conclusion about the parties' intent in using the word "wilful."[13]

Turning to the language of the Agreement itself, plaintiff argues that the context of the Agreement makes clear that "wilful" does not imply malice.  Section 7.01(b), plaintiff notes, provides that the right to terminate is not available to a party whose "wilful breach of a representation or warranty in this Agreement" is a principal cause of the failure of the merger. Thus, if "wilful" implies malice, § 7.01(b) would deny the right to terminate to those who breached with malice — but not, by inference, to those whose breach was merely intentional. Defendants' argument that "wilful" means "with malice" thus implies that a party who breaches a representation intentionally, but without malice (e.g., purely for financial gain), still has the right to terminate.

J&J argues that it would be absurd to read § 7.01(b) to allow termination by a party that intentionally breaches its representations, because that would mean that Guidant could intentionally mismanage its internal accounting controls (in breach of § 3.01(e)(iii) of the

_____

[13] Defendants also rely on <u>Reiver v. Murdoch & Walsh, P.A.</u>, 625 F.Supp. 998, 1015 (D. Del. 1985), in which a court considering the availability of punitive damages interpreted the word "willful" to mean "maliciously and without probable cause, for the purpose of injuring [the other party] by depriving him of the benefits of the [contract]."  <u>Id</u>. at 1015 (internal citations, alterations and quotation marks omitted) (<u>see</u> Guidant/BSC Mem. 11).  This Delaware case, of course, is not directly applicable here, and the court noted that a broader reading was also possible.  <u>See id</u>. ("A breach of contract typically involves purposive behavior which could loosely be considered wilful.").  The parties also discuss the Third Circuit case of <u>Martin v. Monumental Life Insurance Co.</u>, 240 F.3d 223, 239 (3d Cir. 2001), but that case grounded its holding in the particular wording of the insurance contract it analyzed: "Wilful nonfeasance must be distinct from wanton nonfeasance, or else both terms would not be stated in the same section of the Agreement."  <u>Id</u>.  The word "wanton" is not used in the Agreement at issue in this case.

Agreement) or that J&J could intentionally fail to make funds available for closing (in breach of § 3.02(f) of the Agreement), and then terminate the Agreement without penalty, as long as self-interest, not malice, motivated their actions.  (Pl. Mem. 25.)

It is true that defendants' reading suggests the possibility of a strange termination scenario, in which a party that wanted to terminate is allowed to do so by intentionally failing to live up to its promise, then invoking that failure as a basis for termination.  This is not much stranger, however, than allowing a party that has negligently breached its warranties to invoke that breach as a basis for termination, which the Agreement clearly does.  Limitations on liability are not uncommon, and this would not be the first contract that limited liability for intentional breaches.  See, e.g., Met. Life, 84 N.Y.2d at 436.

Defendants rely on Met. Life, in which the New York Court of Appeals found that the word "willful," as it appeared in the general limitation on liability section of the contract, had to be construed to mean more than "intentional."  It based this conclusion on another provision of the contract at issue in that case.  The other provision was a specific limitation of liability, in which "plaintiff agreed to limit its remedies for defendant's nonperformance of the most vital of its obligations under the Agreement, even when such nonperformance persists after notice."  84 N.Y.2d at 437.  It would be inconsistent, the court concluded, to hold that the general limitation on liability section allowed liability for intentional breach, when a specific section clearly did not do so.  Id.  Defendants have not pointed to similar language in this Agreement; there is no other limitation of liability that might shed light on the provision in question.

In support of their argument that the Agreement preserves liability only for malicious breaches, defendants argue that the word "willful" would be unnecessary unless it meant

22

"malicious."  There is no reason to limit liability to breaches that are intentional, they claim, because any breach of this Agreement would be intentional — "[h]eavily counseled parties to mega-mergers do not breach merger agreements out of inadvertence, negligence, or mistake." (Guidant/BSC Reply 5.)  As a factual matter, this claim is questionable.  It could just as well be said that heavily counseled parties to mega-mergers do not sign merger agreements containing glaringly ambiguous terms that lead to avoidable litigation — but here we are.  It certainly cannot be said as a matter of law that a breach of the Agreement's many representations and warranties, such as its technical requirements pertaining to internal management and accounting, could only occur intentionally.

In the absence of contextual evidence of the meaning of the term "wilful" as used in the Agreement, it is too early in this litigation for a finding as to its meaning.  Extrinsic evidence — that is, "evidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement" — is admissible to explain the meaning of an ambiguous term. Simon Prop. Group, L.P. v. Michigan Sporting Goods Distrib., Inc., 837 N.E.2d 1058, 1071 & n.10 (Ind. Ct. App. 2005); see also Univ. of S. Ind. Found. v. Baker, 843 N.E.2d 528, 535 (Ind. 2006) (holding that where an instrument is ambiguous, all relevant extrinsic evidence may properly be considered in resolving the ambiguity).  Discovery in this case has not yet been had. In order to determine what the parties meant by "wilful," it will be necessary to consider all relevant evidence.  At this time, defendants' argument that plaintiff has failed to state a claim of willful breach within the meaning of the contract are unpersuasive.

## C.      Materiality

Defendants contend that the damages sought by J&J are unavailable because any breach of the contract was not material.  As noted above, the Agreement provides liability beyond the termination fee only for material breaches.  "Material," unlike "willful," is a well-defined term in the law of contracts and in Indiana law.  A material breach is one that goes "to the very heart of the agreement."  City of Indianapolis v. Twin Lakes Enter., Inc., 568 N.E.2d 1073, 1080 (Ind. App. 1991).  However, Indiana courts have "long held that whether a party has committed a material breach is a question of fact," Frazier v. Mellowitz, 804 N.E.2d 796, 802 (Ind. App. 2004), which is generally not appropriate for resolution as a matter of law.  Smith v. State Lottery Comm'n, 812 N.E.2d at 1073.

In order to make sense of the parties' arguments on materiality, it is important to keep in mind the exact nature of the alleged breach and the contract provisions that govern it.  The putative breach was the provision of due diligence by Guidant to Abbott, which took place somewhere between December 2005 and January 2006.  The Agreement authorizes the provision of such due diligence to a party that has made a "Takeover Proposal," defined broadly as "any inquiry, proposal or offer . . . relating to, or that could reasonably be expected to lead to, any direct or indirect acquisition or purchase."  (Agreement § 4.02(a).)[14]  The provision of due

---

[14] Under the Agreement, Guidant is only allowed to give due diligence "to the person making such Takeover Proposal."  (§ 4.02(a).)  But an inquiry qualifies as a Takeover Proposal if it can "reasonably be expected to lead to" a "direct or indirect acquisition" of 15% of Guidant's business (id.) — apparently regardless of whether the person making the Takeover Proposal would be the person eventually performing that acquisition.  Nothing in the Agreement requires that the inquiry concern a possible *bid by the person making the Takeover Proposal*.  In fact, the Agreement defines a Takeover Proposal as an inquiry that could lead "directly or indirectly" to "any person" owning more than 15%.

Thus, as long as Abbott made an inquiry itself, and as long as it could lead to some entity

diligence to a party that has made no Takeover Proposal is a breach.  Due diligence may only be provided "to the person making such Takeover Proposal."  (§ 4.02(a)).  Thus, before Guidant was allowed to give Abbott due diligence, *Abbott* — not BSC — had to make an inquiry that Guidant could reasonably expect to lead to a proposal.

Defendants argue in effect that even if there was a breach — that is, even if Guidant or BSC made the first inquiry that led to the provision of due diligence — it was not material. Although defendants contend that the exemption to the no-solicitation clause should be read broadly because it is a "fiduciary out" provision (Tr. 27), that is, a protection of the Guidant board's fiduciary duty to consider all takeover offers, they do not argue that the board's fiduciary duty required the provision of due diligence to a party that made no inquiry into the possibility of a takeover offer.  See Omnicare, Inc. v. NCS Healthcare Inc., 818 A.2d 914, 938-939 (Del. 2003) (discussing fiduciary duty to negotiate provisions allowing consideration of superior takeover offers).  The parties were permitted to restrict such unsolicited provision of information designed to induce a bid, as it is clear that a board has the "authority to give the proponent of a recommended merger agreement reasonable structural and economic defenses."  Id. at 938.  J&J bargained for just such defenses, which were written into the Agreement.

The complaint is not specific as to what prompted Guidant to send the due diligence to Abbott.  Drawing all inferences in favor of plaintiff, the Court must assume that Abbott made no

---

acquiring more than 15% of the business, Guidant would have been allowed to give Abbott the due diligence.  An inquiry from Abbott could therefore have qualified as a Takeover Proposal even if Abbott did not itself plan to acquire more than 15% of Guidant, and even if the prospective deal was structured so that Abbott would purchase its portion of Guidant from BSC, rather than directly from Guidant, so long as the inquiry could reasonably be expected to lead to a qualifying acquisition.

Takeover Proposal, and that the Agreement was therefore breached.[15]  There are various ways in which the provision of due diligence could have been prompted, other than via an inquiry from Abbott, and the materiality of each breach would present a slightly different question of fact, but in each scenario it is possible that a reasonable factfinder could conclude that Guidant violated key portions of the Agreement and thus committed a material breach.

The strongest case for a material breach would be a scenario in which Guidant approached Abbott with no inquiry from Abbott or BSC.  For Guidant to set out to solicit a bid in this manner would be contrary to the heart of the agreement reached by the parties concerning solicitation.  A somewhat closer question might be presented if Abbott was recruited by BSC, but *BSC* — not Abbott — proposed to Guidant that Guidant send due diligence to Abbott.  (For example, one might imagine BSC telling Guidant that it had a possible divestiture party in mind, and that Guidant should therefore pass the due diligence along to Abbott.)  This scenario, perhaps the most likely one (see Tr. 13, 19), would be a breach because Guidant was allowed to send information only to "the person making [the]  Takeover Proposal." (Agreement § 4.02(a).) There might be a genuine issue of fact as to whether such a breach was material; defendants

---

[15] The complaint does not specifically allege that BSC or Guidant made the first inquiry that led to the provision of due diligence.  It is thus possible, even taking all plaintiff's allegations as true, that Abbott did in fact make the first proposal.  Plaintiff acknowledged at oral argument that it simply does not know what happened in this regard. (Tr. 14.)  If Abbott made such an inquiry prior to the provision of due diligence, there would have been no breach.  If such an inquiry was made, it will no doubt be produced by defendants early in discovery, and defendants will have ample grounds for a summary judgment motion.  For purposes of the present motion, however, the Court is required to draw all inferences in favor of plaintiff.  ATSI Commc'ns, 2007 WL 1989336, at *5.  Since no inquiry by Abbott is referenced in the complaint and the other relevant documents, the Court will assume that no such inquiry was made.  The question, then, is whether, if one draws all inferences in plaintiff's favor and assumes that BSC or Guidant initiated the provision of due diligence in the absence of a Takeover Proposal, such a breach could have been material.

might be able to persuade the factfinder that Guidant's provision of due diligence was at bottom a part of its response to BSC's Takeover Proposal, and therefore not in conflict with the heart of the parties' agreement that Guidant would not solicit bids.  Even if such an argument would prove convincing at the factfinding stage, however, and even if the Court could draw inferences favorable to defendants and conclude that Guidant did not reach out to Abbott on its own initiative, defendants' argument could not be accepted as a matter of law.

Defendants argue that any breach here would have been merely a technical one, without real content.[16]  As BSC sees the situation, there would have been no material breach had its December 2005 proposal simply identified Abbott as the intended divestiture party.  In other

---

[16] The defendants rely on Cirrus Holding Co. v. Cirrus Industries, 794 A.2d 1191 (Del. Ch. 2001), for the proposition that mere technical violations of merger agreements are not material breaches.  In Cirrus, the plaintiff (again, the would-be purchaser who lost the bidding to a more attractive offeror) complained that the defendant target company had breached a representation that it had ceased all negotiations concerning acquisitions.  Id. at 1206.  That is, the company lied about whether it was in negotiations with competing bidders.  The court denied a preliminary injunction, finding that the plaintiff had failed to show "a causal connection between the breach of the representation (as opposed to the occurrence of the matters misrepresented) and the proposal."  Id.  In this case, unlike Cirrus, the issue is not Guidant's representations concerning other offers, but its conduct in facilitating them.

Cirrus also held that a fiduciary out provision would be a "sham" if it failed to allow disclosures necessary to allow a prospective bidder to formulate a superior proposal.  794 A.2d at 1208.  There is no contention here that the no-solicitation clause was insufficient to allow BSC and Abbott to formulate their offers.  Similarly, the court in Cirrus declined to order the "onerous relief" of disqualifying a superior proposal on the grounds that the board meeting at which the proposal was considered failed to precisely satisfy the "difficult and contrived" timing requirements of the fiduciary out clause.  Id. at 1208.  In particular, the court noted that the timing requirement was arguably invalid for reasons having to do with possibly duplicity, or at least ambiguity, in the drafting process.  Id. at 1209.  Contrary to defendants' arguments, these holdings do not bear on whether the Agreement's no-solicitation clause was too "hyper-technical" for a breach to be considered material.  (Guidant/BSC Mem. 18.)  In fact, the court in Cirrus acknowledged that "in many contexts," even a provision as technical as a limitation on the timing of board meetings at which competing proposals are discussed "can be of critical importance."  794 A.2d at 1209.

words, any breach arose only from BSC's failure to disclose Abbott's name.  Rather than

violating the heart of the agreement by soliciting a bid, defendants argue, Guidant violated only

the technical requirement that due diligence be sent only to the person making the Takeover

Proposal, that is, BSC.

The possibility that defendants could have avoided a breach by naming Abbott in

December is irrelevant.  Perhaps if Abbott had been named in the December letter as a

prospective purchaser, defendants could have argued that there was no breach because the letter

from BSC would have been in effect an "inquiry, proposal or offer" *from Abbott* that would

trigger the exception to the no-solicitation clause.  (Agreement § 4.02(a).)  In that hypothetical

scenario, defendants might be able to show that there was no breach, because if the letter could

thus be interpreted as a Takeover Proposal by Abbott as well as by BSC, Abbott would have

been entitled to receive the due diligence, just as BSC was.  Even if defendants are right,

however, that it would have been easy for BSC to prevent the breach by naming Abbott in the

December letter, BSC did not name Abbott in the letter.  An easily preventable breach may

nonetheless be material.

Nor, more fundamentally, is the defendants' argument that the breach was merely

technical persuasive as a matter of law.  J&J argues, plausibly, that the no-solicitation clause was

meant "not to facilitate a competing proposal but simply to allow the Guidant board the

opportunity to consider one if it was made."  (Pl. Mem. 27.)  A reasonable factfinder could

conclude that the heart of the Agreement was a guarantee that Guidant would make no efforts to

find a better deal than the one J&J offered; Guidant was allowed only to consider a competing,

superior offer, because rejecting a superior proposal would violate its directors' fiduciary

obligation to its shareholders.  If Guidant forwarded its due diligence to Abbott on the basis of a

tip from BSC that doing so might result in a bid from Abbott, the breach was less flagrant than if

it approached Abbott on its own initiative, but the breach would still be potentially material,

because the purpose of the Agreement was arguably to prevent Guidant from taking any such

affirmative steps.  The no-solicitation clause was designed maintain the "reasonable structural

and economic defenses" allowed by Omnicare, 818 A.2d at 938, by preventing Guidant from

sharing information with parties that had not expressed interest in making a bid.  Acting on a

bidder's tip to provide information to a third party could be found inconsistent with the letter and

spirit of that commitment.[17]

Although defendants' arguments against materiality are without merit, it certainly cannot

be said as a matter of law that any breach *was* material.  A reasonable factfinder might conclude

that sending due diligence to Abbott on the basis of a request from BSC was not a material

breach, especially if the request from BSC clearly indicated Abbott's readiness to make a

Takeover Proposal and desire for the due diligence materials that were eventually provided.

Such a response might well have been the functional equivalent of responding to a request from

Abbott itself.  A reasonable factfinder might conclude that the Agreement was not violated in

any crucial respect if Guidant responded to a request from BSC on Abbott's behalf by simply

sending the materials to Abbott, instead of telling BSC to tell Abbott to ask Guidant directly for

---

[17] Defendants' argument that plaintiff's claim is "at most a one-month nitpick" because
Abbott's identity was announced in January (Tr. 53) is misplaced.  The due diligence was
provided during the month at issue.  That due diligence can be provided in response to a bid does
not imply that it could be provided before one, no matter how soon after the information is
provided a bid is forthcoming.  Defendants' argument is comparable to an insider trading
defendant's arguing that he is innocent because the information he leaked was publicly disclosed
a month later.

the due diligence.

It remains possible, of course, that discovery will reveal that Guidant approached Abbott with no prompting whatever, even if this seems unlikely as a practical matter.  Since factual development is necessary to determine what exactly occurred, and since it is at least possible that a reasonable factfinder could conclude that any breach was material, defendants' motion to dismiss on materiality grounds cannot be granted.

In essence, this case is not complicated.  Plaintiff claims that Guidant sent due diligence materials to Abbott at a time when there was no Takeover Proposal triggering the exemption clause that allowed Guidant to share information with Abbott.  This is enough to make a "plausible" case.  Twombly, 127 S. Ct. at 1974.  If there is an inquiry or communication constituting a Takeover Proposal by Abbott, defendants will surely produce it and move for summary judgment in short order.  For the moment, however, plaintiff has adequately stated its claim.

## III.   **Implied Duty of Good Faith and Fair Dealing**

Defendants argue that plaintiff's claim for breach of an implied duty of good faith and fair dealing against Guidant must be dismissed because no such duty exists under Indiana law. (Guidant/BSC Mem. 19.)  Defendants are correct.

"Indiana law does not require that a general duty of good faith and reasonableness be implied in every contract."  Pardieck v. Pardieck  676 N.E.2d 359, 364 (Ind. App. 1997). "To the contrary, when a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made."  Id.  "[H]owever, a duty of good faith may apply to a contract where the terms of the

30

contract are ambiguous or where the terms expressly apply such a duty." <u>Lake County Trust Co.</u> <u>v. Wine</u>, 704 N.E.2d 1035, 1039 (Ind. App. 1998).  "[W]here the terms and the intentions of the parties can be readily determined from the language in the instrument . . . [i]t is not the province of courts to require a party acting pursuant to such a contract to be 'reasonable,' 'fair,' or show 'good faith' cooperation." <u>First Fed. Sav. Bank of Indiana</u>, 559 N.E.2d at 604.

It is undisputed that the terms of the Agreement do not expressly impose a duty of good faith.  Plaintiff asserts, however, that the duty of good faith applies because the terms "Representatives" and "wilful and material breach" are ambiguous.  In the preceding discussion, the Court found no ambiguity in the term "Representatives," at least as to the question of whether it included Abbott.  Whatever ambiguity can be found in the phrase "wilful and material breach" — and the word "wilful" is certainly ambiguous — that phrase is used in the Agreement not to delineate the duties of the parties, but to identify the circumstances in which a breach will give rise to a claim for damages.  There is therefore no ambiguity that is relevant to the question of whether Guidant performed consistently with its obligations under the Agreement.  <u>See</u> <u>Peoples Bank & Trust Co. v. Price</u>, 714 N.E.2d 712, 717 (Ind. App. 1999) ("The existence of express terms in a valid written contract precludes the substitution of any implied terms regarding the subject matter covered by the express terms.").  Plaintiff has pointed to no ambiguity that would require the imputation of a duty of good faith and fair dealing as a substitute for the explicit contract provisions governing Guidant's conduct.  Accordingly, there is no basis in Indiana law for a claim of violation of such a duty, and this claim must be dismissed.

**IV.**     <u>**Tortious Interference With Contract**</u>

     **A.**     **Applicable Law**

     There is a substantial question as to whether Indiana or New Jersey law applies to plaintiff's claim against Abbott and BSC for tortious interference with contract. It is not necessary to resolve this issue, however, because plaintiff has failed to state a claim for tortious interference under either state's law. <u>Cf</u>. <u>White Plains Coat & Apron Co. v. Cintas Corp.</u>, 460 F.3d 281, 284 (2d Cir. 2006) ("<u>White Plains I</u>") ("[A] choice of law analysis is necessary because the elements of tortious interference with contract in the relevant states differ."). Under both New Jersey and Indiana law, a tortious interference plaintiff must demonstrate that the defendant's action was unjustified. <u>See</u> <u>DiMaria Const., Inc. v. Interarch</u>, 799 A.2d 555, 560 (N.J. Super. App. Div. 2001) (noting that an element of tortious interference is "malice — that is, defendant's intentional interference without justification"); <u>Bilimoria Comp. Sys., LLC v. Am. Online, Inc.</u>, 829 N.E.2d 150, 156 (Ind. App. 2005) (requiring "the absence of justification"). The complaint fails to satisfy this element.

     Before the merits of the tortious interference claim are reached, it should be noted that J&J has had a last-minute change of heart (or two) concerning the governing law on this issue. In its motion papers, J&J took no position on whether New Jersey or Indiana law applies. (Pl. Mem. 31.) In a letter to the court dated May 14, 2007, J&J called the Court's attention to a recent decision of the New York Court of Appeals, <u>White Plains Coat & Apron Co. v. Cintas Corp.</u>, 867 N.E.2d 381 (N.Y. 2007) ("<u>White Plains II</u>"), which held that under New York law, a generalized economic interest in soliciting business is not a defense to tortious interference with contract. <u>Id</u>. at 383. J&J did not claim that New York law governed this case, but argued, citing

no authority, that "the New York Court of Appeals' analysis applies equally under the tortious interference laws of New Jersey and Indiana." (Letter from Harold P. Weinberger, Esq., to the Court, dated May 14, 2007.) Defendants responded by pointing out that New York law does not govern this case. (Letter from John Gueli, Esq., to the Court, dated May 16, 2007.)

J&J submitted a further letter on May 18, 2007. Perhaps having realized that New Jersey law and Indiana law were less favorable to its case than New York's, see White Plains I, 460 F.3d at 284 (noting that New Jersey law "require[s] proof that the defendant acted maliciously, while New York only requires proof of malice if the economic interest defense has been triggered,"), J&J boldly asserted that "having reviewed the Second Circuit's choice of law analysis in [White Plains I], it would appear to us that New York may have the strongest interest in applying its law to the resolution of the tortious interference claim." (Letter from Harold P. Weinberger, Esq., to the Court, dated May 18, 2007.) The letter suggested that the Court should postpone ruling on the choice of law issue until discovery can be had "as to where the relevant events took place" to insure that any choice of law analysis by the Court "is based on facts, rather than assertions." (Id. at 3.) The only explanation given for J&J's sudden conviction that New York law applies is its assertion that "[w]e believe . . . that the due diligence that was made available to Abbott . . . may have come from the data room maintained by the Skadden Arps law firm in New York City." Id. at 1. No basis was given for this assertion.

Defendants, quite rightly, have declined to respond to plaintiff's new and untimely argument. (Letter from John Gueli, Esq., to the Court, dated May 18, 2007.) Arguments first raised in reply memoranda are "not properly considered," Int'l Elecs., Inc. v. Media Syndication Global, Inc., No. 02 Civ. 4274, 2002 WL 1897661, at *3 n.2 (S.D.N.Y. Aug. 17, 2002), and of

course the same is true of arguments first raised by letter several months after reply memoranda and all other motion papers have been filed.  The case that supposedly inspired J&J's change of position, White Plains I, was available well before J&J's opposition papers were filed, and J&J does not claim that its alleged information about the use of Skadden Arps's data room is newly received.  The only new development leading to J&J's sudden conviction that New York law should apply is not any change in the law or facts relating to choice of law, but rather a recent New York decision, White Plains II, favorable to plaintiff's position on the merits.  There is thus no reason to consider plaintiff's belated argument.

In any event, plaintiff's argument that New York law should apply is without foundation. Without even an allegation "upon information and belief" in the complaint or a supplementary affidavit to support the supposed connection with New York, there is nothing in the record remotely indicating that New York law applies to this case.  Moreover, plaintiff's new allegation, even if true, would not justify a choice of New York law.  "[T]he relevant analytical approach to choice of law in tort actions is the 'interest analysis'," under which "the law of the jurisdiction having the greatest interest in the litigation will be applied."  White Plains I, 460 F.3d at 284 (internal citations and quotation marks omitted).  The contract allegedly interfered with was governed by Indiana law and concerned an Indiana corporation.  The alleged victim of the tort, J&J, is a New Jersey corporation.  The alleged tortfeasors, BSC and Abbott, are based in Massachusetts and Illinois, respectively.  (Compl. ¶¶ 16-18.)  See White Plains I, 460 F.3d at 284 (noting the importance of the location of the victims of the tort and the law that governs the contract).

34

Plaintiff's argument that the "situs of the tort" would be New York if the relevant documents were copied in New York is misplaced.  "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  Cooney v. Osgood Mach., Inc., 595 N.Y.S.2d 919, 922 (1993).  The tort at issue is interference with contract.  The tortious act, then, was the act by Abbott and/or BSC that interfered with the contract — that is, the act that caused Guidant to send due diligence to Abbott.  This act was presumably a communication between one of these corporations and Guidant; none of the three are based in New York.  The photocopying of the relevant documents was not itself tortious, and would provide no basis for selecting a New York forum.

> **B.**   **Defendants' Actions Were Not Tortious Under New Jersey Law**

The complaint alleges that BSC and Abbott "knowingly, intentionally, and maliciously interfered with J&J's binding contract to acquire Guidant."  (Compl. ¶ 68.)  This is the extent of the allegations relating to the malice element of the tortious interference claim.

Under New Jersey law, "'[m]alice' as used in the tortious interference cause of action is not construed as ill will toward the plaintiffs.  Rather, malice is defined to mean that the interference was inflicted intentionally and without justification or excuse."  DiMaria, 799 A.2d at 560 (citation omitted).  For an interference with contract to be tortious, it must be "unjustified" in one of two respects: the interest pursued must be illegitimate, or the means used must be inappropriate.  "[I]f the act complained of does not rest upon some legitimate interest or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed."  Harris v. Perl, 197 A.2d 359 (N.J. 1964).

Competition and financial self-interest are regarded by New Jersey law as legitimate interests. "[T]he fact that a breaching party acted to advance its own interest and financial position does not establish the necessary malice or wrongful conduct." Cedar Ridge Trailer Sales, Inc. v. Nat. Cmty. Bank of N.J., 711 A.2d 338, 345 (N.J. Super. App. Div. 1998) (internal alteration and quotation marks omitted). In Cedar Ridge, the court found that a defendant that acted in its own self-interest had not acted with malice: "At worst, the Bank was advancing its own interest and financial position, which is not enough to establish tortious interference." Id. (quotation marks omitted). In another case, a New Jersey court noted that defendant's "motive was to compete, i.e., to induce users of the vascular grafts to purchase the device from the Meadox Company, rather than from plaintiff." C.R. Bard, Inc. v. Wordtronics Corp., 561 A.2d 694, 697 (N.J. Super. Law. Div. 1989). The court concluded, "There is simply nothing wrong with that. A competitor has an absolute right to take away as much of the 'other fellow's' business as he can lawfully." Id., citing Louis Kamm, Inc., v. Flink, 175 A. 62 (N.J. 1934) ("Everyone has a right to enjoy the fruits and advantages of his own enterprise, industry, skill and credit. He has no right to be protected against competition.").

Older cases in New Jersey contain language which J&J reads to suggest that business interests are not a sufficient justification for interference with contract. For example, the New Jersey Supreme Court stated in 1950 that "interference is not justified for the indirect purpose of benefiting the actor at the expense of another, unless done in the exercise of an equal or superior right." Louis Schlesinger Co. v. Rice, 72 A.2d 197, 203 (N.J. 1950). The question, then, is what kind of action is "done in the exercise of an equal or superior right."

> The essence of the cases in this field is that in adjudging whether
> what the defendant has done is actionable, i. e., not done in the

36

> exercise of an equal or superior right, the ultimate inquiry is
> whether the conduct was both injurious and transgressive of
> generally accepted standards of common morality or of law.  In
> other words, was the interference by defendant "sanctioned by the
> 'rules of the game.'  There can be no tighter test of liability in this
> area than that of the common conception of what is right a just
> dealing under the circumstances.  Not only must defendants'
> motive and purpose be proper but so also must be the means.

Sustick v. Slatina, 137 A.2d 54, 60 (N.J. Super. App. Div. 1957) (internal citations and quotation

marks omitted).  The inquiry under New Jersey law is thus somewhat more vague in contour

than the Indiana inquiry discussed below, but New Jersey caselaw makes clear that the kind of

behavior at issue in this case is qualitatively different than the behavior that would give rise to

liability.

"Although competition may constitute a justification, a defendant claiming a

business-related excuse must justify not only its motive and purpose, but also the means used."

Id.  Thus, a tortious interference claim may be stated even where the defendant is motivated by

competition — that is, even where the end is justified — if there is some impropriety in the

means.  The holding in another tortious interference case is worth quoting in full:

> Plaintiff has not offered anything specific regarding its contention
> that defendant competed dishonestly.  It has not demonstrated that
> defendant transgressed generally accepted standards of morality,
> nor has it demonstrated that the truth was so shaded as to be
> misleading.  Instead, it speaks in glittering generalities of bad
> motives and underhanded conduct, offering no proofs in that
> regard, nor with regard to either 'recognized ethical business
> codes,' or of 'established customs or practices,' which might
> prescribe unacceptable conduct.  This is simply not enough.
>
> We live, after all, in a society consumed by the desire to acquire
> wealth, enamored by entrepreneurship and enthralled by success.
> Competition is always the premise, winning always the goal.  In

> such an environment, can one conclude that the means used by
> defendant in this case to compete with plaintiff were wrongful?  I
> think not.

C.R. Bard, 561 A.2d at 698.

Plaintiff relies on a number of New Jersey cases involving a defendant's use of unjustified means to achieve a legitimate, business-related end.  That is, the conduct that was used to achieve an economic advantage was in some way deceitful or fraudulent or otherwise in violation of what New Jersey courts often refer to as "the rules of the game."  Lamorte Burns & Co., Inc. v. Walters, 770 A.2d 1158, 1170 (N.J. 2001).  These cases are inapplicable here, however, because the allegations in this case do not even suggest the kind of conduct that gives rise to liability.

For example, in DiMaria v. Interarch, the defendants tortiously interfered with the contract when they terminated the plaintiff's contract on the basis of their own false representation that plaintiff had failed to perform.  799 A.2d at 560.  "If the jury believed [that the representation was false], then the firing was without justification or excuse."  Id. at 560.  Another case found it "malicious" to persuade a company to accept an order with the purpose of placing the company "in a position where, by reason of its totally inadequate production capacity, [it] could not fulfil the order and would thereby subject [itself] to suit for damages," and to then "force [the company] under threat of suit for damages to ship merchandise to [defendants] in violation of [plaintiffs'] exclusive contract."  Schechter v. Friedman, 57 A.2d 251, 253 (N.J. 1948).  See also Lamorte Burns, 770 A.2d at 1172 ("Walters and Nixon gathered and used Lamorte's protected information to effect a surprise weekend coup, secretly soliciting

38

Lamorte's clients at a time when Lamorte's knowledge of their competition was delayed, to put a best light on the tactic.").

In this case, there is no allegation that Abbott or BSC deceived J&J or used any other illicit means to induct Guidant to improperly provide due diligence to Abbott.  The complaint alleges no facts that would make it "plausible," <u>Twombly</u>, 127 S. Ct. at 1974, that Abbott or BSC did anything more underhanded than simply asking Guidant for the due diligence in the course of proposing to Guidant a transaction more advantageous to its shareholders than the deal offered by J&J.  This is hardly comparable to the kind of illicit actions described in the cases listed above.  Accordingly, plaintiff has failed to state a claim for tortious interference under New Jersey law.

### C.    Defendants' Actions Were Not Tortious Under Indiana Law

Plaintiff's allegation that Abbott and BSC "maliciously" interfered with its contract is similarly insufficient to state a claim under Indiana law.  Plaintiff does not deny that Abbott and BSC were motivated by economic self-interest when they took the actions that led to the alleged breach by Guidant.  Instead, plaintiff argues that actions motivated by economic self-interest may nevertheless constitute tortious interference with contract.  (Pl. Mem. 35-39.)  Under Indiana law, however, the undisputed fact that the defendants were motivated by economic self-interest, in the absence of allegations of any other motivation, requires dismissal of the tortious interference claims.

Under Indiana law, "absence of justification" is a required element of a tortious interference claim.  <u>Bilimoria</u>, 829 N.E.2d at 156.  Although several factors may be considered in determining whether conduct was justified, including inter alia the nature of the defendant's

conduct, its motive, and the parties' respective interests, id., absence of justification "is established only if the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another." Id. at 157-158. "The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability." Id. at 158. Thus, the Bilimoria court held that no claim was stated where "there existed a legitimate business purpose for the [action] and it was not exclusively directed to the injury and damage of [the plaintiff]."

The fact that an action is taken with knowledge that it will cause a breach of contract does not suffice to show tortious interference with contract. McLinden v. Coco, 765 N.E.2d 606, 617 (Ind. Ct. App. 2002) ("one does not induce a second party to breach a contract with a third party when one merely enters into an agreement with the second party with knowledge that the second party is unable to perform both contracts"); see also Indiana Health Ctrs., Inc. v. Cardinal Health Sys., Inc., 774 N.E.2d 992 (Ind. App. 2002) ("[T]he mere fact that Cardinal hired Dr. Wolfe with knowledge that his employment would violate the Agreement's non-compete clause does not amount to inducement of breach.").

Instead, to state a claim, lack of justification requires "malicious [intent] unmixed with any other and exclusively directed to injury and damage of another." Flintridge Station Assoc. v. Am. Fletcher Mortgage Co., 761 F.2d 434, 441 (7th Cir. 1985) (noting that lack of justification has been held to require "disinterested malevolence"). Thus, a conclusory allegation that "no justification exists" for a defendant's inducement of breach is insufficient. Morgan Asset Holding Corp. v. CoBank, ACB, 736 N.E.2d 1268, 1272 (Ind. App. 2000). To state a claim for tortious interference with contract, a plaintiff must "allege conduct . . . that was intended for the

40

sole purpose of causing injury and damage to [plaintiff]." Id.  The court in Morgan Asset held

that even an allegation that defendant had "specifically intended to thwart efforts by the [contract

parties] to enforce their rights" under the contract was inadequate, because "this statement does

not necessarily mean that such intent to 'thwart' was the *exclusive* purpose" of the defendant's

actions.  Id. (emphasis in original).  Thus, the claim was properly dismissed.

     Modern cases make clear that a business interest is a sufficient justification under Indiana

law.  See Coleman v. Vukovich, 825 N.E.2d 397, 404 (Ind. App. 2005) ("To be unjustified,

Vukovich's actions must be malicious and exclusively directed to the injury and damage of

another.  Vukovich's actions do not fit this definition.  His decision . . . was motivated by his

own business interest").  For example, in Winkler v. V.G. Reed & Sons, Inc., 638 N.E.2d 1228

(Ind. 1994), the plaintiff claimed that in the course of defendant Reed & Sons's takeover of his

employer, Typoservice, Reed & Sons induced Typoservice to breach its employment contract

with him by terminating him without the benefits to which he was entitled.  Assuming that

Typoservice had in fact breached the contract, the court noted that plaintiff "[did] not suggest

that defendants' motive was a willful or spiteful intent to injure him," and that Reed & Sons was

motivated by financial considerations.  Id. at 1236.  It found no liability for tortious interference:

"[a]lthough [plaintiff's] interest in continued employment under the contract is certainly entitled

to protection, contract law provides those protections."  Id.

> Winkler gives, and we perceive, no reasons why his contract
> interests should receive greater protection in tort law than the
> business interests sought to be advanced by defendants here,
> namely, acquiring the Typoservice business and attempting to put
> it on a sound financial footing. . . .  We perceive no reasonable
> argument that, given the legitimate business intent of Typoservice
> and Reed & Sons in engaging in the sales transaction, any tort was
> committed.

Id.  "In instances where there is a good-faith purchase of a business, the justification necessary to avoid tort liability for altering existing employment contract will usually be present."  Id.[18]

It is not alleged or contended that BSC and Abbott entered a $27 billion transaction solely out of a malicious desire to harm J&J by inducing Guidant to breach its contract. Unquestionably, they acted to further their own economic self-interest.  Accordingly, whether New Jersey or Indiana law is applied, plaintiff has failed to state a claim for tortious interference with contract.

## CONCLUSION

For the foregoing reasons, the motion to dismiss by defendant Abbott Laboratories (Doc. #16) is granted.  The motion to dismiss by defendants Boston Scientific Corporation and Guidant Corporation (Doc. #21) is granted in part and denied in part.  The claims against defendants Abbott Laboratories and Boston Scientific, and the claim against defendant Guidant for breach of an implied duty of good faith and fair dealing, are dismissed.

─────────────────

[18] In its discussion of Indiana law, plaintiff relies on Wade v. Culp, 23 N.E.2d 615, 619 (Ind. App. 1939), which stated that "[w]hen one has knowledge of the contract rights of another, his wrongful inducement of a breach thereof is a willful destruction of the property of another and cannot be justified on the theory that it enhances and advances the business interests of the wrongdoer."  Id. at, 619, quoting Sorenson v. Chevrolet Motor Co., 214 N.W. 754, 756 (Minn. 1927).  That case, however, involved inducing Wade, an employee who had been hired to develop an electric steak broiler, to "sell the entire assets of [his employer's] business" — assets that were not his to sell.  23 N.E.2d at 619.  This conduct, like the conduct discussed in the New Jersey cases above, was in pursuit of a legitimate interest (money-making), but clearly violated "the rules of the game."  No comparable conduct is alleged in this case.

Plaintiff also relies on three other cases: Wheel Masters, Inc. v. Jiffy Metal Products Co., 955 F.2d 1126 (7th Cir. 1992), Waldinger Corp. v. CRS Group Engineers, Inc., 775 F.2d 781 (7th Cir. 1985), and Hannigan v. Sears, Roebuck & Co., 410 F.2d 285 (7th Cir. 1969).  These cases, however, applied Illinois law, which no one contends is relevant here.

The parties remaining in the case are directed to submit an amended Case Management

Plan to the Court by September 10, 2007, setting forth a schedule for discovery.


SO ORDERED.

Dated: New York, New York
     August 29, 2007

                                 GERARD E. LYNCH
                             United States District Judge