# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

———————————

No. 06-cv-7685 (RJS)

———————————

JOHNSON & JOHNSON,

Plaintiff,

VERSUS

GUIDANT CORPORATION,

Defendant.

———————————

SEALED OPINION AND ORDER
July 7, 2014

———————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff Johnson & Johnson ("J&J") brings this diversity action against Defendant Guidant Corporation ("Guidant" or "GDT"), asserting a state law breach of contract claim arising from an agreement regarding J&J's potential acquisition of Guidant in late 2004.  Now before the Court is Guidant's motion for summary judgment.  For the reasons that follow, Guidant's motion is denied.

## I.  BACKGROUND

### A.  Facts

Guidant is an Indiana corporation that designs, develops, and markets medical devices used in cardiovascular treatment.  (Compl. ¶ 16, Doc. No. 1.)[1]  In August

("BF"), the numbered paragraphs of J&J's Local Civil Rule 56.1 Statement ("J&J's 56.1 Stmt."), and the separately numbered paragraphs of the "Additional Material Facts" section of J&J's Local Civil Rule 56.1 Statement ("AF").  In deciding this motion, the Court has also considered J&J's Complaint ("Compl.") (Doc. No. 1), Answer to Counterclaim (Doc. No. 43), and brief in opposition to the instant motion ("Opp'n."); Guidant's Answer (Doc. No. 39), opening memorandum of law in support of the instant motion ("Mem."), and reply memorandum of law ("Reply"); and the exhibits and declarations attached thereto.  Additionally, the Court has considered the parties' arguments made at a hearing on this motion.  (See Doc. No. 83, Oral Arg. Tr., July 25, 2012.)

The Court notes that portions of Guidant's Local Civil Rule 56.1 Statement do not comport with Local Rule 56.1(d), which requires that "[e]ach statement by the movant . . . must be followed by citation to evidence which would be admissible . . . as required by Fed. R. Civ. P. 56(c)."  Because the authenticity of the evidence at issue does not affect the outcome of the instant summary judgment motion, the Court treats those factual assertions as mere context.  Of course, at trial the parties must properly introduce admissible evidence.

---

[1] The following facts are drawn from the numbered paragraphs of Guidant's Local Civil Rule 56.1 Statement ("Guidant's 56.1 Stmt."), the separately numbered paragraphs of the "Background Facts" section of Guidant's Local Civil Rule 56.1 Statement

2004, in connection with their discussion of a potential merger, J&J and Guidant executed a confidentiality agreement (the "J&J-GDT Confidentiality Agreement"), which permitted an exchange of information between the parties (including their subsidiaries) and their "Representatives," defined as "officers, directors, employees, agents, advisors or representatives." (Decl. of Harold P. Weinberger dated August 1, 2011, ("Weinberger Decl."), Ex. 1 at GDT00016136.)

Thereafter, on December 15, 2004, J&J and Guidant executed an initial merger agreement, pursuant to which J&J agreed to pay $25.4 billion, or $76 per share, to acquire Guidant. (BF ¶ 3.) The deal raised potential antitrust problems because J&J was one of only two companies in the United States then marketing "drug-eluting stents," and it was seeking to acquire Guidant, one of three companies in the process of seeking regulatory approval to market the stents.[2] (Compl. ¶¶ 19–20, 27.) On November 2, 2005, the Federal Trade Commission ("FTC") conditionally approved the merger based on J&J divesting, licensing, or terminating "certain rights or assets of its businesses in[, *inter alia*,] drug-eluting stents . . . ." (Weinberger Decl. Ex. 2 at GDT00026959.) Consistent with the FTC's conditional approval, on August 12, 2005, J&J and Abbott Laboratories ("Abbott") – a now-dismissed Defendant in this action, *see Johnson & Johnson v. Guidant Corp.*, 525 F. Supp. 2d 336, 357 (S.D.N.Y. 2007) [hereinafter *J&J*] – entered into an agreement whereby J&J would grant Abbott a non-exclusive license

---

[2] A stent is a metallic device surgically inserted to keep arteries open after balloon angioplasty to clear blockages. (Compl. ¶ 19.) A drug-eluting stent is a stent that slowly releases a drug preventing tissue build-up while keeping an artery open. (*Id.*)

to certain patents relating to drug-eluting stents in the event J&J acquired Guidant. (Compl. ¶ 27.)

On November 14, 2005, following J&J's assertions that a series of product recalls had a material adverse effect on Guidant, J&J and Guidant entered into an Amended and Restated Agreement and Plan of Merger (the "Merger Agreement"). (Guidant's 56.1 Stmt. ¶11; BF ¶¶ 6–7; Dep. of Bernard Kury, Feb. 4, 2009, ("Kury Dep."), at 48:6–50:5.) The Merger Agreement set a purchase price of approximately $63 per share, or roughly $21.5 billion. (Guidant's 56.1 Stmt. ¶11; Decl. of John Gueli, dated June 17, 2011, ("Gueli Decl."), Ex. B.) The Merger Agreement also contained a "no-solicitation clause" that is at the center of this dispute. The "no-solicitation clause" prohibited Guidant from soliciting or encouraging a competing "Takeover Proposal," specifically providing that:

> [Guidant] *shall not,* nor shall it authorize or permit any of its Subsidiaries or any of their respective directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative (collectively, "Representatives") retained by it or any of its Subsidiaries to, directly or indirectly through another person, (i) *solicit, initiate or knowingly encourage, or take any other action designed to, or which could reasonably be expected to, facilitate, any Takeover Proposal* or (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any person any information, or otherwise cooperate in any way with, any Takeover Proposal.

(Weinberger Decl. Ex. 3 § 4.02(a) (emphasis added).)

Importantly, the "no-solicitation" clause contained an exception that permitted Guidant to furnish confidential business information in response to a written, unsolicited "Takeover Proposal."[3] (*Id.*) Specifically, the exception provided that if Guidant's board of directors "reasonably" determined that an unsolicited Takeover Proposal constituted or was reasonably likely to lead to a "Superior Proposal," then Guidant could provide information to the "person making such Takeover Proposal (and its Representatives)."[4] (*Id.*) The Merger Agreement also provided that, in the event Guidant intended to disclose such information, the disclosure had to be made

pursuant to a confidentiality agreement "not less restrictive to such person than the confidentiality provisions of the [J&J-GDT] Confidentiality Agreement." (*Id.*) Even then, disclosure could be made only if Guidant concurrently provided or already had provided the same information to J&J. (*Id.*) Furthermore, the Merger Agreement required Guidant to keep J&J informed in "all material respects of the status and details . . . of any Takeover Proposal" and to "promptly advise" J&J of the "identity of the person making any such Takeover Proposal." (*Id.* § 4.02(c).)

In the event of a successful unsolicited takeover bid, and a "reasonabl[e]" determination by the Guidant board of directors that the Takeover Proposal actually constituted a Superior Proposal, Guidant could terminate its agreement with J&J. (*Id.* § 4.02(b).) Such termination, however, would trigger the payment of a $625 million termination fee to J&J pursuant to the Merger Agreement. (Weinberger Decl. Ex. 3 § 5.06(b); *see also* Guidant's 56.1 Stmt. ¶ 58.) Section 7.02, another provision central to this dispute between the parties, explains in relevant part what would happen if the agreement were to be terminated:

> In the event of termination of this Agreement by either the Company or Parent . . . , this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of Parent, Sub or the Company under this Agreement, other than the provisions of . . . Section 5.06 [outlining termination fees], this Section 7.02 and Article VIII, which provisions shall survive such termination; *provided, however*, that no such termination shall relieve any party hereto from any liability or damages resulting from the wilful and

---

[3] The "no-solicitation clause" defines "Takeover Proposal" as:

> *any inquiry, proposal or offer from any person relating to, or that could reasonably be expected to lead to, any direct or indirect acquisition or purchase . . .* of assets (including equity securities of any Subsidiary of [Guidant]) or businesses that constitute 15% or more of the revenues, net income or assets of [Guidant] and its Subsidiaries, taken as a whole . . . .

(Gueli Decl. Ex. B. § 4.02(a) (emphasis added).)

[4] The clause defined "Superior Proposal" as a "bona fide offer" by a third party that would be more financially favorable than J&J's offer and "reasonably capable of being completed." (Gueli Decl. Ex. B. § 4.02(a).) The term "Representatives," as used in the Merger Agreement, was defined slightly differently than in the J&J-GDT Confidentiality Agreement. (*Compare id., with* Weinberger Decl. Ex. 1 at GDT00016136.) In the Merger Agreement, the term included Guidant's "Subsidiaries or any of their respective directors, officers or employees or any *investment banker, financial advisor,* attorney, accountant, or other advisor, agent or representative . . . retained by it or any of its Subsidiaries." (Gueli Decl. Ex. B. § 4.02(a) (emphasis added).)

material breach by a party of any of its representations, warranties, covenants or agreements set forth in this Agreement.

(Weinberger Decl. Ex. 3 § 7.02 (emphasis in original).)

On December 5, 2005, before the merger between J&J and Guidant had closed, another company – Boston Scientific Corporation ("BSC") – publicly made an unsolicited proposal to acquire Guidant for $25 billion, or $72 per share. (Guidant's 56.1 Stmt. ¶ 18.) In the press release announcing its bid for Guidant, BSC revealed that, because of antitrust concerns, it planned to divest Guidant's vascular intervention ("VI") and endovascular solutions ("ES") businesses. (Id. ¶ 19; Gueli Decl. Ex. C at ML0084820, ML0084823.)

On December 7, 2005 – after consulting with Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as its legal advisor and JPMorgan and Morgan Stanley as its financial advisors – Guidant determined that BSC's proposal was reasonably likely to lead to a Superior Proposal and that Guidant should provide due diligence to BSC. (Guidant's 56.1 Stmt. ¶ 22; J&J's 56.1 Stmt. ¶ 22; Weinberger Decl. Ex. 2 at GDT00026961.) On that same day, Guidant and BSC executed a confidentiality agreement governing the exchange of confidential information between the two companies (the "BSC-GDT Confidentiality Agreement"). (Weinberger Decl. Ex. 5.) Although modeled on the J&J-GDT Confidentiality Agreement, the BSC-GDT Confidentiality Agreement differed from the latter in that it altered the definition of "Representatives" permitted to receive Guidant's confidential information to include "financing sources" and "third parties reasonably satisfactory to [Guidant] that are identified to us as potential

purchasers of assets to be divested." (Id.) Skadden also drafted, for the signature of Guidant's general counsel, Bernard E. Kury, a letter notifying J&J's general counsel, Russell C. Deyo, that the BSC-GDT Confidentiality Agreement had been concluded and that it was "consistent with [Guidant's] obligations under [the] Merger Agreement." (Weinberger Decl. Ex. 6; Decl. of Charles W. Mulaney, dated June 17, 2011, ("Mulaney Decl."), ¶ 16.) Kury signed the letter on December 9, 2005. (See Weinberger Decl. Ex. 6.) In the interim, between approximately December 5 and December 19, 2005, BSC and Abbott separately negotiated the principal terms of a divestiture transaction for Guidant's VI and ES assets. (BF ¶¶ 28–33.)

On December 18, 2005, Guidant executed an addendum to the BSC-GDT Confidentiality Agreement (the "Addendum") whereby Guidant agreed, inter alia, not to disclose "the existence or name of any third party who is a potential purchaser of the Company's assets to be divested" without the prior consent of BSC and that third party. (Weinberger Decl. Ex. 7 at GDT00133820, GDT00133823.) On December 20, 2005, BSC informed Guidant that it had elected to proceed, in accordance with its December 5 announcement, with Abbott as the VI/ES divestiture buyer. (Weinberger Decl. Ex. 8; BF ¶ 34.) Guidant's VI and ES businesses constituted at least 15% of the revenues, net income, or assets of Guidant and its subsidiaries, taken as a whole. (Guidant's 56.1 Stmt. ¶ 48.)

On December 22, 2005, Abbott and BSC executed an accession agreement (the "Accession Agreement") binding Abbott to the terms of the Addendum. (Guidant's 56.1 Stmt. ¶ 41; see Weinberger Decl. Ex. 11.) The Accession Agreement described Abbott as "retained by [BSC] to advise it in connection with a potential transaction."

4

(Weinberger Decl. Ex. 11 at SA00013588.) Soon after signing the Accession Agreement, Guidant began furnishing Abbott with due diligence – a process that was completed by December 30, 2005. (Guidant's 56.1 Stmt. ¶ 47; BF ¶ 41.)

On January 8, 2006, after Abbott had already received Guidant's due diligence, BSC and Abbott signed a Transaction Agreement whereby Abbott agreed to purchase Guidant's VI and ES businesses in the event that BSC acquired Guidant. (*See* Guidant's 56.1 Stmt. ¶ 47; BF ¶ 47.) That same day, BSC submitted a firm offer to acquire Guidant for $72 per share. (BF ¶ 48.)

Shortly thereafter, J&J began to suspect that Guidant may have impermissibly facilitated BSC's takeover proposal by providing due diligence directly to Abbott in violation of the Merger Agreement. This suspicion was confirmed during a January 9, 2006 analyst conference call when Lawrence Best, BSC's chief financial officer, explained that Abbott had been given "the opportunity to do a much deeper dive" into Guidant's due diligence. (Guidant's 56.1 Stmt. ¶ 49; *see also* AF ¶ 65.) Based on this statement, J&J concluded that at some time between BSC's announcement of its bid for Guidant on December 5, 2005, and BSC's submission of a formal proposal on January 8, 2006, Guidant had breached the terms of the Merger Agreement. (*See, e.g.*, Decl. of Russell C. Deyo, dated July 28, 2011, ("Deyo Decl."), ¶¶ 2–3.) Accordingly, J&J's in-house corporate lawyer, James R. Hilton, and its general counsel, Deyo, called Kury to express J&J's concern that providing diligence to Abbott was a violation of the Merger Agreement. (Deyo Decl. ¶¶ 2–3; *see also* Guidant's 56.1 Stmt. ¶¶ 50–51; AF ¶ 65.) During the call, Kury expressed "significant dismay" at the

suggestion that Guidant had breached the merger agreement and promised to get back to J&J regarding the alleged breach. (Dep. of James R. Hilton, July 27, 2010, ("Hilton Dep."), at 221:5–15.)

Following BSC's firm takeover proposal at $72 per share, J&J raised its offer for Guidant to $68 per share, prompting a bidding war with BSC. (Guidant's 56.1 Stmt. ¶¶ 56–58, 61–63.) On January 11, 2006, Guidant accepted J&J's raised offer and the parties amended the Merger Agreement to reflect the new price term and increase the termination fee, originally set at $625 million, to $675 million. (Guidant's 56.1 Stmt. ¶ 58.) On January 12, 2006, in response to J&J's raised offer, BSC made a revised offer of its own, increasing the proposed purchase price from $72 to $73 per share. (BF ¶ 52.) On January 13, 2006, again before Guidant responded to BSC's raised offer, J&J made a revised offer of $71 per share, which Guidant accepted. (Guidant's 56.1 Stmt. ¶¶ 61, 63.) J&J and Guidant then amended the Merger Agreement again to reflect the new price term and to further increase the termination fee from $675 million to $705 million. (*Id.* ¶ 63.) Ultimately, the bidding contest culminated in an $80 per share offer made by BSC on January 17, which Guidant's board of directors determined was a Superior Proposal to J&J's $71 offer. (BF ¶¶ 57–59.)

On January 23, 2006, Deyo sent a letter to Kury, expressing J&J's continued concern about whether Guidant had violated the terms of the Merger Agreement. (Weinberger Decl. Ex. 15; Guidant's 56.1 Stmt. 67; AF ¶ 66.) On January 25, 2006, Guidant delivered a termination notice to J&J stating Guidant's intention to exercise its rights under the Merger Agreement to (1) accept a competing "Superior Proposal" and (2) terminate its agreement with J&J.

5

(Guidant's 56.1 Stmt. ¶ 66.) The following day, in accordance with the terms of the amended Merger Agreement, Guidant wired J&J a $705 million termination fee. (*Id.* ¶ 72.)

## B.  Procedural History

On September 25, 2006, J&J filed its Complaint in this action alleging that Guidant breached the Merger Agreement, as well as the common law implied covenant of good faith and fair dealing, by disclosing confidential business information to Abbott. (Compl. ¶¶ 44, 53–59, 60–64.) The Complaint also alleged that Abbott and BSC tortiously interfered with the Merger Agreement by inducing Guidant to provide this information to Abbott. (*Id.* ¶¶ 65–70.) All three Defendants moved to dismiss the claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. Nos. 16, 21.)

In an Opinion and Order issued on August 29, 2007, Judge Lynch – to whom this case was originally assigned – dismissed the tortious interference claims against BSC and Abbott but denied Guidant's motion to dismiss the breach of contract claim.[5] *J&J*, 525 F. Supp. 2d at 341–42. In considering Guidant's motion to dismiss the breach of contract claim, Judge Lynch refused to reject, as a matter of law, J&J's principal allegation – namely, that "Guidant provided the due diligence without any inquiry from Abbott that permitted it to do so." *Id.* at 344. Thus, Judge Lynch found that the breach of contract claim survived because

the Merger Agreement made "clear that Guidant was not allowed to solicit bids." *Id.*

On October 1, 2009, following Judge Lynch's elevation to the Second Circuit, the case was transferred to my docket. (Doc. No. 56.) On February 16, 2010, this Court issued a Memorandum and Order denying Plaintiff's motion to amend the Complaint to reassert tortious interference claims against Abbott and BSC and to add allegations to its breach of contract claim against Guidant. *Johnson & Johnson v. Guidant Corp.*, No. 06-cv-7685 (RJS), 2010 WL 571814 (S.D.N.Y. Feb. 16, 2010). Following the close of discovery, Guidant filed the instant motion for summary judgment on J&J's breach of contract claim. (Doc. No. 78.)

## II.  LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to

---

[5] Judge Lynch also dismissed J&J's claim against Guidant for breach of an implied duty of good faith and fair dealing because no such duty exists under Indiana law, the law governing the Merger Agreement. *J&J*, 525 F. Supp. 2d at 357; (*see* Gueli Decl. Ex. B. § 8.08).

view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [non-moving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact.

A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

The parties agree that, pursuant to the terms of the Merger Agreement, J&J cannot recover damages in excess of its $705 million termination fee unless it can demonstrate that Guidant breached the agreement and that its breach was both "wilful and material."[6]   (*See* Weinberger

Decl. Ex. 3 § 7.02.)  Guidant assumes for purposes of the instant motion that it breached the terms of the agreement. (Mem. at 5.)  However, it argues that it is entitled to summary judgment because: (1) J&J's claim is barred by the doctrines of election of remedies and equitable estoppel; (2) even if J&J is not so precluded, Guidant did not commit a "wilful" breach of the Merger Agreement; (3) Guidant did not commit a "material" breach of the Merger Agreement; and (4) J&J cannot prove causation.  The Court will address each of these issues in turn.

### A. Election of Remedies and Estoppel

As an initial matter, Guidant argues that it is entitled to summary judgment because J&J is barred from asserting its breach of contract claim by two doctrines:  (1) election of remedies and (2) estoppel.  (Mem. at 21–27.)  For the reasons that follow, the Court finds that neither of these doctrines nor two similar doctrines under Indiana law – which governs this dispute (Gueli Decl. Ex. B § 8.08) – bars J&J from asserting that Guidant committed a wilful and material breach of the contract or from seeking damages for that breach.

#### 1. Election of Remedies

The election of remedies doctrine provides that "where a party has two coexisting but inconsistent remedies and elects to prosecute one such remedy to a conclusion, [it] may not thereafter sue on the other remedy." *UFG, LLC v. Southwest Corp.*, 848 N.E.2d 353, 361 (Ind. Ct. App. 2006) (citing *Cahoon v. Cummings*, 734 N.E.2d 535, 542 (Ind. 2000)).  However, the

---

[6] There are two accepted spellings of "willful." *See* Black's Law Dictionary 1630 (8th ed. 2004). This opinion uses "wilful," the spelling the parties employed in the Merger Agreement, but uses "willful" when that spelling appears in other quoted sources and authorities.

doctrine "does not preclude the concurrent or successive pursuit of two or more remedies which are consistent in nature." *Gold v. Cedarview Mgmt. Corp.*, 950 N.E.2d 739 (Ind. Ct. App. 2011) (internal quotation marks omitted).

Guidant argues, in essence, that J&J had two mutually exclusive options after learning of the alleged breach by Guidant. It could *either* (1) consider the breach to be material and thus terminate the contract and seek damages, *or* (2) consider the breach not to be material, forego seeking damages, and continue performing the contract. (*See* Doc. No. 83, Oral Arg. Tr. 6:3–7:9, July 25, 2012.) Guidant contends that because J&J, after becoming aware of the alleged breach, chose to continue the contract on at least five occasions rather than terminate it and seek damages, J&J is now barred from seeking damages. (*Id.* at 7:10–17:12.) In making this argument, Guidant relies principally on one case from this district – *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383 (S.D.N.Y. 1999) – that did not apply Indiana law. (*See* Mem. at 22–24.) However, even that case is inapposite.

In *ESPN*, the court explained that "the 'right' to terminate . . . is available only where one party has materially breached the contract"; however, "where a party with the right to terminate chooses instead to continue, . . . the party's election to continue rather than end the contract essentially moots its legal justification for termination." 76 F. Supp. 2d at 392. True enough: under the election of remedies doctrine, at least as interpreted under New York law, a non-breaching party that continues to perform loses its right to otherwise *terminate* the contract based upon that breach at some later point. *See, e.g.*, *Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 254, 258–59 (S.D.N.Y. 2001). However,

the plain terms of the Merger Agreement reveal that the remedies of accepting a termination fee and seeking damages due to a "wilful and material breach" were *not* mutually exclusive and *not* inconsistent. Indeed, the Court in *ESPN* recognized that, although the parties had not done so in that case, "parties could conceivably draft language that purports to avoid the consequences of election." 76 F. Supp. 2d at 390 n.5. Here, Section 7.02 of the Merger Agreement did just that, providing:

> *In the event of termination* of this Agreement by either the Company or Parent as provided in Section 7.01, *this Agreement shall forthwith become void and have no effect*, without any liability or obligation on the part of Parent, Sub or the Company under this Agreement, *other than the provisions of* Section 3.01(8) and 3.02(g), the second, third and fourth sentences of Section 5.02(a), *Section 5.06 [outlining termination fees]*, this Section 7.02 and Article VIII, which provisions shall survive such termination; *provided, however, that no such termination shall relieve any party hereto from any liability or damages resulting from the wilful and material breach by a party of any of its representations, warranties, covenants or agreements set forth in this Agreement.*

(Weinberger Decl. Ex. 3 § 7.02 (emphasis added).)   Although Guidant argues that "Section 7.02 forecloses . . . such [a] post-termination damages remedy" (Reply at 11), Guidant's analysis appears to focus only on the first part of the provision while ignoring the last clause, which carves out damages resulting from a "wilful and material breach."  Thus, examining the entire text of Section 7.02, the Merger Agreement seems

to explicitly contemplate a scenario whereby an aggrieved J&J might collect the contractual termination fee while also pursuing damages resulting from Guidant's wilful and material breach of the Merger Agreement.

Not surprisingly, courts have found that such arrangements are not inconsistent with the election of remedies doctrine. For instance, in *NAACO Industries, Inc. v. Applica Inc.*, 997 A.2d 1 (Del. Ch. 2009), the Delaware Chancery Court, faced with a nearly identical fact pattern and contract language, reached the same conclusion. There, a target company allegedly breached the no-facilitation clause of a merger agreement, resulting in a bidding war in which the initial bidder lost. *Id.* at 6–7. The merger agreement provided for a termination fee, but also, "as is customary in merger agreements," expressly "exclude[d] from the limitation on liability any termination resulting 'from the willful and material breach by a party of any of its representations, warranties or covenants in [the a]greement.'" *Id.* at 19. After the initial bidder sued for breach of contract and the defendant moved to dismiss, the Chancery Court found that, in light of the merger agreement's language, it was by no means clear that the plaintiff was barred from seeking full expectancy damages, despite having received a $4 million termination fee and $2 million in expense reimbursements. *Id.* at 12, 19; *see also Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 736 (S.D.N.Y. 2000) ("A non-breaching party who elects to continue to perform a contract may still sue later and recover damages solely for the *breach* of the agreement, provided that it gives notice of the breach to the breaching party." (emphasis in original)), *aff'd*, 294 F.3d 383 (2d Cir. 2002); *see also id.* at 736–37 (explaining that a non-breaching party who

elects to continue to perform a contract loses only its ability to rescind the contract, not to seek damages resulting from the breach); *cf. Phillips v. Green St. Corp.*, 237 N.E.2d 590, 595 (Ind. App. 1968) (finding that appellee's "repeated objections to the deviation and delays in performance," despite appellee's acceptance of the defective performance, preserved appellee's right to seek damages and did not constitute a waiver).[7]

Accordingly, for the reasons discussed above, the election of remedies doctrine does not foreclose J&J from asserting its breach of contract claim against Guidant.

---

[7] Guidant argues that any notice that J&J purportedly gave as to whether Guidant breached was deficient because, pursuant to Section 8.02 of the Merger Agreement, "all notices, requests, claims, demands and other communications hereunder shall be in writing" to both the other party and its counsel. (Gueli Decl. Ex. B. at SA 00026244.) After learning during an analyst conference call that Abbott had been given a "deeper dive" into Guidant's confidential information (Dep. of Lawrence Best, May 25, 2010, ("Best Dep."), at 162, 174–76), Deyo and Hilton called Kury on December 9, 2005 to relay J&J's concern that providing Abbott with due diligence was a violation of the Merger Agreement. (Deyo Decl. ¶¶ 1–2; Hilton Dep. at 217–21). While the call alone may not have been sufficient under section 8.02, J&J's subsequent actions were. After waiting for a response from Guidant without answer, Deyo sent Kury a written letter, copying Guidant's counsel at Skadden, dated January 23, 2006 (Weinberger Decl. Ex. 15), which Kury understood to be asserting a breach by Guidant (Kury Dep. at 275–76). Therefore, even if the Court were to find that written notice was required by the Merger Agreement in order for J&J to pursue a breach of contract claim, a factfinder could certainly conclude that J&J complied with its obligation in that regard. *See ESPN*, 76 F. Supp. 2d at 393–94 (noting that "the doctrine of election permits parties to wait a 'reasonable time' after learning of the alleged breaches before terminating the contract . . . . [H]ow much time is reasonable depends on the nature of the performance to be rendered under the contract." (internal quotations omitted) (alterations in original)).

### 2.  Estoppel

Guidant also argues that the doctrine of equitable estoppel precludes J&J from asserting that Guidant's breach was "material" and seeking damages.[8] (Mem. at 24–27.)   Estoppel is a judicial doctrine "sounding in equity.   Although variously defined, it is a concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct." *MDG Int'l, Inc. v. Australian Gold, Inc.*, 606 F. Supp. 2d 926, 933 (S.D. Ind. 2009) (explaining further that all varieties of estoppel "are based on the same underlying principle: one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other" (citations omitted)).   To satisfy the elements of an equitable estoppel claim under Indiana law, Guidant must prove that: (1) J&J made a false representation or concealed material facts with knowledge of the facts and the intention that Guidant would act on that representation or false concealment; (2) Guidant lacked knowledge, or the means to know, of the facts; and (3) Guidant reasonably and detrimentally relied on J&J's actions.  *City of New Albany v. Cotner*, 919 N.E.2d 125, 133 (Ind. Ct. App. 2009); *accord Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 141 (7th Cir. 1990).

Guidant's basic contention is that J&J's conduct – both by renegotiating the terms of the merger agreement upon discovery of the alleged breach, and later by accepting

payment of the termination fee – caused Guidant to believe that J&J would not assert a material breach and seek damages, thus preventing Guidant from "tak[ing] steps to protect itself and potentially even avoid the crushing liability that J&J now seeks to impose."   (Mem. at 26.)   Among other things, Guidant suggests that but for J&J's subterfuge, it might have rejected BSC's offer, sought a declaratory judgment as to the rights of the parties, or withheld payment of the termination fee.  (*Id.*)  This argument fails.

First, Guidant's position is premised on its view that J&J was required to choose between terminating the merger agreement or seeking damages – which, as discussed above, the Court does not find to be the best reading of the agreement.   Moreover, it is undisputed that J&J told Guidant on numerous occasions, orally and in writing, that it was concerned that Guidant's provision of information to Abbott constituted a breach of the Merger Agreement.  (*See, e.g.*, Deyo Decl. ¶¶ 2–3; Weinberger Decl. Ex. 15; Guidant's 56.1 Stmt.   ¶¶   50–51, 67; AF   ¶   65–66.) Therefore, Guidant has not established that J&J made any false representation to or concealed some material fact from Guidant.

Even if Guidant could meet the first prong of its estoppel defense, it cannot establish, as a matter of law, that it reasonably relied on J&J's subsequent bids as a renunciation of any and all future legal action.   Guidant points to nothing in the record to suggest that either party conditioned its subsequent negotiations on such a renunciation.   If that had, in fact, been Guidant's belief at the time, one might have expected Guidant and its lawyers to have included language to that effect in the amended merger agreements.  They did not. Thus, on the record before it, the Court cannot say, as a matter of law, that Guidant

---

[8] While Guidant argues estoppel in its briefs, it did not raise this defense at oral argument.   Nonetheless, as it is unclear to the Court whether Guidant intended to waive this argument, the Court explains its finding that estoppel does not bar J&J from seeking damages in this case.

reasonably interpreted J&J's conduct as a waiver of future legal action. *See O.K. Sand & Gravel, Inc. v. Martin Marietta Corp.*, 819 F. Supp. 771, 783 (S.D. Ind. 1992) (holding that non-breaching party's renewal of agreement after the alleged breach did not entitle breaching party to summary judgment on the basis of estoppel).

Finally, Guidant's equitable estoppel argument also fails because Guidant cannot demonstrate that its reliance, whether reasonable or not, was detrimental. As noted above, J&J gave Guidant notice of its alleged breach on multiple occasions prior to Guidant's termination of the Merger Agreement. Moreover, by sparking a bidding war between J&J and BSC in which J&J continued to submit higher bids despite Guidant's alleged breach of the Merger Agreement, Guidant's shareholders ended up receiving a higher price for their shares ($80 per share) than they would have based on either BSC's initial definitive offer ($72 per share) or J&J's original purchase price under the Merger Agreement ($63 per share). Thus, the Court cannot find as a matter of law that J&J's conduct resulted in any "detrimental" effect upon Guidant; indeed, quite the opposite may be true.

Accordingly, the Court finds that the doctrine of estoppel does not bar J&J from asserting a breach of contract claim against Guidant and seeking damages on that basis.[9]

### 3.  Substituted Contract and Modification

Although not specifically addressed by the parties, their arguments at times appear to draw on two additional equitable

doctrines – substituted contract and modification – that are recognized under Indiana law. The Court will address them briefly here.

Indiana law recognizes the "old rule" that "where a contract embraces the entire substance of a former contract, with some variations, the first contract is merged in the second." *Skaggs v. Merchants Retail Credit Ass'n*, 519 N.E.2d 202, 204 (Ind. Ct. App. 1988) (citing *McDonough v. Kane*, 75 Ind. 181, 184 (1881)); *see also* Restatement (Second) of Contracts § 279(1) (1981) ("A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's duty."). Under Indiana law, "[a] novation is a new contract made with the intent to extinguish one already in existence . . . ." *Rose Acre Farms, Inc. v. Cone*, 492 N.E.2d 61, 68, 69 (Ind. Ct. App. 1986) (holding that a novation occurred where an employee had accepted a bonus as a substitute in place of a previously promised bonus).[10] There are four elements needed to effect a substitution under Indiana law: "(1) a valid existing contract, (2) the agreement of all parties to a new contract, (3) a valid new contract, and (4) an extinguishment of the old contract in favor of the new one." *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1233 (Ind. 1994) (citations omitted). Clearly, the doctrine would not apply here because the amendments at issue did not include the type of express language – extinguishing the

---

[9] J&J does concede, however, that if J&J prevails on its damages claim, "Guidant would be entitled to offset the termination fee against any recovery by J&J since it would not have been paid in the 'but for' world." (Opp'n at 27 n.7.) The Court agrees.

[10] The substituted contract doctrine overlaps significantly with the doctrine of novation. 30 Williston on Contracts § 76:7 (4th ed. 1993) ("A novation is a type of substituted contract. Technically, and as used by both the Restatement (Second) of Contracts and most courts, a novation differs from other substituted contracts in that a novation involves the addition of a new party to the transaction." (footnotes omitted)). Here, there is no dispute that no new parties were added to the amended merger agreements.

original Merger Agreement – that is needed to constitute a substitution. *See, e.g.*, *Boswell v. Lyon*, 401 N.E.2d 735, 742 (Ind. Ct. App. 1980) (finding no novation where parties did not include language in contract extinguishing prior agreement).

Similarly, Indiana courts have recognized modification of a contract as a defense to breach. Under this doctrine, when parties modify the terms of an existing contract, they waive any claim of breach, with respect to the modified terms, deriving from conduct that occurred prior to the modification. *See, e.g.*, *Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 759 (Ind. Ct. App. 2002) ("Written modification is a defense against breach of contract."); *Skaggs*, 519 N.E.2d at 204 (deciding as a matter of law that where the parties had entered into two sets of contracts "cover[ing] the same subjects with the later contracts changing only the amount of the initial payment due and the amount to be paid each month thereafter," the latter set of contracts were the applicable contracts governing the parties' duties and obligations with respect to the modified payment terms). Here, however, because the amendments did not change the no-solicitation clause – the provision that Guidant allegedly breached – the doctrine of modification does not bar J&J from suing, post-amendment, for breach of the no-solicitation clause.

\*   \*   \*

Accordingly, for the reasons discussed above, the Court finds that J&J is not barred from asserting a breach of contract claim against Guidant.

## B.  "Wilful" Breach

As noted above, Guidant assumes for purposes of the instant motion that it breached the terms of the Merger Agreement. (Mem. at 5.) Notwithstanding that concession, Guidant argues that any breach was not "wilful" because (1) Guidant did not act knowingly or with "'reckless disregard' of the law" (Mem. at 8), as required to establish a "wilful" breach of the Merger Agreement; and (2) any breach by Guidant could not have been "wilful" because of its reasonable, good-faith reliance on the advice of outside counsel (Mem. at 15–17). The Court will address each argument in turn.

### 1.  Interpretation of the Term "Wilful"

As noted above, Section 8.08 of the Merger Agreement provides that it "shall be governed by, and construed in accordance with, the laws of the state of Indiana." (Gueli Decl. Ex. B. § 8.08 (emphasis omitted).) Under Indiana law, the interpretation of a contract presents a pure question of law for the court to decide de novo. *Bailey v. Mann*, 895 N.E.2d 1215, 1217 (Ind. 2008); *accord Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

When construing a contract, Indiana courts apply well-settled principles of contract law. *See, e.g.*, *Dave's Excavating, Inc. v. City of New Castle*, 959 N.E.2d 369, 376 (Ind. Ct. App. 2012) ("[O]ur primary task is to determine and effectuate the intent of the parties."). A court's task is to first "determine whether the language of the contract is ambiguous." *Id.* If the contract is unambiguous, then the contract's language is conclusive, and the parties' intent is determined from the four corners of the contract. *Id.* "If, on the other hand, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact finder." *Id.* When a court interprets a written contract, it must attempt "to

determine the intent of the parties at the time the contract was made . . . by examining the language used in the instrument to express their rights and duties." *Id.* at 376–77. Courts must read the contract so as not to render any portion of it meaningless or superfluous, and should strive for an interpretation that yields a harmonious reading of the contract's provisions. *See id.*; *see also Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006) (holding that where a contractual term is ambiguous, the court may consider extrinsic evidence in resolving the ambiguity); *Simon Prop. Grp., L.P. v. Mich. Sporting Goods Distrib., Inc.*, 837 N.E.2d 1058, 1071 n.10 (Ind. Ct. App. 2005) (explaining that extrinsic evidence is "evidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement").

When a court has found that a contractual term is ambiguous, summary judgment is generally inappropriate, *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995) (finding that resolution of contract interpretation is inappropriate for summary judgment where the contract is ambiguous and the fact-finder may need to resort to extrinsic evidence), unless the undisputed extrinsic evidence weighs heavily in favor of one interpretation over another, *see ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 956–57 (7th Cir. 2006); *accord Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir. 2000) ("This Court may resolve the ambiguity in the contractual language as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so-one sided that no reasonable factfinder could decide contrary to one party's interpretation.").

*a. Ambiguity of "Wilful"*

In Judge Lynch's well-reasoned opinion earlier in this litigation, he noted that "'[w]illful' is a notoriously ambiguous word, which can indicate any of a number of mental states." *J&J*, 525 F. Supp. 2d at 349. Moreover, the Merger Agreement itself does not define "wilful" – either in § 7.02 itself or in the separate definitional section of the agreement. (*See generally* Weinberger Decl. Ex. 3.) After considering the parties' arguments, Judge Lynch concluded that the meaning of the term "willful" in the agreement was ambiguous and thus discovery was needed to determine the parties' intended meaning. *J&J*, 525 F. Supp. 2d at 353. Notwithstanding Judge Lynch's ruling, and the fact that discovery – which began over four years ago – is now finished, each party now argues that the definition it favors is evident from the text of the Merger Agreement without relying on extrinsic evidence. Thus, J&J argues that wilful means only "voluntary and intentional" (Opp'n at 15–16), whereas Guidant argues that wilful requires acting knowingly or with "'reckless disregard' of the law" (Mem. at 8). However, as explained below, the Court is not persuaded by either side's arguments that the term is unambiguous or that it can be conclusively determined from the four corners of the agreement.

In support of its argument that wilful means only "voluntary and intentional," J&J relies primarily on Black's Law Dictionary, which defines "willful" to mean "[v]oluntary and intentional, but not necessarily malicious". (Opp'n at 15 (citing Black's Law Dictionary 1630 (8th ed. 2004).) The Court also notes that Webster's Dictionary offers four definitions of the term "willful", the second of which mirrors that in Black's Law Dictionary – "done deliberately[;] not accidental or without

purpose" – and three others that are inapplicable to the term's use in the Merger Agreement.[11]   Webster's Third New International Dictionary 2617 (2002). Nevertheless, the Court does not find the dictionary definitions to be dispositive. First, immediately following the Black's Law Dictionary definition cited by J&J is an excerpt from a treatise on criminal law, which notes that the two definitions proposed by J&J and Guidant – one simply meaning intentional and the other requiring "bad purpose or evil intent" – are advocated with "equal repetition and insistence." Black's Law Dictionary 1630 (quoting Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 875–76 (3d ed. 1982)). Moreover, an earlier edition of Black's Law Dictionary, which Judge Lynch quoted in his decision, offers both of these definitions of the term.  *J&J*, 525 F. Supp. 2d at 350 (reciting the two definitions of "willful" in the Sixth Edition of Black's Law Dictionary, published in 1990).

Nor do the cases relied on by the parties provide much guidance.  For instance, in the *Cooprider* case upon which J&J relies (*see* Opp'n at 16), the court interpreted the word "willfully" in the context of a criminal statute, concluding that "good faith was immaterial" to a determination of whether a criminal defendant had acted "willfully." *Cooprider v. State*, 218 Ind. 122, 126–30, 130 (1941). However, this decision is of limited probative value since it interprets the meaning of "willfully" in a criminal statute, *see, e.g.*, *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 n.9 (2007) (contrasting the different uses of the term "willful" in civil

and criminal contexts"); *Spies v. United States*, 317 U.S. 492, 497 (1943) ("[W]illful . . . is a word of many meanings, its construction often being influenced by its context."), and, in any event, is hardly dispositive of the parties' intended meaning in this contract.

By contrast, Guidant points to a series of tort cases under Indiana law in which wilfulness was deemed to require an analysis of the actor's state of mind to determine whether ill will was present. (Mem. at 9–11, 11 n.2 ("Indiana law considers 'willful' and 'wanton' fundamentally equivalent with each other and to the concept of 'recklessness' when any of those terms is used to describe a defendant's state of mind in acting with disregard for the consequences of his conduct.").)   Similarly, Guidant points to Indiana cases discussing wilfulness in the context of punitive damages, which were once recoverable in contract cases where a breach was wilful (Mem. at 10–11), and argues that "establishing . . . a 'willful' breach required the same showing as was necessary to establish 'willful' misconduct in a tort action" (Mem. at 10).  However, this action is for breach of contract – not a tort – and, as Judge Lynch correctly noted, "Section 7.02 does not pertain to punitive damages, but to ordinary contract damages that exceed the fixed termination fee established by the contract."  *J&J*, 525 F. Supp. 2d at 352; (*see also* Weinberger Decl. Ex. 3 at SA00026243.)   Moreover, discussions of "wilful" in the punitive damages context cease to have relevance given that the Indiana Supreme Court abolished punitive damages for wilful breaches of contracts in 1993.  *See Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975 (Ind. 1993) (abolishing punitive damages for breaches of contracts). So these cases are also of limited value in

---

[11] The other three definitions are: (1) "governed by will without yielding to reason or without regard to reason; obstinately or perversely self-willed"; (3) "ready or disposed to comply"; and (4) "done of one's own free will[;] not compulsory".  Webster's Third New International Dictionary 2617 (2002).

assessing the meaning of "wilful" in the Merger Agreement.

Guidant also cites American Bar Association surveys of merger and acquisition ("M&A") deals announced in 2008 and 2009 in support of its interpretation of "wilful." (Gueli Decl. Exs. J, K; Mem. at 11–12.)  However, the survey's findings as to what similar provisions meant in other M&A contracts executed in 2008 is hardly dispositive of what meaning the parties intended in their 2004 agreement.  *See Rueille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008) (explaining that, under Indiana law, where a contract does not define a term, a court "will turn to sources that reflect the ordinary meaning of the term *at the time [that] the contract was executed*" (emphases added)).

Lastly, Guidant argues that because "wilful" modifies the word "breach" in the context of the phrase "wilful and material breach," the breach itself must be deliberate rather than merely the result of an intentional act.  (Mem. at 8 (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) ("[The] word 'willful' [in the statute] modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely . . . a deliberate or intentional *act* that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead 'willful acts that cause injury.'" (alteration in original))).)  While Guidant's argument might have some appeal as a matter of statutory construction, it has limited import as a matter of construing a contract entered into between two private parties, particularly given that the term is not defined in the Merger Agreement.

Indeed, as Judge Lynch rightly noted, "'[t]he issue here is not how . . . courts have construed "wilful" in other contexts, such as in interpreting statutes using that term or in formulating or applying legal principles in tort or contract law.  Rather, the issue is what the parties intended' . . . when they used 'wilful' in the [Merger] Agreement."  *J&J*, 525 F. Supp. 2d at 351 (quoting *Met. Life Ins. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 435 (1994)).

Therefore, the Court can only conclude that the precise meaning of the term "wilful," as used in the Merger Agreement, is ambiguous and that resort to extrinsic evidence is necessary to determine the parties' intent.[12]  *See Fresh Cut*, 650 N.E.2d at 1133.

### b. *Extrinsic Evidence of the Meaning of "Wilful"*

The parties point to no extrinsic evidence regarding the meaning of "wilful" in Section 7.02 and concede that no negotiations about its meaning in this provision took place.  (Mem. at 7; Opp'n at 6.)  Nevertheless, even though there was "no specific negotiation concerning the word 'wilful' in Section 7.02" (Opp'n at 6; *see* Decl. of Robert I. Townsend, III, dated July 28, 2011, ("Townsend Decl."), ¶ 14), there *was* a negotiation concerning the word "wilful" in another provision – Section

---

[12]  Guidant argues that extrinsic evidence is not admissible to explain the meaning of "wilful" because the word, as used in section 7.02, "presents a patent, facial ambiguity" – as opposed to a "latent" ambiguity – the construction of which, Guidant contends, is a pure question of law for courts to decide.  (Mem. at 6.)  However, the Indiana Supreme Court has abandoned the distinction between "patent" and "latent" ambiguities and held that "it is proper to admit extrinsic evidence to resolve *any* ambiguity."  *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006) (emphasis added).

7.01(b)(i) – suggesting that the meaning of the term should apply consistently throughout the contract (Opp'n at 16–17).

Section 7.01(b)(i) provides each party with the right to terminate the Merger Agreement if the merger is not consummated by a date certain, with the caveat that this right to terminate "shall not be available to any party whose wilful breach of a representation or warranty in this Agreement or whose other action or failure to act has been a principal cause of or resulted in the failure of the Merger to be consummated on or before such date." (Townsend Decl. ¶ 15.) According to Robert Townsend of Cravath, Swaine & Moore LLP, who represented J&J in negotiating the Merger Agreement, he discussed with Guidant's counsel at Skadden, Charles W. Mulaney, "the insertion of the term . . . to address [Guidant's] concern that [it] not be precluded from terminating the agreement after a 'drop dead' date based on a breach resulting from its inadvertently providing inaccurate or incomplete information in a representation or warranty." (Townsend Decl. ¶¶ 2, 15; *see also* Gueli Decl. Ex. L ("Townsend Dep.") at 82:7–9 ("My recollection is that 'willful' was inserted in [section 7.01(b)(i)] as a means of . . . exclud[ing] out inadvertent breaches.").) And while Townsend did not recall any discussion with Skadden regarding what was meant by an "inadvertent" breach, he did remember that the parties "definitely discussed the problems with having [representations] and warranties be a trigger for [section 7.01(b)(i)], because it is possible, *with all good intent*, to have breaches of [representations] and warranties." (Townsend Dep. at 82:10–18 (emphasis added).) In other words, Townsend appears to have implicitly acknowledged that the parties understood the concept of "wilful breach" within

Section 7.01(b)(i) to require something more than mere *intentionality* – it required knowledge that breach would ensue. (*See* Reply at 3.)

Such an interpretation of "wilful" in Section 7.01(b)(i) is consistent with the recollection of Mulaney (Guidant's counsel at Skadden), who spoke with Townsend and testified that he told him that "the only circumstances under which [Guidant] should not be permitted to terminate the agreement when we hit the drop-dead date [are] where we've been a bad actor or acted inappropriately or intentionally engaged in conduct to prevent [J&J] from getting the benefit of the bargain." (Decl. of John Gueli Decl., dated Aug. 22, 2011, ("Gueli Decl. II"), Ex. M. at 61:12–18; *see also id.* at 62:19–21 ("[T]he point we wanted in the agreement was the ability to terminate on the drop-dead date unless we've been a bad actor.").) Although Townsend did not recall Mulaney making such a statement (Townsend Decl. at ¶ 15), he does not deny the conversation with Mulaney, and his own deposition testimony is consistent with Mulaney's explanation of the intended meaning of the term. Therefore, the Court credits Mulaney's testimony that the parties' understanding of the term "wilful" in Section 7.01(b)(i) included an element of knowledge that breach would ensue.

"[T]he general rule of contract construction presum[es] that words have the same meaning throughout the contract." *SCF Arizona v. Wachovia Bank, N.A.*, No. 09 Civ. 9513 (WHP), 2010 WL 5422505, at *6 (S.D.N.Y. Dec. 14, 2010) (internal quotation marks omitted); *see also Comm'r v. Lundy*, 516 U.S. 235, 250 (1996) (noting that the same rule of interpretation applies in statutory construction); *cf. Dep't of Treasury of Ind. V. Muessel*, 32 N.E.2d 596, 599 (Ind. 1941) ("[W]e have a rule of construction that the same word used in the same manner

in different places in the same statute is presumed to be used with the same meaning . . . ."). The Court sees no reason why this standard rule should not apply to the present contract. Accordingly, because the parties intended "wilful" within section 7.01(b)(i) to require acting with knowledge that a breach would ensue, as opposed to mere intentionality, the Court applies a consistent interpretation of the term throughout the contract and adopts Guidant's interpretation of the term "wilful" as used in Section 7.02.

## 2. Good-Faith Reliance

Having accepted Guidant's interpretation of the term "wilful," the Court turns to Guidant's next argument – that any breach by it could not have been "wilful" because it relied in good faith on the advice of its outside counsel, Skadden, in determining that Abbott was entitled to due diligence as a "Representative" of BSC within the meaning of the Merger Agreement. (Mem. at 13–17.) Specifically, Guidant argues that it reasonably relied on "Skadden's advice that Guidant could allow financing sources and third-party divestiture candidates to conduct due diligence." (Mem. at 15.) J&J does not directly challenge whether good faith reliance on counsel's advice can, as a matter of law, negate a finding of "wilfulness"; rather, it argues that there is a dispute of material fact as to whether Guidant reasonably relied on Skadden's counsel. (Opp'n at 18–20.)

In evaluating reasonable reliance, the Court need not find that counsel's advice was accurate for the breaching party's reliance to be reasonable. *See Eco Mfg. LLC v. Honeywell Int'l, Inc.*, No. 03 Civ. 0170 (DFH), 2003 WL 1888988, at *6 (S.D. Ind. 2003) ("The facts of consequence to the determination of a claim of willful infringement relate to the infringer's state of mind. Counsel's mental impressions, conclusions, opinions or legal theories are not probative of that state of mind unless they have been communicated to that client." (quotation marks omitted)). Similarly, in the patent context, "an opinion of counsel letter is an important factor in determining the willfulness of infringement," but that determination ultimately turns on the reasonableness of the infringer's belief that his conduct would be endorsed by a court. *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992) ("Rather, counsel's opinion must be thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable."); *cf id.* (noting that "intent and reasonable belief[] are the primary focus of a willful infringement inquiry").

In arguing that it reasonably relied on Skadden's advice in providing Abbott with due diligence at the end of December 2005, Guidant points to two written communications from Skadden and one oral conversation: (1) a December 7, 2005 email from Brian Duwe of Skadden to Kury; (2) a letter prepared by Skadden and signed by Kury on December 9, 2005, informing J&J that Guidant had concluded a confidentiality agreement with BSC; and (3) a conversation around this time between Mulaney and Kury. (*See* Mem. at 12–15; Reply at 4; Guidant's 56.1 Stmt. ¶ 26; Weinberger Decl. Ex. 6.) As an initial matter, Guidant notes that Skadden, which had negotiated the agreements between J&J and Guidant, prepared the initial draft of the BSC-GDT Confidentiality Agreement by "working from" the J&J-GDT Confidentiality Agreement. (Mulaney Decl. ¶¶ 2, 11.) In this draft, Skadden defined BSC's "Representatives" to include "financing sources" and "potential purchasers of assets to be divested" – terms that were not

included within the respective definitions of "Representative" in either the Merger Agreement or the J&J-GDT Confidentiality Agreement. (Gueli Decl. Ex. B § 4.02(a); Weinberger Decl. Ex. 5.) However, in the December 7, 2005 email from Duwe to Kury, to which the draft BSC-GDT Confidentiality Agreement was apparently attached, Duwe noted that it was BSC's mergers and acquisitions counsel, Shearman & Sterling (*see* Guidant's 56.1 Stmt. ¶¶ 25–26), who requested, among other things, that "Representatives" in the BSC-GDT Confidentiality Agreement be broadened to include potential divestiture parties. (*See* Weinberger Decl. Ex. 18.) The next line of the email read: "Ian [John] and Neal [Stoll, antitrust attorneys at Skadden] are OK with the addition to 'representatives' described and the other changes are fine with me." (*Id.*; *see also* Guidant's 56.1 Stmt. ¶ 26; BF ¶ 25.)

As for the second written communication, soon after Duwe's December 7 email, Skadden drafted a letter for Kury's signature advising J&J's general counsel, Russell Deyo, that the BSC-GDT Confidentiality Agreement was "consistent with [Guidant's] obligations under [the] Merger Agreement."[13] (Weinberger Decl. Ex. 6; Mulaney Decl. ¶ 16.) Kury signed the letter on December 9, 2005. (Weinberger Decl. Ex. 6.) Also in December 2005, although the precise timing is not clear, Mulaney advised Kury that it was appropriate for Guidant to provide Abbott with due diligence because it was –

"by way of its divestiture purchase" (Opp'n at 15) – "providing financing [for BSC]" and thus was covered as a "Representative" (Gueli Decl. Ex. E, Dep. of Charles W. Mulaney, Dec. 1, 2010, ("Mulaney Dep."), at 114:10–116:3). For his part, Kury, at his deposition, confirmed Mulaney's account of events, testifying that he asked Skadden whether the additions in the GDT-BSC Confidentiality Agreement were "all right" and that Skadden "assured [him] that they were." (Gueli Decl. Ex. F, Dep. of Bernard Kury, Aug. 19, 2010, ("Kury Dep. II"), at 255:9–256:9; *see also id.* at 266:4–13, 268:20–22 (noting that Kury "felt comfortable that Skadden had considered the question" and that he "was comfortable with their advice.").)

As J&J correctly notes, however, even if one accepts that the above-referenced communications did in fact occur, serious questions remain as to whether Guidant reasonably relied on the above letters and conversation in deciding to provide Abbott with the due diligence. As an initial matter, there seems to be good reason to question the idea that "financing sources" and "potential purchasers of assets to be divested" – which are included in the definition of "Representatives" in the BSC-GDT Confidentiality Agreement – are consistent with the J&J-GDT Confidentiality Agreement's definition of "Representatives" – which does not include "financing sources" or "potential purchasers of assets to be divested." As Judge Lynch found earlier in this case, "[Defendants] make various arguments as to how the word 'Representative' can be read to include Abbott, none of which are convincing." *J&J*, 525 F. Supp. 2d at 346. In analyzing the relevant texts, he concluded that "a divestiture party is too unlike the enumerated 'Representatives' to fall within any reasonable interpretation of that term. . . . [And] Abbott can no more be

---

[13] As noted above, the Merger Agreement permitted Guidant to furnish confidential business information in the event of a Takeover Proposal, which constituted or was likely to lead to a Superior Proposal. However, such disclosure had to be made pursuant to a confidentiality agreement "not less restrictive . . . than the confidentiality provisions of the [J&J-GDT] Confidentiality Agreement." (Weinberger Decl. Ex. 3 § 4.02(a).)

18

considered a representative by virtue of its loan to BSC than it can by virtue of its status as a divestiture party." *Id.* at 348–49. Indeed, Skadden's suggestion that the new agreement's definition of "Representatives" was no broader than the old one, while simultaneously recommending that these two new terms be added, is difficult to square. Put another way, why would these terms need to be added if they were already covered?

As to the December 7 email, there is likewise cause to question the reasonableness of Guidant's reliance on Skadden's conclusory approval of adding new terms to the definition of Representatives. First, Duwe's email – "Ian and Neal are OK with the addition to 'representatives' described and the other changes are fine with me" – does not indicate whether Skadden was "okay" with the changes solely from an antitrust perspective or from a contract one as well. In fact, at his deposition, Duwe testified that Ian John and Neal Stoll were both antitrust lawyers at Skadden and that he lacked any independent recollection as to whether he or any non-antitrust lawyer ever reviewed the additions to the term "Representatives" before sending the email to Kury. (Dep. Of Brian Duwe, Dec. 2, 2010, ("Duwe Dep."), at 27:3–29:8.) Kury also testified that while he assumed Duwe's email implied that Skadden had reviewed the changes against the Merger Agreement, he acknowledged that he did not know for sure whether Skadden had performed a specific analysis of that agreement. (Kury Dep. at 259:22–261:7.)

As for the December 9 letter that Skadden drafted for Kury to send to J&J, it also fails to provide any substantive analysis of the appropriateness of adding terms to the definition of "Representatives" or note for J&J the changes that it made; instead, the letter simply declared the new agreement to be "consistent with [Guidant's] obligations under [the] Merger Agreement." (*See* Weinberger Decl. Ex. 6.) Indeed, even after this lawsuit commenced, Kury did not demand a thorough explanation from Skadden of the analysis that led it to conclude that the inclusion of these terms, upon which it justified providing the due diligence to Abbott, conformed with Guidant's commitments to J&J. (Kury Dep. II at 268:9–12 ("I left it to Skadden . . . for the legal technical analysis. . . . I felt comfortable that Skadden had considered the question and I was comfortable with their advice."); *id.* at 278:9–12 ("I don't know that at the time I did a technical analysis as to just how it parsed out under the contract[.]   I was relying on Mr. Mulaney for that.").)   However, there is evidence suggesting that even weeks after the diligence was provided to Abbott, Kury still was not entirely comfortable with the basis for doing so.   In response to J&J's objection to Guidant's provision of diligence to Abbott, Kury sent Deyo an email that was drafted by Mulaney, dated January 23, 2006, defending its provision of diligence to Abbott as proper because their confidentiality agreement permitted sharing diligence with parties providing financing and "joint bidders." (Weinberger Decl. Ex. 16; *see also* Kury Dep. at 273:15–276:24; *id.* at 277:8–21 (characterizing Abbott as a "joint bidder").)   But shortly thereafter, Kury emailed Skadden asking, "But seriously folks, what is the technical analysis of whether [Abbott] is a bidder?" (Weinberger Decl. Ex. 17.)

Kury's skepticism was understandable, particularly in light of the circumstances surrounding Guidant's provision of diligence to Abbott. J&J notes that at the time the diligence was provided, Guidant and, in turn, Skadden, were under "tremendous pressure" to provide diligence

to Abbott. (Opp'n at 20.) The record bears this out. On December 20, 2005, BSC emailed Guidant to say that Abbott wanted to "proceed with their own due-diligence of [the assets in question] immediately" and it was "therefore imperative that you insist that the relevant [G]uidant personnel cooperate fully with [A]bbott so this due-diligence process can proceed successfully immediately." (Weinberger Decl. Ex. 8; BF ¶ 34.) Despite a Skadden attorney's email to Guidant on that same day, advising that "[t]here can be no third party [due diligence] until we have a signed [A]ccession [A]greement" (Weinberger Decl. Ex. 9), Kury emailed Skadden on December 21 stating that "[w]e are under tremendous pressure from [BSC] to accommodate [Abbott]" and "so let's do what we can without violating the AT [antitrust] constraints (reasonably interpreted) or otherwise shooting ourselves in the foot" (id. Ex. 10). Skadden responded, "[w]e understand and are responding accordingly." (Id.) At the very least, this chain of events shows the pressure Guidant felt to get the diligence to Abbott, and Skadden's commitment to act accordingly.

Shortly thereafter, Skadden told BSC that, in order for Abbott to receive the diligence, BSC and Abbott must sign an accession agreement stating that Abbott had "been retained by [BSC] . . . to *advise* it [in] connection with a potential transaction." (Dep. of Clare O'Brien, June 30, 2010, ("O'Brien Dep."), at 110:23–112:5; Weinberger Decl. Exs. 7 at GDT00133826, 12 at SA00106738; *see also* Opp'n at 9–10.) When Abbott protested that it was not BSC's "advisor," Skadden replied that this language was non-negotiable. (*See* Opp'n at 10; Dep. of Laura Gunther, Dec. 14, 2010, ("Gunther Dep."), at 113:15–114:1.) Notwithstanding its concerns, Abbott nevertheless signed the agreement as an "advisor," whereupon Guidant provided it

with the due diligence. (*See* Opp'n at 10; Guidant's 56.1 Stmt. ¶ 41.) Guidant then forwarded to J&J the diligence provided to Abbott with a cover letter stating that "[t]hese materials have been provided to [BSC] or their *advisors* in connection with their diligence review" (Weinberger Decl. Ex. 14 (emphasis added).) Significantly, Guidant did not refer to BSC or its "Representative," "financing source," or "potential purchasers of assets to be divested." (*See id.*)

In light of the above, the Court finds that material issues of fact exist – which must be resolved at trial – as to the reasonableness of Kury's reliance on Skadden's advice that Abbott was entitled to due diligence as BSC's "Representative" under the Merger Agreement. As mentioned earlier, the justification for adding financing sources and divestiture partners to the definition of "Representative" in the confidentiality agreement with BSC is far from obvious. In essence, Kury's reliance argument boils down to an assertion that Skadden told him that he could provide the diligence, without further explanation as to the reasons why, and that he trusted Skadden's advice. He neither received a written explanation of Skadden's basis for providing the diligence nor understood the "technical" reasons why this act was justified. *See Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, No. IP 99-38-C (H/K), 2001 WL 1397304, at *19 (S.D. Ind. Oct. 29, 2001) (noting that "[r]eliance on oral opinions of counsel is not favored . . . because they must be proved perhaps years after the event, based only on testimony which may be affected by faded memories and the forces of contemporaneous litigation," and finding patent infringement to be wilful despite alleged reliance on oral advice of patent counsel) (citation omitted); *id.* at *16, *26 ("A court presented with an opinion of counsel should review the opinion to

determine whether it shows an adequate foundation based on a review of all necessary facts or whether it is merely conclusory."); *McDermott v. Omid Int'l*, 723 F. Supp. 1228, 1233 (S.D. Ohio 1988) ("The issue of infringement was of sufficient importance that a prudent person would have requested a written opinion."). In light of Kury's experience, legal training, and awareness of Guidant's obligations to J&J, the Court is not prepared to find as a matter of law that his reliance on Skadden's advice under these conditions was reasonable. Such a determination will require assessments of credibility and the weighing of evidence, neither of which is appropriate at this stage of the proceedings. Accordingly, the Court finds that material issues of fact exist as to whether Guidant reasonably relied on Skadden's advice in deciding to provide the diligence to Abbott.

## C. Materiality

Guidant next contends that, even if it did wilfully breach the Merger Agreement, the breach was not material. As Judge Lynch rightly noted earlier in this litigation, "'[m]aterial,' unlike 'willful,' is a well-defined term in the law of contracts and in Indiana law. A material breach is one that goes 'to the very heart of the agreement.'" *J&J*, 525 F. Supp. 2d at 354 (quoting *City of Indianapolis v. Twin Lakes Enter., Inc.*, 568 N.E.2d 1073, 1080 (Ind. Ct. App. 1991)). The determination of "materiality" is a "complicated question of fact . . . [which] must be resolved with reference to the intent of the parties as evidenced in large part by the full circumstances of the transaction, thus making these issues especially unsuited to resolution by summary judgment." *Sahadi v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 706 F.2d 193, 196–97 (7th Cir. 1983) (citations omitted); *accord J&J*, 525 F. Supp. 2d at 354 (citing *Frazier v. Mellowitz*, 804 N.E.2d 796, 802 (Ind. Ct.

App. 2004); *Smith v. State Lottery Comm'n*, 812 N.E.2d 1066, 1073 (Ind. Ct. App. 2004)).

As noted above, in evaluating whether Guidant's breach was material, the Court must determine whether the breach went to the heart of the contract. "A reasonable factfinder could conclude that the heart of the [Merger] Agreement was a guarantee that Guidant would make no efforts to find a better deal than the one [J&J] offered." *J&J*, 525 F. Supp. 2d at 356. Indeed, the exception to the no-solicitation clause existed only to prevent Guidant from violating its directors' fiduciary obligation to its shareholders by rejecting a superior proposal. *Id.* at 356–57. Thus, because the purpose of the clause was to prevent "Guidant from sharing information with parties that had not expressed interest in making a bid . . . [, a]cting on a bidder's tip to provide information to a third party could be found inconsistent with the letter and spirit of that commitment." *Id.* at 357 (footnote omitted).

Guidant argues that any breach it may have committed was a "technicality at best" and "wholly tangential to the fundamental purpose of Section 4.02" because (1) Guidant did not solicit Abbott, and (2) Abbott made a qualifying Takeover Proposal or inquiry entitling it to due diligence. (Mem. at 17–18 (internal quotation marks omitted).) As to Guidant's first argument that it did not solicit Abbott, that fact alone is not sufficient to demonstrate that any breach was immaterial because section 4.02(a) prohibits more than mere solicitation – it prohibits facilitating a competing offer unless certain conditions are met. (*See* Weinberger Decl. Ex. 3 § 4.02(a).)

As to Guidant's second argument, Judge Lynch's opinion flagged a potentially

dispositive issue for summary judgment, explaining that "[if] there is an inquiry or communication constituting a Takeover Proposal by Abbott, [Guidant] will surely produce it and move for summary judgment in short order." *J&J*, 525 F. Supp. 2d at 357. As a preliminary matter, the definition of "Takeover Proposal" is unquestionably a broad one, encompassing "*any inquiry, proposal or offer from any person* relating to, or that could reasonably be expected to lead to, any *direct or indirect* acquisition or purchase, in *one transaction or a series of transactions*, of assets . . . or businesses that constitute 15% or more of the revenues, net income or assets" of Guidant. (Weinberger Decl. Ex. 3 § 4.02(a) (emphasis added).) There is also no dispute that Guidant's VI and ES businesses met the 15% threshold under that definition. (Guidant's 56.1 Stmt. ¶ 48.) Thus, as Judge Lynch explained, "as long as Abbott made an inquiry itself, and as long as it could lead to some entity acquiring more than 15% of the business, Guidant would have been allowed to give Abbott the due diligence." *J&J*, 525 F. Supp. 2d at 354 n.14.

In this vein, Guidant argues that Abbott's Accession Agreement qualified as a Takeover Proposal as defined in Section 4.02. J&J, however, points to significant evidence in the record showing that no one, including Guidant itself, viewed Abbott to be making a Takeover Proposal at the time the Accession Agreement was presented to Guidant. (*See* Opp'n at 20–24.) Indeed, Guidant itself concedes that the Accession Agreement was "a document conceived of for antitrust purposes." (Mem. at 18.) Similarly, BSC's outside counsel testified that BSC made the proposal to purchase Guidant and that it would then divest certain assets to Abbott; she was not aware of any proposal by Abbott made directly to Guidant, either jointly with BSC or on its own, to purchase any assets. (O'Brien Dep.

at 93–95.) Similarly, Laura Gunther, Abbott's in-house counsel, confirmed that Abbott held discussions only with BSC, not Guidant, about possibly purchasing the "the [VI] and [EV] solutions business of Guidant in connection with [BSC's] acquisition of Guidant as a whole." (Gunther Dep. at 32:11–16; Opp'n at 10.) Indeed, Gunther testified both that Abbott viewed itself as "the antitrust fix for [BSC's] proposed transaction" and that she was not "aware of any document that was styled as a proposal to acquire assets and was provided to Guidant by Abbott." (Gunther Dep. at 110:19–23, 216:7–9.) Therefore, it appears clear that at the time the diligence was provided to Abbott, nobody viewed (or even argued that) the justification for doing so was that Abbott had actually made a Takeover Proposal.

Notwithstanding those facts, Guidant's argument boils down to an assertion that the Accession Agreement, when viewed in the context of the BSC proposal, met the definition of a Takeover Proposal and thus *could have* justified the provision of diligence by Guidant to Abbott. (*See* Mem. at 18–20.) It may very well be that the Accession Agreement satisfied the elements of a Takeover Proposal in that it was an inquiry by a person relating to an indirect acquisition of assets that constituted at least 15% of Guidant's business and, if considered as part of BSC's proposal, had already been approved by Guidant's board of directors. However, the problem with Guidant's argument is that Section 4.02 does not simply provide an alternate route for providing diligence to a party; it also sets forth a scheme by which Guidant has certain obligations – obligations that Guidant failed to fulfill. Most importantly, upon Guidant's receipt of a party's Takeover Proposal, Section 4.02(c) obligated it to "*promptly* advise [J&J] orally and in writing . . . of . . . the material terms and conditions . . . and the

identity of the person making any such Takeover Proposal," as well as provide J&J "*as soon as practicable* after receipt or delivery thereof copies of all correspondence and other written material sent or provided to" Guidant. (Gueli Decl. Ex. B (emphasis added).)  The record is clear that Guidant did not provide such notice to J&J until two weeks later.  (*See* Mem. at 21.)  Guidant argues that this delay is immaterial because J&J was still able to engage in the "active bidding contest" with BSC, and "J&J is unable to identify anything it would have done differently had it known [two weeks earlier] that Abbott was the divesture buyer or was conducting diligence of Guidant."  (*Id.*)  However, this argument misses the point.  First, it is not only J&J that saw the disclosure of Abbott's identity as material; Abbott itself was insistent that its identity not be disclosed to J&J.  (*See* O'Brien Dep. at 79:18–80:19 (recalling that Abbott did not want its involvement disclosed before it became definitive because they feared it could threaten their relationship with J&J); Dep. of Lawrence J. Knopf, May 20, 2010, ("Knopf Dep."), at 104:20–105:7.)  Moreover, as explored more fully below, there is at least some evidence that there never would have been an "active bidding contest" if Guidant had disclosed Abbott's role to J&J before providing Abbott with the diligence that then allowed it to finalize its commitments with BSC.  (*See, e.g.,* Deyo Decl. ¶ 5.) Therefore, the Court finds that Guidant's post-hoc rationalization that it *could have* provided Abbott with the diligence pursuant to Section 4.02, especially where it did not perform any of the obligations required of it under that section, does not immunize it from a finding that its breach was material.

Accordingly, the Court finds that a reasonable factfinder could conclude that Guidant's breach of the contract by improperly providing Abbott with diligence

went to the heart of the contract and was thus a material breach.[14]

### D.  Causation

Finally, Guidant argues that even if the breach was wilful and material, summary judgment is still inappropriate because J&J cannot establish that the breach caused any of its alleged injuries.

To recover on a breach of contract claim, the alleged breach must be a "cause in fact of the plaintiff's loss."  *Fowler v. Campbell*, 612 N.E.2d 596, 601 (Ind. Ct. App. 1993); *see also Wright v. St. Mary's Med. Ctr. of Evansville, Inc.*, 59 F. Supp. 2d 794, 799 (S.D. Ind. 1999) ("To defeat a motion for summary judgment, the plaintiff must present evidence of probative value based on facts, or inferences to be drawn from the facts, from which a reasonable juror could conclude that, more likely than not, the defendant's wrongful act was a cause in fact of his injury.").  For a cause in fact to be a legal cause, it must have been "a substantial factor in bringing about the harm."  *Fowler*, 612 N.E.2d at 602 (explaining that the test of causation in common law contract actions is "not whether the breach was the only cause, or whether other causes may have contributed, but whether the breach was a substantial factor in bringing about the harm"); *accord Thor Elec., Inc. v. Oberle &*

---

[14] In a variant of its argument concerning the election of remedies, Guidant also contends that J&J's decision not to terminate the agreement upon learning of Guidant providing diligence to Abbott demonstrates that J&J could still gain value from the merger agreement and thus the breach could not be "material."  (*See* Mem. at 24–26.)  As J&J rightly argues, however, this seems to misconstrue the meaning of "material" as it is generally used in contract law, and it does not follow that a non-breaching party's decision to continue performing the contract necessarily means that the breach was not "material."  (*See* Opp'n at 24–26.)

*Assocs., Inc.*, 741 N.E.2d 373, 381 (Ind. Ct. App. 2000). "While there may be other contributing causes and more than one factor operating, the trier of fact may determine that one cause predominates over another in bringing about the harm." *Fowler*, 612 N.E.2d at 602. "[I]n a breach of contract action, where an injury arising from the breach may have resulted from multiple causes, Indiana does not recognize comparative causation." *Id.*

Guidant essentially argues that regardless of whether it provided the due diligence materials to Abbott, J&J still would not have been able to effectuate the takeover of Guidant at its initial bid of $63 per share, and therefore J&J cannot meet its burden of establishing that it was harmed by Guidant's breach.   (*See* Mem. at 28–30.) Specifically, Guidant argues that the $63 per share deal died upon BSC announcing its proposal on December 5 and the Guidant board deeming it potentially likely to lead to a superior proposal on December 7 – two weeks before any due diligence was provided to Abbott. (*Id.*; Reply at 13.) While Guidant's timing argument as to BSC's *making* of the proposal may be right, there is evidence in the record that BSC was not prepared to *effectuate* the proposal until after Abbott had received the due diligence. As Lawrence Best (BSC's chief financial officer) testified, BSC's board would not have carried out its proposal unless it had a "committed sign-on-the-dotted-line partner" (Best Dep. at 94:20–21), and Abbott was unwilling to make a firm commitment to the divestiture deal until it had reviewed the diligence materials (*see* Weinberger Decl. Ex. 8; John Dep. at 140:16–14:113; Best Dep. at 80:7–81:12; Opp'n at 9–11). Hence, without the provision of the diligence to Abbott, J&J may have very well ended up with an opportunity to close the deal at $63 per share. Although Guidant contends that BSC surely could have found another

divesture partner if Abbott did not commit, there is no evidence of this in the record. Rather, the evidence reflects that BSC was eager to get Abbott what it needed in order to commit to the deal.   Moreover, even if Guidant is correct that the $63 deal was dead after BSC's initial proposal, it is reasonable to think that Abbott's commitment to the divestiture deal – again, the result of Guidant's breach – emboldened BSC in making subsequent proposals in the bidding war with J&J. Thus, even if J&J could not have closed the deal at $63 per share, it may still have done so at a slightly higher price. Therefore, Guidant's breach appears to be a substantial factor in bringing about J&J's injury.   Accordingly, at the very minimum, there is a triable issue of fact as to causation. *See Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251, 267 (S.D.N.Y. 2003) (holding that summary judgment was not appropriate where there remained triable issues of fact as to "but for" causation).

## IV. CONCLUSION

For the reasons discussed above, Guidant's motion for summary judgment is denied.   Although the Court finds as a matter of law that the term "wilful" as used in the Merger Agreement is meant to require acting with knowledge that a breach would ensue, a trial is necessary to determine whether (1) Guidant's breach of the Merger Agreement was "wilful;" (2) the breach was material, *i.e.*, it went to the heart of the contract between the parties; and (3) Guidant's breach was a substantial factor in causing any harm suffered by J&J.

Accordingly, IT IS HEREBY ORDERED THAT the parties shall appear for a conference on August 8, 2014 in Courtroom 905 of the Thurgood Marshall Courthouse at 2:00 p.m. to set a trial date and a schedule for pre-trial submissions.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: July 7, 2014
      New York, New York

\*    \*    \*

Plaintiff Johnson & Johnson is represented by Harold Paul Weinberger and Joel Malen Taylor of Kramer, Levin, Naftalis & Frankel, LLP, 1177 Avenue of the Americas, New York, New York 10036.

Defendant Guidant Corporation is represented by Stuart Jay Baskin, Daniel Hector Rees Laguardia, and John Gueli of Shearman & Sterling, LLP, 599 Lexington Avenue, New York, New York 10022 and David Boies, II, and William S. Ohlemeyer of Boies, Schiller & Flexner LLP, 333 Main Street, Armonk, New York 10504.