UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHNSON & JOHNSON, a New Jersey Corporation,<br><br>   Plaintiff/Counterclaim Defendant,<br><br>  – against –<br><br>GUIDANT CORPORATION, an Indiana Corporation,<br><br>   Defendant/Counterclaim Plaintiff. | No. 06 Civ. 7685 (RJS)<br><br>Confidential Pursuant to Court Order dated February 26, 2008 |

## TRIAL TESTIMONY AFFIDAVIT OF NEAL R. STOLL



DEFENDANT'S
EXHIBIT
**DX0168**

## CONTENTS

1. Introduction ........................................................................................................................... 1
2. The Boston Scientific–Guidant Joint Defense Agreement ..................................................... 3
3. The Addendum to the BSC–GDT Confidentiality Agreement .............................................. 4
4. The Accession Agreement ..................................................................................................... 6
5. The Provision of Due Diligence to J&J ............................................................................... 11
6. Conversation with James Hilton and Eric Harris of J&J on January 6, 2006 ................. 12

i

**ABBREVIATIONS AND DEFINED TERMS**

| Abbott or ABT | Abbott Laboratories |
| --- | --- |
| Accession Agreement | Accession Agreement among Abbott, Guidant, and Boston, signed on or about December 22, 2005 |
| Addendum | Addendum dated December 18, 2005 to the BSC–GDT Confidentiality Agreement |
| BSC–GDT Confidentiality Agreement | Confidentiality Agreement dated December 7, 2005, between Boston and Guidant |
| Boston Scientific or BSX | Boston Scientific Corporation |
| DD | due diligence |
| DES | drug-eluting stent |
| ES | endovascular solutions |
| FTC | Federal Trade Commission |
| Guidant or GDT | Guidant Corporation |
| Highly Confidential Material | "Highly Confidential Material" as defined in the Addendum |
| J&J–GDT Confidentiality Agreement | Confidentiality Agreement dated August 4, 2004 between J&J and Guidant |
| J&J or JNJ | Johnson & Johnson |
| Merger Agreement | Amended and Restated Agreement and Plan of Merger among J&J, Shelby Merger Sub, Inc., and Guidant, dated as of November 14, 2005 |
| Skadden | Skadden, Arps, Slate, Meagher & Flom LLP |
| Superior Proposal | "Superior Proposal" as defined in the Merger Agreement |
| Takeover Proposal | "Takeover Proposal" as defined in the Merger Agreement |
| VI | vascular intervention |

ii

NEAL R. STOLL, being sworn, deposes and says:

1. I am a partner with the law firm Skadden, Arps, Slate, Meagher & Flom LLP. I received my J.D. degree from Fordham University in 1973, and joined Skadden in September 1973. I have been with Skadden since then, and became a partner in January 1981. I submit this affidavit based on my personal knowledge.

**1.  Introduction**

2. Throughout my career at Skadden, my practice has focused predominately on antitrust and trade regulation. Attached as Exhibit 1 to this affidavit is a true and correct copy of my profile from the Skadden website, which further details my professional activities and accomplishments.

3. I was the senior antitrust lawyer at Skadden involved in Skadden's representation of Guidant in connection with its December 15, 2004 merger agreement with J&J, its November 14, 2005 merger agreement with J&J, and its January 25, 2006 merger agreement with Boston Scientific. My representation of Guidant solely concerned antitrust issues, and I advised on issues associated with Guidant's merger discussions with J&J, Boston Scientific, and Abbott only from an antitrust perspective.

4. I advised Guidant on its obligations under the antitrust laws in connection with the provision of due diligence to Boston Scientific and Abbott, and I supervised the due diligence process to ensure that (i) Guidant's provision of due diligence to Boston Scientific and Abbott complied with the antitrust laws, and (ii) Guidant satisfied its obligation under the Merger Agreement to provide J&J with any due diligence provided to Boston Scientific or Abbott that had not previously been provided to J&J.

5. In general, the antitrust issues implicated by the due diligence process arose from the fact that Boston Scientific and Abbott were both competitors or potential competitors of Guidant with respect to certain of the products and businesses of Guidant that were to be a subject of due diligence. (*See generally* John Ex. 4 [Tab 1].) That Boston Scientific, and later Abbott, expressed an interest in acquiring certain of Guidant's businesses or assets provided a legitimate basis, from an antitrust perspective, for Guidant to share certain competitively sensitive information with them. Nevertheless, it was important that the specifics of any such sharing (*e.g.*, the information shared, the specific individuals with whom it could be shared, and the conditions under which it could be shared) were controlled and appropriately limited so as to ensure that Guidant's provision of due diligence complied with the antitrust laws. As indicated, much of my work on behalf of Guidant was focused on ensuring that Guidant's provision of due diligence to Boston Scientific and Abbott was done in a manner that was consistent with Guidant's obligations under the antitrust laws.

6. In its December 5, 2005 Takeover Proposal, Boston Scientific stated that, as part of its proposal, it would divest Guidant's VI and ES businesses to a third party (later identified by Boston Scientific to be Abbott), and that it intended to share with that third party rights to Guidant's DES program. (*See* Best Ex. 12 [Tab 2].) These aspects of Boston Scientific's Takeover Proposal were among the most important for purposes of analyzing and addressing the antitrust issues implicated by the due diligence process.

7. I was not involved in the drafting or negotiation of the J&J–GDT Confidentiality Agreement or Section 4.02 of the Merger Agreement. I did not provide advice to Guidant with respect to its rights or obligations under the J&J–GDT Confidentiality Agreement or Section 4.02(a) of the Merger Agreement, including with respect to whether or not Guidant was

permitted under the Merger Agreement to provide due diligence to Abbott in connection with Boston Scientific's unsolicited December 5, 2005 Takeover Proposal to Guidant. I understood that such matters were being considered by the Skadden corporate attorneys working on the transaction, including Charles Mulaney and Brian Duwe.

### 2. The Boston Scientific–Guidant Joint Defense Agreement

8. On December 7, 2005, the Guidant Board determined that Boston Scientific's Takeover Proposal was reasonably likely to lead to a Superior Proposal and, therefore, to proceed with negotiations and due diligence. Accordingly, on December 9, 2005, I met with Michael Sohn and Deborah Feinstein of Arnold & Porter, who were antitrust counsel to Boston Scientific. The purpose of the meeting was to discuss antitrust issues related to a proposed acquisition by Boston Scientific of Guidant and a divestiture of Guidant's VI and ES businesses.

9. During the course of that meeting, Guidant and Boston Scientific, through Skadden and Arnold & Porter, respectively, entered into an oral joint defense agreement. (*See* Stoll Ex. 3 [Tab 3].) I did not advise Guidant concerning whether it was permitted under the Merger Agreement to enter into a joint defense agreement with Boston Scientific, and I did not myself consider that question or discuss it, other than from an antitrust perspective, with members of Skadden's antitrust team, before entering into the joint defense agreement with Boston Scientific on behalf of Guidant. Further, I did not have a concern that doing so could be viewed as a violation of the Merger Agreement because joint defense agreements are a customary component of (and often a pre-condition to) discussions between parties to a proposed transaction that may present antitrust issues.

10. Throughout my 40-year career, I have consistently sought to ensure that a joint defense agreement is in place before the parties to a potential transaction that could implicate

3

antitrust issues engage in any discussion of antitrust-related matters. In doing so in connection with Boston Scientific's Takeover Proposal, I was following my usual practice, which in my experience is common and widely accepted among antitrust and transactional lawyers.

### 3. The Addendum to the BSC–GDT Confidentiality Agreement

11.     Boston Scientific and Guidant entered into a confidentiality agreement on December 7, 2005. (*See* Stoll Ex. 1 [Tab 4].) On December 18, 2005, Boston Scientific and Guidant entered into an Addendum to the BSC–GDT Confidentiality Agreement. (*See* Kury Ex. 21 [Tab 5].) The Addendum was prompted by and was intended to address antitrust concerns related to the due diligence process. Specifically, the BSC–GDT Confidentiality Agreement did not have detailed terms to manage the process of sharing Guidant's competitively sensitive information in areas in which Boston Scientific could be viewed as competing with Guidant. Such terms were necessary to ensure that Guidant's sharing of such information with Boston Scientific was done in a manner that was consistent with Guidant's obligations under the antitrust laws. Accordingly, the purpose of the Addendum was to set forth the specific terms under which Guidant would share competitively sensitive information with Boston Scientific.

12.     The Addendum provided for different treatment and review protocols for different categories of competitive material based on their degree of sensitivity. It also provided that Highly Confidential Material could not be shared with potential divestiture purchasers or their representatives without Guidant's prior written consent and execution of a confidentiality agreement satisfactory to Guidant. From my antitrust perspective, these terms were appropriate pre-conditions for a potential divesture purchaser's due diligence, and the Accession Agreement ultimately signed between Guidant and Abbott (see Section 4 below) was an appropriate

confidentiality agreement that permitted Guidant to make due diligence available to Abbott consistent with the antitrust laws.

13. The Addendum included a short-form accession agreement as Exhibit A. (*See* Kury Ex. 21 [Tab 5], at GDT 00133826.) This short-form accession agreement was similar to the form of accession agreement that we had used in past transactions as an expedient way for third parties or specific individuals that the transaction principals might want to involve in the due diligence process to be bound by confidentiality agreements in place between the principals.

14. In negotiations over the terms of the Addendum, Boston Scientific's counsel at Shearman & Sterling proposed, among other things, adding language that would have prohibited Guidant from disclosing the existence or name of any potential divestiture purchaser "to any person" without the consent of Boston Scientific and such divestiture purchaser. (*Compare* Stoll Ex. 12 [Tab 6] *with* Kury Ex. 18 [Tab 7] at GDT 00133889.) In an e-mail to Mr. John and others at Skadden, I wrote, "I would reject this proposed change. For example, we'd have to tell our advisors and potential consultants." (Stoll Ex. 14 [Tab 8].) I also discussed with Mr. John and Linda Cenedella (one of the Skadden antitrust associates working on the deal under my supervision) that a restriction on Guidant's ability to disclose the identity of a potential divestiture purchaser might hinder our ability to resolve issues relating to whether a divestiture candidate would be acceptable to the FTC.

15. From my perspective, this issue was resolved when it was agreed that Guidant would be able to make such disclosures to its "Representatives," as that term was defined in the BSC–GDT Confidentiality Agreement. (*See* John Ex. 5 [Tab 9] at GDT 00133844, -47; Kury Ex. 21 [Tab 5] at GDT 00133821, -23.) I did not analyze the question whether, under the Merger Agreement, Guidant was required to disclose to J&J the existence or name of potential

divestiture buyers, and I did not express any view on that subject. My (resolved) concerns regarding Shearman & Sterling's proposed edits to the Addendum related solely to antitrust considerations. I was not of the view and did not have a concern that the Addendum was in any way improper, and I am not aware of anyone at Skadden or Guidant ever expressing any such concern.

**4. The Accession Agreement**

16. On or about December 20, 2005, I learned that Boston Scientific had selected Abbott as the divestiture buyer. (*See* Duwe Ex. 5 [Tab 10].) To my knowledge, no one from Skadden or Guidant had any involvement in negotiating with or soliciting Abbott as a potential divestiture buyer, and the first communications between Guidant or Skadden with Abbott relating to a potential divestiture transaction did not take place until after Boston Scientific identified Abbott to Guidant as the divestiture candidate. (*See* Knopf Ex. 29 [Tab 11].)

17. Because the Skadden antitrust lawyers understood that Abbott would want to perform due diligence on Guidant's VI and ES businesses before a definitive purchase agreement was signed, we prepared a set of proposed due diligence "ground rules" to be followed for such diligence. (*See* Kury Ex. 71 [Tab 12]; DX0057 [Tab 13]; DX0058 [Tab 14].) Among other things, we proposed that Abbott sign the accession agreement to the Addendum before it was provided with any due diligence. (Kury Ex. 30 [Tab 15] at BSC 00108502.) The proposed ground rules, including the requirement that Abbott sign the accession agreement to the Addendum, were entirely driven by antitrust considerations – namely, to ensure that the provision of competitively sensitive VI and ES information to Abbott (or any other potential competitor) would not violate Guidant's obligations under the antitrust laws. These ground

6

rules, including the requirement that third-party buyers and their advisors execute the accession agreement, were not related to or motivated by Section 4.02(a) of the Merger Agreement.

18.     The accession agreement referred to in the proposed ground rules was the short-form accession agreement – Exhibit A to the Addendum.  As explained in paragraph 13 above, Exhibit A was a form document intended to provide an expedient way to enable the principals to a transaction to involve third parties in the due diligence process.  By signing the short-form accession agreement, the third party was agreeing to abide by the confidentiality and other restrictions in the Addendum.  Given the time that had gone into negotiating the Addendum and the fact that it carefully detailed how competitively sensitive information would be shared with Boston Scientific, I was comfortable that sharing information with a third party who agreed to the confidentiality and other restrictions in the Addendum would satisfy Guidant's obligations under the antitrust laws.  Accordingly, I would have been comfortable in allowing Abbott to perform VI and ES due diligence if it had signed the short-form accession agreement.

19.     Abbott, however, was unwilling to sign the short-form accession agreement.  (*See* DX0059 [Tab 16].)  Although it would have been acceptable from an antitrust perspective to allow Abbott to proceed with due diligence without an accession agreement in place and instead do so pursuant to a letter of the type that Mr. John e-mailed to Mr. Kury on December 22, 2005 (*see* DX0060 [Tab 17]), I was of the view that a signed accession agreement provided greater antitrust protections and, accordingly, allowed Abbott to propose a mark-up of the short-form accession agreement.

20.     As noted in paragraph 12 above, I viewed the Accession Agreement as a confidentiality agreement that would ensure that Guidant's provision of due diligence to Abbott complied with the antitrust laws.  I did not analyze the question whether, under the Merger

7

Agreement, Guidant was permitted to enter into the Accession Agreement or was required to disclose its existence to J&J, and I did not express any views on those subjects. I myself did not consider the Accession Agreement to be improper in any way, and am not aware of anyone within Skadden or Guidant ever expressing any such concern.

21. On December 12, 2005 – before Skadden or Guidant had learned that Abbott would be the divestiture buyer and (naturally) before Abbott had executed the Accession Agreement – I received an e-mail from Alison Rhoten (a member of Mr. Mulaney's team):

> [Boston Scientific] seems to be pushing to get confidentiality agreements signed up with potential acquirors of the divested VI and ES businesses. Should this process be starting now, or is it more preferable to wait until [Guidant] has a signed agreement with [Boston Scientific] before providing such competitively sensitive information to potential acquirors? Please let me know your thoughts.

I replied:

> [Boston Scientific] can start negotiating such agreements, however, due diligence will not begin until there is a definitive [merger agreement] btw [Boston Scientific] and [Guidant].

(Kury Ex. 68 [Tab 18].)

22. My statement in this December 12 e-mail did not relate to the question of whether, under the Merger Agreement, a potential acquirer of Guidant's VI and ES assets could conduct due diligence before a definitive agreement was signed by Guidant and Boston Scientific. Rather, my statement was based on two considerations: (i) the FTC would not have been pleased if GDT had allowed essentially "carte blanche" due diligence where firms that may have simply been fishing for information were allowed access to competitively sensitive information related to assets that ultimately would be acquired by another party, and (ii) if highly

8

sensitive information were revealed to other parties, the ultimate buyer of the divested assets might consider them to be less valuable.

23. The more concrete the identity of the divestiture buyer, the less concerned I was that permitting the divestiture buyer to conduct due diligence prior to the signing of a definitive agreement between Boston Scientific and Guidant would present such issues. Accordingly, once Boston Scientific identified Abbott as its preferred divestiture candidate, and once Abbott signed the Accession Agreement, I was comfortable that Guidant could permit Abbott to conduct due diligence on Guidant's VI and ES assets.

24. By way of illustration, shortly before learning Abbott's identity as the divestiture buyer, on the afternoon of December 20, 2005, I received an e-mail from Ms. Cenedella:

> John Lapke received call from Larry Best ([Boston Scientific's] CFO) and Larry [Knopf] from [Boston Scientific] Legal this afternoon. They told John that they are close to signing deal with a third party that "has no VI business but want to get into DES." John [Lapke] has surmised it to be ABT; [John] Capek is not so sure. In any case, Larry Best told Lapke that he wanted a management overview for the unidentified third party tomorrow in Santa Clara. Is this something that [Arnold & Porter] knows about? Do we need to set any ground rules? Why is Larry Best calling GDT directly? [By the [w]ay, John mentioned they ([Boston Scientific]) don't like us (apparently, we're too conservative on the information exchange)]

I replied and added some additional addressees to the e-mail thread:

> All
>
> This is getting out of hand. There can be no third party VI DD until we have a signed accession agreement and know the identity of the third party. If [it's] ABT, my earlier email sets forth the ground rules for their initial due diligence. I'm about to circulate a more detailed DD memorandum. (Working draft is attached.)
>
> Bottom line, [Boston Scientific] is using as leverage our strategy to maximize our position relative to JNJ's rights under the merger agreement

9

> and not breach any negative or other covenants by taking control of, and excluding Skadden from, the DD process.
>
> This is going too fast and is unnecessary. Please consider my comment regarding the importance of having a deal with [Boston Scientific], prior to allowing in depth third party DD.

(Kury Ex. 71 [Tab 12].)

      a.     As this e-mail shows, my antitrust-driven preconditions to providing due diligence information to a divestiture buyer were "a signed accession agreement" and "know[ing] the identity of the third party."

      b.     My concern at this time, as I explain in this e-mail, was that I perceived that Boston Scientific may have been trying to move "too fast" and "exclud[e] Skadden" from the due diligence process. As Ms. Cenedella described it in her e-mail, I perceived that Boston Scientific considered Skadden "conservative on the information exchange." Along these same lines, I received an e-mail from Mr. Kury on December 21, 2005, stating: "We are under tremendous pressure from BSX to accommodate [Abbott] so let's do what we can without violating the AT [*i.e.*, antitrust] constraints (reasonably interpreted) or otherwise shooting ourselves in the foot." (Kury Ex. 70 [Tab 19].) This was far from the first time in my experience that a party expressed eagerness to receive due diligence information as soon as possible. No amount of "pressure" from a party seeking information would cause me to allow the integrity of an information-exchange process to be compromised, and I do not believe that the integrity of the information-exchange process was compromised in any way in this case.

      c.     My December 20 reply to Ms. Cenedella's e-mail refers to "our strategy to maximize our position relative to JNJ's rights under the merger agreement and not breach any negative or other covenants" – this reflects my awareness at the time that Guidant

10

was determined to "not breach any negative or other covenants" in the Merger Agreement. But I had no involvement in making the determinations as to whether any particular action was or was not a breach of those "negative or other covenants" in the Merger Agreement.

   d. My December 20 reply to Ms. Cenedella's e-mail also refers to "the importance of having a deal with [Boston Scientific], prior to allowing in depth third party DD." While I viewed it as preferable from an antitrust perspective to have a deal in place prior to allowing due diligence by divestiture buyers, and expressed that view numerous times, I did not consider it an absolute requirement.

  25. I understand that J&J has taken issue with the statement in the Accession Agreement preamble that Abbott had been "retained by Boston Scientific to advise it in connection with a potential transaction." From my perspective, this language was not important. What was important to me from an antitrust perspective was that Abbott was agreeing to be bound by the Addendum (as modified with respect to Abbott under the Accession Agreement), meaning that Guidant could provide Abbott with VI and ES due diligence consistent with its obligations under the antitrust laws. That was the beginning and the end of my concern and analysis with respect to the Accession Agreement. Accordingly, I was not concerned about the issue raised in Clare O'Brien's December 23, 2005 e-mail about the characterization of Abbott in the Accession Agreement (*see* Duwe Ex. 9 [Tab 20]), and do not recall giving the matter any consideration.

## 5. The Provision of Due Diligence to J&J

  26. As noted above, I was aware of Guidant's obligation under the Merger Agreement to provide J&J with any due diligence provided to Boston Scientific or Abbott that had not

previously been provided to J&J, and I oversaw the Skadden antitrust attorneys who were involved in the process of assisting Guidant to satisfy this contractual obligation to J&J. In connection with doing so, I did not consider whether Guidant had an obligation to inform J&J what information it was providing or had previously provided to Abbott as distinct from Boston Scientific, and did not myself make any such distinction.

### 6. Conversation with James Hilton and Eric Harris of J&J on January 6, 2006

27. On January 6, 2006, Mr. John and I participated in a conference call with James Hilton, J&J's associate general counsel, and Eric Harris, an antitrust attorney at J&J. Mr. Hilton commented during the conversation that he thought Boston Scientific's divestiture buyer was Abbott, to which we referred by the code name "Apple." (Harris Ex. 12 [Tab 21].)

_____
NEAL R. STOLL

Sworn to before me this
9th day of October 2014

_____
Notary Public

GEORGE PERKINS
Notary Public, State of New York
No. 01PE6091495
Qualified in Queens County
Commission Expires 4/28/2015

12

# Exhibit 1



| | Enter keyword | Search |

**View Folder (0)**
Email a collection of pages

| The Firm | Insights | Practices | Professionals | News | Diversity & Inclusion | Citizenship | Alumni | Careers |

Home / Professionals / Neal R. Stoll

# Neal R. Stoll

Back to Results

New Search



**Partner**
Antitrust and Competition
**New York**
T: 1.212.735.3660
F: 1.917.777.3660
**neal.stoll@skadden.com**
Download vcard

- Add to Folder
- Print
- Share
- Download PDF

**Related Practices**
Antitrust and Competition
Litigation

**Publications**
"Revised HSR Thresholds to Become Effective February 24, 2014"
*Skadden, Arps, Slate, Meagher & Flom LLP*

"Revised HSR Thresholds Announced"
*Skadden, Arps, Slate, Meagher & Flom LLP*

View All ›

Neal R. Stoll represents clients in connection with investigations conducted by the staff of the U.S. Department of Justice, Antitrust Division; Part 2 investigations conducted by the staffs of the Federal Trade Commission's Bureau of Competition and Bureau of Consumer Protection; and Part 3 administrative proceedings and appeals. He also has federal trial and appellate experience in cases involving monopolization, distribution practices, the Robinson-Patman Act and acquisitions.

Mr. Stoll counsels clients on antitrust issues stemming from mergers and acquisitions. For example, he represented BlackRock, Inc. in its $20 billion acquisition of Barclays Global Investors; Chevron Corporation in its $4.3 billion acquisition of Atlas Energy Inc.; Ecolab Inc. in its $8.1 billion acquisition of Nalco Holdings Company; Pactiv Corporation in its $6 billion acquisition by Reynolds Group Holdings Limited; CF Industries Holdings Inc. with its exchange offer for Terra Industries Inc. and CF Industries Holdings Inc. regarding Agrium Inc.'s unsolicited exchange offer; The Coca-Cola Company in its proposed acquisition of China Huiyuan Juice Group Limited; M&F Worldwide Corp. in its acquisition of John H. Harland Company; The May Department Store Company in connection with its merger with Federated Department Stores, Inc.; Guidant Corporation in connection with its proposed acquisitions by Johnson & Johnson and Boston Scientific; Caesars Entertainment, Inc. in connection with its merger with Harrah's Entertainment, Inc.; and TRW Inc. in connection with its merger with Northrop Grumman Corporation. He also was lead counsel in *United States v. The Gillette Company* (acquisition of Parker Pen Ltd.), and *United States v. Rank Organisation Plc* (acquisition of Deluxe Film Laboratories). In addition, he has handled the antitrust matters relating to acquisitions and dispositions for The Milton Hershey Trust, MacAndrews & Forbes Group Incorporated, Revlon Group Incorporated and Ball Corporation.

Mr. Stoll also advises corporate clients on other antitrust and consumer protection matters, including compliance programs and advice regarding the implementation of proposed business plans. He has advised a number of consumer product companies in connection with the implementation of marketing and promotional business plans.

Mr. Stoll has lectured for the Practicing Law Institute, the New York State and City Bar Associations, and has co-authored a treatise and more than 360 articles on antitrust and trade regulation matters. He repeatedly has been included in *The Best Lawyers in America* and *Chambers USA: America's Leading Lawyers for Business*. In addition, he was selected for inclusion in *Leaders in Their Field 2006*.

**News**
*The American Lawyer* Honors Skadden's Litigation Practices

**Search for a Professional**
| Enter Keyword | Search |

**Bar Admissions**
New York

**Education**
J.D., Fordham University, 1973 (Member, *Fordham Law Review*)
B.A., Pennsylvania State University, 1970

CONNECT WITH US  


See what's new with Skadden alumni.
**TAKE A LOOK ›**

| THE FIRM | PRACTICES (cont.) | DIVERSITY & INCLUSION | CITIZENSHIP |
|---|---|---|---|
| History | Industry-Related | Recruiting a Diverse Group | Pro Bono Activities |
| Offices | Regional | Attorney Development and Retention | **ALUMNI** |
| Rankings | Pro Bono | Affinity Groups | |
| **INSIGHTS** | **PROFESSIONALS** | Women's Initiatives | **CAREERS** |
| **PRACTICES** | **NEWS** | Work/Life Resources and Benefits | Attorneys |
| Corporate | Events | Pipeline Into the Profession | Legal Assistants |
| | | | Support Staff |

Litigation
Regulatory/Legislative

*FACETS* Newsletter
Diversity Committee

© 2014 Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates   Home   |   Contact Us                    Disclaimer   |   Attorney Advertising