UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHNSON & JOHNSON, a New Jersey Corporation, | No. 06 Civ. 7685 (RJS) |
| Plaintiff/Counterclaim Defendant, | Confidential Pursuant to Court Order dated February 26, 2008 |
| – against – | |
| GUIDANT CORPORATION, an Indiana Corporation, | |
| Defendant/Counterclaim Plaintiff. | |

**TRIAL TESTIMONY AFFIDAVIT OF JAMES A. STRAIN**



DEFENDANT'S EXHIBIT

DX0169

# TABLE OF CONTENTS

I. **Professional Background** ....................................................................................... 1

    A. Education and Employment History .................................................................1

    B. Practice History in Indiana.............................................................................2

II. **Summary** ................................................................................................................ 5

    A. Skadden's Advice to Guidant Was Consistent with Custom and Practice .........6

    B. Guidant's Reliance on the Advice of Skadden and Mr. Mulaney Was
       Reasonable ....................................................................................................11

III. **Indiana Business Corporation Law**.....................................................................  12

IV. **Chronology of Events** ......................................................................................... 14

    A. The First J&J–Guidant Merger Agreement ...................................................14

    B. J&J Renegotiates the First Merger Agreement ...............................................17

    C. The Second J&J–Guidant Merger Agreement ................................................18

    D. Boston Scientific's Proposal ..........................................................................18

    E. Abbott's Involvement ....................................................................................20

    F. Boston Scientific, Abbott, and Guidant Reach Definitive Agreement .............21

    G. Increasing Proposals for Guidant ..................................................................21

    H. Termination of the Second J&J–Guidant Merger Agreement ..........................23

V. **Analysis** ............................................................................................................... 23

    A. Guidant's Provision of Due Diligence Information to Abbott Was
       Consistent with Custom and Practice (Merger Agreement Section 4.02) ........23

    B. Guidant Reasonably Relied on the Advice of Skadden and Mr. Mulaney ......29

## ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| Abbott | Abbott Laboratories |
| Bank of America | Bank of America, N.A. |
| BSC | Boston Scientific Corporation |
| Conor | Conor MedSystems, Inc. |
| Cordis | Cordis Corporation |
| D&O | Directors' and Officers' |
| Guidant | Guidant Corporation |
| IBCL | Indiana Business Corporation Law |
| J&J | Johnson & Johnson |
| Merger Agreement | Amended and Restated Agreement and Plan of Merger among J&J, Shelby Merger Sub, Inc., and Guidant, dated as of November 14, 2005 |
| Merrill Lynch | Merrill Lynch & Co. |
| Skadden | Skadden, Arps, Slate, Meagher & Flom LLP |

JAMES A. STRAIN, being sworn, deposes and says:

## I.      PROFESSIONAL BACKGROUND

1.      After working as a lawyer in Chicago, New York City, and Washington, D.C., I returned to Indiana to practice law in September of 1973.  My principal areas of concentration have been mergers and acquisitions, both hostile and friendly, public company securities matters, and corporate governance.  In my practice, I have represented hostile bidders, takeover targets, merger parties, and acquisition parties.  I have been in situations where I advised boards of Indiana public companies with respect to intervening bids in negotiated mergers as well as strategy in making an intervening bid.  In short, in representing Indiana public companies, I have been in a situation similar to the one that Mr. Mulaney found himself in representing Guidant when BSC intervened in the negotiated transaction between Guidant and J&J.

### A.      Education and Employment History

2.      I received a BA in Economics at Indiana University – Bloomington in 1966.  I then went to law school at the Indiana University School of Law – Bloomington, graduating *cum laude* and Order of the Coif in 1969.  Between my second and third years of law school, I was a summer associate at Cahill, Gordon & Reindel, in New York City.  My first year out of law school, I was an instructor in law at the Indiana University School of Law in Indianapolis, including teaching a section on corporate law.

3.      During the term 1970-71, I was a law clerk for the Honorable John S. Hastings, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.  Following my clerkship with Judge Hastings, I returned to Cahill as an associate, splitting my time between corporate practice and litigation.

4.      When the Honorable William H. Rehnquist, Associate Justice, United States Supreme Court, was appointed, he hired me as one of his first full-term law clerks for the October Term 1972.  Before starting that job, I returned to the Indiana University School of Law – Bloomington as an adjunct professor in constitutional law for the summer term, 1972.

5.      Upon completion of my clerkship with Justice Rehnquist, I came back to Indianapolis, first as an associate and then as a partner in Barnes & Thornburg (then Barnes, Hickam, Pantzer & Boyd).  I became a partner at Barnes & Thornburg on January 1, 1976, and stayed there until March 15, 1996.  During my last several years at Barnes & Thornburg, I was the chair of the Business Department.

6.      On March 18, 1996, I started with the predecessor to my current firm, Sommer & Barnard PC.  Again, I was chair of the Business Department.  On May 1, 2008, Sommer & Barnard PC merged into Taft Stettinius & Hollister LLP, and since that merger, I have been a partner and a co-chair (with one of my Cincinnati partners and now, with one of my Chicago partners, as well) of the Business & Finance practice group of Taft.

7.      Beginning in the mid-1980s, I was also an adjunct professor at the Indiana University School of Law – Bloomington, initially teaching a mergers and acquisitions seminar. I did that on and off for many of the years between the mid-1980s and the spring term of 2007. In the last ten years of that period, my teaching alternated annually between a corporate finance course and a mergers and acquisition course.

### B.      Practice History in Indiana

8.      My practice is concentrated in advising public companies, primarily those organized under Indiana law, regarding mergers and acquisitions, takeover defense, securities law, and corporate governance.  My practice has been concentrated on these matters since

approximately 1975, when I was involved in my first hostile tender offer on the acquirer's side. In addition to representing public companies, I have advised private companies and individuals in corporate law and corporate governance, securities law, securities law compliance, and mergers and acquisitions. The kinds of transactions in which I have been either the lead, co-lead or local counsel have included straight mergers, hostile takeovers (on either side), going-private transactions (both with and without liquidity events), asset acquisitions, share purchases, public offerings, and freeze-out transactions. While most of these transactions have involved Indiana-chartered companies, some have involved companies with charters from Delaware and a handful of other states.

9.      In 1984, the Indiana Corporate Law Study Commission undertook to update the Indiana corporate statutes. An *ad hoc* group of practitioners representing public companies were invited to aid in that effort by focusing on concerns peculiar to public companies chartered in Indiana. The effort intensified in 1985 when *Smith v. Van Gorkom* was decided by the Delaware Supreme Court and D&O liability insurers ceased writing insurance in Indiana.

10.     As a member of that *ad hoc* group, I was a significant contributor to the language and concepts that ended up as the Indiana Business Corporation Law, particularly as they relate to public companies. I was the architect of some of the provisions of the law that are the subject of the proceedings between J&J and Guidant. Specifically, I was largely responsible for the provisions codifying the business judgment rule in Indiana and limiting the liability of directors except in situations where they both breached their duties and acted with reckless disregard or engaged in willful misconduct. Those kinds of provisions were necessary because (1) Indiana's courts historically have not recognized degrees of negligence, and (2) there was a need to get insurers to write D&O liability insurance again for Indiana corporations.

3

11.     Up until the passage of the IBCL, the Indiana courts would look to the Delaware courts for guidance on how the Indiana General Corporation Law should be interpreted.  Thus, when the IBCL was drafted, the Study Commission and the group of *ad hoc* advisers were at great pains to establish that Indiana's corporate law was not Delaware's corporate law, and that the interpretations of the IBCL were to be guided by both the statutory language and the Official Comments that were passed by the Indiana General Assembly for interpretive purposes, rather than by a court's view of equity.  The statute expressly states, contrary to the prior rule, "Certain judicial decisions in Delaware and other jurisdictions, which might otherwise be looked to for guidance in interpreting Indiana corporate law . . . are inconsistent with the proper application of the business judgment rule under this article."  Ind. Code § 23-1-35-1(f).  There are many provisions in the IBCL that are obviously "not Delaware," including several that are implicated in this matter, which are discussed in Part III below.  Although the Indiana General Assembly normally eschews legislative history, with respect to the IBCL, it adopted "official comments" which could be consulted by the courts to determine the "underlying reasons, purposes, and policies" of the IBCL and which could be "used as a guide in its construction and application."  Ind. Code § 23-1-17-5.  This, too, was a "not Delaware" provision intended by the legislature to reaffirm that it was setting the corporate law policy for Indiana.

12.     In 1986, shortly after the IBCL was passed by the Indiana legislature, signed by the governor, and put into effect, I was engaged in fighting a hostile partial tender offer on behalf of one client and working on a management-led leveraged buy-out on behalf of another.  The former engagement resulted in a holding by the court in the Northern District of Illinois that the Indiana Control Shares Acquisition Chapter was unconstitutional, a judgment the Seventh Circuit affirmed.  Representing CTS Corporation, I was the lawyer in charge of the appeal of the

Seventh Circuit's ruling to the United States Supreme Court.  The Supreme Court noted probable jurisdiction in the fall of 1986 and set argument for early March 1987.  I argued the case on behalf of CTS Corporation, and on April 21, 2007, the Supreme Court, in a 6-3 decision upheld the constitutionality of the Indiana statute, reversing the Seventh Circuit.  Not only did the Supreme Court uphold the constitutionality of the Control Shares Acquisition Chapter, it also reaffirmed the rights of the several states to enact the corporate governance rules applicable to corporations chartered under their respective laws, even for publicly-held corporations.

13.    Throughout my career, I have been engaged to advise boards of directors of Indiana public corporations regarding their rights and obligations, as well as the liabilities attendant to their positions.  In addition, I have advised general counsel and executive officers about the corporate governance, anti-takeover, and liability portions of the IBCL.  The transactions have ranged in size from a few million dollars to $40 billion.  Most of the public company transactions in which I have been engaged since about the mid-1980s have involved "non-solicitation/non-facilitation" covenants with fiduciary outs, bust-up fees, and, on occasion, reverse bust-up fees.

## II.    SUMMARY

14.    On March 9, 2011, I submitted my expert report in this matter.  In my report, based on my knowledge and experience as an Indiana attorney representing clients in public company mergers and acquisitions involving Indiana corporations, and after considering numerous documents and testimony, I reached, among others, the following conclusions:

a.    The advice given by Skadden and specifically Skadden partner Charles Mulaney to the Guidant Board of Directors and officers in connection with its investigation of the BSC "Takeover Proposal" was consistent with the custom and

practice in Indiana of making a "reasonable investigation" into unsolicited acquisition inquiries consistent with provisions such as Section 4.02 of the Merger Agreement.

      b.     An experienced Indiana mergers and acquisitions lawyer would have advised the Guidant Board of Directors or its officers that they were acting in good faith under Indiana Business Corporation Law in relying on the advice given by Skadden and Mr. Mulaney.  (*See* Ind. Code § 23-1-35-1(c).)

      c.     No experienced Indiana mergers and acquisitions lawyer would have advised the Guidant Board or its officers that following the Skadden advice under the circumstances that it was provided constituted willful misconduct or recklessness.

In this affidavit, I reaffirm those opinions.

**A.     Skadden's Advice to Guidant Was Consistent with Custom and Practice**

      15.     Because the focus of the Indiana Business Corporation Law and the director protections built into the IBCL require directors to form a "reasonable belief" that their actions are in the "best interests of the corporation," Ind. Code § 23-1-35-1(a)(3), and to conduct a "reasonable investigation," Ind. Code § 23-1-35-1(g), it is the custom and practice of lawyers advising the boards of directors of Indiana public corporations with respect to unsolicited acquisition inquiries to advise the company to follow a thorough process in determining whether to take action and what that action should be as a means of both fulfilling the directors' obligations and availing themselves of the "conclusive presumption" protection contained in subsection (g).

      16.     The Merger Agreement had built into its non-solicitation/non-facilitation covenant the ability of the Board of Directors of Guidant to follow a process to determine whether a "Takeover Proposal" was reasonably likely to lead to a "Superior Proposal."  The

contract did not require the "Takeover Proposal" to be fully financed.  The contract did not exclude the person making a "Takeover Proposal" from utilizing a divestiture at any point in time for financing or regulatory purposes.  Indeed, the contract contemplated that such a "Superior Proposal" could be constituted by multiple transactions.  The custom and practice of lawyers advising a public company recipient of a Takeover Proposal about Indiana law would be to (i) advise the Board of Directors of Guidant that, given the language of the Merger Agreement, it was their fiduciary obligation to follow a thorough process to determine what was in the best interests of the corporation in light of the qualifying "Takeover Proposal" and (ii) advise the Board of Directors of Guidant to follow a thorough process to determine whether the "Takeover Proposal" made by BSC was reasonably likely to lead to a "Superior Proposal" until such time as the Board determined that the Takeover Proposal would not lead to a Superior Proposal.

17.    Non-solicitation/non-facilitation covenants are typically designed to provide the directors of a publicly held corporation the opportunity to explore potential transactions that might be better for the corporation than a transaction that had not yet been approved by that corporation's shareholders, but to balance that interest against the desire of the acquiring company not to be a "stalking horse."  For that reason, directors and other representatives of the acquired corporation are not prohibited from providing information altogether, but they are prohibited from soliciting offers or providing information indiscriminately in response to an unsolicited offer.  The potential rival suitor or suitors must present a serious written proposal that is capable of being turned into a superior proposal for the company, and the initial acquirer typically negotiates for the time and opportunity to match or exceed that superior proposal.

18.     As a matter of custom and practice in Indiana, once Guidant received the
"Takeover Proposal" from BSC, an experienced merger and acquisition Indiana lawyer would
have provided to the board of directors of a public company the same process advice that
Skadden provided, especially given the language of the non-solicitation/non-facilitation covenant
and given that the Guidant Board of Directors determined that the BSC proposal was reasonably
likely to lead to a higher price for Guidant and its shareholders.

19.     According to the Merger Agreement, the Board could authorize the execution of a
"customary confidentiality agreement" not less restrictive than the "confidentiality provisions" of
the confidentiality agreement between J&J and Guidant.  The custom and practice of a lawyer
advising about Indiana law would be to advise the Board of Guidant to enter into such a
confidentiality agreement with BSC and supply it information pursuant to such agreement
because the Board had a fiduciary obligation to act in the best interests of the corporation to
determine whether BSC's "Takeover Proposal" could reasonably lead to a "Superior Proposal."

20.     As a matter of custom and practice in Indiana, the confidentiality agreement that
Skadden advised Guidant to execute with BSC was appropriate because, among other things,
(a) the Merger Agreement allowed for the execution of a "customary confidentiality agreement,"
not only one that was identical to J&J's, (b) the Merger Agreement did not preclude the Board
from considering a "Takeover Proposal" that was not fully financed or that might have antitrust
issues, (c) J&J, when it executed its original confidentiality agreement had expressed the intent
to fund the acquisition exclusively from internally generated funds and not from financing
sources and so no party had requested the express addition for financing representatives in the
confidentiality agreement J&J executed with Guidant, (d) Skadden knew that J&J had
discussions with at least one potential divestiture or licensing partner, and (e) the confidentiality

provisions themselves, as opposed to the express additions, were identical in both confidentiality agreements.

21.     The Merger Agreement did not require that the confidentiality agreement be identical to the one executed by J&J and Guidant.  Therefore, it would be the custom and practice of a lawyer advising about Indiana law that (i) if a "Takeover Proposal" were made and if the bidder making that proposal wanted to specify certain persons within the confidentiality agreement, and (ii) so long as such persons were subject to the same confidentiality requirements with respect to information provided as required by the confidentiality agreement between J&J and Guidant, and could only use that information for the same reasons stated in the J&J confidentiality agreement, *viz.*, to explore a possible negotiated business transaction, then (iii) the target company could agree to the modification to the agreement to expressly include such other persons so that the Board could fulfill its duty to determine whether the "Takeover Proposal" could lead to a "Superior Proposal."

     a.     The fact that Skadden was aware that J&J had engaged in divestiture discussions for antitrust reasons with Abbott and another party, would provide added support to an Indiana lawyer in understanding and advising that including potential divestiture candidates among the permitted recipients of due diligence was appropriate in the confidentiality agreement with BSC, especially when it turned out to be, in one case, the same potential divestiture candidate with which J&J had discussions and the only rubric within the J&J–Guidant Confidentiality Agreement in which Abbott could possibly fall was as a "representative."

     b.     The term "representative" is subsumed in the defined term "Representative" in Section 4.02 of the Merger Agreement and in the confidentiality

9

agreements between Guidant and J&J and between Guidant and BSC.  In each

confidentiality agreement, the term "representative" follows a series of terms that

includes "agents" and "advisors."  In each confidentiality agreement, the authorized use

of the confidential information is agreed to be "exploring possible negotiated business

arrangements."  Mr. Mulaney expressed the view that the term "representative," as used

in Section 4.02 of the Merger Agreement, included Abbott because, among other reasons,

Abbott was a potential financing source.  Mr. Mulaney's view was both reasonable and

consistent with the custom and practice in Indiana because the Merger Agreement did not

restrict a "Takeover Proposal" or a "Superior Proposal" to one that was fully financed

and the custom and practice in Indiana would be to provide potential financing sources

due diligence so the Board could fulfill its duty to determine whether there could be a

"Superior Proposal" that would be in the best interests of the corporation.

22.     The Merger Agreement contemplated that a "Takeover Proposal" that needed to

be examined by the Board included any "inquiry" that could reasonably be expected to lead to

any "direct or indirect" acquisition or purchase "in one or a series" of transactions, of assets that

constitute 15% or more of Guidant's business.  The "Takeover Proposal" Guidant received from

BSC included a clear statement that BSC expected to divest the vascular intervention and

endovascular businesses of Guidant, assets that I have been told represented more than 15% of

Guidant's business.  Guidant had written notice of Abbott's interest in those businesses at the

point that it signed the Accession Agreement.  Even if Abbott were not a "Representative," given

the terms of the Merger Agreement, it would be the custom and practice of lawyers advising

about Indiana law to advise the Board of Guidant that Abbott's inquiry—presaged in BSC's

"Takeover Proposal" of December 5, 2005, followed up by BSC's e-mail of December 20, 2005,

and reflected in the Accession Agreement dated as of December 22, 2005—could independently justify the granting of due diligence and running a process to determine whether Abbott's inquiry would lead to a "Superior Proposal."

23.    It would be the custom and practice of a lawyer advising about Indiana law to have advised the Board of Guidant to follow the same process that Skadden and Mr. Mulaney advised the Board and Guidant to follow after it received BSC's "Takeover Proposal" on December 5, 2005, to fulfill its duty to determine whether that "Takeover Proposal" could result in a "Superior Proposal."

**B.    Guidant's Reliance on the Advice of Skadden and Mr. Mulaney Was Reasonable**

24.    The Merger Agreement between J&J and Guidant required that Guidant's actions in respect of that process be based on the advice of outside counsel (in this case Skadden) and on the advice of nationally recognized financial advisers.  Because directors of Indiana corporations are entitled to rely on "information, opinions, reports or statements" if they are prepared by "legal counsel" as to matters the director "reasonably believes are within the person's professional or expert competence," Ind. Code § 23-1-35-1(b)(2), it would be the custom and practice of lawyers advising about Indiana law to incorporate such reliance into a merger agreement and to advise the Board of Directors of Guidant that, once BSC appeared on the scene, the Board should follow the advice of experienced merger and acquisition counsel with respect to the process to be followed and its completion, unless the Board believed that such counsel was not expert in merger and acquisition matters.

25.    No lawyer advising a board of any public company in Indiana, as a matter of custom and practice, would or could tell that board that Skadden's and Mr. Mulaney's advice

should not be followed due to a lack of expertise in public company merger and acquisition matters by that law firm and that individual.

## III.    INDIANA BUSINESS CORPORATION LAW

26.    Lawyers negotiate merger agreements and advise directors of Indiana public corporations against the statutory backdrop of the IBCL.  Because of this statutory backdrop, the custom and practice of lawyers negotiating merger agreements governed by Indiana law and advising boards of Indiana corporations is to focus on the process of conducting a "reasonable investigation" into acquisition inquiries so that the directors can make determinations in good faith, with the care an ordinarily prudent person would exercise, in the best interests of the corporation.

27.    The section of the IBCL relating to the business judgment rule is purposefully different from Delaware and most other states.  While parts of it were drawn from the 1984 version of the Model Business Corporation Act, there were significant differences, including the areas of concern in this case.

28.    The focus of the Indiana business judgment rule is process.  The general, codified business judgment rule requires a director of an Indiana corporation to act "(1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner the director reasonably believes to be in the best interests of the corporation," based on the facts then known to the director.  Ind. Code § 23-1-35-1(a).

29.    A director of an Indiana corporation is allowed to rely on information, opinions, reports or statements if prepared by "legal counsel . . . as to matters the director reasonably believes are within the person's professional or expert competence . . . ."  Ind. Code § 23-1-35-1(b).  If "the director has knowledge concerning the matter in question that makes

reliance . . . unwarranted," then that director is not acting in good faith.  Ind. Code
§ 23-1-35-l(c).

30.     Both for the purpose of enabling D&O liability insurance to be written for
Indiana-chartered corporations, and for attracting qualified directors, the personal liability of a
director of an Indiana corporation is tied to (1) a breach of his or her duty as set forth in Indiana
Code § 23-1-35-1(a), and (2) having acted with willful misconduct or recklessness.  Ind. Code
§ 23-1-35-1(e).  In the Official Comments, adopted by the Indiana legislature, the legislature
explained that this standard was intended to be different from "negligence, regardless of
'degree,'" and requires, "at a minimum, a conscious disregard of or indifference to the
consequences of a risky act."

31.     Indiana's statute says that the legislature intended to protect "both directors and
the validity of corporate action taken by them in the good faith exercise of their business
judgment after *reasonable investigation*."  Ind. Code § 23-1-35-1(f)(2) (emphasis added).
Similarly, the statute sets up a conclusive presumption of validity of any corporate action
approved by a majority of independent directors unless it can be "demonstrated that the
determination was not made in good faith after *reasonable investigation*."  Ind. Code
§ 23-1-35-1(g).

32.     As noted in paragraph 26 above, this statutory emphasis on "reasonable
investigation" informs the custom and practice of lawyers negotiating merger agreements
governed by Indiana law and advising boards of Indiana corporations.

IV.     **CHRONOLOGY OF EVENTS**

A.      **The First J&J–Guidant Merger Agreement**

33.     On August 4, 2004, J&J and Guidant executed a confidentiality agreement.  (Kury Ex. 2.)  In its introductory paragraph, it defined the term "Representatives" as persons who might either provide or be provided with "Information" as defined in the agreement.  The term "Representatives" was defined to include "officers, directors, employees, agents, advisors or representatives."  The first sentence of the second paragraph of the confidentiality agreement required that the "Information" be used "solely for the purpose of exploring possible negotiated business arrangements and not for any other business or competitive purpose."  The second sentence required that the "Information" be kept confidential.  There followed some sentences regarding keeping the Information confidential, returning or destroying the Information if there is no agreement, standstills with respect to transactions in securities, and employees and enforcement.

34.     J&J and Guidant executed a merger agreement as of December 15, 2004. (Townsend Ex. 1.)  Sections 4.02 and 7.02 of this December 14, 2004 merger agreement appear to be identical to the same numbered provisions in the November 14, 2005 Merger Agreement. (Kury Ex. 9.)  The original merger consideration was to be a combination of cash and stock valued at approximately $76 per share of Guidant stock.  The cash component was $30.60 per share.  The agreement included a termination fee of $700 million, or about 3% of the total merger consideration.  Before this merger agreement was signed, Guidant had not engaged in any attempt to "shop" the company or seek other bidders.  It dealt exclusively with J&J.

35.     Abbott and Cordis Corporation (a subsidiary of J&J) executed a confidentiality agreement dated April 15, 2005.  (Morano Ex. 3.)  In the introductory paragraph, there is a

14

reference to a possible transaction involving Cordis, J&J, Abbott, and Guidant; and Cordis states it may disclose "certain non-public information relating to Guidant."  The collective definition of "Representatives" in this agreement includes "directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors)."  This is yet a different definition of "Representatives" from that contained in the initial confidentiality agreement between J&J and Guidant, and from the December 15, 2004 merger agreement and the Merger Agreement.  This confidentiality agreement also had the following sentence:  "In no event shall Representatives include Guidant and/or its respective directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors)."

36.    Also on April 15, 2005, Cordis and Medtronic executed a confidentiality agreement that appears substantially identical to the Abbott agreement with the same definition of Representatives and disclaimer of Guidant as a representative.  (Rosenberg Ex. 30.)

37.    Cordis executed a third confidentiality agreement dated April 15, 2005, with Conor MedSystems, Inc.  While it was substantially identical to the Medtronic and Abbott confidentiality agreements, it did not contain the disclaimer language regarding Guidant as a representative.  (Harris Ex. 6.)

38.    On April 22, 2005, Steven Rosenberg of Cordis sent an e-mail to David Scharf of Guidant confirming that Cordis had entered into confidentiality agreements with Abbott, Conor and Medtronic for the purpose of discussing potential "transactions with one or more of them in connection with our efforts to obtain FTC approval to close our acquisition of Guidant."  (Strain Ex. 11.)  The e-mail also stated that the arrangement that Cordis had with Abbott and Conor was that Guidant would enter into its own free-standing confidentiality agreement with them,

whereas with respect to Medtronic, Cordis would remain responsible for compliance with the confidentiality obligations under its confidentiality agreement with Guidant.

39.     On April 25, 2005, Guidant and J&J executed a confidentiality agreement with Standard & Poor's Corporate Value Consulting, described as a Representative of J&J advising with respect to certain aspects of the planning for the integration of Guidant and J&J.  (Harris Ex. 15.)

40.     On May 2, 2005, Guidant and Cordis executed a "Back-Up Confidentiality Agreement" relating to the Cordis/Medtronic Confidentiality Agreement dated April 15, 2005. In the recitals of this agreement was the following:  "WHEREAS, Cordis has the right under the CDA to disclose Medtronic's Confidential Information to Guidant if (i) Guidant 'agrees to be bound by the terms of the CDA' and (ii) Cordis agrees to be responsible for such compliance by Guidant."  (Strain Ex. 13.)

41.     On May 11, 2005, Guidant and Abbott executed a confidentiality agreement.  It disclaimed Cordis's status as a "Representative" of Guidant.  (From the standpoint of those who were at Guidant, Abbott's request that it have its own confidentiality agreement and the fact that Abbott was given a role in the transaction to win FTC approval likely would not have seemed much different when the substantively identical request came in December 2005.)  (Strain Ex. 14.)

42.     On August 25, 2005, Guidant and J&J executed a confidentiality agreement with PricewaterhouseCoopers LLP, described as a Representative of J&J, for the purpose of planning the 2005 audit.  (This is yet a different twist on the "Representative" definition.  In some of J&J's confidentiality agreements, accountants are expressly identified as persons who might

receive or give information, but not in the August 4, 2004 confidentiality agreement between J&J and Guidant.)  (Rosenberg Ex. 29.)

43.     Also on August 25, 2005, the European Commission issued a decision declaring the merger of J&J and Guidant compatible with the European Common Market, with conditions. One of the conditions was the divestiture of Guidant's endovascular solutions business in Europe.

### B.     J&J Renegotiates the First Merger Agreement

44.     On September 29, 2005, the non-executive chair of Guidant, James M. Cornelius, met with William Weldon, J&J's Chairman and CEO.  At this meeting, Mr. Weldon told Mr. Cornelius that he wanted to discuss a renegotiation of the terms of the original J&J–Guidant merger in light of the regulatory difficulties that Guidant was facing.  He further said that any renegotiation would have to include a significant reduction in price from the merger consideration in the December 15, 2004 agreement.  (*See* Caruso Ex. 9.)

45.     On November 2, 2005, the FTC notified J&J that it had conditionally approved its acquisition of Guidant, subject to J&J divesting, licensing or terminating certain rights or assets of its businesses in drug-eluting stents, endoscopic vessel harvesting products, and anastomotic assist devices.  J&J then issued a public statement to the effect that it believed Guidant's product recalls and related matters had resulted in a "material adverse effect" under the December 15, 2004, merger agreement.  (Best Ex. 3 at JPMC019068.)  Guidant followed with its own press release stating that J&J remained legally obligated to complete the transaction under its original terms.  (Best Ex. 3 at JPMC019069.)

46.     On November 7, 2005, Guidant filed suit in the Southern District of New York seeking specific performance of the December 15, 2004, merger agreement.  (PX 5.)

### C.    The Second J&J–Guidant Merger Agreement

47.    Following discussions between Guidant and J&J on November 12 and 13, 2005, the parties agreed to restructure the merger consideration to increase the cash component to $33.25 per share and reduce the stock component.  The approximate total merger consideration per share of Guidant stock became $63, or approximately $4 billion less in total merger consideration from the original merger agreement.

48.    As of November 14, 2005, J&J and Guidant executed the Merger Agreement. (Kury Ex. 9.)  The Merger Agreement's non-solicitation/non-facilitation covenant was contained in Section 4.02.  Section 4.02 permitted the Board of Guidant to respond to a "bona fide written Takeover Proposal" as defined.  If the Board determined, after consultation with outside counsel and a nationally recognized financial adviser, that the Takeover Proposal was reasonably likely to lead to a "Superior Proposal" as defined, then it could supply information pursuant to a "customary confidentiality agreement" that was "not less restrictive to such person" than the "confidentiality provisions" of the J&J and Guidant confidentiality agreement.  The termination fee in the Merger Agreement was $625 million, again about 3% of the total merger consideration.

### D.    Boston Scientific's Proposal

49.    BSC made its unsolicited "Takeover Proposal" on December 5, 2005, in a letter to Guidant.  (Rosenberg Ex. 22 at JJH00016017-19.)  In that letter it proposed merger consideration of $36 per share in cash and $36 per share in stock (priced as of the date the definitive agreement was signed), or $72 per Guidant share.  This letter also indicated BSC's willingness to divest the vascular intervention and endovascular businesses to resolve antitrust issues.  It also said that it had received commitments from Bank of America and Merrill Lynch for all of the financing it

18

would need to consummate the transaction, that it would be subject to "confirmatory" due diligence, and that BSC believed it could execute a definitive agreement before year end.  The letter also stated that the total merger consideration was approximately $3 billion above the amount of J&J's total consideration, or 14% higher.  At the same time that BSC delivered the written Takeover Proposal, it issued a press release including the letter.  (Morano Ex. 10.)  The press release included language saying that the proposed transaction was not subject to any financing condition.

50.     On December 7, 2005, the Board of Directors of Guidant made the requisite finding under the Merger Agreement that BSC's Takeover Proposal was reasonably likely to lead to a "Superior Proposal" and authorized discussions and the execution of a confidentiality agreement.  (Strain Ex. 5.)

51.     On December 7, 2005, Guidant executed a confidentiality agreement with BSC.  (Kury Ex. 13.)  It was substantially identical to the August 4, 2004 confidentiality agreement with J&J though:  (a) it included in the list of kinds of persons who would be "Representatives" the phrase "financing sources" and (b) there was an additional sentence that read, "With respect to you [BSC], the term 'Representatives' shall also include third parties reasonably satisfactory to us [Guidant] that are identified to us as potential purchasers of assets to be divested and who execute a confidentiality agreement reasonably acceptable to us."

52.     On December 12, 2005, Brian Duwe of Skadden sent a memorandum to Guidant's general counsel outlining the material terms of the commitment letters from Merrill Lynch and Bank of America.  (DX0055.)  Item 3 in that memorandum recited that the lenders had to be satisfied in their sole judgment with results of customary legal, regulatory, tax, environmental, accounting and business due diligence of Guidant and its subsidiaries.  Then Mr.

Duwe stated that "This is a customary condition given the lenders have not had access to Guidant for any due diligence.  We should be clear to [BSC] that we expect their lenders' diligence to be completed along with their own prior to signing and this condition to be eliminated in an amended commitment letter."

53.    On December 18, 2005, Guidant and BSC executed an addendum to their confidentiality agreement to deal with "Highly Confidential Material," establishing classes of such materials and how they were to be handled.  (Kury Ex. 21.)

### E.    Abbott's Involvement

54.    On December 20, 2005, Guidant received notice from BSC that it intended to proceed with Abbott as the buyer of choice for the units it was going to divest, and stating that Abbott would want to do its own due diligence.  (Best Ex. 18.)

55.    On December 21, 2005, BSC and Abbott executed a confidentiality agreement relating to Abbott's potential acquisition of "certain assets" of Guidant.  (Mulaney Ex. 18.)  It appears to be substantially identical to the confidentiality agreement executed by Guidant and BSC except for the introductory paragraph dealing with the "certain assets" and the absence of the sentence relating to "potential purchasers of assets to be divested and who execute a confidentiality agreement reasonably acceptable to us" language.

56.    On December 22, 2005, Abbott, BSC and Guidant executed an "Accession Agreement" to the Addendum.  (Knopf Ex. 34.)  The defined term "Abbott Parties" and the defined term "Representatives" in this agreement mirrored the definition of "Representatives" in the confidentiality agreement executed by Abbott and BSC.  In addition, the agreement defined "Highly Confidential Information" as applied to Abbott to include information related to "the assets proposed to be acquired by Abbott."

20

**F.      Boston Scientific, Abbott, and Guidant Reach Definitive Agreement**

57.      On January 8, 2006, BSC presented its definitive offer to Guidant in a letter accompanied by a signed merger agreement.  (Knopf Ex. 49.)  The letter stated that due diligence had been completed and that BSC had received sufficient financing commitments to complete the transaction.  There was no financing condition and the merger consideration was a nominal $72 per Guidant share, with a cash component of $36 per share and a BSC stock component of $36 per share.  There was a collar based on the BSC stock price so that if it fell too low, more stock would go to the Guidant shareholders and if it went too high, less stock would go to the Guidant shareholders.  The letter also stated that BSC had entered into a definitive agreement with Abbott to divest Guidant's vascular intervention and endovascular businesses, while agreeing to share rights to Guidant's drug-eluting stent program.  These steps were said to be sufficient to address any potential antitrust issues.

58.      Both BSC and Abbott issued press releases on January 8, 2006, relating to their definitive agreement.  (Hilton Ex. 18.)  In addition to the divestiture of certain Guidant assets and the sharing of rights with respect to Guidant's drug-eluting stent programs, the BSC press release disclosed a $700 million loan from Abbott to BSC in the form of a subordinated note with an interest rate of 5.25%.

**G.      Increasing Proposals for Guidant**

59.      On January 11, 2006, the Chairman and CEO of J&J sent a letter with a revised offer for Guidant, increasing the merger consideration to $37.25 per Guidant share in cash plus 0.493 shares of J&J.  (Deyo Ex. 23.)  As of that same day, Guidant and J&J executed Amendment No. 1 to the Merger Agreement with the revised merger consideration, an increase

21

in the termination fee of $50 million, from $625,000,000 to $675,000,000, and more technical conforming amendments.  (Kury Ex. 43.)

60.     On January 12, 2006, BSC revised its definitive offer by increasing the exchange rate on the stock portion of the merger consideration so that each Guidant shareholder would receive approximately $73 per share instead of $72, addressing antitrust concerns, and agreeing to pay a daily interest amount in cash for each day between April 1, 2006, and the closing. (Knopf Ex. 52.)  In its revised definitive offer, BSC emphasized that its offer represented approximately $1.8 billion more to Guidant shareholders than J&J's transaction.

61.     On January 13, 2006, J&J submitted a revised offer of 0.493 shares for each Guidant share plus the amount of cash necessary to bring the merger consideration to $71 per share, based on the closing price of J&J stock on January 13, 2006.  Guidant and J&J executed Amendment No. 2 to the Merger Agreement increasing the cash portion of the merger consideration to $40.52 per Guidant share, and increasing the termination fee by another $30 million from $675,000,000 to $705,000,000.  (Hilton Ex. 24; Kury Ex. 47.)

62.     On January 17, 2006, following two amendments to its transaction agreement with Abbott, BSC revised its offer to $80 per Guidant share with the cash portion being $42 per Guidant share and the stock portion being $38 per Guidant share subject to a revised collar that was designed to provide more certainty to the Guidant shareholders.  (Kury Ex. 49.)  It remained committed to the payment of interest at an annual rate of 6% if the closing extended beyond April 1, 2006.  In addition, the offer letter reflected conforming revisions to the commitment letters and emphasized the $3.3 billion difference in purchase price over J&J's Amendment No. 2 price.

63.     On January 17, 2006, Guidant informed J&J that the Guidant Board had determined the BSC $80 offer was superior and that Guidant intended to terminate the J&J merger agreement if the BSC offer remained superior as of January 25, 2006.  (DX0190.)

**H.     Termination of the Second J&J–Guidant Merger Agreement**

64.     On January 25, 2006, Guidant delivered a notice to J&J terminating the parties' merger agreement pursuant to section 7.01 (f).  (Kury Ex. 53.)

65.     On January 25, 2006, J&J issued a press release acknowledging receipt of a termination notice of the Merger Agreement from Guidant, stating that J&J would not increase its bid and reciting that Guidant was required to pay J&J a fee of $705 million on or before January 26, 2006.  (Darretta Ex. 4.)

**V.     ANALYSIS**

**A.     Guidant's Provision of Due Diligence Information to Abbott Was Consistent with Custom and Practice (Merger Agreement Section 4.02)**

66.     Section 4.02(a) contained a "non-solicitation/non-facilitation" covenant that prohibited Guidant and its "Representatives" from soliciting, initiating, knowingly encouraging, or taking any action that could facilitate a "Takeover Proposal," as defined.

67.     "Representatives" was a defined term following an incomplete list of what constitutes a "Representative" including Guidant's or its Subsidiaries' "directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative."

23

68.     My understanding is that there is no allegation that Section 4.02 was violated by or before the written BSC "Takeover Proposal" made on December 5, 2005, and there is nothing in my review of the record that indicates any such violation.

69.     The BSC "Takeover Proposal" included the following:  "We have received commitment letters from Bank of America, N.A. and Merrill Lynch & Co., for all the financing we need to consummate the proposed transaction. . . .  Our proposal is subject to completion of a confirmatory due diligence review of your company. . . .  [W]e are prepared to divest Guidant's vascular intervention and endovascular businesses while retaining shared rights to Guidant's drug eluting stent program."

70.     Under Section 4.02(a), once a bona fide written "Takeover Proposal" was made, and "after consultation with outside counsel and a financial advisor of nationally recognized reputation," the Board of Directors of Guidant, if it reasonably determined that the "Takeover Proposal" either constituted or was reasonably likely to lead to a "Superior Proposal," could authorize Guidant to furnish information with respect to Guidant and its Subsidiaries to the person making the "Takeover Proposal" and that person's "Representatives" pursuant to "a customary confidentiality agreement not less restrictive to such person than the confidentiality provisions of the Confidentiality Agreement, provided that all such information has previously been provided to Parent [J&J] or is provided to Parent prior to or substantially concurrent with the time it is provided to such person."

71.     On December 7, 2005, the Board of Directors of Guidant determined that the BSC "Takeover Proposal"—which included the statement that BSC was prepared to divest the vascular intervention and endovascular businesses—was reasonably likely to lead to a "Superior Proposal" and authorized management to provide information and to enter into discussions with

24

BSC.  At the point the Board of Directors of Guidant made that determination, it would be the custom and practice of lawyers advising the board of an Indiana corporation that, to fulfill its duties under Indiana Code Section 23-1-35-1(a), given the language of the Merger Agreement, the board would have to conduct a "reasonable investigation" to determine whether the BSC "Takeover Proposal" was in the best interests of the corporation compared to the J&J transaction and was, therefore, a "Superior Proposal."

72.    Such a "reasonable investigation" necessarily involved the provision of due diligence so that the Board of Directors of Guidant could form a judgment whether the "Takeover Proposal" could become a "Superior Proposal."

73.    The definition of "Superior Proposal" in Section 4.02(a) included a requirement that the Board be able to determine whether the "Takeover Proposal" was "reasonably capable of being completed, taking into account all financial, legal, regulatory and other aspects of such proposal."  Thus, it would be the custom and practice of a lawyer advising the board of an Indiana corporation in these circumstances that "reasonable investigation" includes determining whether the transaction could be completed, which in turn includes providing information to assure that any contingencies in the financing commitments could be met and that any divestitures for antitrust compliance could be timely accomplished.  In this respect, it would be the custom and practice of a lawyer advising the board of an Indiana corporation to recognize that financing sources providing the billions necessary to accomplish the "Takeover Proposal" customarily request and receive due diligence on the acquired company.

74.    It would be inconsistent with custom and practice to construe Section 4.02(a) of the Merger Agreement to preclude the Board of Guidant from causing the Company to provide the necessary information regarding financing and divestitures for antitrust purposes, because it

would impede the ability of a party making a "Takeover Proposal" to get to the point of

transaction certainty contemplated by the "Superior Proposal" language of the Merger

Agreement without serving the purpose of the non-solicitation/non-facilitation provision—which

is to prevent Guidant from soliciting a "Takeover Proposal," but to allow Guidant to provide

information to a third party making a proposal so long as the proposal is unsolicited.  This is

especially true on the facts of this case, where Guidant (a) had not been "shopped," and (b) had

been subject to the December 15, 2004, merger agreement and the Merger Agreement for an

aggregate period of almost a year at the point in time that BSC intervened.

     75.     It would be the custom and practice of a lawyer advising the board of an Indiana

corporation to advise that it was reasonable under Section 4.02 of the Merger Agreement to have

the company provide the confidential information necessary to determine whether there could be

a "Superior Proposal," to require that information be kept confidential, and to provide whatever

information was supplied for these purposes to J&J, if it had not been supplied already.  Section

4.02(a) did not require a "Takeover Proposal" to be fully financed and did not require that there

be no divestiture parties for regulatory or financing purposes.  I am unaware of any evidence that

the parties intended to limit Takeover Proposals in that manner.

     76.     It has been my experience in negotiating merger and acquisition agreements and

in advising boards of Indiana corporations that non-solicitation/non-facilitation provisions do not

routinely include express language allowing an acquired corporation to be able to provide due

diligence directly to financing sources or potential divestiture candidates.  It has also been my

experience that due diligence is routinely provided to financing sources when there are overbids,

even in the absence of an express listing of a financing source as a "Representative" in a non-

solicitation/non-facilitation covenant.  I do not recall having been involved in a competitive

26

bidding situation where there was the necessity to provide due diligence directly to a potential divestiture partner, but, in my experience, the same considerations that permit financing sources to routinely have access to due diligence would apply to a potential divestiture partner.

77. The confidentiality agreement executed by BSC and Guidant on December 7, 2005, contained provisions relating to confidentiality that were substantively identical to those contained in the confidentiality agreement executed by J&J and Guidant, as required by Section 4.02 of the Merger Agreement. Specifically, the language defining "Representatives" to include "financing sources" and, with respect to BSC, "third parties reasonably satisfactory to us [Guidant] that are identified to us as potential purchasers of assets to be divested and who execute a confidentiality agreement reasonably acceptable to us" was appropriate and consistent with the custom and practice of a lawyer advising a board of an Indiana corporation, in light of the terms of the contracts, the history of the transaction, and the need for "reasonable investigation" into whether the BSC "Takeover Proposal" could become a "Superior Proposal" within a reasonable period of time.

78. It would have been the custom and practice of a lawyer advising the board of an Indiana corporation in these circumstances to advise it that the Merger Agreement allowed the Board to conduct the "reasonable investigation" needed to determine whether a "Takeover Proposal" could be solidified into a "Superior Proposal," and that the board had a duty under the IBCL and consistent with the Merger Agreement to take the steps necessary to determine whether the "Takeover Proposal" could become a "Superior Proposal." Failure to take those steps could have led to a determination that the board members had not, based on the facts then known to them – that there was a credible bidder with a higher bid on the table – fulfilled their obligation to act in the company's best interests, and potentially had acted willfully or recklessly

in failing to follow up on a potential transaction that could have been in the company's best interests.

79.     The advice that Skadden and Mr. Mulaney gave both the Board of Directors of Guidant with respect to consideration of BSC's "Takeover Proposal" and the Company's officers in connection with the provision of due diligence directly to Abbott consistent with the confidentiality agreement between BSC and Guidant—and only after the execution of an Accession Agreement in which Abbott formally became a party to the BSC–Guidant confidentiality agreement—followed the custom and practice of a lawyer experienced in mergers and acquisitions advising the board of an Indiana corporation faced with a "Takeover Proposal" and the board's duty to examine whether it could be a "Superior Proposal."

a.     In my experience, the advice that Skadden and Mr. Mulaney gave— specifically, that Abbott could be considered a "Representative" within the meaning of Section 4.02 of the Merger Agreement—was consistent with how a practitioner advising the Board or officers of an Indiana corporation would and should act.  Under the circumstances of BSC's unsolicited offer, Abbott in its roles as divestiture party and financing source would have been considered a "Representative" of BSC for the purposes of receiving due diligence information according to the custom and practice of the M&A industry at the time, particularly when considered against the backdrop of the Guidant board's fiduciary duties to conduct a "reasonable investigation" consistent with the IBCL.

b.     The execution of the "Accession Agreement" by Abbott, independently, could have been considered by the Board of Guidant as a "Takeover Proposal" given the size of the businesses that were being divested to Abbott (more than 15%), and thus independently justified the provision of due diligence directly to Abbott.  That neither

28

Mr. Mulaney nor Skadden may have regarded that step as a necessary step because they considered Abbott to be a "Representative" is not inconsistent with how a lawyer advising an Indiana corporation would consider Abbott's entitlement to due diligence directly from Guidant.

**B.      Guidant Reasonably Relied on the Advice of Skadden and Mr. Mulaney**

80.      It would be the custom and practice of a lawyer advising a board and officers of an Indiana corporation to advise that Skadden and Mr. Mulaney are experienced in public company mergers and acquisitions.  In addition, it would be reasonable for Guidant's board and officers to believe that matters involving construction of and compliance with the terms of the Merger Agreement were within Skadden's and Mr. Mulaney's professional competence. Further, I have seen nothing to suggest that in this case the Guidant board and officers were not or would not be justified in relying on Skadden's and Mr. Mulaney's process advice with respect to the Merger Agreement and the BSC Takeover Proposal.  Thus, a lawyer advising an Indiana corporation would not advise that following Skadden's and Mr. Mulaney's process advice in good faith would constitute a "wilful" breach if that advice were later found to be incorrect.

JAMES A. STRAIN

29

STATE OF INDIANA        )
                        )ss:
COUNTY OF MARION        )

Before me, a Notary Public in and for said County and State, personally appeared James A. Strain, who, being first duly sworn, acknowledged execution of the foregoing Trial Testimony Affidavit this 9th day of October, 2014.

_Kimberly K Russell_
Notary Public

_Kimberly K. Russell_
(Printed signature)

My Commission Expires:          My County of Residence:

_January 23, 2019_              _Marion_

30