UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x
JOHNSON & JOHNSON, a New Jersey                    :
Corporation,                                       :
                                                   :
                                                   :
              - against -                          :        No. 06 CV 7685 (RJS)
                                                   :
                                                   :
GUIDANT CORPORATION, an Indiana                    :
Corporation.                                       :        **FILED UNDER SEAL**
                                                   :
—————————————————————— x


### JOHNSON & JOHNSON'S MEMORANDUM OF LAW IN SUPPORT OF ITS DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF MEREDITH MASON BROWN AND JAMES A. STRAIN AND TO PARTIALLY <u>EXCLUDE THE TESTIMONY OF BRADFORD CORNELL</u>

Harold P. Weinberger
John P. Coffey
Joel M. Taylor
Jennifer Diana
Jason M. Moff
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Attorneys for Plaintiff Johnson & Johnson*

## Table of Contents

Page

Preliminary Statement ....................................................................................................... 1

Background ........................................................................................................................ 2

    A.    Issues Addressed by the Brown, Strain, and Cornell Reports ................................. 2

    B.    Report of James A. Strain ......................................................................................... 2

    C.    Report of Meredith Mason Brown ............................................................................ 5

    D.    Report of Bradford Cornell ....................................................................................... 6

Argument .......................................................................................................................... 7

    A.    The governing *Daubert* standard for admissibility ................................................. 7

    B.    The Legal Opinions Expressed in Strain's and Brown's Expert Reports Are Inadmissible ........................................................................................ 9

    C.    Brown's and Cornell's Loss Causation Opinions Are Unsupported and Unrealistic And Therefore Are Inadmissible ................................................. 18

Conclusion ...................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
    222 F. Supp. 2d 423 (S.D.N.Y. 2002)......................................................................8

*Boucher v. United States Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996)..................................................................................18

*Cacciola v. Selco Balers, Inc.*,
    127 F. Supp. 2d 175 (E.D.N.Y. 2001) ...............................................................8

*Campbell v. Metro. Prop. & Cas. Ins. Co.*,
    239 F.3d 179 (2d Cir. 2001)..............................................................................8

*CFM Commc'ns, LLC v. Mitts Telecasting Co.*,
    424 F. Supp. 2d 1229 (E.D. Cal. 2005).............................................................10

*CIT Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*,
    815 F. Supp. 2d 673 (S.D.N.Y. 2011)...............................................................11

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
    650 F. Supp. 2d 314 (S.D.N.Y. 2009)......................................................... 18-19

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579 (1993) ..........................................................................................1

*EEOC v. Locals 14 & 15, Int'l Union of Operating Eng'rs*,
    No. 72 Civ. 2498(VLB), 1981 WL 163 (S.D.N.Y. Feb. 11, 1981) .....................8

*F.H. Krear & Co. v. Nineteen Named Trustees*,
    810 F.2d 1250 (2d Cir. 1987)...............................................................10, 11, 12

*In re Fosamax Prod. Liab. Litig.*,
    807 F. Supp. 2d 168 (S.D.N.Y. Aug. 30, 2011).................................................19

*Fujitsu Ltd. v. Federal Express Corp.*,
    76 F. Supp. 2d 474 (S.D.N.Y. 1999).................................................................13

*Herz Straw Co. v. Capitol Paper Co.*,
    216 Ind. 568 (Sup. Ct. Ind. 1940) .................................................................13

*Highland Capital Management, L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005).........................................................9, 11

*In re Initial Public Offering Sec. Litig.*,
    174 F. Supp. 2d 61 (S.D.N.Y. 2001).........................................................9, 10

*Johnson & Johnson v. Guidant Corp.*,
    525 F. Supp. 2d 336 (S.D.N.Y. 2003)....................................................1, 17, 18

*Kidder, Peabody & Co. v. IAG Intl. Acceptance Group Naamloze Vennootschap*,
    14 F. Supp. 2d 391 (S.D.N.Y. 1998)............................................................12

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)..................................................................................7

*LaSalle Bank N.A. v. CIBC Inc.*,
    No. 08 Civ. 8426 (WHP)(HBP), 2012 BL 40702 (S.D.N.Y. Feb. 14, 2012) ........11

*Lava Trading Inc. v. Hartford Fire Ins. Co.*,
    No. 03 Civ. 7037 (PKC), 2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ........17, 18

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003)..................................................................20

*Marx & Co., Inc. v. The Diners' Club, Inc.*,
    550 F.2d 505 (2d Cir. 1977)..............................................................9, 10, 12

*Media Sport & Arts s.r.l. Kinney Shoe
    Corp.*, No. 95 Civ 3901 (PKL), 1999 BL 126 (S.D.N.Y. Oct. 18, 1999) .............13

*Mink Mart, Inc. v. Reliance Ins. Co.*,
    65 F. Supp. 2d 176 (S.D.N.Y. 1999)...........................................................19

*Muller-Paisner v. TIAA*,
    881 F. Supp. 2d 579 (S.D.N.Y. 2012), *judgment vacated and case remanded
    on other grounds*, 528 Fed. Appx. 37 (2d Cir. 2013) .............................................11

*Music Sales Corp. v. Morris*,
    73 F. Supp. 2d 364 (S.D.N.Y. 1999)...........................................................10

*National Union Fire Ins. Co. of Pittsburgh, PA v. L.E. Myers Co. Group*,
    937 F. Supp. 276 (S.D.N.Y. 1996) .............................................................18

*Primavera Familienstifung v. Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001).............................................................8

*Roberts v. Community Hospitals of Indiana, Inc.*,
    897 N.E.2d 458 (Ind. 2008) ...................................................................................14

*Seneca Ins. Co. v. Wilcock*,
    No. 01 Civ. 7620 (MHD), 2007 WL 415141 (S.D.N.Y. Feb. 5, 2007) ...................19

*Sompo Japan Ins. Co. of Am. V. Norfolk S. Ry.*,
    762 F.3d 165 (2d Cir. 2014).......................................................................16, 17 n.4

*U.S. v. Stewart*,
    433 F.3d 273 (2d Cir. 2006)......................................................................................9

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)...............................................................................9, 13

*United States v. Brooks*,
    2010 BL 5690, 4-5 (E.D.N.Y. Jan. 11, 2010) .......................................................11

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)......................................................................................7

## Statutes & Rules

28 U.S.C. § 455 ..............................................................................................................10

Fed. R. Evid. 401 .............................................................................................................8

Fed. R. Evid. 702 ....................................................................................................1, 7, 8

Ind. Code § 23-1-35-1(a)(3) ............................................................................................3

Ind. Code § 23-1-35-1(g) ..........................................................................................3, 15

Ind. Code § 23-1-35-(b)(2) ............................................................................................15

Pursuant to Fed. R. Evid. 702 ("FRE 702") and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and its progeny, plaintiff Johnson & Johnson ("J&J") submits this memorandum of law in support of its motion to exclude the testimony of James A. Strain and Meredith Mason Brown, two attorneys proffered as experts by defendant Guidant Corporation ("Guidant"), and to partially exclude the testimony of Bradford Cornell, also proffered as an expert by Guidant.

## Preliminary Statement

In the face of the prior determination by this Court that designating Abbott Laboratories ("Abbott") as a "Representative" of Boston Scientific Corporation ("Boston Scientific") does not "fall within any reasonable interpretation of that term" in the Merger Agreement between Guidant and J&J, *Johnson & Johnson v. Guidant Corp.*, 525 F. Supp. 2d 336, 348-49 (S.D.N.Y. 2003), Guidant has proffered the testimony of Meredith Mason Brown ("Brown") and James A. Strain ("Strain"). Both of these proposed expert witnesses are lawyers who advocate for conclusions of law, including their conclusions about a critical issue in this case: whether Guidant willfully breached its contractual obligations by providing due diligence to Abbott as a purported "Representative" of Boston Scientific. In reports disclosing that proposed testimony, these attorneys provide their rendition of the facts, a series of statutory and common law standards they believe are applicable to those facts and their conclusions that Guidant did not breach any contractual or other legal obligations and was justified in relying on advice of counsel. Both reports cite statutes and case law and are in reality legal briefs dressed in clothing of supposed experts. Second Circuit precedent makes it clear that such testimony is improper and should not be admitted at trial.

Brown, along with Bradford Cornell ("Cornell"), has also been proffered to engage in rank speculation, namely, to opine that J&J would not have been able to purchase Guidant at the

price set in the Merger Agreement because Boston Scientific supposedly could have pursued an alternate path to acquire Guidant if it had not given due diligence to Abbott. But none of the scenarios Brown has fashioned has any basis in the record evidence; to the contrary, the evidence is that Boston Scientific would not have proceeded in that fashion. As for Cornell's opinions on this subject, he also presumes, contrary to the record evidence, that Boston Scientific would have bid on Guidant absent a firm divestiture commitment from Abbott. Both of these opinions should be excluded because they have no more than a conjectural connection to the facts of this case.

**Background**

**A.   Issues Addressed by the Brown, Strain, and Cornell Reports**

The facts underlying J&J's claim that Guidant breached the Merger Agreement by providing due diligence to Abbott are known to the Court and summarized in its opinion denying Guidant's motion for summary judgment. (Decision on Defendant's Motion for Summary Judgment ("SJ Decision") (Dkt. 101)). Suffice it to say for present purposes that three key issues in the case are: (i) did Guidant breach the Merger Agreement when, among other things, it provided due diligence to Abbott;[1] (ii) were Guidant's breaches willful or its purported reliance on "advice" of counsel reasonable; and (iii) did Guidant's breaches cause J&J to lose the deal. As detailed below, the expert reports of Brown and Strain purport to address each of these issues.

**B.   Report of James A. Strain**

Strain is an Indiana lawyer who is offered as an expert on mergers and acquisitions. In his report ("Strain Rep."), attached as Exhibit A to the Declaration of Harold P. Weinberger

---

[1] For reasons discussed later in this memorandum, J&J believes this issue has already been decided adversely to Guidant, at least to the extent that Guidant contends that Abbott was a "Representative" of Boston Scientific.

dated October 10, 2014 ("Weinberger Decl."), Strain opines that the legal advice purportedly provided by Charles Mulaney of Skadden Apps ("Skadden"), Guidant's outside counsel, was consistent with the "custom and practice of lawyers advising the boards of directors of Indiana public corporations." Strain further concludes that by following Skadden's supposed advice, Guidant board members complied with the law, comported with their good faith obligation to Guidant, and did not willfully breach the Merger Agreement. (Strain Rep. at 20).[2]

Strain starts his report with a section titled "Introduction and Summary of Opinions," in which he supplies a series of Indiana legal standards and opines repeatedly that "it is the custom and practice" of Indiana lawyers to advise boards of directors to follow those standards. Specifically, Strain asserts that the "custom and practice" of Indiana lawyers is to advise their clients: (a) to follow Sections 23-1-35-1(a)(3) & (g) of the Indiana Code (Strain Rep. at 1-2, Opinions Nos. 1 & 2); (b) to comply with their fiduciary duties under Indiana law; and (c) to follow Section 23-1-35-1(b) of the Indiana Code by "rely[ing] on information, opinions, reports or statements . . . prepared by legal counsel." (Strain Rep. at 2, Opinion No. 4).

Following his "Introduction and Summary of Opinions," Strain goes on to describe his view of the legal duties under the Indiana Business Code in more detail (*id.* at 8-9), and then fashions a "Chronology of Events" that spans seven pages (*id.* at 9-15). His chronology sets forth provisions from the Confidentiality Agreement between J&J and Guidant; summarizes his understanding of certain terms of the Merger Agreement, including Section 4.02(a); excerpts the definition of "Representatives" from these and other agreements between the parties; and offers his rendition of events comprising the merger negotiations between J&J and Guidant, Boston

---

[2] It is unclear why Mr. Strain formulated his opinion in this fashion as there is no evidence that (a) Skadden ever advised the Guidant board that it could provide diligence to Abbott or (b) the board ever considered that issue.

Scientific's Takeover Proposal, and the concomitant discussions between Abbott and Guidant. Strain does not provide any expertise to contextualize the allegations in his chronology; he merely recites his version of the facts.

Following his "Chronology of Events," Strain offers a series of statements under the heading "General Opinions," many of which are reassertions of the factual allegations outlined in his chronology. For example, he reasserts his understanding of Section 4.02 and his definition of the term 'Representative' as used in the agreements between the parties. Then, he applies his understanding of Indiana law—frequently couched as his understanding of the "custom and practice of [Indiana] lawyers"—to these factual allegations and opines that Guidant's actions followed those laws. He describes the measures he believes Guidant was required to take in order to comport with its statutory obligations under the Indiana Business Code (Strain Rep. at 15); he provides his own interpretation of already-defined unambiguous terms in the contracts between the parties (*id.* at 15-16); and he offers his view of Guidant's legal and contractual requirements in the event of a "Takeover Proposal" (*id.* at 16). For each of these opinions, Strain has applied his view of the law to his view of the facts in order to craft ultimate conclusions that he believes the trier of fact should reach. At the end of his report, he enumerates those "Conclusions":

(1)     Skadden's advice to Guidant "in connection with the investigation of the 'Takeover Proposal' by [Boston Scientific] was consistent with Guidant's obligations under Indiana law and Section 4.02 of the Merger Agreement between Johnson & Johnson and Guidant";

(2)     Guidant's Board of Directors acted consistently with its legal obligation of good faith when it followed Skadden's advice; and

(3)     Guidant did not act with "willful misconduct or recklessness" when it followed Skadden's advice.

(Strain Rep. at 20). Strain acknowledged in his deposition that "approximately all I did" with respect to the legal advice Skadden gave Guidant was "review[ ] what we call the deck that

[Charles] Mulaney gave to the Board of Directors fundamentally to see if I thought it complied with my understanding of Indiana law." (Strain Deposition at 59:15-24, Weinberger Decl. Exh. B). In sum, Mr. Strain has stated his view of Indiana law, anointed the legal advice that Guidant supposedly received as consistent with that view, and concluded that Guidant comported with the law by following that advice.

## C.    <u>Report of Meredith Mason Brown</u>

Brown is a retired New York mergers and acquisitions lawyer. His report ("Brown Rep.", Weinberger Decl. Exh. C) is as rife with legal opinions and ultimate conclusions as Strain's. In his "Summary of Opinions" subsection, Brown offers myriad assertions of law, including his understanding that directors of target companies in Indiana owe their companies a duty of care; his understanding that directors of target companies also owe their companies a duty of good faith; his view that "no-shop, no-talk provisions without reasonable exceptions may be held to be unenforceable" under the law; and his view about what kind of conduct by a target company amounts to "willful" behavior under the law. (Brown Rep. at 3-5).

Brown concludes by asserting that Guidant's conduct was lawful. Specifically, Brown opines that it was "reasonable and permissible . . . for Abbott to be furnished with information relating to Guidant" and, therefore, "Guidant's general counsel proceeded with due care and relied reasonably . . . on advice of outside counsel." (Brown Rep. at 4). Brown specifically opines that Guidant was authorized to provide due diligence to Abbott on the basis that Abbott was either a "Representative," because it was "a key member of the team working with Boston Scientific to effect the acquisition of Guidant" (Brown Rep. at 4), or that it made a Takeover Proposal either alone or jointly with Boston Scientific. (*Id.*)

On a different subject, Brown asserts that it would be unrealistic to assume that J&J would have successfully completed its acquisition of Guidant at $63.08 per share but for

Guidant's breach.  (Brown Op. at ¶ 1.2(j)).  Casting a blind eye at the record evidence so utterly at odds with his theses, Brown contends that there were other ways Boston Scientific could have made an offer for and acquired Guidant that did not involve providing due diligence to Abbott. It should be noted that this is flatly inconsistent with Mr. Brown's opinion regarding interpretation of Section 4.02 of the Merger Agreement, which is predicated on the notion that, unless Boston Scientific could provide due diligence to Abbott, there was no way for it to make an offer for Guidant.  (Brown Rep. at 22).  In any event, Mr. Brown suggests: (1) Boston Scientific *could have* made an offer to buy Guidant and Abbott *could have* made an offer to buy the assets to be divested conditioned on completion of due diligence; (2) Boston Scientific *could have* made an offer conditioned on the shareholders' rejection of the Merger Agreement; or (3) Boston Scientific *could have* tendered an offer directly to the shareholders of Guidant for their shares.  While these were undoubtedly possible in theory, there is no evidence whatsoever to suggest that they would have occurred; to the contrary, Boston Scientific's board made clear that Boston Scientific would *not* make a definitive offer without a binding agreement with Abbott, which Abbott would *not* enter into without the due diligence it ultimately received.  (SJ Decision at 24).  Nor is there any evidence that Boston Scientific could have secured any other divestiture purchaser.  *Id.*

**D.    Report of Bradford Cornell**

Cornell, a professor of finance, employs "empirical research" to reach the same conclusion as Brown that it would be unreasonable to assume that J&J would have acquired Guidant for $63.08 per share but for Guidant's breach.  In his report ("Cornell Rep.", Weinberger Decl. Exh. D), Cornell examines instances in the marketplace in which a second bidder emerged to acquire a target company and concludes that: (1) the likelihood that the first bidder will end up acquiring the target are reduced by approximately 50% (Cornell Rep. at 3);

and (2) the final bids in multiple bidder contests are almost 18% higher than the initial bid (*id.* at 18). Though these findings may accurately recount other acquisitions, Cornell has admitted that his analysis is based on the same faulty premise as Brown's: that Boston Scientific would have made a definitive offer without a firm commitment from Abbott. (Cornell Tr., attached at Weinberger Decl., Exh. E at 84:18-87:10). Cornell cites no evidence in his report—nor is there any—supporting this presumption. Indeed, the record evidence, from the mouth of Boston Scientific's CFO, is that Boston Scientific was not prepared to move forward without a "committed sign-on-the-dotted-line partner" in hand. (Best Tr., attached at Weinberger Decl., Exh. F at 94:16-21).

**Argument**

**A.      The governing *Daubert* standard for admissibility**

FRE 702 permits "a witness who is qualified as an expert" to testify if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; if "the testimony is based on sufficient facts or data"; if "the testimony is the product of reliable principles and methods"; and if "the expert has reliably applied the principles and methods to the facts of the case." The rule entrusts the District Court with the critical gatekeeping task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The gatekeeping responsibility "applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotations omitted). The proponent of expert testimony must carry the "burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*).

The expert's testimony also must "fit" the issues in the case by having a "valid scientific [or other technical] connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591-92. Courts have looked to the definition of relevance under FRE 401 for guidance, examining whether the testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (analyzing *Daubert* and quoting FRE 401). "If the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002).

Under FRE 702, an expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate.  Experts "perform a very different function in litigation than that of the lawyer; they do not serve as advocates, but as sources of information."  *EEOC v. Locals 14 & 15, Int'l Union of Operating Eng'rs*, No. 72 Civ. 2498(VLB), 1981 WL 163, at *4 (S.D.N.Y. Feb. 11, 1981).  Indeed, "'[w]hen expert witnesses become partisans, objectivity is sacrificed to the need to win.' " *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 184 (E.D.N.Y. 2001) (quoting *Rubinstein v. Marsh*, No. CV–80–0177, 1987 WL 30608, at *7 (E.D.N.Y. Dec. 10, 1987)); *see also Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (granting motion to exclude expert testimony where witness "does not serve as an expert but, rather, seeks to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence").

**B.**     **The Legal Opinions Expressed in Strain's and Brown's Expert Reports Are Inadmissible**

The Second Circuit Court of Appeals has repeatedly held that "[a]s a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). *Accord, e.g., U.S. v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) (discussing impropriety of expert testimony that appl[ies] the law to the facts before it" or "purports to explain the law"); *Marx & Co., Inc. v. The Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) ("The special legal knowledge of the judge makes the witness' testimony superfluous."); *see also In re Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("This Court has repeatedly held that the testimony of an expert on matters of domestic law is inadmissible for *any* purpose.") (emphasis in original; citation omitted).

On the basis of this rule, courts in this circuit have consistently precluded experts from testifying as to the statutes and case law governing a particular area of the law, the interpretation of the law, and the application of the law to the facts. For instance, in *Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005), the plaintiffs in a breach of contract action sought to introduce expert testimony to the effect that certain parties involved in the challenged transaction had violated securities laws. The expert report "set[] forth the governing statutes and case law that underlie criminal violations of the securities laws" and "discuss[ed], through reference to case law, the type of conduct that [the expert] believe[d] would constitute a criminal violation of [securities laws]." *Id.* at 465-66. In reliance on the Second Circuit precedent cited above, the court excluded the report, holding that it was improper for a witness to discuss governing law, apply legal principles to the facts, or reach ultimate conclusions of law. *Id.* at 470-72.

Similarly, in *Initial Public Offering Securities Litigation*, defendants in securities litigation attempted to introduce affidavits from law professors opining on whether 28 U.S.C. § 455 required recusal of the presiding judge.  The court excluded the declarations as improper "legal opinions and analyses," 174 F. Supp. 2d at 66, and went on to note:  "In our adversarial system, lawyers make arguments, judges write legal opinions – and there is no such thing as an expert opinion when it comes to interpreting a statute unless that opinion belongs to a court." *Id.* at 69.

Cases excluding expert testimony of this sort are legion.  *See, e.g., Marx*, 550 F.2d at 509-10 (testimony of expert who "gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed [defendants'] conduct," provided "legal opinions as to the meaning of the contract terms at issue," and "repeatedly gave his conclusions as to the legal significance of various facts adduced at trial" should have been excluded); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1258 (2d Cir. 1987) (affirming exclusion of expert-attorney's proposed testimony that contracts were unenforceable for lack of essential terms); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 381 (S.D.N.Y. 1999) (excluding expert affidavit that "almost wholly expresses legal conclusions on the meaning of the 1976 [Copyright] Act"); *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1235-36 (E.D. Cal. 2005) (excluding expert report that read "like a legal brief," "features numerous citations to federal court opinions," and "applies a variety of regulatory law to facts," and noting that the court "is perfectly able to review FCC decisions and regulations to decide how the law applies to the present facts").

Brown's report sets forth a series of opinions that either state his understanding of Guidant's statutory and contractual obligations, or express his view on whether Guidant violated

those obligations.  With each opinion, he impermissibly applies legal principles to the facts or

asserts conclusions of law.  *Cf. Highland Capital*, 379 F. Supp. 2d at 470-72.  He summarizes his

opinions, each of which are inadmissible, in Section 1.2 of his Report.  Taking them in turn:

- Brown asserts that "[a] director of a target company such as Guidant that is
incorporated in Indiana is required to act 'with the care an ordinarily prudent
person in a like position would exercise under circumstances' and 'in a manner
the director reasonably believes to be in the best interests of the corporation,' and
directors will not be protected from liability for actions not taken 'in the good
faith exercise of their business judgment after reasonable investigation.'"  (Brown
Rep. at 3, ¶ 1.2(b)).  But experts may not testify about general principles of the
law, including standards of care.  *Cf. LaSalle Bank N.A. v. CIBC Inc.*, No. 08 Civ.
8426 (WHP)(HBP), 2012 BL 40702 (S.D.N.Y. Feb. 14, 2012) (precluding expert
who provided instructions "as to the applicable principles of the law").

- Brown opines that "it was reasonable, and permissible under section 4.02 . . . for
Abbott to be furnished with information relating to Guidant . . . ."  (Brown Rep. at
4, ¶ 1.2(f)).  But expert opinions about whether a party breached a contractual or
other legal duty have been repeatedly precluded by courts, especially where such
opinions pertain to the ultimate legal issue to be decided by the court.  *Cf. CIT
Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp.
2d 673, 678 (S.D.N.Y. 2011) (expert may not "opine as to whether events
constituted a material breach of the Credit Agreement" because such "testimony
would constitute an impermissible opinion as to an ultimate legal conclusion").

- Brown opines that "Guidant's general counsel proceeded with due care and relied
reasonably . . . on advice of outside counsel, before authorizing due diligence
information relating to Guidant to be furnished to Abbott . . . ."  (Brown Rep. at 4,
¶ 1.2(g))  This, too, constitutes a legal opinion with respect to whether a party
breached a legal duty—here, the duty of due care—and expert opinions
addressing this topic have been routinely rejected by courts. *See, e.g., Muller-
Paisner v. TIAA*, 881 F. Supp. 2d 579, 591 (S.D.N.Y. 2012) (excluding expert
who opined that defendants breached fiduciary duty and duty of due care because
expert may not give testimony stating ultimate legal conclusions based on those
facts"), *judgment vacated and case remanded on other grounds*, 528 Fed. Appx.
37 (2d Cir. 2013); *cf. also United States v. Brooks*, 2010 BL 5690, 4-5 (E.D.N.Y.
Jan. 11, 2010) ("[A]lthough a corporate governance expert can explain what a
CEO does . . . , the expert cannot opine as to whether a specific CEO's acts
breached any fiduciary duty.").

- Brown asserts that certain "[n]o-shop, no-talk provisions . . . may be held to be
unenforceable."  (Brown Rep. at 3, ¶ 1.2(c)).  Courts have consistently ruled that
experts who opine on the enforceability of a contract may not testify at trial. *See,
e.g., F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1258 (2d Cir.

1987) ("district court did not err in excluding [the attorney's] proposed testimony that the Contracts were unenforceable for lack of essential terms").

- Brown opines on whether Section 4.02 would unreasonably bar other corporate entities not party to the Merger Agreement from making their own Takeover Proposal. (Brown Rep. at 4, ¶ 1.2(e)). But expert witnesses may not opine on the meaning of readily understood contract terms or on the legal effect contract terms may be given. *See F.H. Krear & Co.*, 810 F.2d at 1258 (same as above); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977) (excluding expert's testimony that was tantamount to "legal opinions as to the meaning of the contract terms at issue").

- Brown furnishes his own definition of the word 'willful' and then opines that Guidant did not act willfully. (Brown Rep. at 5, ¶ 1.2(h)). But experts may not offer opinions that purport to state ultimate legal conclusions about a party's state of mind. *Cf., e.g., Kidder, Peabody & Co. v. IAG Intl. Acceptance Group Naamloze Vennootschap*, 14 F. Supp. 2d 391, 401 (S.D.N.Y. 1998) ("[W]hile a client such as Kidder, asserting a reasonable reliance defense, may testify as to . . . the advice it received and its reliance upon it, and the advisers may describe the advice they gave, questions of whether the client . . . acted throughout in good faith or with malice" are fact issues not helped by "expert opinion testimony about the reasonableness of the advice or the client's reaction to it").[3]

In nearly every respect, Brown's opinions are indistinguishable from statements made in Guidant's legal briefs. He recites certain laws and then explains Guidant's view of how those laws should be applied to the facts of the case. In fact, Mr. Brown spends nearly seven pages of his report recapitulating pure principles of statutory and case law and citing several cases from the Delaware Chancery Court and elsewhere to support his conclusions. (*See* Brown Rep. at 11-17). His testimony falls squarely within the well-settled Second Circuit authority precluding experts from offering legal opinions and therefore must be excluded from trial.

Strain's opinions also violate Second Circuit precedent. Although he couches his legal opinions as explanations of the advice that Indiana lawyers would purportedly give their clients as a matter of "custom and practice," that custom and practice, according to Mr. Strain, is to

---

[3] In any event, Brown's opinions about the definition of "willful" should be excluded as the Court has already ruled on that issue. (SJ Decision at 12-16).

advise Indiana lawyers what the law is in a given situation.  His use of the phrase "custom and practice" does not transform his opinions about the application of Indiana law to the facts of this case into permissible, non-legal assertions.  *Cf. Media Sport & Arts s.r.l. Kinney Shoe Corp.*, No. 95 Civ. 3901 (PKL), 1999 BL 126 (S.D.N.Y. Oct. 18, 1999) ("Even if [the proposed expert's] testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case.").  *See also United States v. Bilzerian*, 926 F.2d 1285, 1294-95 (2d Cir. 1991) (precluding testimony of expert who impermissibly "blurr[ed] the line between testimony regarding industry practice and an opinion of defendant's conduct").

Moreover, as this Court has already noted, under Indiana law, a court must "'determine whether the language of the contract is ambiguous.'  If the contract is unambiguous, then the contract's language is conclusive, and the parties' intent is determined from the four corners of the contract." (SJ Decision at 12, *citing Dave's Excavating, Inc. v. City of New Castle*, 959 N.E.2d 369, 376 (Ind. Ct. App. 2012)).  Indiana courts have long held that custom and practice—or "custom and usage"—is just the kind of extrinsic evidence not properly admitted to determine the meaning of an unambiguous contract term.  *See, e.g., Herz Straw Co. v. Capitol Paper Co.*, 216 Ind. 568, 572 (Sup. Ct. Ind. 1940) ("Usage or custom may never be utilized, however, to vary or contradict the terms of a clear and unambiguous contract. In other words, any ambiguity or uncertainty must appear in the contract before it is proper to turn to usage and custom to determine its meaning.").  *See also Fujitsu Ltd. v. Federal Express Corp.*, 76 F. Supp. 2d 474, 475 (S.D.N.Y. 1999) ("custom and usage may not modify a clear provision of a contract").

In *Roberts v. Community Hospitals of Indiana, Inc.*, a medical professional brought a breach of contract action against his hospital employer for terminating his employment in

violation of his medical residency contract.  897 N.E.2d 458, 467 (Ind. 2008). On a motion to

correct judicial error, the court denied plaintiff's request to proffer testimony from a medical

residency contract expert about the custom and usage of certain terms in the plaintiff's

employment agreement.  *Id.*  The appellate court affirmed, noting that it was "not persuaded by

the plaintiff's proposal to present expert testimony on the custom and usage of medical residency

contracts [because] Indiana follows 'the four corners rule' that 'extrinsic evidence is not

admissible to add to, vary, or explain the terms of a written instrument if the terms of the

instrument are susceptible of a clear and unambiguous construction.'"  *Id.*

      Giving nearly all of the opinions set forth in the "Introduction and Summary of Opinions"

section of Strain's report a semantic tweak lays bare how each claimed "custom and practice of

[Indiana] lawyers" merely recites Mr. Strain's belief about the application of Indiana law to the

facts of this case.  Below are nearly all of his opinions listed in his "Introduction," replacing the

"custom and practice" phrases with essentially synonymous words, without altering the meaning

of his opinions:

- "~~The custom and practice of lawyers advising about Indiana law would be to [ ]~~ ~~advise the Board of Directors of Guidant that~~ **[Indiana law requires that]** (i) given the language of the [Merger Agreement], it was [the directors'] fiduciary obligation to follow a thorough process to determine what was in the best interests of the corporation in light of the qualifying 'Takeover Proposal.'"  (Strain Rep. at 2, ¶ I(2)).

- "~~The custom and practice of lawyers advising about Indiana law would be to . . .~~ ~~advise~~ **[Indiana law requires]** the Board of Directors of Guidant to follow a thorough process to determine whether the 'Takeover Proposal' made by BSX would be reasonably likely to lead to a 'Superior Proposal' until such time as the Board determined that the Takeover Proposal would not lead to a Superior Proposal." (Strain Rep. at 2, ¶ I(2)).

- "~~[I]t is the custom and practice of lawyers advising the boards of directors of~~ ~~Indiana public corporations to advise the company to~~ **[It is proper under Indiana law]** to advise the company to follow a thorough process in determining whether to take action and what that action should be as a means of both fulfilling

the directors' obligations and availing themselves of the 'conclusive presumption' protection contained in [Ind. Code § 23-1-35-1(g)]." (Strain Rep. at 1, ¶ I(1)).

- "Because directors of Indiana corporations are entitled to rely on 'information, opinions, reports or statements' if they are prepared by 'legal counsel' as to matters the director 'reasonably believes are within the person's professional or expert competence,' Ind. Code § 23-1-35-(b)(2), ~~it would be the custom and practice of lawyers advising about Indiana law to~~ [it would be proper under Indiana law to] incorporate such reliance into a merger agreement and . . . that, once BSX appeared on the scene, the Board should follow the advice of experienced merger and acquisition counsel with respect to the process to be followed and its completion, unless they believed that such counsel was not expert in merger and acquisition matters."  (Strain Rep. at 3, ¶ I(4)).

- "~~No lawyer advising a board of any public company in Indiana, as a matter of custom and practice, would or could tell that board~~ [It is not true under Indiana law] that Skadden Arps' and Mr. Mulaney's advice should not be followed because neither it nor he was expert in public company merger and acquisition matters."  (Strain Rep. at 3, ¶ I(5)).

- "~~The custom and practice of a lawyer advising about Indiana law would be to advise~~ [Under Indiana law, it was proper for] the Board of Guidant to enter into [the] confidentiality agreement with BSX and supply it information pursuant to such agreement because the Board was obligated, as a matter of its fiduciary duty, to act in the best interests of the corporation, to determine whether BSX's 'Takeover Proposal' could reasonably lead to a 'Superior Proposal' as defined." (Strain Rep. at 3, ¶ I(7)).

- "~~As a matter of custom and practice in Indiana,~~ [Under Indiana law,] the confidentiality agreement that Skadden Arps advised Guidant to execute with BSX was appropriate . . . ." (Strain Rep. at 3, ¶ I(7)(a)).

- "[I]t ~~would be the custom and practice of a lawyer advising about Indiana law that~~ [Under Indiana law,] (i) if a 'Takeover Proposal' were made and if the bidder making that proposal wanted to include limited other persons within the confidentiality agreement, and (ii) so long as such persons were subject to the same confidentiality requirements with respect to information provided as required by the confidentiality agreement between J&J an Guidant, and could only use that information for the same reason as stated in the J&J confidentiality agreement, viz., to explore a possible negotiated business transaction, then (iii) the target company should allow the modification to the agreement to expressly include such other persons so that the Board could fulfill its duty to determine whether the 'Takeover Proposal' could lead to a 'Superior Proposal.'" (Strain Rep. at 4, ¶ I(8)).

- "~~[I]t would be the custom and practice of lawyers advising about Indiana law to advise the Board of Guidant that~~ [**Under Indiana law,**] Abbott's inquiry . . . could independently justify the granting of due diligence and running a process to determine whether Abbott's inquiry would lead to a 'Superior Proposal.'" (Strain Rep. at 5, ¶ I(9)).

- "~~[I]t would be the custom and practice in Indiana to advise that~~ [**Under Indiana law,**] the word 'willful' . . . had the same meaning as the word 'willful' in the directors liability section of the [Indiana Business Corporation Law], and therefore, imposes a standard of liability requiring, 'at a minimum a conscious disregard of or indifference to the consequences of a risky act' . . . ." (Strain Rep. at 5, ¶ I(10)).

- "~~[I]t would be the custom and practice of a lawyer advising about Indiana law to advise that~~ [**Under Indiana law,**] a board following Skadden Arps' and Mr. Mulaney's advice in connection with the various steps that occurred after the receipt of BSX's 'Takeover Proposal' on December 5, 2005, would not be acting either 'willfully' or with 'reckless disregard' as those terms are used in the [Indiana Business Corporation Law] . . . ." (Strain Rep. at 5-6, ¶ I(12)).

That none of these tweaks changes the meaning of any of Strain's opinions demonstrates that Guidant's attempt to avoid their obvious characterization as legal opinions is nothing but fancy footwork.

At the heart of both Strain's and Brown's reports are their opinions that the interpretation of "Representatives" that Guidant prefers is legally correct. (*See* Strain Rep. at 16, ¶I(8)b; Brown Rep. at 4, ¶ 1.2(f)). Their interpretations are advanced in aid of their conclusions that Guidant's actions were consistent with the Merger Agreement and that it was reasonable for Guidant to rely on advice to that effect. (*Id.*). While experts are allowed to testify about the specialized meanings of terms in their industry of expertise, *see Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry.*, 762 F.3d 165 (2d Cir. 2014), the term "Representative" has no specialized or

accepted industry meaning, nor does Guidant contend that it does.[4]   These contractual
interpretation "opinions" are nothing short of inadmissible conclusions of law.

In addition, neither Brown nor Strain have any basis for opining that Abbott is a
"Representative" under Section 4.02(a) other than their own say-so.  Specifically, the sole reason
advanced by Strain in support of his opinion that the term "Representative" somehow includes
Abbott, is that his view is "consistent" with his understanding of "how a practitioner advising the
Board or officers of an Indiana corporation would and should act."  (Strain Rep. at 18).  For his
part, Brown says Abbott was a "Representative" because it was "a key member of the team
working with Boston [Scientific] to effect the acquisition of Guidant . . . ."  (Brown Rep. at 4, ¶
1.2(f)), without even attempting to explain how the conclusion follows from the premise.
"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit
opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."  *Lava
Trading Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037 (PKC), 2005 WL 4684238, at *10
(S.D.N.Y. Apr. 11, 2005).

Finally, in ruling on Guidant's motion to dismiss, Judge Lynch held that "a divestiture
party is too unlike the enumerated 'Representatives' to fall within any reasonable interpretation
of the term . . . [and] Abbott can no more be considered a representative by virtue of its loan to
[Boston Scientific] than it can by virtue of its status as a divestiture party."  525 F. Supp. 2d 336,
548-49 (S.D.N.Y. 2007).  This Court reiterated that conclusion in denying Guidant's motion for

---

[4] *See Sompo Japan Ins. Co.*, 762 F.3d at 181 ("Consideration of trade practice may be a useful
interpretation aid where there is a term in the contract that has an accepted industry meaning
different from its ordinary meaning or where there is a term with an accepted industry meaning
that was omitted from the contract. But [appellant] does not claim that there is such a term of art
included or omitted here.  Trade practice is therefore irrelevant in this case . . . .") (internal
quotations omitted).

summary judgment.  (SJ Decision at 17-18).  Judge Lynch also rejected the very argument advanced by Brown that "Representative" includes any key members of the team working with Boston Scientific to effect the acquisition of Guidant," holding that the parties could have drafted the agreement that way "but they did not do so."  525 F. Supp. 2d at 347.  These holdings establish as the law of the case that Abbott is not a "Representative" under Section 4.02(a).  "Under the law of the case doctrine, a determination by the Court at one stage of a proceeding becomes the 'law of the case' to be followed in successive stages of the same litigation, thus ensuring "the orderly progress of court proceedings."  *National Union Fire Ins. Co. of Pittsburgh, PA v. L.E. Myers Co. Group*, 937 F. Supp. 276, 284 (S.D.N.Y. 1996) (applying law of the case doctrine to exclude at trial any evidence meant to contravene conclusions reached by the court on motion for summary judgment).  Accordingly, even if one were to ignore the ample Second Circuit precedent for excluding these expert-lawyer opinions, Strain and Brown should nonetheless be barred from offering testimony revisiting and contradicting that determination.

C.    **Brown's and Cornell's Loss Causation Opinions Are Unsupported and Unrealistic And Therefore Are Inadmissible**

Brown also offers an opinion, as does Cornell, that even had Guidant not breached the Merger Agreement, J&J would not have been able to purchase Guidant for $63.08 per share.  (*See* Brown Op. at 1.2(j) & 6).  But "expert testimony should be excluded if it is speculative or conjectural," and the "[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion."  *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21, 22 (2d Cir. 1996). *See also Lava Trading Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037 (PKC), 2005 WL 4684238, at*21 (S.D.N.Y. Apr. 11, 2005) (excluding expert analysis "premised on a number of crucial factual assumptions that are dramatically belied by the record").  *Cf., e.g., Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319-20 (S.D.N.Y.

2009) (rejecting expert analysis based on "a series of assumptions that have no basis in fact or reality"); *Seneca Ins. Co. v. Wilcock*, No. 01 Civ. 7620 (MHD), 2007 WL 415141, at *11 (S.D.N.Y. Feb. 5, 2007) (rejecting expert who made "concededly false assumptions as to facts that are central to the accuracy or inaccuracy of [his] calculations"); *Mink Mart, Inc. v. Reliance Ins. Co.*, 65 F. Supp. 2d 176, 180-81 (S.D.N.Y. 1999) (excluding expert testimony based on "speculation" and not "grounded on verifiable propositions of facts"); *In re Fosamax Prod. Liab. Litig.*, 807 F. Supp. 2d 168, 183 (S.D.N.Y. Aug. 30, 2011) (excluding opinion testimony premised on false assumption that plaintiff took medication at issue for six years).

Brown's opinion has no basis other than rank speculation. He imagines three alternative scenarios that, according to him, could have transpired had Guidant not breached the Merger Agreement, none of which has any support in the record. Specifically, he contends that: (1) Boston Scientific could have submitted a proposal which included a contract with Abbott that was subject to completion on satisfactory due diligence; (2) Guidant shareholders could have disapproved the Merger Agreement following a firm offer by Boston Scientific; or that (3) Boston Scientific could have tendered an offer directly to the shareholders of Guidant for their shares. But there is not a shred of evidence that Boston Scientific would have submitted a "Superior Proposal" or offered to purchase Guidant shareholders' interests in the company without a firm commitment from Abbott. In fact, as the Court noted in its summary judgment decision, Boston Scientific's Chief Financial Officer testified that Boston Scientific's "board would not have carried out its proposal unless it had a 'committed sign-on-the-dotted-line partner' . . . and Abbott was unwilling to make a firm commitment to the divestiture deal until it had reviewed the diligence materials." (SJ Decision at 24). To the extent Guidant tries to support Brown's opinion by suggesting that Boston Scientific could have found another divestiture

partner had Abbott not firmly committed, the Court squarely rejected that possibility as well because "there is no evidence of this on the record." *Id.* *Cf. Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003) (rejecting expert's testimony who assumed contrary to fact that there were additional prospective purchasers of company at issue).[5]

Cornell's loss causation opinion is based on the same flawed premise. Cornell performs "empirical research" by showcasing a series of other acquisitions in which a second party emerges to bid on a target company. The problem is that Cornell concedes that his opinion is predicated on the *assumption* that Boston Scientific would have bid on Guidant without a firm divestiture commitment from Abbott (Exh. E at 84:18-87:10), and there is no evidence whatsoever to support that assumption. Indeed, the necessary premise of his loss causation analysis is totally contrary to the facts.

### Conclusion

For the reasons set forth above, James A. Strain and Meredith Mason Brown should be precluded from offering any expert testimony at trial, and Bradford Cornell should be precluded from offering any opinions regarding loss causation.

---

[5] The only factual evidence Brown offers to support any of his three scenarios are two emails indicating that Boston Scientific had a "strong interest" in acquiring Guidant, plus a December 7, 2005 email suggesting that the Guidant board determined that Boston Scientific tentative offer was likely to lead to a Superior Proposal. (Brown at ¶ 6.0) None of this even remotely contradicts the evidence the Boston Scientific would not have made a definitive offer.

Dated:    New York, New York
          October 10, 2014

Kramer Levin Naftalis & Frankel LLP

By: _____
     Harold P. Weinberger
     John P. Coffey
     Joel Taylor
     Jennifer Diana
     Jason M. Moff

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
hweinberger@kramerlevin.com
scoffey@kramerlevin.com
jtaylor@kramerlevin.com
jdiana@kramerlevin.com
jmoff@kramerlevin.com

*Attorneys for Plaintiff Johnson & Johnson*

KL3 2982672.8