UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————— x

JOHNSON & JOHNSON, a New Jersey       :
Corporation,                          :
                                      :
              Plaintiff,              :            **FILED UNDER SEAL**
                                      :
            - against -               :            Affidavit of William C. Weldon
                                      :
GUIDANT CORPORATION, an Indiana       :
Corporation,                          :
                                      :
              Defendant.              :

————————————————————————— x

STATE OF NEW JERSEY          )
                             ) ss.:
COUNTY OF MIDDLESEX          )

William C. Weldon, being sworn, says:

1.      I served as Chief Executive Officer of Johnson and Johnson ("J&J")
from 2002 until my retirement in April 2012.

2.      J&J agreed to acquire Guidant Corporation ("Guidant") in December
of 2004 for $72 per share for strategic reasons.  Specifically, we believed the Guidant
acquisition would strengthen our own cardiovascular franchise by adding a cardiac rhythm
management ("CRM") business that we could grow over a period of time, creating
substantial value for J&J shareholders.  It also offered the possibility of a second generation
drug-eluting stent ("DES") to complement or replace J&J's first generation Cypher stent,
which was at that time a market leader.

3.      In the fall of 2005, however, while we were working on securing
Federal Trade Commission ("FTC") approval for the transaction and on integration
activities, J&J came to the conclusion that Guidant had suffered a material adverse change

since the signing of the December 2004 agreement in that certain events involving recalls of CRM products and related investigations and litigation had decreased the value of Guidant. On October 18, J&J announced that it was "continuing to consider the alternatives" under the initial merger agreement, citing Guidant's recalls and related regulatory scrutiny. (PX 4). On November 2, J&J issued a press release announcing that it believed that there had been a material adverse change in the value of Guidant and that J&J was not obligated to close the merger transaction. Guidant disagreed and filed a lawsuit against J&J. During that time, I personally negotiated with my counterpart at Guidant, James Cornelius, the result of which was an amended agreement (the "Merger Agreement") reflecting a revised purchase price of approximately $63 per share. J&J believed this price was fair to Guidant's shareholders, while at the same time creating significant value for J&J's shareholders. Based on our valuation, at this price the transaction provided a net present value of $5 billion to J&J.

4.      In early December 2005, I became aware that Boston Scientific Corporation ("Boston Scientific") had made a tentative proposal to acquire Guidant for $72 per share. I instructed J&J's management to revisit our valuation models to see to what extent we might be willing to pay more than the $63 provided for in our Merger Agreement. I realized that if Boston Scientific decided to make a definitive offer at the $72 price envisioned in its tentative offer, the $63 per share that we had contracted to pay might not be sufficient. But we were not going to do anything until we saw whether Boston Scientific actually made a definitive offer. I believed that if Boston Scientific decided not to make a definitive offer or, even if it did, if the Guidant board nevertheless recommended the J&J transaction to Guidant's shareholders, the Guidant shareholders would approve our deal.

5.     After Boston Scientific made a definitive offer on January 8, 2006, I asked the J&J Board, in a meeting on January 10, 2006, to authorize me to increase J&J's offer to $71 and possibly to $72 per share assuming our financial advisor, Goldman Sachs, would issue a fairness opinion at that higher level.  While I was obviously not happy that we found ourselves in the position of having to increase what we had agreed to pay, the strategic rationale for acquiring Guidant remained compelling to J&J.  Because J&J already had antitrust approval and would have more resources to support the Guidant business once it was acquired, we did not believe we had to match the Boston Scientific offer dollar for dollar, as long as we were close.  A copy of the minutes of the January 10 Board of Directors' meeting is appended as Hilton Ex. 21.

6.     J&J increased its offer in two steps.  First, I sent a letter to Mr. Cornelius, along with an executed amendment to the Merger Agreement, increasing J&J's offer to $68 per share.  (Kury Ex. 43).  When Boston Scientific thereafter increased its offer to $73 per share, I sent Mr. Cornelius another letter increasing J&J's offer to $71 per share, along with an executed second amendment to the Merger Agreement.  (Hilton Ex. 24; Kury Ex. 47).

7.     I was aware that Boston Scientific might top this bid as well.  We were in fact prepared to go as high as $75 or perhaps even $76 per share if necessary.  I discussed with Kenneth Hitchner of Goldman Sachs, our investment banker, whether Goldman's fairness opinion would support an offer at the $75 level and he indicated that it would.  At my request, our management team prepared presentation materials for an upcoming January 18 meeting of J&J's Board of Directors to support my request for authorization to increase J&J's offer to $75 per share.  (Korbich Ex. 28).  After Boston

Scientific increased its bid to $80 per share on January 16, I called Mr. Cornelius and told him that J&J was prepared to bid as high as $75 per share. He told me that Guidant's Board of Directors was not interested in an offer from J&J that was lower than Boston Scientific's. It was clear to me that $75 would not be sufficient. Accordingly I recommended to the Board of Directors at our January 18 meeting that J&J not increase its offer. A copy of the minutes of the January 18 Board of Directors' meeting is attached at Deyo Ex. 29.

8.      I may have been aware at this time of facts that, if proven true and not explained, would indicate that Guidant had breached the Merger Agreement by providing confidential information to Abbott Laboratories ("Abbott"). I left those issues to the attorneys; my primary goal at the time, as I have indicated, was to try to salvage what I viewed as a very important transaction for J&J. When that effort failed, I ultimately authorized the commencement of this lawsuit because I believed that J&J had been seriously harmed by losing the opportunity to gain access to technologies and products that could be grown and enhanced over a protracted period of time. As of today, J&J has no presence in the CRM market and last year exited the DES market because it was unable to effectively compete with Boston Scientific and Abbott, both of whom are marketing second generation drug-eluting stents acquired in the Guidant transaction.

_William C. Weldon_
William C. Weldon

Sworn to before me this
9th day of October 2014

_Deborah Kinelski-Tommelli_
Notary Public

DEBORAH KINELSKI-TOMMINELLI
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 10/26/2015

- 4 -

**DEYO EX. 29**

JOHNSON & JOHNSON

Special Meeting of the Board of Directors

January 18, 2006

(Via Telephone Conference)

A Special Meeting of the Board of Directors of Johnson & Johnson was held on Wednesday, January 18 at 7:00 p.m. via a telephone conference call. All participants were able to hear and be heard by each other. The following Directors, constituting a quorum, participated in the meeting:

James Cullen
Robert Darretta
Arnold Langbo
Susan Lindquist
Michael Johns
Leo Mullin
Christine Poon
Steve Reinemund
William Weldon

[Dr. Mary Sue Coleman, Mrs. Ann Jordan and Dr. David Satcher received a full report from Messrs. Weldon and Deyo and Ms. Poon in a telephone conference call on Thursday, January 19.]

In addition, the following people participated in the meeting: Russ Deyo, Mike Dormer, Kaye Foster-Cheek, Colleen Goggins, Per Peterson, Joe Scodari and Nick Valeriani, Members of the Executive Committee; Michael Ullmann, Secretary; John Papa, Treasurer; James Hilton, Associate General Counsel; Dominic Caruso, Group Vice President, Finance; Robert Townsend from Cravath Swaine & Moore and Ken Hitchner and Elizabeth Mily from Goldman Sachs.

Mr. Weldon presided as Chairman of the Meeting and Mr. Ullmann served as Secretary.

1

EXHIBIT
Deyo . 29
E-16-10

CONFIDENTIAL

JJH00111603

Mr. Weldon described the recent developments since the last Board meeting, including the decision by Guidant's Board to declare the current Boston Scientific offer "superior" to the current J&J offer, which had triggered the five-day notice the previous day.

Mr. Weldon reported to the Board that management did not recommend increasing the Company's bid at this point in time. Mr. Weldon also discussed the possibility that the Company might increase its offer if it could enter into satisfactory licensing arrangements with a third party.

There were questions from the Board and discussion among the Board and management.

At this point, the Goldman Sachs advisors, James Hilton and Robert Townsend left the meeting. The meeting was joined by Mr. Tom Heyman, Executive Vice President Licensing & Acquisitions, and Mr. John Crisan, Assistant General Counsel.

Mr. Weldon introduced and asked Ms. Poon to lead the Project Deli discussion. Ms. Poon described the background of the target company, including company ownership, sales growth rates and geographic presence.

Mr. Scodari reviewed the strategic rationale for the transaction, including, diversification of the Company's pharmaceutical business between biologics and small molecules, a platform for globalization of the Company's biotechnology business and expansion of biologics manufacturing capabilities and capacity. There was discussion on the advantages of biological products over small molecule products in the current environment.

He continued by reviewing the projected impact of the transaction on the compound annual growth rate of the Medicines & Nutritionals Group. He then reviewed the key product value drivers, including, multiple sclerosis products and other products in the pipeline.

2

There was then discussion of key deal issues, including, the sellers' request for a tax indemnity, considerations under Swiss law and a recent settlement and resulting corporate integrity agreement arising from the sales of one of the target company's products.

Mr. Scodari then reviewed the valuation, purchase price comparisons and the impact on earnings per share.

Throughout the presentation there were questions from the Board and discussion among the Board and management. Among the issues discussed were competition for the target, the sellers' motivation for selling the target and the Company's ability to purchase both the target and Guidant.

There being no further questions from the Board, Mr. Weldon asked if there was support from the Board to submit a non-binding bid for the target. It was the sense of the Board that the Company should submit a non-binding bid, which would be subject to continued due diligence and final Board approval.

At the request of the Board, Mr. Weldon then recapped the Company's position with respect to Guidant. There was further discussion of the reaction in the investment community to the Boston Scientific offer.

There being no further business to come before the Board, the meeting was adjourned at 8:30 p.m.

Michael H. Ullmann
Secretary

BODMTGS\Special Board Meeting Jan 18 2006.doc

3

CONFIDENTIAL

JJH00111605

# HILTON EX. 21



# JOHNSON & JOHNSON

## Special Meeting of the Board of Directors
### January 10, 2006
### (Via Telephone Conference)

A Special Meeting of the Board of Directors of Johnson & Johnson was held on Tuesday, January 10 at 7:00 p.m. via a telephone conference call. All participants were able to hear and be heard by each other. The following Directors, constituting a quorum, participated in the meeting:

> Mary Sue Coleman
> James Cullen
> Robert Darretta (did not participate in Executive Session)
> Michael Johns
> Ann Jordan
> Arnold Langbo
> Leo Mullin
> Christine Poon (did not participate in Executive Session)
> Steve Reinemund
> William Weldon

[Dr. Susan Lindquist and Dr. David Satcher were unable to participate in the special meeting of the Board, but received a full report from Messrs. Weldon and Deyo in a telephonic conference call on Wednesday, January 11.]

The meeting began with an Executive Session of Mr. Weldon and the independent directors. At 7:30 p.m. the meeting was joined by Mr. Darretta and Ms. Poon and Russ Deyo, Michael Dormer, and Nicholas Valeriani, members of the Executive Committee, and the following individuals: Michael Ullmann, Secretary; John Papa, Treasurer; James Hilton, Associate General Counsel; Dominic Caruso, Group Vice President, Finance; and Steven Rosenberg, Assistant General Counsel. The following individuals, representing the Company's Advisors, were also present: Robert Townsend from Cravath Swaine & Moore and from Goldman Sachs: John Powers, Ken Hitchner, Elizabeth Mily and Peter van der Goes.

Mr. Weldon presided as Chairman of the Meeting and Mr. Ullmann served as Secretary.

1

CONFIDENTIAL

Mr. Weldon explained that he had reviewed and discussed recent developments with the independent directors during the Executive Session.

Mr. Valeriani reviewed the continued strategic value of the proposed transaction, including, entry into the cardiac rhythm management (CRM) business, benefits to the Cordis franchise and the Company's core growth, and Guidant's micro-technology capabilities.

Mr. Valeriani reviewed the competitive landscape in certain areas, including, drug-eluting stent pipeline, commercial strength, catheter lab breadth and CRM, in the current environment, in the event that the Company acquires Guidant and in the event that Boston Scientific were to merge with Guidant and sell certain businesses to Abbott Laboratories.   Mr. Valeriani also reviewed worldwide stent share estimates and cardiovascular device sales estimates in each of the above-described scenarios.

Mr. Caruso then provided an update on the valuation, including, core assumptions for CRM and stent market growth, market share and compound annual growth rate (CAGR) in the original model and the current model.  He continued by reviewing the components of value in the proposed transaction, as well as changes in the value from the initial deal.  Mr. Caruso then reviewed the changes in net present value and IRR of the transaction at the initial deal price, the re-negotiated deal price and the current proposed offer price.  He also reviewed the sensitivities included in the current financial model.  Mr. Caruso concluded by reviewing a financial summary comparing the re-negotiated price as of November 13, 2005, the current value of the re-negotiated price and the current proposed offer price.

REDACTED

CONFIDENTIAL

JJH00111608

**REDACTED**

Throughout the presentations there were questions from the Board and discussion among the Board, management and the advisors.

There being no further questions from the Board, Mr. Weldon asked the Board to authorize the Finance Committee of the Board of Directors to approve a revised definitive amendment to the Amended and Restated Merger Agreement with terms and conditions consistent with those discussed with the Board. The Board unanimously indicated their approval for an aggregate price of up to $71 for each share of Guidant stock and, subject to confirmation of the ability of Goldman Sachs to deliver a fairness opinion at $72 for each share of Guidant stock, authorized the Finance Committee to approve an aggregate purchase price not to exceed $72 for each share of Guidant stock.

The formal portion of the Board meeting ended at 8:30 p.m. At that time, the independent members of the Board reconvened in Executive Session with the Goldman Sachs advisors, Mr. Ullmann and Mr. Weldon. The other members of management and Mr. Townsend left the meeting. Mr. Hitchner discussed the ability of Goldman Sachs to deliver a fairness opinion at a range of prices above $71 per share. There were additional questions from the members of the Board on the financial and strategic implications of the proposed transaction.

The Goldman Sachs advisors and Mr. Ullmann then left the meeting and Mr. Weldon met alone with the independent members of the Board.

There being no further business to come before the Board, the meeting was then adjourned at 8:45 p.m.

Michael H. Ullmann
Secretary

3

CONFIDENTIAL

JJH00111609

# HILTON EX. 24

Jan-13-06   03:24pm   From-GUIDANT                    +3178712118      T-086   P.002/011   F-994

*Johnson & Johnson*

WILLIAM C. WELDON
CHAIRMAN
AND
CHIEF EXECUTIVE OFFICER

NEW BRUNSWICK, NEW JERSEY 08933

January 13, 2006

James M. Cornelius
Chairman of the Board of Directors
Guidant Corporation
111 Monument Circle, 29th Floor
Indianapolis, IN 46204-5129
Attention: Board of Directors

Dear Jim:

Johnson & Johnson remains committed to a combination with Guidant, which we firmly believe will be in the best interests of Guidant shareholders and employees and for cardiovascular physicians and their patients. We are submitting a revised offer of $71, consisting of 0.493 shares of Johnson & Johnson common stock and an amount of cash (to be inserted into the attached amendment) equal to the difference between $71 and the value of the stock component as of the close of trading on January 13, 2006. This transaction can be closed by month end as scheduled.

In contrast, Boston Scientific's latest offer continues to suffer from risks and uncertainty. Boston's revised offer shifts certain risks to shareholders of a combined Guidant/Boston, and does not eliminate them. The risk that regulators will require the complete divestiture of Guidant's drug eluding stent program remains. If Boston is ultimately unable to retain rights to this program, there will be a substantial economic impact to a combined Boston/Guidant. Guidant's shareholders would suffer since the value of Boston stock they are to receive would decline, at a time when the collar no longer exists.

Boston's latest offer will also lead to significant additional dilution by increasing the amount of leverage that Boston must incur to complete a transaction. This additional leverage will require Boston to depend further on aggressive cost cutting and will further limit its flexibility during a period when substantial investments will be required to rebuild Guidant's business and grow its market share. These factors also increase the risk that any further adverse developments will result in a negative vote by Boston's shareholders, who are entitled to block the transaction for any reason.

EXHIBIT
Hilton 24
7 27 10
GAIL F. SCHOBEL, C.S.R., C.R.R.

CONFIDENTIAL

GDT 00027113

In addition, Boston's proposed extension of the kick out date to September 30, 2006 reflects Boston's expectation of a lengthy and difficult regulatory approval process. Any delay in closing a transaction hurts Guidant's business, both in terms of extending an already delayed transition and in the substantial likelihood of employee departures. In addition, such delay exposes Guidant's shareholders to risks that such delay may result in events that could derail the transaction or reduce the value of the consideration. Notably, the collar protection afforded by Boston's proposal expires if and when Guidant's shareholders approve a merger with Boston, leaving your shareholders exposed to any decline in Boston's share price during the several months between approval and closing.

We continue to believe that a transaction between Johnson & Johnson and Guidant Corporation provides the best outcome for Guidant, its shareholders and its employees, and honors the organization that you have built. We believe that our revised offer represents clearly superior value for Guidant's shareholders, which they can obtain with speed and certainty, and that Boston Scientific's offer continues to contain significant risks to Guidant and its shareholders.

Our revised offer, which has been approved by our Board of Directors, will remain open until 4:00 pm on January 17, 2006. Attached is a signed Amendment No. 2 to the Amended and Restated Agreement and Plan of Merger dated as of November 14, 2005, as amended, among Johnson & Johnson, Guidant and Shelby Merger Sub, Inc., which reflects our revised offer. Please indicate your acceptance of our offer by signing and returning a copy of the attached amendment.

We look forward to your prompt consideration of our revised offer. As you know, this letter and our discussions are confidential subject to the terms of our confidentiality agreement with you, and as such are not to be disclosed.

We look forward to working together with you in obtaining shareholder approval and completing our transaction.

Sincerely,

*William C. Weldon*

William C. Weldon
Chairman & Chief Executive Officer

KORBICH EX. 28

From:         Muller, Adam
Sent:         Wednesday, January 18, 2006 9:51 AM
To:           Hitchner, Ken, Mily, Elizabeth, van der Goes, Peter, Sissel, Anne, Sun, Judy
Subject:      Fw: Draft

Attachments:     011806BODupdatev1.ppt

```
-----Original Message-----
From: Korbich, William [JJCUS] <BKorbich@CORUS.JNJ.com>
To: Papa, John A. [JJCUS] <JPAPA@CORUS.JNJ.com>; Muller, Adam <amuller@am.ibd.gs.com>
Sent: Wed Jan 18 09:42:28 2006
Subject: RE: Draft
```



```
011806BODupdate
      v1.ppt
---          -Original Message-----
From: Papa, John A. [JJCUS]
Sent: Wednesday, January 18, 2006 9:37 AM
To: Korbich, William [JJCUS]
Subject: Re  Draft


Bill, please sen a copy of the deck to Adam ASAP.


-----Original Message-----
From: Korbich, William [JJCUS] <BKorbich@CORUS.JNJ.com>
To: Papa, John A. [JJCUS] <JPAPA@CORUS.JNJ.com>
Sent: Wed Jan 18 07:43:15 2006
Subject  Draft



William E. Korbich, Jr.
Project Director
Finance, Mergers & Acquisitions Analysis Johnson & Johnson World Headquarters

P: (732) 524-3555
F: (732) 524-6467

Department Website:
http //thepulse.jnj.com/portal/jnj/thepulse/mna
```

EXHIBIT
Korbich 28
72340
GAIL F. SCHORR, C.S.R., C.R.R.

CONFIDENTIAL

# Guidant Update

## Board of Directors

*Johnson & Johnson*

## January 18th, 2006

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL    CONFIDENTIAL

CONFIDENTIAL

GG-JJ_018847

## AGENDA

- Introduction                W. Weldon

- BSX offer                    TBD

- Strategic considerations     N. Valeriani

- Valuation update             D. Caruso

- Fairness Opinion             K. Hitchner- Goldman Sachs

- Motion to approve            W. Weldon

ATTORNEY CLIENT PRIVILEGED -- PREPARED AT THE REQUEST OF COUNSEL    CONFIDENTIAL

1

CONFIDEN

J_018848

## INTRODUCTION

- Discussions with GDT's Chairman:

  – Timing considerations and risks

  – Overall value of combined enterprise with J&J

- Considerations of long-term impact to J&J has led us to conclude that pursuit of this asset is in our shareholder's best interests

- We are seeking authorization to increase our offer up to $75 per share and we will need additional authorization to increase the currently authorized level of debt the corporation can incur, should we need to increase the cash component of our offer

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL    CONFIDENTIAL

2

CONFIDENTIAL

GG-JJ_018849

# OVERVIEW OF BSX OFFERS

|  | Jan. 8th 2006 $72.00/shr | Jan. 12th 2006 $73.00/shr | Jan. 17th 2006 $80.00/shr |
|---|---|---|---|
| **Gross Acquisition Price** | $24.5BN | $24.8BN | $27.2BN |
| **Equity** | | | |
| • Per Share | $36.00 | $36.50 | $38.00 |
| • Shares Issuable (MM) | 510 (38%) | 517 (39%) | 538 (38%) |
| **Cash** | | | |
| • Per Share | $36.00 | $36.50 | $42.00 |
| • Gross | $12.2BN | $12.4BN | $14.3BN |
| • % of deal price | 50% | 50% | 53% |
| **ABT Terms** | | | |
| • Upfront cash | $3.8BN | $3.8BN | $4.1BN |
| • Contingent cash | $0.5BN | $0.5BN | $0.5BN |
| • Loan | $0.7BN | $0.7BN | $0.9BN |
| • Loan rate | 5.25% | 5.25% | 4.00% |
| • Equity investment | n/a | n/a | $1.4BN |
| • Shares issuable (MM) | n/a | n/a | 56 (4%) |

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL   CONFIDENTIAL

3

CONFIDEI   -

C    )_018850

## ASSESSMENT OF BSX EQUITY COMPONENT

- Extremely dilutive to EPS for a sustainable period (beyond 2010)

- Creates significant risk for the 47% financed via the issuance of BSX shares (~500MM shares or 38% of the combined entity)

- It is possible that BSX's shares could drop to a trading value below the lower end of the exchange collar of $22.62

- EPS / multiple analysis suggests that the revised trading value could drop as low as [$19.00] per share, or a [$3.62] reduction in BSX

- Value of equity to GDT shareholders would be reduced by a multiple of the difference, or the exchange ratio of 1.6799, resulting in [$6.09] of lost deal value to the GDT shareholders

- BSX deal would drop from $80 to [$74] per share

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL    CONFIDENTIAL

4

CONFIDENTIAL

GG-JJ_018851

## REVIEW OF STRATEGIC VALUE

- **Strengthens existing leadership in MD&D**
  - Entry into CRM
    - Largest MD&D white space for JNJ
    - Clinical trials continue to expand patient pool
    - Guidant provides strong innovation and breadth in a 3 player market
  - Enhances Cordis franchise at a critical point
    - Next generation products
    - New competitive entrants
    - Organizational capabilities

- **Enhances JNJ long-term growth**
  - No similar alternative uses of capital
  - No comparable growth market

- **Diversifies mix of our business**
  - Provides less dependence on Pharmaceutical market
  - Offsets sales erosion to generics

- **Provides implantable micro-electronics technology base**
  - Potential for future growth platforms
  - Increase leverage in obtaining relevant IP

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL    CONFIDENTIAL

5

## ENHANCES SALES & INCOME GROWTH ($ BN's)

| | JNJ | GDT | Combined | GDT % of J&J | Cardio % of J&J |
|---|---|---|---|---|---|
| **• Sales** | | | | | |
| — 2006 | $54.1 | $3.6 | $ 57.7 | 6% | 14% |
| — 2009 | $70.2 | $6.9 | $ 77.1 | 9% | 15% |
| — 2012 | $94.8 | $9.5 | $104.3 | 9% | 16% |
| '05-'12 CAGR | 9.4% | 15.0% | 9.8% | | |
| | | | | | |
| **• Net Inc.*** | | | | | |
| — 2006 | $11.3 | ($0.6) | $ 10.6 | -6% | 6% |
| — 2009 | $14.7 | $0.7 | $ 15.4 | 4% | 11% |
| — 2012 | $21.9 | $1.4 | $ 23.3 | 6% | 13% |
| '05-'12 CAGR | 11.0% | 16.8% | 11.3% | | |

* GDT net income includes deal costs, amortization, synergies & financing impact

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL   CONFIDENTIAL

6

CONFIDENTIAL

# POTENTIAL MARKET CAP EXPANSION ($ BN's)

$36.4BN enhancement present valued back to 2006 @ 9.5% cost of capital = $21.1BN implied increase in JNJ shareholder value or ~ $7 per share



$199.3          $422.3     Combined Market Cap

36.4 → GDT Enhancement = 9.4% increase to Base JNJ
- PE of 18.1
- PEG of 1.61
- Growth of 11.3%

385.9

199.3

→ Base JNJ
- PE of 17.7
- PEG of 1.61
- Growth of 11.0%

2006          2012

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL   CONFIDENTIAL

7

CONFIDEI                                         J_018854

# COMPARATIVE FINANCIAL SUMMARY

| | Announcement Jan. 13th 2006 $71.00/shr | Jan. xth 2006 $75.00/shr | Jan. xth 2006 $75.00/shr |
|---|---|---|---|
| • Gross Acquisition Price | $24.2BN | $25.7BN | $25.7BN |
| • Net Acquisition Price | $21.8BN | $23.2BN | $23.2BN |
| • Net Present Value | $2.0BN | $0.7BN | $0.7BN |
| • IRR | 10.7% | 9.9% | 9.9% |
| • Shares Issuable (MM) | 175 (5.8%) | 177 (5.9%) | 114 (3.8%) |
| • Equity Per Share | $30.48 | $30.48 | $18.75 |
| • Cash Portion | $13.4BN | $14.8BN | $18.7BN |
| • Cash Per Share | $40.52 | $44.52 | $56.25 |
| • Cash% of deal price | 57.1% | 59.3% | 75.0% |
| • EPS Impact (exc. 1 time charges & amortization) | | | |
| – 2006 | ($0.21) | ($0.23) | ($0.19) |
| – 2007 | ($0.09) | ($0.10) | ($0.06) |
| – 2008 | $0.01 | ($0.01) | $0.05 |
| • EPS Impact (GAAP) | | | |
| – 2006 | ($0.37) | ($0.38) | ($0.34) |
| – 2007 | ($0.25) | ($0.26) | ($0.21) |
| – 2008 | ($0.15) | ($0.16) | ($0.10) |

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL   CONFIDENTIAL

8

CONFIDENTIAL



## MODEL RISK / SENSITIVITIES

|  | NPV<br>$ Billions | IRR<br>Percent |
|---|---|---|
| At $71.00/share | $2.0 | 10.7 |
| At $75.00/share | $0.7 | 9.9 |

- CRM market growth to 12% vs 13% (2005 to 2014)    -1.3      -0.7

+ New indications probability at 100%
(Model currently assumes 50% probability)    1.9      1.0

+/- CRM Share +/- 1% starting in 2008 thru perpetuity    -0.6   0.6      -0.4   0.4

+/- ROS +/- 1%
(Model currently assumes 23.8%)    -1.0   1.0      -0.6   0.6

+ Non-cardiac micro-electronics    0.5      0.3

+/- $1 in Purchase Price    -0.4   0.4      -0.2   0.2

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL    CONFIDENTIAL

9

CONFIDE    L      J_018856

## AUTHORIZATION TO INCREASE DEBT LIMIT

- Authorization is requested to increase JNJ's debt limit as follows:

  – Total Debt limit +4.0BN from $8.0BN to $12.0BN

  – Commercial paper +$4.0BN from $5.0BN to $9.0BN


- Moody's has reviewed multiple acquisition scenarios for JNJ and has confirmed that the  increase in cash / debt financing to these levels will not result in a downgrade to our our AAA rating (up to $75 per share @ 75% cash)

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL    CONFIDENTIAL

10

CONFIDENTIAL

GG-JJ_018857

## MOTION TO APPROVE

# The acquisition of Guidant continues to represent a significant strategic opportunity for  Johnson & Johnson.

We request that the Board authorize the Finance Committee of  the Board of Directors to approve:

1) a revised definitive Amended and Restated Merger Agreement providing for an aggregate price not to exceed $75 for each share of Guidant stock and other terms and conditions as are consistent with those presented to the Board &

2) a change in the mix of cash and stock which would then increase the current authorized level of Debt and Commercial Paper to $12BN and $9BN, respectively

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL   CONFIDENTIAL

11

CONFIDE!   _   ʟ _018858

# BACK-UP

Johnson & Johnson

## January 6th, 2006

## DRAFT

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL   CONFIDENTIAL

CONFIDENTIAL

GG-JJ_018859

## ENHANCES PE / MARKET CAP.

- Guidant Transaction is expected to increase J&J's market capitalization over time due to an increase in J&J's core growth rate from 11.0% to 11.3%

- Relationship of increased growth and impact to PE can be demonstrated through an assumed constant PEG ratio
  - PE (price earnings ratio)
  - PEG (price divided by LTG or long term growth)

- Assuming a constant PEG while growth increases results in PE multiple expansion from 17.7 to 18.1

- J&J's PEG ratio has ranged between blank and blank over the past several years

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL   CONFIDENTIAL

13

C ._018860

## AUTHORIZATION TO INCREASE DEBT LIMIT – BACK-UP ($BN's)

- Gross Acquisition Price          $25.7
- Cash Acquisition @ 75%           $18.7
- Less: Cash on Hand in US         ($12.6)
- Incremental Debt Required        $ 6.1

|                                  |        | Commercial Paper |
|----------------------------------|--------|------------------|
| • Incremental Debt Required      | $ 6.1  | $6.1             |
| • Plus: Existing Debt            | $ 3.8  | -                |
| • Total Debt                     | $ 9.9  | $6.1             |
| • Current Authorized Debt Limit  | $ 8.0  | $5.0             |
| • Increase in Authorized Debt    | $ 1.9  | $1.1             |
| • Increase Requested             | $ 4.0  | $4.0             |

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL    CONFIDENTIAL

14

CONFIDENTIAL

GG-JJ_018861

# COMPARATIVE FINANCIAL SUMMARY

|  | Nov. 13th 2005 $63.28/shr | Jan. 10th 2006 $64.30/shr | Jan. 10th 2006 $71.00/shr |
|---|---|---|---|
| • Net Acquisition Price | $19.0BN | $19.3BN | $21.8BN |
| • Net Present Value | $5.1BN | $4.5BN | $2.0BN |
| • IRR | 12.6% | 12.3% | 10.7% |
| • Shares Issuable (MM) | 172 (5.7%) | 172 (5.7%) | 174 (5.8%) |
| • Equity Per Share | $30.03 | $31.05 | $31.05 |
| • Cash Purchase Price | $11.0BN | $11.0BN | $13.4BN |
| • Cash Per Share | $33.25 | $33.25 | $39.95 |
| • EPS Impact (exc. 1 time charges & amortization) | | | |
| – 2006 | ($0.11) | ($0.19) | ($0.21) |
| – 2007 | ($0.06) | ($0.07) | ($0.09) |
| – 2008 | $0.08 | $0.03 | $0.01 |
| • EPS Impact (GAAP) | | | |
| – 2006 | ($0.27) | ($0.35) | ($0.37) |
| – 2007 | ($0.22) | ($0.22) | ($0.25) |
| – 2008 | ($0.08) | ($0.13) | ($0.15) |

ATTORNEY CLIENT PRIVILEGED – PREPARED AT THE REQUEST OF COUNSEL    CONFIDENTIAL

15

CONFIDEN

J_018862

KURY EX. 43

From: Kury, Bernard (HDQ)
Sent: Wednesday, January 11, 2006 9:26 PM
To: 'rdeyo@corus.jnj.com'; 'jhilton@corus.jnj.com';
'rtownsend@cravath.com'
Cc: 'Rhoten, Alison'
Subject: FW: Scan from a Xerox WorkCentre Pro - 27th Floor

Attachments: Scan001.PDF


-----Original Message-----
From: Bruhn, Bernie (HQ)
Sent: Wednesday, January 11, 2006 4:21 PM
To: Kury, Bernard (HDQ)
Subject: FW: Scan from a Xerox WorkCentre Pro - 27th Floor

 William C. Weldon letter and attachment

-----Original Message-----
From: xeroxtest
Sent: Wednesday, January 11, 2006 11:21 AM
To: Bruhn, Bernie (HQ)
Subject: Scan from a Xerox WorkCentre Pro - 27th Floor

Please open the attached document.  It was scanned and sent to you using a Xerox
WorkCentre Pro.

Sent by: Guest [xeroxtest@guidant.com]
Number of Images: 9
Attachment File Type: PDF

WorkCentre Pro Location: 27th Floor Copy Room Device Name: HDQA2705 Device Serial Number:
KMM-003228 WorkCentre Pro IP Address: 10.36.161.22


For more information on Xerox products and solutions, please visit http://www.xerox.com



EXHIBIT

CONFIDENTIAL

GDT 00105776

Johnson&Johnson

WILLIAM C. WELDON
CHAIRMAN
AND
CHIEF EXECUTIVE OFFICER

NEW BRUNSWICK, NEW JERSEY 08933

January 11, 2006

James M. Cornelius
Chairman of the Board of Directors
Guidant Corporation
111 Monument Circle, 29th Floor
Indianapolis, IN 46204-5129

Dear Jim:

   Reference is made to our letter of January 11, 2006, setting forth our revised offer. At your request, attached is a signed Amendment No. 1 (the "Amendment") to the Amended and Restated Agreement and Plan of Merger dated as of November 14, 2005, among Johnson & Johnson, Guidant Corporation and Shelby Merger Sub, Inc. The offer reflected in our letter and in the attached Amendment will remain open for acceptance by Guidant until the close of business on January 17, 2006. Please indicate your acceptance of our offer by signing and returning a copy of the attached Amendment by the close of business on January 17, 2006.

Sincerely,

William C. Weldon
Chairman & Chief Executive Officer

CONFIDENTIAL

GDT 00105777

AMENDMENT NO. 1 TO AMENDED AND RESTATED AGREEMENT AND PLAN OF MERGER (this "Amendment") dated as of January __, 2006, by and among JOHNSON & JOHNSON, a New Jersey corporation ("Parent"), SHELBY MERGER SUB, INC., an Indiana corporation and a wholly owned Subsidiary of Parent ("Sub"), and GUIDANT CORPORATION, an Indiana corporation (the "Company").

WHEREAS Parent, Sub and the Company are parties to that certain Amended and Restated Agreement and Plan of Merger dated as of November 14, 2005 (the "Merger Agreement");

WHEREAS, pursuant to Section 7.03 of the Merger Agreement, Parent, Sub and the Company desire to amend the Merger Agreement as provided in this Amendment; and

· WHEREAS the Board of Directors of each of the Company and Sub have adopted, and the Board of Directors of Parent has approved, this Amendment;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Amendment and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

SECTION 1. Amendments to the Merger Agreement.

(a) The second "Whereas" clause of the Merger Agreement is hereby amended and restated in its entirety as follows:

WHEREAS the Board of Directors of each of the Company and Sub has adopted, and the Board of Directors of Parent has approved, this Agreement and the merger of Sub with and into the Company (the "Merger"), upon the terms and subject to the conditions set forth in this Agreement, whereby each issued and outstanding share of common stock, without par value, of the Company ("Company Common Stock"), other than shares of Company Common Stock directly owned by Parent, Sub or the Company, will be converted into the right to receive (a) a number of validly issued, fully paid and nonassessable shares of common stock, par value $1.00 per share, of Parent ("Parent Common Stock") and (b) $37.25 in cash, without interest;

(b) The first sentence of Section 2.01(c) of the Merger Agreement is hereby amended and restated in its entirety as follows:

Subject to Section 2.02(e), each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than shares to be canceled in accordance with Section 2.01(b)) shall be converted into the right to receive (i) 0.493 (the "Exchange Ratio") validly issued, fully paid and nonassessable shares of Parent Common Stock (the "Stock Portion") and

[NYCORP:2570913v4:4658W:01/11/06--12:40 p]]

2

(ii) $37.25 in cash, without interest (the "Cash Portion" and, together with the Stock Portion, the "Merger Consideration").

(c) The first paragraph of Section 3.01 of the Merger Agreement shall be amended as follows:

(i) the phrase "prior to November 14, 2004" shall be replaced with the phrase "prior to January ___, 2006" and

(ii) the phrase "prior to the execution of this Agreement" shall be amended by replacing the words "the execution of this Agreement" with the words "November 14, 2005".

(d) The phrase "as of November 14, 2005" in the fourth sentence of Section 3.01(d) of the Merger Agreement and in Section 3.01(t) of the Merger Agreement shall be replaced, in each case, with the phrase "as of January ___, 2006".

(e) The phrase "a fee equal to $625,000,000" in Section 5.06(b) of the Merger Agreement shall be replaced with the phrase "a fee equal to $675,000,000".

(f) The phrase "after November 14, 2005" in Section 5.08 of the Merger Agreement shall be replaced with the phrase "after January ___, 2006".

(g) Exhibit B to the Merger Agreement is hereby replaced in its entirety by Exhibit A attached hereto.

SECTION 2.  Representations and Warranties.

(a) The Company represents and warrants to Parent and Sub as follows:

(i) The Company has been duly organized, and is validly existing and in good standing under the Laws of the State of Indiana.

(ii) The Company has all requisite corporate power and authority to execute and deliver this Amendment. The execution and delivery of this Amendment by the Company have been duly authorized by all necessary corporate action on the part of the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Amendment. This Amendment has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery by each of the other parties hereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b) Parent and Sub represent and warrant to the Company as follows:

[[NYCORP:2570911v4;4638W:01/11/06—12:40 p]]

CONFIDENTIAL

GDT 00105779

3

(i) Each of Parent and Sub is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is incorporated.

(ii) Each of Parent and Sub has all requisite corporate power and authority to execute and deliver this Amendment. The execution and delivery of this Amendment by Parent and Sub have been duly authorized by all necessary corporate action on the part of Parent and Sub and no other corporate proceedings on the part of Parent or Sub are necessary to authorize this Amendment. This Amendment has been duly executed and delivered by each of Parent and Sub and, assuming the due authorization, execution and delivery by the Company, constitutes a legal, valid and binding obligation of Parent and Sub, enforceable against Parent and Sub in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies (regardless of whether such enforceability is considered in a proceeding in equity or at law).

SECTION 3.  Ratification of Merger Agreement.  Except as otherwise provided herein, all of the terms, covenants and other provisions of the Merger Agreement are hereby ratified and confirmed and shall continue to be in full force and effect in accordance with their respective terms. After the date hereof, all references to the Merger Agreement shall refer to the Merger Agreement as amended by this Amendment (it being understood that all references to "the date hereof" or "the date of this Agreement" shall continue to refer to December 15, 2004). Capitalized terms used but not defined in this Amendment shall have the meanings assigned to them in the Merger Agreement.

SECTION 4.  Counterparts.  This Amendment may be executed in one or more counterparts (including by facsimile), all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

SECTION 5.  GOVERNING LAW.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF INDIANA, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

[[NYCORP:2570913v4;4638W:01/11/06–12:40 p]]

CONFIDENTIAL

GDT 00105780

EXHIBIT A
TO AMENDMENT NO. 1

EXHIBIT B
TO THE AMENDED AND RESTATED MERGER AGREEMENT

Form of Affiliate Letter

Dear Sirs:

The undersigned, a holder of shares of common stock, without par value ("Company Common Stock"), of Guidant Corporation, an Indiana corporation (the "Company"), acknowledges that the undersigned may be deemed an "affiliate" of the Company within the meaning of Rule 145 ("Rule 145") promulgated under the Securities Act of 1933, as amended (the "Securities Act"), by the Securities and Exchange Commission (the "SEC").  Pursuant to the terms of the Amended and Restated Agreement and Plan of Merger dated as of November 14, 2005 (the "Merger Agreement"), among Johnson & Johnson, a New Jersey corporation ("Parent"), Shelby Merger Sub, Inc., an Indiana corporation and a wholly owned subsidiary of Parent ("Sub"), and the Company, as amended by Amendment No. 1 thereto dated as of January __, 2006, among the Company, Parent and Sub, Sub will be merged with and into the Company (the "Merger"), and in connection with the Merger, the undersigned is entitled to receive 0.493 shares of the common stock of Parent ("Parent Common Stock") and $37.25 in cash for each share of Company Common Stock, without interest.

If in fact the undersigned were an affiliate under the Securities Act, the undersigned's ability to sell, assign or transfer the shares of Parent Common Stock received by the undersigned in exchange for any shares of Company Common Stock in connection with the Merger may be restricted unless such transaction is registered under the Securities Act or an exemption from such registration is available.  The undersigned understands that such exemptions are limited and the undersigned has obtained or will obtain advice of counsel as to the nature and conditions of such exemptions, including information with respect to the applicability to the sale of such securities of Rules 144 and 145(d) promulgated under the Securities Act.  The undersigned understands that Parent will not be required to maintain the effectiveness of any registration statement under the Securities Act for the purposes of resale of Parent Common Stock by the undersigned.

The undersigned hereby represents to and covenants with Parent that the undersigned will not sell, assign or transfer any of the shares of Parent Common Stock received by the undersigned in exchange for shares of Company Common Stock in connection with the Merger except (i) pursuant to an effective registration statement under the Securities Act, (ii) in conformity with the volume and other limitations of Rule 145 or (iii) in a transaction which, in the opinion of counsel to the undersigned, such counsel to be reasonably satisfactory to Parent and such opinion to be in form and substance reasonably satisfactory to Parent, or as described in a "no-action" or interpretive letter from the Staff of the SEC specifically issued with respect to a transaction to be engaged in by the undersigned, is not required to be registered under the Securities Act.

[NYCORP:2570913v4:4638W;01/11/06–12:40 p]

CONFIDENTIAL

GDT 00105781

2

In the event of a sale or other disposition by the undersigned of the shares of Parent Common Stock pursuant to Rule 145, the undersigned will supply Parent with evidence of compliance with such Rule, in the form of a letter in the form of Annex I hereto or the opinion of counsel or no-action letter referred to above. The undersigned understands that Parent may instruct its transfer agent to withhold the transfer of any shares of Parent Common Stock disposed of by the undersigned, but that (provided such transfer is not prohibited by any other provision of this letter agreement) upon receipt of such evidence of compliance, Parent shall cause the transfer agent to effectuate the transfer of the shares of Parent Common Stock sold as indicated in such letter.

Parent covenants that it will take all such actions as may be reasonably available to it to permit the sale or other disposition of the shares of Parent Common Stock by the undersigned under Rule 145 in accordance with the terms thereof.

The undersigned acknowledges and agrees that the legend set forth below will be placed on certificates representing the shares of Parent Common Stock received by the undersigned in connection with the Merger or held by a transferee thereof, which legend will be removed by delivery of substitute certificates (i) if the undersigned provides evidence of compliance with Rule 145 to Parent, in the form of a letter in the form of Annex I hereto, or (ii) upon receipt of an opinion in form and substance reasonably satisfactory to Parent from counsel reasonably satisfactory to Parent to the effect that such legend is no longer required for purposes of the Securities Act.

There will be placed on the certificates for Parent Common Stock issued to the undersigned in connection with the Merger, or any substitutions therefor, a legend stating in substance:

"The shares represented by this certificate were issued pursuant to a transaction to which Rule 145 promulgated under the Securities Act of 1933 applies. The shares have not been acquired by the holder with a view to, or for resale in connection with, any distribution thereof within the meaning of the Securities Act of 1933. The shares may not be sold, pledged or otherwise transferred except in accordance with Rule 145, pursuant to a Registration Statement under the Securities Act of 1933 or in accordance with an exemption from the registration requirements of the Securities Act of 1933."

The undersigned acknowledges that (i) the undersigned has carefully read this letter and understands the requirements hereof and the limitations imposed upon the distribution, sale, transfer or other disposition of Parent Common Stock and (ii) the receipt by Parent of this letter is an inducement to Parent's obligations to consummate the Merger.

[[NYCORP:2570913v4;4638W:01/11/06-12:40 p]]

CONFIDENTIAL

GDT 00105782

3

Execution of this letter should not be considered an admission on the part of the undersigned that the undersigned is an "affiliate" of the Company as described in the first paragraph of this letter, or as a waiver of any rights the undersigned may have to object to any claim that the undersigned is such an affiliate on or after the date of this letter.

Very truly yours,

Dated:

[[NYCORP:2570913v4:4638W:01/11/06--12:40 p]]

CONFIDENTIAL

GDT 00105783

ANNEX I
TO EXHIBIT B

[Name]                                                                                    [Date]

        On _____, the undersigned sold the securities of Johnson & Johnson ("Parent") described below in the space provided for that purpose (the "Securities"). The Securities were received by the undersigned in connection with the merger of Shelby Merger Sub, Inc., an Indiana corporation, with and into Guidant Corporation, an Indiana corporation.

        Based upon the most recent report or statement filed by Parent with the Securities and Exchange Commission, the Securities sold by the undersigned were within the prescribed limitations set forth in paragraph (e) of Rule 144 promulgated under the Securities Act of 1933, as amended (the "Securities Act").

        The undersigned hereby represents that the Securities were sold in "brokers' transactions" within the meaning of Section 4(4) of the Securities Act or in transactions directly with a "market maker" as that term is defined in Section 3(a)(38) of the Securities Exchange Act of 1934, as amended. The undersigned further represents that the undersigned has not solicited or arranged for the solicitation of orders to buy the Securities, and that the undersigned has not made any payment in connection with the offer or sale of the Securities to any person other than to the broker who executed the order in respect of such sale.

                                  Very truly yours,

Dated:

[[NYCORP:2570913v4:4638W:01/11/06--12:40 p]]

CONFIDENTIAL

GDT 00105784

IN WITNESS WHEREOF, Parent, Sub and the Company have caused this Amendment to be signed by their respective officers hereunto duly authorized, all as of the date first written above.

JOHNSON & JOHNSON,

by _____
Name:   WILLIAM C. WELDON
Title: Chairman & Chief Executive Officer

SHELBY MERGER SUB, INC.,

by _____
Name: JAMES R. HILTON
Title: President

GUIDANT CORPORATION,

by _____
Name: James M. Cornelius
Title: Chairman of the Board and CEO

[[2510913]]

CONFIDENTIAL

GDT 00105785

KURY EX. 47

AMENDMENT NO. 2 TO AMENDED AND RESTATED AGREEMENT AND PLAN OF MERGER (this "Amendment") dated as of January 13, 2006, by and among JOHNSON & JOHNSON, a New Jersey corporation ("Parent"), SHELBY MERGER SUB, INC., an Indiana corporation and a wholly owned Subsidiary of Parent ("Sub"), and GUIDANT CORPORATION, an Indiana corporation (the "Company").

WHEREAS Parent, Sub and the Company are parties to that certain Amended and Restated Agreement and Plan of Merger dated as of November 14, 2005 and amended by Amendment No. 1 thereto dated as of January 11, 2006 (the "Merger Agreement");

WHEREAS, pursuant to Section 7.03 of the Merger Agreement, Parent, Sub and the Company desire to amend the Merger Agreement as provided in this Amendment; and

WHEREAS the Board of Directors of each of the Company and Sub have adopted, and the Board of Directors of Parent has approved, this Amendment;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Amendment and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

SECTION 1.  Amendments to the Merger Agreement.

(a) The second "Whereas" clause of the Merger Agreement is hereby amended and restated in its entirety as follows:

WHEREAS the Board of Directors of each of the Company and Sub has adopted, and the Board of Directors of Parent has approved, this Agreement and the merger of Sub with and into the Company (the "Merger"), upon the terms and subject to the conditions set forth in this Agreement, whereby each issued and outstanding share of common stock, without par value, of the Company ("Company Common Stock"), other than shares of Company Common Stock directly owned by Parent, Sub or the Company, will be converted into the right to receive (a) a number of validly issued, fully paid and nonassessable shares of common stock, par value $1.00 per share, of Parent ("Parent Common Stock") and (b) $40.52 in cash, without interest;

(b) The first sentence of Section 2.01(c) of the Merger Agreement is hereby amended and restated in its entirety as follows:

Subject to Section 2.02(e), each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than shares to be canceled in accordance with Section 2.01(b)) shall be converted into the right to receive (i) 0.493 (the "Exchange Ratio") validly issued, fully paid and nonassessable shares of Parent Common Stock (the "Stock Portion") and

[[NYCORP:2572378v1.4638W:01/13/06–05:37 p]]

EXHIBIT

K 47

2

(ii) $40.52 in cash, without interest (the "Cash Portion" and, together with the Stock Portion, the "Merger Consideration").

(c) The first paragraph of Section 3.01 of the Merger Agreement shall be amended by replacing the phrase "prior to January 11, 2006" with the phrase "prior to January 13, 2006".

(d) The phrase "as of January 11, 2006" in the fourth sentence of Section 3.01(d) of the Merger Agreement and in Section 3.01(t) of the Merger Agreement shall be replaced, in each case, with the phrase "as of January 13, 2006".

(e) The phrase "a fee equal to $675,000,000" in Section 5.06(b) of the Merger Agreement shall be replaced with the phrase "a fee equal to $705,000,000".

(f) The phrase "after January 11, 2006" in Section 5.08 of the Merger Agreement shall be replaced with the phrase "after January 13, 2006".

(g) Exhibit B to the Merger Agreement is hereby replaced in its entirety by Exhibit A attached hereto.

SECTION 2.  Representations and Warranties.

(a) The Company represents and warrants to Parent and Sub as follows:

(i) The Company has been duly organized, and is validly existing and in good standing under the Laws of the State of Indiana.

(ii) The Company has all requisite corporate power and authority to execute and deliver this Amendment. The execution and delivery of this Amendment by the Company have been duly authorized by all necessary corporate action on the part of the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Amendment. This Amendment has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery by each of the other parties hereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b) Parent and Sub represent and warrant to the Company as follows:

(i) Each of Parent and Sub is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is incorporated.

(ii) Each of Parent and Sub has all requisite corporate power and authority to execute and deliver this Amendment. The execution and delivery of this Amendment by Parent and Sub have been duly authorized by all necessary corporate action on the part of Parent and Sub and no other corporate proceedings on the part of Parent or Sub are

[[NYCORP:2572378v1:4638W:01/13/06-05:37 p]]

3

necessary to authorize this Amendment. This Amendment has been duly executed and delivered by each of Parent and Sub and, assuming the due authorization, execution and delivery by the Company, constitutes a legal, valid and binding obligation of Parent and Sub, enforceable against Parent and Sub in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies (regardless of whether such enforceability is considered in a proceeding in equity or at law).

SECTION 3. <u>Ratification of Merger Agreement</u>. Except as otherwise provided herein, all of the terms, covenants and other provisions of the Merger Agreement are hereby ratified and confirmed and shall continue to be in full force and effect in accordance with their respective terms. After the date hereof, all references to the Merger Agreement shall refer to the Merger Agreement as amended by this Amendment (it being understood that all references to "the date hereof" or "the date of this Agreement" shall continue to refer to December 15, 2004). Capitalized terms used but not defined in this Amendment shall have the meanings assigned to them in the Merger Agreement.

SECTION 4. <u>Counterparts.</u> This Amendment may be executed in one or more counterparts (including by facsimile), all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

SECTION 5. <u>GOVERNING LAW.</u> **THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF INDIANA, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.**

[[NYCORP:2572378v1;4638W:01/13/06--05:37 p]]

FROM : GUIDANT AVIATION        PHONE NO. : 3172416507        Jan. 13 2006 04:45PM P2
        Jan-12-06   03:28pm   From-GUIDANT                   +3178712118        T-088  P.007/011  F-884

IN WITNESS WHEREOF, Parent, Sub and the Company have caused this Amendment to be signed by their respective officers hereunto duly authorized, all as of the date first written above.

JOHNSON & JOHNSON,

by _William C. Shelby_____

Name: William C. Weldon
Title: Chairman & Chief Executive Office

SHELBY MERGER SUB, INC.,

by _James R. Hilton_____

Name: James R. Hilton
Title: President

GUIDANT CORPORATION,

by _James M. Cornelius_____

Name: JAMES M. CORNELIUS
Title: Chairman and CEO

[NYCORP3773138v4 FW-DY2066-123419]]

EXHIBIT A
TO AMENDMENT NO. 2

EXHIBIT B
TO THE AMENDED AND RESTATED MERGER AGREEMENT

Form of Affiliate Letter

Dear Sirs:

The undersigned, a holder of shares of common stock, without par value ("Company Common Stock"), of Guidant Corporation, an Indiana corporation (the "Company"), acknowledges that the undersigned may be deemed an "affiliate" of the Company within the meaning of Rule 145 ("Rule 145") promulgated under the Securities Act of 1933, as amended (the "Securities Act"), by the Securities and Exchange Commission (the "SEC"). Pursuant to the terms of the Amended and Restated Agreement and Plan of Merger dated as of November 14, 2005 (as amended from time to time, the "Merger Agreement"), among Johnson & Johnson, a New Jersey corporation ("Parent"), Shelby Merger Sub, Inc., an Indiana corporation and a wholly owned subsidiary of Parent ("Sub"), and the Company, Sub will be merged with and into the Company (the "Merger"), and in connection with the Merger, the undersigned is entitled to receive the Merger Consideration (as defined in the Merger Agreement) for each share of Company Common Stock, without interest.

If in fact the undersigned were an affiliate under the Securities Act, the undersigned's ability to sell, assign or transfer the shares of Parent Common Stock (as defined in the Merger Agreement) received by the undersigned in exchange for any shares of Company Common Stock in connection with the Merger may be restricted unless such transaction is registered under the Securities Act or an exemption from such registration is available. The undersigned understands that such exemptions are limited and the undersigned has obtained or will obtain advice of counsel as to the nature and conditions of such exemptions, including information with respect to the applicability to the sale of such securities of Rules 144 and 145(d) promulgated under the Securities Act. The undersigned understands that Parent will not be required to maintain the effectiveness of any registration statement under the Securities Act for the purposes of resale of Parent Common Stock by the undersigned.

The undersigned hereby represents to and covenants with Parent that the undersigned will not sell, assign or transfer any of the shares of Parent Common Stock received by the undersigned in exchange for shares of Company Common Stock in connection with the Merger except (i) pursuant to an effective registration statement under the Securities Act, (ii) in conformity with the volume and other limitations of Rule 145 or (iii) in a transaction which, in the opinion of counsel to the undersigned, such counsel to be reasonably satisfactory to Parent and such opinion to be in form and substance reasonably satisfactory to Parent, or as described in a "no-action" or interpretive letter from the Staff of the SEC specifically issued with respect to a transaction to be engaged in by the undersigned, is not required to be registered under the Securities Act.

[[NYCORP:2572378v1:4638W:01/13/06-05:37 p]]

Confidential

2

In the event of a sale or other disposition by the undersigned of the shares of Parent Common Stock pursuant to Rule 145, the undersigned will supply Parent with evidence of compliance with such Rule, in the form of a letter in the form of Annex I hereto or the opinion of counsel or no-action letter referred to above. The undersigned understands that Parent may instruct its transfer agent to withhold the transfer of any shares of Parent Common Stock disposed of by the undersigned, but that (provided such transfer is not prohibited by any other provision of this letter agreement) upon receipt of such evidence of compliance, Parent shall cause the transfer agent to effectuate the transfer of the shares of Parent Common Stock sold as indicated in such letter.

Parent covenants that it will take all such actions as may be reasonably available to it to permit the sale or other disposition of the shares of Parent Common Stock by the undersigned under Rule 145 in accordance with the terms thereof.

The undersigned acknowledges and agrees that the legend set forth below will be placed on certificates representing the shares of Parent Common Stock received by the undersigned in connection with the Merger or held by a transferee thereof, which legend will be removed by delivery of substitute certificates (i) if the undersigned provides evidence of compliance with Rule 145 to Parent, in the form of a letter in the form of Annex I hereto, or (ii) upon receipt of an opinion in form and substance reasonably satisfactory to Parent from counsel reasonably satisfactory to Parent to the effect that such legend is no longer required for purposes of the Securities Act.

There will be placed on the certificates for Parent Common Stock issued to the undersigned in connection with the Merger, or any substitutions therefor, a legend stating in substance:

"The shares represented by this certificate were issued pursuant to a transaction to which Rule 145 promulgated under the Securities Act of 1933 applies. The shares have not been acquired by the holder with a view to, or for resale in connection with, any distribution thereof within the meaning of the Securities Act of 1933. The shares may not be sold, pledged or otherwise transferred except in accordance with Rule 145, pursuant to a Registration Statement under the Securities Act of 1933 or in accordance with an exemption from the registration requirements of the Securities Act of 1933."

The undersigned acknowledges that (i) the undersigned has carefully read this letter and understands the requirements hereof and the limitations imposed upon the distribution, sale, transfer or other disposition of Parent Common Stock and (ii) the receipt by Parent of this letter is an inducement to Parent's obligations to consummate the Merger.

[[NYCORP:2572378v1:4638W:01/13/06-05:37 p]]

Confidential

SA 00022901

3

Execution of this letter should not be considered an admission on the part of the undersigned that the undersigned is an "affiliate" of the Company as described in the first paragraph of this letter, or as a waiver of any rights the undersigned may have to object to any claim that the undersigned is such an affiliate on or after the date of this letter.

Very truly yours,

Dated:

[[NYCORP:2572378v1:4638W:01/13/06—05:37 p]]

Confidential

SA 00022902

ANNEX I
TO EXHIBIT B

[Name]                                                                                                    [Date]

On                              , the undersigned sold the securities of Johnson & Johnson ("Parent") described below in the space provided for that purpose (the "Securities").  The Securities were received by the undersigned in connection with the merger of Shelby Merger Sub, Inc., an Indiana corporation, with and into Guidant Corporation, an Indiana corporation.

Based upon the most recent report or statement filed by Parent with the Securities and Exchange Commission, the Securities sold by the undersigned were within the prescribed limitations set forth in paragraph (c) of Rule 144 promulgated under the Securities Act of 1933, as amended (the "Securities Act").

The undersigned hereby represents that the Securities were sold in "brokers' transactions" within the meaning of Section 4(4) of the Securities Act or in transactions directly with a "market maker" as that term is defined in Section 3(a)(38) of the Securities Exchange Act of 1934, as amended.  The undersigned further represents that the undersigned has not solicited or arranged for the solicitation of orders to buy the Securities, and that the undersigned has not made any payment in connection with the offer or sale of the Securities to any person other than to the broker who executed the order in respect of such sale.

Very truly yours,

Dated:

[[NYCORP:2572378v1;4638W;01/13/06—05:37 p]]

**PX 4**

From:          Korbich, William [JJCUS]

To:            Brower Jr., William [JJCUS];Caruso, Dominic [JJCUS];
               Papa, John A. [JJCUS];Reichert, Fred [JJCUS]

Subject:       FW: JNJ Final Transcript - Q3'05 Earnings

Date:          10/18/2005 13:29:06 (GMT-05:00)

All,
For your records, attached is today's transcript - I have pulled out Bob's pre Q&A
statement and attached in the text of the email.  I have also attached the last analyst
question and related response (from the transcript).
Thanks,
Bill

Bob Darretta  - Johnson & Johnson - Vice Chairman, CFO, EVP

 This is Bob Darretta again. And before Helen opens the call to your questions, let me say
a few words to address the pending Guidant transaction. We have previously stated that we
anticipated FTC clearance in October. And we continue to believe that to be the case. As
it relates to the previously announced product recalls at Guidant, and the related
regulatory investigations and other developments, we believe that these are serious
matters, and we are continuing to closely monitor the situation at Guidant.

In light of these matters and their impact, we are continuing to consider the alternatives
under our merger agreement. We do not have any further comment on the Guidant transaction
at this time and will not take any questions on the subject of Guidant.

Unidentified Speaker

 Given that Guidant is your largest acquisition, what do you mean by considering
ultimatives and have you had any discussions with Guidant on these alternatives? In
addition for your previous filings, do you still expect the transaction to close in the
fourth quarter? Thank you.

 Bob Darretta  - Johnson & Johnson - Vice Chairman, CFO, EVP

 I think we were very clear at the start of the call that my initial statement would
stand-alone, and I have no further comment to make on the Guidant transaction.


   -----Original Message-----
From:   Bio-Wilson, Angela [JJCUS]
Sent:   Tuesday, October 18, 2005 1:19 PM
To:     Korbich, William [JJCUS]
Subject:   FW: JNJ Final Transcript - Q3'05 Earnings
Importance:   High


Angela A. Bio - Wilson
Johnson & Johnson
Corporate Controllers Group, WHQ
(732) 524-3079 phone
(732) 545-9590 fax

   -----Original Message-----
From:   Lucchetti, Tina [JJCUS]
Sent:   Tuesday, October 18, 2005 11:52 AM
To:     Short, Helen [JJCUS]; Panasewicz, Stan [JJCUS]; Mehrotra, Louise [JJCUS]
Cc:     Thomas, Nancy [JJCUS]; Hoynak, Sherri [JJCUS]; Bio-Wilson, Angela [JJCUS];
Fishman, Lesley [GPCUS]; Walker, Nancy [GPCUS]; Kumar, Seema [PRDUS]
Subject:     JNJ Final Transcript - Q3'05 Earnings

Johnson & Johnson
v.
Guidant Corporation et al.
Case No. 06-cv-7685 (RJS)

PLAINTIFF'S EXHIBIT
4

Importance:      High


Tina M. Lucchetti
Investor Relations
Johnson & Johnson
732.524.3922
tlucchet@corus.jnj.com


Attachments:      JNJ-Transcript-2005-10-18T12-30[1].doc

CONFIDENTIAL

# Conference Call Transcript

## JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Event Date/Time: Oct. 18, 2005 / 8:30AM ET
Event Duration: N/A

Thomson StreetEvents | www.streetevents.com | | Contact Us

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

FINAL TRANSCRIPT

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

## CORPORATE PARTICIPANTS

**Helen Short**
*Johnson & Johnson - VP of IR*

**Bob Darretta**
*Johnson & Johnson - Vice Chairman, CFO, EVP*

**Mike Dormer**
*Johnson & Johnson - Chairman Medical Devices*

**Nick Valeriani**
*Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

## CONFERENCE CALL PARTICIPANTS

**Matthew Dodds**
*Citigroup - Analyst*

**Rick Wise**
*Bear Stearns - Analyst*

**Mike Weinstein**
*J.P. Morgan - Analyst*

**Katherine Martinelli**
*Merrill Lynch - Analyst*

**Glenn Novarro**
*Banc of America Securities - Analyst*

**Larry Keusch**
*Goldman Sachs - Analyst*

**Tao Levy**
*Deutsche Bank - Analyst*

**Bruce Cranna**
*Leerink Swann - Analyst*

**Bruce Nudell**
*Sanford Bernstein - Analyst*

**Sara Michelmore**
*SG Cowen & Co - Analyst*

**Matt Miksic**
*Morgan Stanley - Analyst*

## PRESENTATION

**Operator**

Good morning and welcome to the Johnson & Johnson third-quarter 2005 earnings conference call. All participants will be able to listen only until the question-and-answer session of the conference. This call is being recorded. (OPERATOR INSTRUCTIONS) I would now like to turn the conference over to Johnson & Johnson. You may begin.

**Helen Short - *Johnson & Johnson - VP of IR***

Good morning. I am Helen Short, Vice President of Investor Relations for Johnson & Johnson, and it is my pleasure this morning to review our business results for the third quarter of 2005. With me on the call today is Bob Darretta, Vice Chairman and Chief Financial Officer of Johnson &

| Thomson StreetEvents | www.streetevents.com | | Contact Us |
|---|---|---|---|

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

Oct. 18, 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Johnson; Mike Dormer, worldwide Chairman Medical Devices and Nick Valeriani worldwide Chairman Cardiovascular Devices and Diagnostics. Also with us on today's call is Louise Mehrotra. We recently announced that Louise is replacing me as Vice President of Investor Relations. We are working together to ensure a smooth transition prior to my retirement in early 2006. Louise is looking forward to meeting many of you at our January meeting in New York City if not before.

A few logistics before we get into the details. This review is also available to a broader audience via webcast accessible through the Investor Relations portion of the Johnson & Johnson Internet site. Attached to the copy of the press release that was sent to the investment community earlier this morning is the schedule showing sales for major products and/or business franchises to facilitate in updating your models. These are also available on the J&J website as is the press release. I will review highlights of the third-quarter 2005 results for the total Company and the three business segments. Following additional remarks from Bob Darretta, Mike Dormer and Nick Valeriani will provide an overview of our medical devices and diagnostics businesses. We will then open the call to your questions. We expect the total call to last approximately 90 minutes.

Before I get into the results let me remind you that some of the statements made during this call may be considered forward-looking statements. The 10-K for the fiscal year 2004 identifies certain factors that could cause the Company's actual results to differ materially from those projected in any forward-looking statements made during this call. The 10-K and subsequent filings are available through the Company or online. Last item during the call non-GAAP financial measures may be used to provide information pertinent to ongoing business performance. These measures are reconciled to the GAAP measures and are available on the J&J website.

Now I would like to review our results for the third quarter of 2005. If you refer to your copy of the press release, let's begin with the schedule titled Supplementary Sales Data. Worldwide sales to customers were $12.3 billion for the third quarter of 2005, an increase of 6.6% as compared to the third quarter of 2004. Our operational growth was 5.8%, and we benefited from a positive currency impact of 0.8 points.

If you now turn to the schedule showing sales by geographic area, you can see that the U.S. grew by 2.6%. In regions outside the U.S. our operational growth was 10.3%. The effect of currency exchange rates added 1.9 points of growth to our international results. Strong growth was achieved in all markets outside the U.S. with especially strong growth of nearly 13% in the Asia-Pacific Africa region.

If you will now turn to the consolidated statement of earnings, please direct your attention to the boxed portion of the schedule that excludes special charges. I am pleased to report net earnings of $2.6 billion and earnings per share of $0.87, representing increases of 11.6% and 11.5%, respectively as compared to the third quarter of 2004. Some comments relative to earnings before we move to the segment highlights.

Cost of goods sold at 27.1% is a 50 basis point improvement as compared to the same period in 2004. This improvement is primarily in our medical devices and diagnostic segments related to positive mix as well as ongoing cost containment activities. Selling, marketing and administrative expenses at 33.1% of sales represent a modest improvement of 20 basis point as compared to the same period in 2004. The rate of spending in research and development was 12.2% of sales for the third quarter of 2005, 180 basis points higher than the same period in 2004. Our investment in research and development reflects the significant number of projects in late stage development that we discussed with you this past May, and our commitment to aggressively bringing these and future products to the market in a timely fashion.

Looking at year-to-date nine-month data, consolidated sales to customers for the first three quarters of 2005 were $37.9 billion, an increase of 9.6% over sales of $34.6 billion for the same period a year ago. On a year-to-date basis operational growth was 7.9% with an additional 1.7 points attributable to the weakness of the U.S. dollar relative to foreign currencies.

On the consolidated statement of year-to-date earnings I would first like to draw your attention to the boxed section, excluding charges for in process research and development as well as the adjustment to the tax reserve related to a technical correction associated with the American Jobs Creation Act of 2004 net earnings for the first nine months of 2005 were $8.4 billion or $2.77 per share, up 14.4% and 14%, respectively as compared to the same period in 2004.

Turning now to business segment highlights for the third quarter, let's begin with the consumer segment. Worldwide consumer segment sales grew 10.2% in the third quarter of 2005 with 1.7 points of the growth coming from the effective currency movements. U.S. sales were up 5.1% and international sales were up a very strong 12.1% operationally. As I mentioned at the end of the first quarter, in January we reclassified a group of over-the-counter pharmaceutical products that had previously been reflected in our pharmaceutical segment results outside the United States to our McNeil over-the-counter business, again outside the United States. This reclassification contributed approximately 160 basis points to the growth in the consumer segment, 560 basis points to the McNeil over-the-counter and nutritionals results and reduced the pharmaceutical segment growth by about 50 basis points.

Thomson StreetEvents     www.streetevents.com     Contact Us

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Our adult skin and hair care business continued to show solid growth with operational sales up 13% in the third quarter of 2005. Currency contributed approximately 1 point to bring total growth to 14%. In the U.S. solid performances from our Neutrogena and RoC brands complemented by very strong results with Aveeno were the major drivers of growth in the third quarter. New products launched throughout 2005 continue to drive the growth in our skin care franchise. Outside the U.S. the major drivers of growth in the third quarter were Johnson's adult products, Neutrogena and Clean & Clear.

Baby and kids care products grew on an operational basis 7% in the third quarter, led by strong growth in markets outside the United States. Growth of 8% outside the U.S. was driven by continued success with the soft lotion products, hair care products and the Bathtime Buddies line of cleansers. More modest growth of 3% in the U.S. was led by positive results with Bathtime Buddies and the babycenter.com.

The McNeil over-the-counter and nutritionals franchise had operational growth of 11% for the third quarter. As I mentioned earlier, approximately 6 points were contributed by a reclassification of the over-the-counter products previously reflected in the pharmaceutical segment. Contributors to the positive results in the quarter were the continued growth in Splenda, our no calorie sweetener, where tabletop share in the U.S. came in at 57% in the third quarter, up 6 points from the same period last year and several new product launches in the adult and pediatric analgesics lines. This growth was partially offset by the negative impact of restrictions implemented on products containing pseudoephedrine. McNeil supports the actions to control the inappropriate use of pseudoephedrine and is in the process of reformulating our products that contain this ingredient. McNeil will maintain a limited number of products containing pseudoephedrine for behind-the-counter sales.

Our women's health franchise, which consists primarily of internal and external sanitary protection and the K-Y and Monistat lines achieved operational growth of 5% when compared to the second quarter of 2004. New products in the K-Y line fueled the U.S. growth of 4%. Outside the U.S. operational sales growth of 5% was the result of strong performance from the external sanitary protection line. That concludes the consumer segment commentary. Next, I will review the pharmaceutical segment results.

Worldwide net sales for the third quarter of $5.5 billion were down 1.1% on an operational basis as compared to the same period in 2004. Positive currency contributed 0.6 points, resulting in a reported decline of a half a percent. U.S. sales were positively impacted by a refund of approximately $80 million due to a retroactive change in the methodology used to calculate average manufacturing price for Medicaid charges. The product most impacted by this adjustment was Risperdal. Excluding this onetime gain sales in the United States declined by approximately 7%. Outside the U.S. sales increased on an operational basis by 6%.

Generic competition in the U.S. market significantly impacted the year-to-year comparisons for DURAGESIC, ULTRACET and SPORANOX. The combined effect on the U.S. sales results for these three products was an approximately 5 point reduction to the third-quarter 2005 worldwide pharmaceutical sales and approximately 8 point reduction to the U.S. sales.

PROCRIT and EPREX performance continue to be adversely affected by competition. Combined these two products had an operational decline of 5%. PROCRIT declined by 6% while EPREX declined operationally by 3%. Volumes associated with share loss to competitive products was the primary driver of the decline. PROCRIT share was approximately 49% in the third quarter of 2005 as compared to a 57% share in the third quarter of 2004. Clinical evidence supporting significantly higher hemoglobin response rates to PROCRIT was recently published in the Oncologist.

Though not a product that we disclose sales for, I will mention that we've experienced a significant decline in demand for NATRECOR. This product has been affected by the recent negative public press regarding a netted analysis of selected historical clinical trials conducted with NATRECOR. It is important to note that there has been no date driving the recent medical and consumer publications. The data currently being discussed were reviewed by the Cardio Renal Advisory Committee and the FDA at the time of approval. And the currently approved label reflects all available data to date.

It is also important to note that despite widespread press suggesting that the vast majority of the demand for the product was in serial outpatient use, fully 95% of all sales for the product since its launch has been to hospitals. Though we are dismayed by the impact this reporting of retrospective analysis has had on patience and the acute heart failure clinical community, we remain committed to this brand. As such, we took the step of assembling an expert panel to review the available data and our clinical development plans for the product, and we made the panel's recommendations public. In addition we had an ongoing dialogue with the FDA. Both the panel and FDA support the continued appropriate use of NATRECOR.

With that, let me move on to discuss some of our positive contributors. A number of important products in our pharmaceutical business provided strong growth in the third quarter, specifically Risperdal, Remicade, TOPAMAX and LEVAQUIN. Risperdal, our agent for psychotic disorders

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

JJE00036989

FINAL TRANSCRIPT

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

had operational growth of 22% when compared to the same period a year ago. As I mentioned earlier, Risperdal benefited from a Medicaid rebate adjustment. When adjusted for this onetime benefit, operational growth was still a very strong 16%. U.S. growth excluding this adjustment was 11% while operational growth outside the U.S. was 23%. Sales in all markets benefited from continued success with Risperdal Consta, our long-acting injectable formulation achieved third-quarter sales of $161 million. Risperdal Consta is now approved in more than 70 countries around the world. Continued country approvals outside the U.S. for the use of Risperdal in bipolar mania as well as disruptive behavioral disturbances in both the elderly and children have also been a key factor in product growth.

Remicade, a biologic approved for the treatment of a number of immune mediated inflammatory diseases grew by 15% when compared to the third quarter of 2004. Growth in the U.S. was 12% while sales to our partners for markets outside the U.S. grew by 27%. Strong market growth in the anti TNF category continues to be fueled by new uses such as psoriasis, psoriatic arthritis and now ulcerative colitis. In September Remicade received FDA approval for the treatment of ulcerative colitis, its 10th approved indication. Remicade is the first and only biologic approved for this indication. On September 2nd Centocor filed a supplemental biologic application to the FDA for the use of Remicade in the treatment of psoriasis. In early October the European Commission granted approval of Remicade for the treatment of moderate to severe plaque psoriasis.

TOPAMAX achieved operational growth of 17% with growth in the U.S. of 14% and operational growth outside the U.S. of 26%. TOPAMAX is approved for use in the treatment of epilepsy and migraine prophylaxis. The migraine prevention indication continues to be a key growth driver in all markets. TOPAMAX is now approved for migraine prevention in 41 countries worldwide. Anti infectives grew 23% operationally during the third quarter, driven by strong results with LEVAQUIN. LEVAQUIN benefited from strong market growth as well as an additional FDA approval in August for short course treatment of acute bacterial sinusitis. That completes highlights for the pharmaceutical segment. I will now review highlights for medical devices and diagnostics.

Worldwide the medical devices and diagnostic segment sales to customers were $4.6 billion, representing operational growth of 13.7% in the third quarter of 2005. Currency contributed 0.6 points to bring reported growth to a total of 14.3% with similar rates of growth in and outside the United States. Let me start with some discussion about the results of our Cordis business, which was a major contributor to the overall segment growth. Cordis achieved operational growth of 31% as compared to the same period last year. In the U.S. sales grew by 22% while sales outside the U.S. achieved operational growth of 43%. Cypher, our Sirolimus-eluting stent, the worldwide leader in the drug eluting stent market was the major driver. Cypher sales in the U.S. were $347 million, representing 46% of the U.S. drug-eluting stent market. This represents a substantial increase from the third quarter of 2004 when our U.S. share was at 35%. Strong clinical evidence supporting the benefits of Cypher has been the major driver behind Cypher's continued success.

Cypher sales outside the U.S. were $309 million, representing an estimated 60% share of the international drug-eluting stent market. Our Cypher sales in Japan where we are alone in the drug eluting stent market were $115 million, while our sales in the other markets outside the U.S. were $194 million. Our share of the drug-eluting stent market outside the U.S. excluding Japan (technical difficulty) slightly from the second quarter. In the third quarter a new competitor entered the drug-eluting stent market. We estimate that they have captured approximately 2% of the international market excluding Japan. Market acceptance of drug-eluting stents has been a key contributor to overall growth in markets outside the U.S.

In the third quarter our Cordis Endovascular Group acquired LuMend Inc., a privately held company focused on the development of chronic total occlusion devices to treat peripheral vascular disease. In addition, the Biosense Webster business also had an excellent quarter with 18% operational growth, led by strong results with navigational catheter products. During the quarter Biosense Webster received approval for the NAVISTAR RMT steerable tip diagnostic catheter and the CARTO RMT EP navigation system enabling the release of our first robotically steered electrophysiology catheter in the U.S.

That concludes my comments on Cordis; I will move onto other franchises in the segment. Our DePuy franchise had strong operational growth of 13% when compared to the same period in 2004 with the U.S. growing 15% and the business outside the U.S. growing operationally by 10%. Solid operational growth of nearly 15% in joint reconstruction was the result of knees growing operationally by 16% while hips grew by 11%. Our success from national direct to consumer advertising campaign was a major contributor to the strong category growth. DePuy Spine grew operationally by 15% with CHARITE, our artificial lumbar disc contributing approximately 6 points of this growth. Mitek sports medicine products had strong operational growth of 13% with strong results in tissue management, anchors and knee systems.

ETHICON achieved worldwide operational growth of 7% in the third quarter as compared to the same period in 2004 paced by U.S. sales growth of 12%. Sales outside the U.S. grew by 5% operationally. A key contributor to the growth in the quarter was continued penetration with several suture and mesh products, including VICRYL Plus, our antibacterial coated suture, PROCEED tissue-separating mesh and the MultiPass Needle. Solid results from CardioVations, GYNECARE and the wound management business units all contributed to the growth in the third quarter.

Thomson StreetEvents          www.streetevents.com                    Contact Us

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

JJE00036990

FINAL TRANSCRIPT

Oct. 18, 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Ethicon Endo-Surgery achieved operational growth of 7% in the third quarter of 2005 as compared to the same period in 2004. U.S. growth was 6% with operational growth of 8% outside the U.S. Endo-cutter sales, a key product in performing bariatric procedures as well as strong contributions from our Harmonic Scalpel and CONTOUR. CONTOUR is a (indiscernible) cutter stapler for colorectal surgery were the primary growth drivers in the third quarter. Solid performance of the advanced sterilization productlines related to the growing installed base of STERRAD systems was also a significant contributor to the results in the quarter.

LifeScan achieved operational growth of 9% in the third quarter of 2005 as compared to the same period in 2004. Growth in the U.S. market was a strong 13% with operational growth outside the U.S. of 5%. Growth outside the U.S. was negatively impacted by a sharp reduction in channel inventory. OneTouch Ultra has been the major driver of growth both in and outside the U.S. LifeScan holds U.S. market leadership with strip share of 34.8% as of the second quarter of 2005.

Ortho clinical diagnostics achieved operational growth of 10% in the third quarter of 2005 led by the U.S. growing a very strong 14%. International growth was 6% operationally. Key contributors to the strong growth were continued global market penetration of the automated blood bank products and continued growth of the ECi equipment base. Our vision care franchise achieved a third quarter operational sales increase of 12%. Growth was strong both in and outside the United States; with the U.S. growing by 14% and the international markets growing 12%. U.S. results were driven by the strong growth of ACUVUE ADVANCE with HYDRACLEAR, the third quarter launch of ACUVUE OASYS with HYDRACLEAR Plus for tired and dry eyes, and continued success with ACUVUE ADVANCE for astigmatism which was launched in the first quarter of 2005. Outside the U.S. the key driver was continued strong growth in Japan and other markets in the Asia-Pacific region with One Day ACUVUE and One Day ACUVUE define (ph), as well as the September launch of ACUVUE Moist in Japan. ACUVUE Moist is a new One Day product with the added benefit of HYDRACLEAR.

That concludes the results for the medical devices and diagnostic segment and concludes the segment highlights for Johnson & Johnson's third quarter of 2005. Bob Darretta will now make some additional remarks before we turn the program over to Mike Dormer and Nick Valeriani.

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

Thank you, Helen, and good morning, ladies and gentlemen. Let me start by giving you an update on our cash position. We ended the third quarter with net cash of $12.8 billion. That is up $2.2 billion from the prior quarter and up $3.1 billion over the past twelve months. Excluding the effect of a major acquisition, we would expect further improvement in the fourth quarter and should end the year with a net cash position between 13.5 and $14 billion.

Now a word on other income and expense. By way of a reminder this is the account where we record our royalty income as well as onetime gains and losses, for example the impact of asset sales, litigation settlements, gains and losses on our Johnson & Johnson development corporate investments, et cetera. This quarter as you have seen we recorded a gain of $63 million as contrasted with a loss in the prior year of $41 million. This favorable year-to-year comparison of $104 million was the results of the combined effect of a number of relatively modest sized individual transactions. This quarter we recorded a gain on the sale of our Spectacle Lens business as well as a net gain on our Johnson & Johnson development corporate investments, whereas in the third quarter of '04 we recorded a net loss on our Johnson & Johnson development corporate investments, as well as a loss associated with a write-down of an insurance receivable. This account by its very nature is difficult to forecast but we would recommend that you model it between 150 and a $200 million gain for the full year.

Moving on to interest income and expense, in the third quarter we enjoyed interest income of just over $100 million which was $82 million higher than the interest income earned in the third quarter of last year. The gain reflects both our approved cash position and higher rates and interest being earned on our cash holdings. With regard to the full year '05, we would recommend you model interest income of approximately $350 million. Again, this guidance excludes any effect of a major acquisition.

Moving on to the tax rate, and I'm speaking in terms of our tax rate excluding special items such as the effect of the in process R&D charges, as well as the adjustment to the tax reserve associated with the technical correction to the American Job Creation Act, which we recorded earlier this year. As you've seen during the first nine months of the year, net income growth benefited from a lower effective tax rate. 26.5% this year as contrasted with 28.6% in the first nine months of '04. This trend is consistent with our prior guidance that mix, more specifically that lower sales of higher tax rate products such as DURAGESIC and ULTRACET, and higher sales of lower tax rate products such as Cypher, would help drive a lower tax rate in '05. In light of our experience to date, I would suggest that you base your models on a full year tax rate of between 26% and 26.5%.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

JJE00036991

Oct. 18, 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Moving on to sales guidance and starting with operational growth we recommend that you model full year operational sales growth of approximately 6.5%, which would imply operational growth in the fourth quarter of approximately 3%. The lower fourth-quarter growth rate reflects the fact that the fourth quarter of last year included an additional sales week. As you recall, '04 was a 53 week year for Johnson & Johnson, and last year we estimated the effect of that additional week in the fourth quarter as adding approximately 2% to last year's fourth-quarter sales. The lower growth rate in this year's fourth quarter also reflects the more challenging year-to-year sales comparisons that we face with regard to Cypher and most notably with regard to Cypher Japan.

Turning to currency, based on exchange rates as of the end of last week, and as I'm watching this morning the situation has not been atypical -- continues to change rather significantly. But based as the rates at the end of last week we suggest that you base your models on a full year positive affect from currency of 1%, which implies an adverse impact in the fourth quarter of 0.8%.

Now moving on to earnings guidance. During our last call we recommended that you model full year earnings in the $3.44 to $3.47 per share range. Given our outperformance in earnings growth in the third quarter, we would now suggest that you consider modeling full year earnings per share in the $3.48 to $3.50 range. Now let me turn the call over to Mike Dormer, worldwide Chairman, medical devices.

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

Thank you, Bob. On behalf of Nick Valeriani and I it's great to be with you today to talk about the medical device and diagnostics group. Nick and I will be providing an overview of the seven franchises of the medical device and diagnostics group. After that we will be happy to take your questions. I would also like to announce that although our review today will be brief, we are planning a full day in depth review of the medical device and diagnostic segment in September 2006. As those of you who follow the Company know, every few years we hold more intensive programs focusing on one of our business segments to give a better sense of our portfolios and pipelines. We're looking forward to that next year. You'll hear more about that in the months to come.

Let me start out by sharing with you the vision to which our medical device and diagnostics companies aspire, restoring the joys of life. Our strategic focus is on life extending and life enhancing technologies, and we encourage a patient-focused perspective that aligns our thinking around common goals. Translating this vision to our strategic goals, we have built a strong portfolio of innovative businesses that have continued to set the standards of care in the categories in which we choose to compete. We have recognized the significance of working to shape an increasingly challenging health care environment to improve access and affordability of these technologies for patients. Ultimately, this focus has enabled our companies to deliver consistent, excellent financial performance.

Overall, our medical device and diagnostics businesses have delivered outstanding growth in both revenue and operating profit through the first nine months of this year. Moreover, that performance continues a steady and sustained pattern of growth over the past five years. Not only has this group focused on growing our revenues, but we've also focused on growing them in a manner that delivers greater value to Johnson & Johnson. For the five-year period from 1999 to 2004 the top line compound annual growth rate was 11%, while the operating profit for MD&D grew by 20%. We have accomplished this by strategically managing our portfolio of businesses to best position us for future growth. Over the years we have divested a number of commodity line businesses while at the same time acquiring others that offer unique solutions to compelling clinical needs. This changing and reshaping enables our businesses to deliver the products that are more efficacious and more cost-effective.

Innovations that have resulted include the Cypher stent which radically changed the way the world treats coronary artery disease. The CHARITE disc, the first motion technology to treat degenerative disc disease, the CONTOUR curved cutter, the only curved stapler that allows surgeons to excise tumors low in the pelvis. The rise of OneTouch Blood Glucose meter which makes monitoring possible for millions of people in emerging markets. And CellSearch, a first of its kind diagnostic for use in oncology. There are many others we could name.

For the first nine months of 2005 our medical device and diagnostics businesses demonstrated a very strong operational growth rate of 15% achieving sales of 14.3 billion. Medical device and diagnostics represents nearly 38% of total Johnson & Johnson's third-quarter year-to-date revenues. The focus on innovation coupled with careful financial management, manufacturing rationalization and headcount control has helped us to grow a robust segment.

I will go into a brief review of each franchise in a moment. But you can see from our third-quarter year-to-date results that collectively and individually our businesses have had a strong year. Sales growth over the previous year was in the double-digit range in nearly every franchise, with Cordis having a particularly strong year, achieving operational revenue growth of 28%.

Thomson StreetEvents        www.streetevents.com        Contact Us

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

JJE00036992

Oct. 18, 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Let's begin then with a review of the DePuy franchise, the world's leader in orthopedics. Strong proprietary product positions have enabled the business to sustain excellent financial performance over the past five years. On an operational basis the five-year compound annual growth rate of revenues was a very strong 13%. The DePuy franchise consists of the orthopedics business focused on joint reconstruction, trauma and extremities, DePuy Spine, Codman, which develops technologies to treat neurological and central nervous system disorders, and Mitek, our sports medicine technologies business.

DePuy looks for sustainable growth from strong product positions across its businesses. Recent launches in joints, spine, sports medicine and extremities technologies offer unique clinical solutions. Through its high orthopedics platform DePuy expects to capitalize on a growing trend towards greater precision and improved outcomes afforded by computer assisted memory invasive surgery. And finally, DePuy has tapped the vast experience and resources of the Johnson & Johnson companies in developing responsible, direct patient education initiatives that are clearly raising awareness of the benefits of joint reconstruction.

Going forward DePuy expects increasing pressure on industry to demonstrate clear technological superiority and clinical and economic value. Such issues in part contributed to the challenges we faced in gaining forward adoption of CHARITE, our artificial lumbar disc approved last year by the FDA for use in the United States.

The ETHICON franchise is the world's indisputable leader in wound closure. Despite pricing pressures worldwide, the franchise continues to deliver solid financial performance by continuing to innovate. It is comprised of wound closure and tissue repair, ADVANCE wound management, minimally invasive cardiac surgery and gynecologic and urologic surgery businesses. While over the past five years sales grew on an operational basis an average of 4%, the franchise has had a strong nine-month year-to-date achieving operational revenue growth of 9% over the prior year.

ETHICON can leverage its considerable strength in tissue repair technology to continue to differentiate itself from the market with product innovations like VICRYL Plus, the world's only antibacterial suture. With the acquisition of Closure Medical Corporation this year, ETHICON has the added capacity to expand its biosurgical platform into new areas of tissue repair and regeneration. And by focusing on wound management needs in specialty surgical categories, ETHICON can further distinguish its comprehensive product lines and services.

The Ethicon Endo-Surgery franchise defines the market for procedure enabling minimally invasive technologies. The franchise has contributed significantly and consistently over the past five years, delivering an operational compound growth rate of 10%. Its business is segmented into Endo mechanical devices, energy platforms and advanced sterilization systems. By continually investing in technological improvements Ethicon Endo-Surgery enables minimally invasive procedures in a growing number of surgical categories and specialties. Examples include the CONTOUR curved cutter and the hand assisted laparoscopic disc. The enhanced energy platform can extend that technology to new specialties, including plastic surgery and orthopedics. Finally, the franchise is pioneering innovations to enable natural orifice procedures with products including the PillCam ESO diagnostic imaging system and the adaptation of flexible endoscopy products.

Vistakon is the world leader in contact lenses. Through breadth of line and meaningful innovation has continued to deliver strong double-digit growth. Its innovative marketing, customer relationships and retail execution contribute to its competitive advantage. Vistakon has grown its business by geographic expansion in underpenetrated markets and by expanding its productline to treat new patient populations, including presbyopics. The franchise has a healthy pipeline and has introduced four new products in the last 18 months, two of them this year.

At this point I would like to ask my colleague, Nick Valeriani, to take you through the review of the diagnostic and cardiovascular franchises.

### Nick Valeriani - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

Thanks, Mike. LifeScan is our diabetes management company addressing this global pandemic. In a competitive market the Company has had sustained strong performance with average operational sales growth of 10% over the last five years and 14% for the first nine months of 2005. More and more our LifeScan business is seeking to move the conversation from the convenience and comfort of testing, to a more meaningful understanding of the compelling need for patients to more effectively manage their diabetes. In episodic monitoring, LifeScan's OneTouch brand continues to innovate with the recent and pending introductions of 3 new models, OneTouch Ultra 2, and the OneTouch Horizon and OneTouch Ultra Mini for affordable testing to reach broader groups of patients. Today one in four Americans with diabetes uses a OneTouch Ultra product to test blood glucose levels. The Company continues to explore opportunities in continuous monitoring, including external and implantable devices.

Thomson StreetEvents    www.streetevents.com    Contact Us    

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

The ortho clinical diagnostic business offers clinical laboratory systems and assays, blood bank automation systems and advanced diagnostic technologies through Veridex. In a complex and challenging market, the Company has demonstrated strong performance throughout this year. Compound annual sales growth over the past five years has averaged 6%, but the operational growth for the first nine months of 2005 had a strong 13%. Among this franchise's platforms to ensure sustainable growth, our continued development of the VITROS clinical laboratory system which now offers enhanced integration capabilities. Over time the franchise is exploring opportunities to use existing and novel technology platforms to deliver enhanced, high-value diagnostics to customers. The Veridex business, within ortho clinical diagnostics, continues to make exciting and innovative advances in the field of oncology products. Its CellSearch assays identify, enumerate and characterize circulating tumor cells directly from whole blood. Over the past year, a library of clinical publications validating the importance of circulating tumor cells identified by Veridex systems as predictors of therapeutic effectiveness continued to grow.

Cordis has had a very strong year and continues its leadership in the fight against the world's leading killer, cardiovascular diseases. Fueled by the success of Cypher, the world's first drug-eluting stent, the Cordis franchise has had outstanding operational sales growth of 28% through the first nine months of the year and compound annual operational sales growth of 29% over the past five years. In the third quarter Cordis once again became the world leader in the drug-eluting stent market. In addition to the cardiology business, the Cordis franchise includes the endovascular, neurovascular and Biosense Webster businesses.

The Cypher business continues to demonstrate strong clinical evidence of safety and efficacy for the product and expects new indications and global expansion to continue to deliver significant opportunity into the future. In the peripheral vascular businesses we expect that the application of our technologies to important disease categories, including carotid, SFA, AAA and CTO to represent important growth opportunities. These treatments can make significant contributions to the standard of care for conditions that are seriously undertreated around the world. Similarly, we are actively engaged in efforts to understand and treat hemorrhagic and ischemic stroke. And finally, our Biosense Webster business is expanding its activities in cardiac ablation and has introduced systems like CARTOMERGE to diagnose and treat complex arrhythmias. This concludes our franchise review.

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

This is Bob Darretta again. And before Helen opens the call to your questions, let me say a few words to address the pending Guidant transaction. We have previously stated that we anticipated FTC clearance in October. And we continue to believe that to be the case. As it relates to the previously announced product recalls at Guidant, and the related regulatory investigations and other developments, we believe that these are serious matters, and we are continuing to closely monitor the situation at Guidant.

In light of these matters and their impact, we are continuing to consider the alternatives under our merger agreement. We do not have any further comment on the Guidant transaction at this time and will not take any questions on the subject of Guidant.

**Helen Short** - *Johnson & Johnson - VP of IR*

Before I ask Elisabeth to open the call to your questions and provide instructions, I encourage you to address your questions to Nick Valeriani and Mike Dormer since we have them here with us today. Elizabeth, if you can provide the instructions for questions.

QUESTION AND ANSWER

**Operator**

(OPERATOR INSTRUCTIONS) Matthew Dodds, Citigroup.

**Matthew Dodds** - *Citigroup - Analyst*

Thank you. First for Mike. On the gross margin improvement that Helen talked about earlier in the call, obviously year-over-year Cordis is having a big impact. But Mike, can you tell us whether divisions, if there is anything in particular that are having a big increase in the gross margin and operationally on the profit side, or the overall division? Then I've got a quick question for Nick as well.

| Thomson StreetEvents | www.streetevents.com | | Contact Us |
|---|---|---|---|

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

FINAL TRANSCRIPT

Oct. 18, 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

**Mike Dormer**  - *Johnson & Johnson - Chairman Medical Devices*

Matthew, I think it is interesting. One of the things that we've actually been trying to do, not only this year but if you take the last five years, is actually change the profile as I said of medical devices and diagnostics. And essentially, we've exited a lot of what I would call below-margin commodity like businesses, which generally had low growth profitability. At the same time, we've concentrated on more of the high-technology procedure specific products, which have had a higher gross margin. At the same time as getting that favorable mix, we've also over that five-year period had an extensive manufacturing rationalization program and reduced the number of manufacturing facilities considerably. That has had a significant impact.

And then finally, we've been very careful in terms of headcount over that period of time, which has also led to some substantial productivity gains. All of those gains have shown up, not only in our gross margin, but also led to the strong operating profit performance that we've had for the group.

**Matthew Dodds**  - *Citigroup - Analyst*

But Mike, is there any other division other than Cordis like Endo or ETHICON General that's had a big increase, or is it across the board?

**Mike Dormer**  - *Johnson & Johnson - Chairman Medical Devices*

No, is essentially across the board; essentially across the board.

**Matthew Dodds**  - *Citigroup - Analyst*

Okay, and then quickly for Nick. On LifeScan, it was also said earlier that the OUS slowed a bit due to inventory. The last several quarters, OUS has grown phenomenally well. So should we think here that the inventory maybe got ahead of itself, or is lower reduction level in inventories outside the U.S. for LifeScan?

**Nick Valeriani**  - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

Matt, with regards to LifeScan OUS, what we saw in the third quarter, the slowing was really the result, as you recall, the unit of measure issue we had with some of our meters. We had not been able to for the second quarter be able to put the level of meters into the marketplace as we had previously been accustomed to as we worked through that issue. And obviously, the flow- through of that impact to our strip sales sort of provided a somewhat soft quarter as compared to previous quarters for the LifeScan business, namely in Europe.

**Matthew Dodds**  - *Citigroup - Analyst*

Thanks, Nick. Thanks, Mike.

**Operator**

Rick Wise, Bear Stearns.

**Rick Wise**  - *Bear Stearns - Analyst*

Good morning, everybody. I have a couple questions. Let me start, maybe pick on Mike first. Mike, can you give us your perspective on the outlook for the orthopedic market, specifically pricing? We've seen obviously some considerable price weakness in Japan and Germany. Your view of worldwide pricing trends going forward and in the U.S.

| Thomson StreetEvents | www.streetevents.com | Contact Us |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

FINAL TRANSCRIPT

Oct. 18, 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business
Review Meeting/Webcast

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

Good morning, Rick. I think my views are going to be in line with quite a few others in the sense that we see the growth rate for orthopedics slowing down, in part because of the ability to take less price. And that is true both in the United States and also some other countries around the world. I mean from April onwards in Japan, we will see reasonably significant price reductions as the MHLW pushed through their biannual price reviews for orthopedics, which will also have an impact on our business.

So I think we are seeing not only a reduction in the level of price increases, but we are also seeing an impact as a result of price mix. We did go through a period earlier in this decade where we had the opportunity of seeing improved price mix because of the introduction of the various technologies, cross-linked polyethylene, metal on metal, ceramic on ceramic, etc., which was having a very favorable impact on the price mix. So for both of those reasons I think we will see a slight tick down in terms of the overall orthopedic growth rate. At the same time I would say that we are seeing the benefit of demographics and the demand for earlier treatment partially related to the fact that we can have minimally invasive procedures, which is leading to probably a stronger volume demand for the orthopedic business.

**Rick Wise** - *Bear Stearns - Analyst*

Two quick follow-up questions. First, for Nick, can you can give us some perspective on what is required to resolve FDA -- Cordis' FDA issues and when? And maybe last one for Helen, for the Dapoxetine the PDUFA date is October 27th, I think or end of this month. You haven't commented on a panel. Is it reasonable to think we can see a first quarter launch? Thanks very much.

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

With regards to the FDA situation, obviously it is a critical issue for us, and we are working very diligently to address the issues as outlined by the FDA. All our facilities have been inspected, and we've responded to the inspections, and we have a meeting planned with the FDA later this month. And that really is the best we can comment at this point in time.

**Helen Short** - *Johnson & Johnson - VP of IR*

Rick, with regard to Dapoxetine, the PDUFA date is October 27. Since we have mentioned previously we would likely expect an advisory panel, it is hard to fathom that we will be launching in the first quarter or early next year. So we really have to wait at this point and see what kind of response we get from the FDA, and we will go from there.

**Operator**

Mike Weinstein, J.P. Morgan.

**Mike Weinstein** - *J.P. Morgan - Analyst*

I have a couple of questions and I apologize if I have missed this. But one, could you comment on the outstanding citizens petition for Ditropan XL and for Concerta? And two, could you just (indiscernible) clarify your fourth quarter guidance; it appears you're actually raising guidance for the fourth quarter relative to Street expectations and I wanted to just understand that a bit given what we saw here in the third quarter. Thanks.

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

I will tackle the second question first, Michael. I provided guidance regarding full year sales growth, as well as EPS performance. I assume you are referring to the EPS guidance when you are talking about raising guidance.

**Mike Weinstein** - *J.P. Morgan - Analyst*

Correct.

| Thomson StreetEvents | www.streetevents.com | | Contact Us |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

And that is correct. I think the last time we had guided, provided guidance of 344 to 347. When I last checked the analysts and added the four quarters you're at 347. We outperformed in the third quarter by a penny versus the mean of the analyst estimates. And we therefore have provided revised guidance of 348 to 350. So somewhere in that range, depending on your level of conservatism, you may want to be towards the lower end of the range.

**Helen Short** - *Johnson & Johnson - VP of IR*

I think the other question you asked was about the status of the citizens petitions for CHARITE, excuse me, Concerta and Ditropan XL?

**Mike Weinstein** - *J.P. Morgan - Analyst*

Yes, (inaudible) maybe if you could just shed some light on why you're providing more upbeat or bullish fourth quarter guidance on the bottom line relative to what you're saying on the top line.

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

Just the third-quarter performance and our knowledge of our, both revenue projections and spending plans.

**Mike Weinstein** - *J.P. Morgan - Analyst*

Okay.

**Helen Short** - *Johnson & Johnson - VP of IR*

And on the citizens petitions, we really don't have any further update. We have not heard anything back on either one of those.

**Operator**

Katherine Martinelli, Merrill Lynch.

**Katherine Martinelli** - *Merrill Lynch - Analyst*

A couple questions. Mike, first with respect to orthopedics its definitely benefiting it would seem from the direct to consumer initiatives. Is that something we should assume you are going to continue to do going forward, that that will just be part of the normal course of business with respect to DePuy, and then I was also hoping you could comment on the spine business. If you strip out CHARITE that business is growing below the market; is that a product issue? Is it a sales force issue? Maybe if you could shed some light on what initiatives are underway there and then I have a follow-up, please.

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

Let's take the -- Catherine, good morning -- if we take the direct to consumer advertising, we do believe in response of advertising and we are trying to make sure we follow advertising along those lines. And the answer is yes, we have just recently introduced a new hip advertisement, and we will be following that up with a new knee advertisement. And we do believe that it is having an impact on our business. And we think it is -- so long as it is responsible education of what is available for patients, a good thing to do. So we do aim to continue with that.

| Thomson StreetEvents | www.streetevents.com | | Contact Us | |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

FINAL TRANSCRIPT

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting Webcast

With regard to our spine business you're absolutely right. If we look at our core business excluding CHARITE disc, it is softer than what we anticipate the overall market is growing at. That is resulting predominately from a sales management organization change that we made in 2004, which we are still climbing our way out of that change. As opposed to products, on the product side we've launched a number of really good products, including the EXPEDIUM for example, hook (indiscernible) screw system. We have also as part of a review in our performance recently changed our senior management there and appointed a new President of our DePuy Spine business, Gary Fishetti (ph). And Gary has been in the orthopedics business primarily on the joint side. And we look forward to an improving fortune for our DePuy Spine business going forward.

**Katherine Martinelli** - *Merrill Lynch - Analyst*

Great. Thank you. And Helen, just a follow-up, Boston Scientific's legal win in the Netherlands that they were speaking about last week and their plans to try and assert that IP more aggressively throughout Europe. I was wondered if you could provide any perspective on how you're viewing that threat.

**Helen Short** - *Johnson & Johnson - VP of IR*

Certainly we're going to be appealing the ruling in the Netherlands. But we also don't necessarily see that being able to go across the borders. So we feel pretty comfortable in terms of our position in Europe with our own intellectual property.

**Katherine Martinelli** - *Merrill Lynch - Analyst*

Okay, great. Thank you.

**Operator**

Glenn Novarro of Banc of America Securities.

**Glenn Novarro** - *Banc of America Securities - Analyst*

I have a question for Nick, we're starting to hear the other drug-eluting stent players talking about second and third generation DES platforms. I am wondering if you can talk a little bit more about what your next generation platforms are, and am I correct in thinking that your manufacturing issues -- is that what is causing the delay in J&J starting up next generation drug-eluting stent trials? Thanks.

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

Glenn, we obviously are focused on the development of next generation Cypher drug-eluting stent platforms. Obviously with the challenges that we faced with the FDA warning letter situation we have directed our energies to addressing those issues first and foremost. And with regards to the manufacturing constraints as you might imagine, what you need lines to run in and validate new product platforms and at this point in time we've really directed our available manufacturing to support the needs of the marketplace with today's Cypher productline. As you have seen, we continue to be very pleased with the market acceptance of the Cypher drug-eluting stent based upon just an extraordinary body of clinical evidence that shows its superior results as compared to other drug-eluting stent products. But we are coming out of the work we've been doing on the regulatory and manufacturing capacities improving. And we have a pipeline that we believe will continue to allow us to be competitive in the future.

**Glenn Novarro** - *Banc of America Securities - Analyst*

Can you at least comment, I believe your next generation platform I think it went from Steeple Chase or I think you may have renamed it Leo, and that was a cobalt chromium stent coated with Sirolimus. Is that still your next generation platform?

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

Oct. 18, 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Next generation as defined by an alternative material, yes that would be the cobalt chromium productline. But we have no less than five or six additional PMAs that we plan to submit in 2006 that will continue to expand the productline and the existing Cypher product as well as increased clinical indications. So here again, we've had a difficult situation here with the FDA that is really getting kind of confronted our ability to do product development as we would have liked to.

**Glenn Novarro** - *Banc of America Securities - Analyst*

Would that also include not only stent and catheter adjustments or redesigns, but would it also include drug combinations? We have been hearing about a Sirolimus/heparin combination. Is that still in development?

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

At this point in time we are looking at a multitude of new drug combinations, and when we are further along on that we will give you better insight as to what (multiple speakers) might look like.

**Operator**

Larry Keusch, Goldman Sachs.

**Larry Keusch** - *Goldman Sachs - Analyst*

I just want to touch on PROCRIT, EPREX. You talked about the volume losses to Amgen. But could you talk about how you think about the overall market and the stability of the market? And then the second part of the question is if you don't get the immediate injunction against Amgen, do you think that you will still see your marketshares continue to decline? And then lastly, just on CHARITE, I'm wondering if you can give us any sense of your thoughts in the cervical spine area, and what you might be doing there? And any feel for sort of how many implants were done with CHARITE either year-to-date or in the quarter or any way that we can just sort of measure how that progress is going? Thank you.

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

Why don't I handle the first question? What we've seen is continued double-digit market growth -- excuse me we had a little background there. What we've seen is continued double-digit market growth. I think we estimated the third quarter growth in the 12 to 13% range. So healthy growth somewhat slower than what we had seen in prior years. We did see, however, some real improvement in terms of price stability in the market. Prices most recently have become fairly stable. And what you saw in terms of our results, as Helen commented, our share third quarter to third quarter year-to-year was down, and the market growth was not enough to fully offset it. So we had a modest year on year decline. I should say that the rate of share loss has been slowing over the last nine months. So we are pleased about that. We're pleased about the price stability. We're pleased about the market growth.

The latest competitive tactic, though, is very difficult to handicap should we be unsuccessful in getting the injunction to which we believe we are entitled because it will reinject tremendous price pressure, and of course because our competitor has a monopoly in one of the product categories we simply can't respond with a white blood cell product of our own. So I think it is very difficult for us to handicap what may happen with share should we be unable to get the injunctive relief to which we believe we are entitled.

**Helen Short** - *Johnson & Johnson - VP of IR*

And let me just add to that because I did get an update from our legal department regarding the timing, and it will be some months before we even get an answer on the preliminary injunction motion. So there will be some discovery that takes place first, and so we're talking probably four to six months before we even know in terms of an answer on the preliminary injunction request.

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

Thomson StreetEvents    www.streetevents.com    Contact Us

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

JJE00036999

FINAL TRANSCRIPT

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Let me just talk about first the cervical disc. We actually have a product called the Pegasus which we are very excited about. We look to start our ID in the first half of next year and will be launching the product in the second half of next year outside of the United States. And we like the design of that very much indeed. So obviously we need to go through the PMA process and the launch date probably realistically looking at 2009, possibly even 2010 for entry into the United States. But it looks like a very nice product indeed.

With regard to the CHARITE, the CHARITE number of procedures in the third quarter were again just over 1000, maybe just short of actually 1100 procedures, which is fairly consistent with both first quarter and second quarter. And we are continuing to encounter the reimbursement issues on the CHARITE disc. And we are making progress, but it's slow progress to date.

**Larry Keusch** - *Goldman Sachs - Analyst*

And Mike, just any thoughts on the design of the Pegasus?

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

The Pegasus is a very nice design, more what we would term second generation design of cervical disc, and perhaps we can give you more details of that when we have our in-depth review, which we plan for next year for the medical device and diagnostics group.

**Operator**

Tao Levy, Deutsche Bank.

**Tao Levy** - *Deutsche Bank - Analyst*

Just two quick questions. One, and I am sorry if I missed it before -- provide us with an update on the supply of Cypher or of the market that you can supply in the U.S. year end and maybe early next year. And then also I was wondering if you could quickly comment on the legal action you recently brought against Amgen on bundling and what do you expect to happen to that in terms of pricing or volumes to your PROCRIT franchise going forward? Thanks.

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

I guess I wasn't particularly clear. The immediately prior caller asked a similar question on PROCRIT, and we said we really can't handicap what the consequences would be if we are unsuccessful in getting the preliminary injunction. I think Helen indicated that we think it's going to be four to six months before we have a ruling on the preliminary injunction.

**Tao Levy** - *Deutsche Bank - Analyst*

My apology. I missed that. (multiple speakers) with the Guidant situation.

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

So four to six months before we expect resolution regarding our request for preliminary injunction. It is a significant price increase customers are faced with if they do not move their business to the competitive product. And we will have to determine how best to respond because obviously we can't respond with the white blood cell factor because our competitor has a monopoly in that category. And this is particularly important in oncology clinics and hospitals with large oncology practices. So it is those portions of the business that we would have the greatest concern.

**Tao Levy** - *Deutsche Bank - Analyst*

But you would not expect them to proactively start to change their habits?

| Thomson StreetEvents | www.streetevents.com | | Contact Us |
| --- | --- | --- | --- |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

FINAL TRANSCRIPT

Oct. 18, 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

Well, our competitor has, as you probably know, has served notice to their customers that they will not be honoring their current contracts beyond the thirty-day notice period. And unless the customer then moves a very substantial portion of their PROCRIT business to the competitor, then the customer will be faced with sharply increased prices because they will lose the discounts that they are currently enjoying on the Neulasta and/or Neupogen. So that action has already been taken, and that is what prompted our legal action.

As it relates to Cypher supply, we continue to make progress in our manufacturing operations to ensure increased product availability of the Cypher stent, and we are confident that today we can serve approximately half of the market in the U.S. And we are in the process of adding incremental capacity in our manufacturing facilities, which will be available and validated in the first half of next year, at which time we estimate we can support up to 75% of the U.S. market.

**Operator**

Bruce Cranna, Leerink Swann.

**Bruce Cranna** - *Leerink Swann - Analyst*

Nick, while we have you, can you just quickly comment on whether or not the advent of continuous glucose monitors changes the way you look at the LifeScan business going forward, and whether or not you guys have any plans to go down that read yourself?

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

Yes, our LifeScan business certainly has established its presence in self-monitoring blood glucose. But as I mentioned, we really are beginning to see a transformation of our thinking from, as we call it sort of measurement to management, diabetes management. And continuous monitoring is an important step along that continuum to create this diabetes management company. So we are actively engaged in research to explore technologies that will allow for continuous glucose monitoring. That provides for the patient benefit of tighter glycemic control. And we also look for opportunities to continue to broaden our portfolio of products in the LifeScan Company. So it is an important next step in the process. And if you can envision a day in the future with continuous glucose monitoring, perhaps there is an opportunity to really create a significant end benefit for patients with diabetes and keep them in tighter control.

**Bruce Cranna** - *Leerink Swann - Analyst*

Are you more likely to build or buy that capacity?

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

At this point to comment on that we will explore all opportunities to access that technology, as you might consider we would.

**Bruce Cranna** - *Leerink Swann - Analyst*

Okay, and then just a quick one for either Helen or Mike I guess. Can you remind us on the timing of precise carotid stent and (indiscernible) FDA? I can't recall when we expect to hear something back on that.

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

With regards to our carotid stent, I think it has probably been mentioned in the past as a result of the warning letter with the FDA regarding our Cordis cardiology franchise all new product approvals have been sort of held up in that process. And as I mentioned earlier, we are working very

| Thomson StreetEvents | www.streetevents.com | | Contact Us |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

diligently to address the issues with the FDA. And we have a meeting with them at the end of this month. And really the launch of that product is contingent upon successful resolution of our current situation with the FDA warning letter.

**Operator**

Bruce Nudell, Sanford Bernstein.

**Bruce Nudell**  - *Sanford Bernstein - Analyst*

In terms of the orthopedic unit growth rate from '99 to 2004 was about 7% in the United States. Do you see a significant elevation of that level going forward? I know knees are a little faster than their historic 10% in the U.S. and hips are probably a little slower. And then on the other front with regards to Endeavor, it did look like there were efficacy differences between Cypher and Endeavor yesterday. And I was wondering how you feel that you are going to competitively respond to that especially in the European market that is price sensitive. Thanks so much.

**Mike Dormer**  - *Johnson & Johnson - Chairman Medical Devices*

Just in terms of the numbers we've grown our orthopedics business in the U.S. at a much faster rate than 7% I think you quoted.

**Bruce Nudell**  - *Sanford Bernstein - Analyst*

Units.

**Mike Dormer**  - *Johnson & Johnson - Chairman Medical Devices*

Units?

**Bruce Nudell**  - *Sanford Bernstein - Analyst*

Because you had mentioned that unit growth was accelerating, and I was just wondering if you felt that it would be well above that level.

**Mike Dormer**  - *Johnson & Johnson - Chairman Medical Devices*

Yes, certainly the industry growth rate in units for hips in the U.S. is in the single digits, and also much slower than the growth rate that we've seen in terms of knees. Knees have grown very rapidly and approximate some 500,000 procedures now in the U.S. And so they've certainly grown rapidly. And our business has mirrored that. Except that I mean it is interesting if you take the first nine months of this year, we've seen very strong hip growth particularly internationally, which has been in the strong double-digits area. And there has been very little price internationally coming into actually impact that. Whereas we have seen that continuation if you like of single digits in the U.S. But generally speaking, and I think this is a trend that will continue, we will see knees growing at a faster rate than hips going forward.

**Bruce Nudell**  - *Sanford Bernstein - Analyst*

But I guess if units grew in the United States around 7% in aggregate, do you see from '99 - '04 do you see a large uptick in that 7% combined number?

**Mike Dormer**  - *Johnson & Johnson - Chairman Medical Devices*

On a go forward basis?

**Bruce Nudell**  - *Sanford Bernstein - Analyst*

Thomson StreetEvents     www.streetevents.com          Contact Us

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Yes.

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

No, I think on the hips side we will continue to see high single digits growth going forward. I don't think on a unit basis we will see that for hips moving to double digits.

**Bruce Nudell** - *Sanford Bernstein - Analyst*

Okay. And then Endeavor.

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

With regards to Endeavor, Bruce, obviously as you heard yesterday, Medtronic was unsuccessful in meeting its primary endpoint of in segment late loss with the Endeavor product having 0.3 mm versus 0.13 mm for the Cypher stent. And as well, secondary endpoints of in-stent late loss 0.6 mm for Endeavor versus 0.15 mm for Cypher were statistically significant, along with in segment binary restenosis rates between the two products. And from our perspective the report out of Endeavor really just expanded the extensive clinical data that has been available either through randomized controlled clinical trials or large-scale patient registries, that just continue to validate and support the excellent safety profile across a broad range of patient types and lesion types here. So when you think about the Cypher stent in over 1.5 million patients have been treated with Cypher since its release. And what we plan to do is to continue to reinforce the clinical experience and patient benefits that are realized with Cypher across a broad range of patient and lesion types. And that really is the essence of our marketing approach, a commercial strategy against Endeavor or any other stent that is in the market today.

**Bruce Nudell** - *Sanford Bernstein - Analyst*

Would you consider a head to head?

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

At this point in time it is really not ours to do. I think we have established a threshold here for new market entrance into the drug-eluting stent market. And so from my perspective it is the next entrant has to be able to meet the thresholds that have been established by Cypher.

**Operator**

Sara Michelmore, SG Cowen & Company.

**Sara Michelmore** - *SG Cowen & Co - Analyst*

Just a question for Nick on the ortho clinical diagnostics, how sustainable should we think is that double-digit growth? And could you discuss the timeframe in which you think that Veridex will be a growth driver for that group of companies? And then just a quick follow-up for Helen, Helen if there is any updates on the filing timelines for TNC 114 or Hydromorphone. Thanks.

**Nick Valeriani** - *Johnson & Johnson - Chairman Cardiovascular Devices & Diagnostics*

With regards to the ortho clinical diagnostics business the results we're seeing today are really the result of new product launches that we've had in the business. It is the continued market penetration of our automated blood bank products, continued growth of our ECI equipment and relationship that we have established with Quest Laboratories for ECI infectious diseases in the U.S. and continued growth in our clinical chemistry business, which is really being fueled through the launch of our VITROS 5.1 instrument platform and then the new assays that are being launched on to that system. So the sustainability of this we've really sort of directed our OCD franchise to get focused on research that

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

JJE00037003

FINAL TRANSCRIPT

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

provides assays that create high-value clinical contents for our customers. And I think we can see this continuing into the near future. And we have confidence in the portfolio of new products that we're developing in the OCC franchise.

As it relates to Veridex, and I think it's important to recognize that Veridex is truly changing the standard of care in oncology diagnostics. The CellSearch technology is the first of its kind technology. And as with these types of innovation, it takes time. It takes time to change the paradigm of the clinicians that use these products, specifically in pathology. We are very confident in the science. The science has been recognized in journals like in JAMA and Lancet. So we are going to continue to invest in this business. We believe it has a long-term growth potential, not just in breast cancer, but perhaps in other cancers to include lung and prostate and colon cancer. So I think certainly with our commitment to investing in the long-term and in platforms such as Veridex, we do see it to be an important part of our future in our diagnostic businesses.

**Helen Short** - *Johnson & Johnson - VP of IR*

With regard to your questions about the filing timelines on the OROS Hydromorphone, we do anticipate submitting the complete response as we had indicated by the end of the year. And that is still on track to do that. And then with the PNC 114 the first part of that rolling submission was filed in late September, and the complete filing should be in by the end of the year, as well.

**Operator**

Glenn Reicin, Morgan Stanley.

**Matt Miksic** - *Morgan Stanley - Analyst*

Hi, good morning, it is Matt Miksic for Glenn. A question on orthopedics; I know you mentioned some of the pricing pressure coming in Japan. But I was wondering if you had any comments on the U.S. pricing market for recon. And then I also had a follow-up on mix.

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

As I mentioned earlier, aside from Japan we do see an environment where there will be lower prices being taken in the marketplace in the U.S.

**Matt Miksic** - *Morgan Stanley - Analyst*

So just be crystal clear it was the negative price in the U.S. excluding mix?

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

No, I don't think we were --.

**Matt Miksic** - *Morgan Stanley - Analyst*

You look at them together?

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

I don't think we will move into that territory. Plus also there still remains some interesting new technology that we can introduce for the benefit of patients which may have an impact positively on mix.

**Matt Miksic** - *Morgan Stanley - Analyst*

So lower price increases then is what you're saying?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

I think the environment is one where the healthcare system is truly looking for good value for money, and I think that is an environment where companies have got to be cognizant of. And that is going to be one where there is probably less opportunity to take upward pricing action.

**Matt Miksic** - *Morgan Stanley - Analyst*

Okay, and then on -- question on mix I was wondering in the areas of highly cross-linked poly or mobile bearing knees, do you see an opportunity there for DePuy to have mix, continued mix improvements there? Or do you feel like those have run their course?

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

I think on the hip side we've seen mix essentially run its course. I mean, if we take our individual portfolio we have strong metal on metal. We have a reasonable proportion of ceramic on ceramic. But when we look at our polyethylene, particularly for the hip, it is virtually all cross-linked polyethylene. Moving on to knees, there is some continued opportunity with regard to the different polyethylenes. But the real, as you mentioned, possibility in terms of any added value is with regard to mobile bearing knees. And we continue to see very strong growth, very strong growth of mobile bearing knees in the U.S.

**Matt Miksic** - *Morgan Stanley - Analyst*

Any plans to do say sort of what has been called a next generation of highly cross-linked poly like these annealed or (indiscernible) physical manipulated products?

**Mike Dormer** - *Johnson & Johnson - Chairman Medical Devices*

Not from our perspective.

**Matt Miksic** - *Morgan Stanley - Analyst*

Great. Thank you.

**Helen Short** - *Johnson & Johnson - VP of IR*

Elizabeth I think we have time for one more question.

**Operator**

(indiscernible) of CSFB.

**Unidentified Speaker**

Given that Guidant is your largest acquisition, what do you mean by considering ultimatives and have you had any discussions with Guidant on these alternatives? In addition for your previous filings, do you still expect the transaction to close in the fourth quarter? Thank you.

**Bob Darretta** - *Johnson & Johnson - Vice Chairman, CFO, EVP*

I think we were very clear at the start of the call that my initial statement would stand-alone, and I have no further comment to make on the Guidant transaction.

| Thomson StreetEvents | www.streetevents.com | | Contact Us |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Oct. 18. 2005 / 8:30AM, JNJ - Q3 2005 Johnson & Johnson Earnings Conference Call & Medical Device & Diagnostics Business Review Meeting/Webcast

Well, I think that brings our conference call to a close. In closing, let me say that we are pleased that once again our broad based business model has permitted us to achieve solid short-term financial results while aggressively investing to fuel long-term growth. We look forward to meeting with you in January when we will be joined by our Chairman and Chief Executive Officer, Bill Weldon. And we will have an opportunity to review our full year '05 results, '06 expectations, and our strategic direction.

Thank you for your continued interest and support. Have a great day.

**Operator**

This concludes today's Johnson & Johnson conference call. You may now disconnect.

DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.


© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

CONFIDENTIAL

JJE00037006