UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHNSON & JOHNSON, | |
| Plaintiff, | No. 06 Civ. 7685 (RJS) |
| - against - | |
| GUIDANT CORPORATION, | |
| Defendant. | |

**GUIDANT CORPORATION'S POST-TRIAL
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... vi

Introduction .................................................................................................................. 1

Findings of Fact ........................................................................................................... 9

   I.    Background ...........................................................................................................9

   II.   The Initial Merger Agreement Between J&J and Guidant ................................11

       A.  J&J Expresses Interest in a Potential Acquisition of Guidant .....................11

       B.  J&J and Guidant Negotiate the Terms of the Initial Merger Agreement.................12

       C.  J&J Considers Divesting Guidant Assets .....................................................19

       D.  J&J Declares That Guidant Has Suffered a Material Adverse Change ..................21

   III.  J&J Lowers Its Offer and Boston Scientific Responds........................................24

       A.  J&J and Guidant Renegotiate the Merger Agreement ...............................24

       B.  Boston Scientific Submits an Unsolicited Competing Bid for Guidant .................26

       C.  Boston Scientific Immediately Discloses Its Intent To Divest Guidant's VI and ES Businesses........................................................................................34

       D.  Guidant and Boston Scientific Enter into a Confidentiality Agreement.................36

       E.  Boston Scientific and Abbott Arrange for a Proposed Divestiture.........................41

       F.  Boston Scientific Announces Its Firm Offer and Abbott's Involvement ...............46

       G.  J&J Elects to Proceed Under the Merger Agreement ...............................51

       H.  J&J Requests Analysis from Guidant and Accepts the Termination......................60

           1.  Deyo's January 23 Letter to Kury....................................................60

           2.  Kury's Reaction:  Kury Believed J&J's Position in the January 23 Letter Was "Lame".........................................................................61

           3.  Mulaney's Proposed Response, Following Conversation with Kury...............61

           4.  Kury's Request for a "Technical Analysis".........................................62

i

   5. Kury's January 23 Reply to Deyo ...................................................... 63

   6. Guidant Board Meeting on January 24 ............................................ 63

 IV. Post-Termination ................................................................................... 65

  A. J&J Waits Eight Months and Then Files Its Lawsuit .......................... 65

  B. Guidant's CRM Business Declines ...................................................... 65

  C. J&J Acquires Conor ............................................................................ 69

  D. Procedural History of This Litigation ................................................. 70

Conclusions of Law ............................................................................................ 72

 I. J&J Has Not Met Its Burden to Prove That Guidant Breached the Merger
  Agreement ............................................................................................. 72

  A. Abbott Was a Permissible Recipient of Guidant Information under Section
   4.02 ..................................................................................................... 73

   1. Guidant Bargained for a Robust "Passive Market Check" ............... 79

   2. J&J Had an Interest in Having "Representative" Construed Broadly, and
    It Desired and Benefited from that Construction ............................. 82

   3. Section 4.02's Definition of "Representatives" Includes Parties Who Are
    Not "Representatives" Under a Dictionary Definition of the Term ......... 83

   4. When Understood in the Context of the J&J–Guidant Confidentiality
    Agreement, a Broad Interpretation of "Representatives" Makes More
    Sense than a Narrow Reading ....................................................... 84

   5. Boston Scientific's Lenders Were Entitled to—and Received—Due
    Diligence in Their Capacities as Financing Sources Without Objection
    from J&J ........................................................................................ 88

  B. Guidant Provided Sufficient Notice of Abbott's Takeover Proposal ...... 90

  C. Cooperating with the FTC's Regulatory Review of Boston Scientific's
   Proposed Transaction Was Not a Breach ........................................... 93

  D. Guidant's Entry into Joint Defense Agreements Did Not Breach the Merger
   Agreement Because Such Agreements Were Customary and Preserved
   Confidentiality ..................................................................................... 94

 II. J&J Has Not Met Its Burden To Prove that Any Alleged Breach Was Wilful ......... 95

A.  Guidant Reasonably Relied on Skadden's Advice ....................................................97

B.  None of J&J's "Circumstantial Evidence" Suggests That Guidant Wilfully Breached the Merger Agreement..........................................................................106

   1.  J&J Wrongly Asserts a Lack of Evidence Corroborating Mulaney's Advice to Kury................................................................................................106

   2.  Kury Signed the Boston Scientific–Guidant Confidentiality Agreement Based on Skadden's Reasonable Advice .......................................................110

   3.  Kury Signed the Addendum Based on Skadden's Reasonable Advice That It Was Necessary to Address Antitrust Concerns and Was Permissible.......................................................................................................113

   4.  The Accession Agreement Was Not Drafted or Executed To Provide a Basis Under Section 4.02 To Furnish Information to Abbott .........................116

   5.  Kury Reasonably Relied on Skadden's Advice Regarding the Co-Promotion Agreement .............................................................................120

   6.  Guidant Reasonably Entered a Joint Defense Agreement with No Intent To Breach the Merger Agreement ...............................................................122

   7.  Kury Had No Reason on January 9 To Articulate a Basis for Furnishing Information to Abbott ..............................................................................124

   8.  Kury's January 23 E-mails Provide No Evidence of Wilful Breach of the Merger Agreement .............................................................................126

   9.  Guidant Reasonably Furnished Information to the FTC Based on Skadden's Advice ...................................................................................129

   10. Guidant Promptly Disclosed Abbott's Involvement as Soon as Skadden Advised It To Do So .....................................................................................130

III. J&J Has Not Met Its Burden To Prove That Any Alleged Breach Was Material .......131

A.  Providing Diligence to Abbott Was Not a Material Breach of the Merger Agreement.....................................................................................132

   1.  Section 4.02's Non-Facilitation Provision Was Not at the Heart of J&J's Bargain.............................................................................................133

   2.  Providing Diligence to Abbott as Boston Scientific's Representative Was Not a Material Breach Because Abbott Was a Joint Bidder or Could Have Been the Maker of a Takeover Proposal ...................................137

iii

3. Alternatively, Providing Diligence Directly to Abbott Was Not a Material Breach Because It Was Permissible for Guidant To Provide Diligence to Boston Scientific Which in Turn Was Permitted To Provide Diligence to Abbott.................................................................139

B. J&J Received Sufficiently Timely Notice of Abbott's Role; Any Delay Was Immaterial and Not Actionable Because of Guidant's Substantial Compliance ...............................................................................139

C. Guidant's Cooperation with the FTC's Regulatory Review of Boston Scientific's Proposed Transaction Was Not a Material Breach.............................141

IV. J&J Has Not Met Its Burden To Prove Causation—That "But For" Guidant's Alleged Breach of Section 4.02, J&J Would Have Been Able To Purchase Guidant at $63 per Share....................................................................142

A. J&J Cannot Prove That "But For" the Alleged Breach, J&J Would Have Been Able To Purchase Guidant at All, Let Alone for $63 per Share...................142

1. J&J Has Not Met Its Burden To Prove That Its $63 Offer Would Have Been Approved by Guidant's Shareholders........................................143

2. J&J Has Not Proved That, Without Immediately Providing Due Diligence to Abbott, Boston Scientific Could Not Have Made a Superior Proposal or Joint Bid..........................................................155

B. J&J Has Not Met Its Burden To Prove That But For Guidant's Alleged Breach of the Notice Obligation, J&J Would Have Purchased Guidant for $63 per Share ..................................................................157

C. J&J Has Not Met Its Burden To Prove That Any Alleged Breach by Guidant's Participating in a Joint Defense Agreement, Cooperating with the FTC, or Identifying Abbott in the Co-Promote Agreement Caused J&J Any Harm ......................................................................159

D. Indiana Law Does Not Shift the Burden of Proof on Causation to Guidant...........160

V. J&J Has Not Met Its Burden To Prove the Existence and Amount of Any Damages Caused by the Alleged Breach ..................................................161

A. Under Indiana Law, the Measure of Damages Is the Actual Loss J&J Suffered by the Alleged Breach, Not J&J's Hopes When It Made the Contract.....................................................................162

B. J&J Was Not Injured by Not Purchasing Guidant, Which Suffered Losses Much Larger Than J&J's Claimed Damages in the Decade Following the Merger......................................................................164

C. J&J Offered No Relevant Evidence of Damages Because Its Expert, Professor Jarrell, Did Not Provide Relevant or Reliable Testimony ....................168

   1. Jarrell Failed To Apply Controlling Law and Ignored Evidence That J&J Was Not Harmed................................................................................169

   2. J&J's Unexpressed Claimed Willingness To Bid Is Not Reliable Evidence of Damages ......................................................................174

      a. Jarrell's Uncritical Adoption and Recitation of J&J's Unproven Valuations Do Not Aid the Finder of Fact....................................176

D. If They Were Relevant—And They Were Not—J&J's "Investment Value" and "Fair Market Value" Damages Calculations Fail To Prove Damages............180

   1. J&J Failed To Show Even Potentially Calculable Losses and Instead Seeks Speculative Multi-Billion Dollar Hypothetical Profits........................180

   2. J&J Did Not Prove That the Parties Intended That J&J's Future Operating Profits or Resale Profit Could Be Recoverable Consequential Damages................................................................................182

   3. J&J's Alleged "Investment Value" Damages Are Fatally Speculative ...........185

   4. J&J Failed To Prove the Existence of Market Value Damages.......................190

E. J&J's Failures To Mitigate Damages Preclude Recovery .....................................193

F. Any Damages Must Be Offset Against the $705 Million Termination Fee ..........194

VI. J&J Is Estopped from Claiming Breach....................................................................195

# TABLE OF AUTHORITIES

## Cases

Adams v. Reinaker,
808 N.E.2d 192 (Ind. Ct. App. 2004) .................................................................................... 196

Air Turbine Tech., Inc. v. Atlas Copco AB,
410 F.3d 701 (Fed. Cir. 2005) .......................................................................................... 153

Allstate Ins. Co. v. Dana Corp.,
759 N.E.2d 1049 (Ind. 2001) .......................................................................................... 75

Am. United Life Ins. Co. v. Douglas,
808 N.E.2d 690 (Ind. Ct. App. 2004) .................................................................................... 196

Amorgianos v. Nat'l R.R. Passenger Corp.,
303 F.3d 256 (2d Cir. 2002) ............................................................................................ 173

AquaSource, Inc. v. Wind Dance Farm, Inc.,
833 N.E.2d 535 (Ind. Ct. App. 2005) .................................................................................... 161

Arista Records LLC v. Usenet.com, Inc.,
608 F. Supp. 2d 409 (S.D.N.Y. 2009) .................................................................................... 179

Askren Hub States Pest Control Servs., Inc. v. Zurich Ins. Co.,
721 N.E.2d 270 (Ind. Ct. App. 1999) .................................................................................... 92

Bank One, Nat. Ass'n. v. Surber,
899 N.E.2d 693 (Ind. Ct. App. 2009) .................................................................................... 162

Bd. of Directors, Ben Davis Conservancy Dist. v. Cloverleaf Farms, Inc.,
359 N.E.2d 546 (Ind. Ct. App. 1977) .................................................................................... 196

Biotronik A.G. v. Conor Medsystems Ireland, Ltd.,
22 N.Y.3d 799 (March 27, 2014) ........................................................................................ 183

Bourke v. Dun & Bradstreet Corp.,
159 F.3d 1032 (7th Cir. 1998) ....................................................................................... 75, 76

Brewington v. State Farm Mut. Auto. Ins. Co.,
--- F. Supp. 3d. ----, 2014 WL 4569507 (D. Nev. Sept. 16, 2014) ......................................... 75

Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis,
723 F.2d 512 (Ind. Ct. App. 1983) .................................................................................. 3, 132

Cap Gemini Am., Inc. v. Judd,
597 N.E.2d 1272 (Ind. Ct. App. 1992) .......................................................................... 179, 188

*Cirrus Holding Co. v. Cirrus Indus., Inc.*,
 794 A.2d 1191 (Del. Ch. 2001) ................................................................. 140

*City of Indianapolis v. Twin Lakes Enter., Inc.*,
 568 N.E.2d 1073 (Ind. Ct. App. 1991) ...................................................... 132

*Connersville Wagon Co. v. McFarlan Carriage Co.*,
 76 N.E. 294 (Ind. 1905) ................................................... 7, 163, 187, 190

*Country Contractors, Inc. v. A Westside Storage of Indianapolis, Inc.*,
 4 N.E. 3d 67 (Ind. Ct. App. 2014). ................................................... passim

*Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*,
 No. 98 CIV. 5101 (SHS), 2004 WL 1574629 (S.D.N.Y. July 14, 2004) ...................... 182, 187

*Erie-Haven, Inc. v. First Church of Christ*,
 292 N.E.2d 837 (Ind. Ct. App. 1973) .......................................................... 195

*Fischer v. Heymann*,
 12 N.E.3d 867 (Ind. 2014) ................................................................. 193, 194

*Fischer v. Heymann*,
 943 N.E.2d 896 (Ind. Ct. App. 2011) ............................................................ 76

*Frazier v. Mellowitz*,
 804 N.E.2d 796 (Ind. Ct. App. 2004) ........................................................... 137

*Frontier Oil v. Holly Corp.*,
 2005 WL 1039027 (Del. Ch. Apr. 29, 2005) ..................................................... 143

*Gared Holdings, LLC v. Best Bolt Prods., Inc.*,
 991 N.E.2d 1005 (Ind. Ct. App. 2013) ........................................................... 72

*Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.*,
 2006 WL 1319543 (S.D.N.Y. May 11, 2006) ...................................................... 179

*Garza v. Marine Transp. Lines, Inc.*,
 861 F.2d 23 (2d Cir. 1988) ..................................................................... 75

*Gearreald v. Just Care, Inc.*,
 No. CIV.A. 5233-VCP, 2012 WL 1569818 (Del. Ch. Apr. 30, 2012) ................................ 173

*Hadley v. Baxendale*,
 156 Eng. Rep. 145 (1854) ...................................................................... 182

*Hamilton Cnty. Bank v. Hinkle Creek Friends Church*,
 478 N.E.2d 689 (Ind. Ct. App. 1985) ............................................................ 98

Hamlin v. Steward,
    622 N.E.2d 535 (Ind.Ct.App.1993) ..................................................... 161

In re Complaint of Kreta Shipping, S.A.,
    181 F.R.D. 273 (S.D.N.Y. 1998) ....................................................... 153

In re The Sassi Corp.,
    51 B.R. 534 (Bankr. S.D. Ind. 1983) ................................... 195, 200, 201

Indianapolis City Mkt. Corp. v. MAV, Inc.
    915 N.E.2d 1013 (Ind. Ct. App. 2009) .................................. 7, 163, 183

Indianapolis Traction & Terminal Co. v. Henby,
    97 N.E. 313 (Ind. 1912) .................................................................. 99

Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,
    205 F.3d 1323 (2d Cir. 2000) ................................................ 98, 99, 100

Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.,
    1999 WL 108739 (S.D.N.Y. Mar. 3, 1999) ........................................ 98, 99

Irving v. Ort,
    146 N.E.2d 107 (Ind. Ct. App. 1957) .................................................. 163

Johnson & Johnson v. Guidant Corp.,
    2010 WL 571814 (S.D.N.Y. Feb. 16, 2010)................................... 71, 133

Johnson & Johnson v. Guidant Corp.,
    2014 WL 3728598 (S.D.N.Y. July 22, 2014) ............................... passim

Johnson & Johnson v. Guidant Corp.,
    525 F. Supp. 2d 336 (S.D.N.Y. 2007) ......................................... passim

Johnson v. Scandia Assocs., Inc.,
    717 N.E.2d 24 (Ind. 1999) ............................................................ 182

Kenford Co. v. Cnty. of Erie,
    537 N.E.2d 176 (N.Y. 1989)..................................................... 182, 185

Kenford Co. v. Erie Cnty.,
    493 N.E.2d 234 (N.Y. 1986).............................................. 181, 182, 184

Kovens v. Paul,
    358 F. App'x 228 (2d Cir. 2009) ....................................................... 193

Kovens v. Paul,
    No. 04 CIV. 2238 (TPG), 2009 WL 562280 (S.D.N.Y. Mar. 4, 2009) ......................... 192, 193

L.H. Controls, Inc. v. Custom Conveyor, Inc.,
    974 N.E.2d 1031 (Ind. Ct. App. 2012) ........................................................ passim

L-7 Designs, Inc. v. Old Navy, LLC,
    647 F.3d 419 (2d Cir. 2011) ............................................................ 195, 200

Lexion Med., LLC v. Northgate Techs., Inc.,
    292 F. App'x 42 (Fed. Cir. 2008) ................................................................ 98

Marathon Oil Co. v. Collins,
    744 N.E.2d 474 (Ind. Ct. App. 2001) ....................................................... 186

MDG Int'l. Inc. v. Austl. Gold, Inc.,
    606 F. Supp. 2d 926 (S.D. Ind. 2009) ................................................ 4, 195, 201

Natural Res. Def. Council, Inc. v. Muszynski,
    268 F.3d 91 (2d Cir. 2001) ........................................................................ 75

NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,
    87 N.Y.2d 614 (1996) ............................................................................. 143

Nimely v. City of New York,
    414 F.3d 381 (2d Cir. 2005) ................................................................... 176

NLRB v. Truitt Mfg.,
    351 U.S. 149(1956) ................................................................................ 200

Oscar Gruss & Son, Inc. v. Hollander,
    337 F.3d 186 (2d Cir. 2003) ................................................................... 191

Oxford Fin. Grp., Ltd. v. Evans,
    795 N.E.2d 1135 (Ind. Ct. App. 2003) ....................................................... 92

Penguin Grp. (USA) Inc. v. Steinbeck,
    No. 06 CV 2438 (GBD), 2009 WL 857466 (S.D.N.Y. March 31, 2009) ............... 195

Pigman v. Ameritech Pub., Inc.,
    641 N.E.2d 1026 (Ind. Ct. App. 1994) ...................................................... 192

PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.,
    No. 12 CIV. 8570 PAE, 2014 WL 7146357 (S.D.N.Y. Dec. 15, 2014) ............... 183

Point Prods. A.G. v. Sony Music Entm't, Inc.,
    No. 93 CIV. 4001 (NRB), 2004 WL 345551 (S.D.N.Y. Feb. 23, 2004) ............... 174

Q–Pharma, Inc. v. Andrew Jergens Co.,
    360 F.3d 1295 (Fed. Cir. 2004) ......................................................... 99, 101

Rowe Entm't, Inc. v. William Morris Agency, Inc.,
    No. 98 CIV. 8272 (RPP), 2003 WL 22272587 (S.D.N.Y. 2003) ........................... 153

RSL Commc'ns PLC, ex rel. Jervis v. Fisher,
    412 F. App'x 337 (2d Cir. 2011) .................................................. 73

RSL Commc'ns, PLC v. Bildirci,
    2009 WL 454136 (S.D.N.Y. Feb. 23, 2009)................................................ 73

Safka Holdings LLC v. iPlay, Inc.,
    No. 12 CIV 7301 RJS, 2013 WL 9636959 (S.D.N.Y. May 20, 2013) .................. 184

Sahadi v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.,
    706 F.2d 193 (7th Cir. 1983) ........................................................... 133

Sands, Taylor & Wood Co. v. Quaker Oats Co.,
    978 F.2d 947 (7th Cir. 1992) ....................................................... 99, 104

Schonfeld v. Hilliard,
    218 F.3d 164 (2d Cir. 2000) ............................................. 179, 184, 193

Sheek v. Mark A. Morin Logging, Inc.,
    993 N.E.2d 280 (Ind. Ct. App. 2013) ............................................. 162

Shepard v. State Auto. Mut. Ins. Co.,
    463 F.3d 742 (7th Cir. 2006) ................................................... 142, 162

Sheraton Com. of Am. v. Kingsford Packing Co.,
    319 N.E.2d 852 (Ind. Ct. App. 1974) ......................................... 195, 200

Sinclair Ref. Co. v. Jenkins Petroleum Process Co.,
    289 U.S. 689 (1933).................................................. 7, 163, 164, 172

Smith v. State Lottery Comm'n of Indiana,
    812 N.E.2d 1066 (Ind. Ct. App. 2004) .......................................... 3, 132

Sony Electronics, Inc. v. Soundview Techs., Inc.,
    2005 WL 1661696 (D. Conn. July 13, 2005) ...................................... 98

Spherenomics Global Contact Centers v. v Customer Corp,
    427 F. Supp. 2d 236 (E.D.N.Y. 2006) ............................................ 184

St. Paul Fire & Marine Ins. Co. v. Schilli Transp. Servs.,
    2012 U.S. Dist. LEXIS 160904 (N.D. Ind. Nov. 9, 2012)........................... 75

Sunburst Chem., LLC v. Acorn Distributors, Inc.,
    922 N.E.2d 652 (Ind. Ct. App. 2010) ............................................. 76

Towne v. Eisner,
   245 U.S. 418 (1918)................................................................................ 75

United Rentals, Inc. v. RAM Holdings, Inc.,
   937 A.2d 810 (Del. Ch. 2007) ................................................................ 196

United States v. Guidant LLC,
   10-MJ-00067 (D. Minn. Jan. 13, 2011) .................................................. 67

W.J. Holliday & Co. v. Highland Iron & Steel Co.,
   87 N.E. 249 (Ind. Ct. App. 1909) ........................................................... 159

WaveDivision Holdings LLC v. Millenium Digital Media Systems LLC,
   No. 2993-VCS, 2010 WL3706624 (Del. Ch. Sept. 17, 2010).................. 161

Wi-Lan Inc. v. LG Electronics, Inc.,
   2013 WL 2322483 (S.D.N.Y. May 10, 2013) .......................................... 98

Wright v. St. Mary's Med. Ctr. of Evansville, Inc.,
   59 F. Supp. 2d 794 (S.D. Ind. 1999) ...................................................... 142

**Other Authorities**

3 Dobbs Law of Remedies § 12.2(3) (2d ed. 1993)................................... 180, 183, 186

Del. Code Ann. tit. 8, § 262(h) .................................................................. 173

Fed. R. Civ. P. 37(c)(1)............................................................................. 153

Fed. R. Evid. 702 ...................................................................................... 175, 180

Restatement (Second) of Contracts § 344................................................. 162, 165, 170

Restatement (Second) of Contracts §201(2) ............................................ 196

## INTRODUCTION

This trial was held to resolve a claim brought by J&J concerning Guidant's decision to furnish information to Abbott in late December of 2005 in response to Abbott's unsolicited interest in purchasing Guidant assets as part of Boston Scientific's proposal to purchase Guidant.

**J&J has failed to prove a wilful breach of the Merger Agreement.**  From the moment it became aware of Boston Scientific's December 5 Takeover Proposal, Guidant worked closely with its outside deal counsel, Skadden, to ensure that Guidant's response to Boston Scientific's proposal was consistent with (i) Guidant's fiduciary duties to its shareholders, (ii) Guidant's contractual obligations to J&J, and (iii) the antitrust laws.  Guidant's general counsel, Bernard Kury, was advised by Skadden partners that, given Abbott's role in Boston Scientific's offer, it was proper under the Merger Agreement for Guidant to provide Abbott with due diligence.  Guidant did not breach the Merger Agreement, by providing information to Abbott or otherwise, as explained more fully below.  Kury's good faith belief that Guidant's conduct was complying with the contract,  based upon his demonstrated reliance on the advice of counsel personally familiar with the underlying issues,  make it clear that neither Kury, nor anyone else at Guidant acted "with knowledge that [because of their conduct] a breach would ensue."  See Johnson & Johnson v. Guidant Corp., 2014 WL 3728598, at *15 (S.D.N.Y. July 22, 2014).  Even now at the close of trial, J&J has not been able to move its case for wilfulness beyond a series of misinterpreted snippets taken out of context to a fully articulated theory that can withstand close scrutiny and fit with the remainder of the contemporaneous evidence which shows no intent to breach.

**J&J has failed to prove that any alleged breach of the Merger Agreement was material.**  J&J has failed to prove that the heart of the bargain was that Guidant could not provide due diligence to a divestiture candidate identified by the maker of a Takeover Proposal

without first identifying that divestiture candidate to J&J.  J&J's claim of material breach is based on an amalgam of hindsight, revisionist history, and supposition contradicted by the evidence presented at trial.  Instead, all of the relevant evidence, including the parties' conduct, indicates any breach was immaterial.

J&J has presented no evidence from before the alleged breach that suggests that it was concerned about a divestiture party receiving due diligence.  And J&J's conduct after it learned of the breach directly contradicts J&J's claim of material breach.  J&J General Counsel Russell Deyo claims he was aware of an alleged breach on January 9, 2006.  Yet no written notice of breach was provided to Guidant.  J&J outside counsel, Cravath partner Robert Townsend, claims—albeit within a claim of privilege as to the substance—that he participated in discussions about the "strategic value of claiming breach" (presumably with Deyo on or after January 9, 2006) (Trial Tr. 330:18-331:19 (Townsend Cross)), yet Deyo testified "he didn't remember considering" suing Guidant for breach prior to termination of the contract.  (Trial Tr. 132:9-12 (Deyo Cross)).  Moreover, J&J CEO William Weldon made it clear that if there was a breach, J&J did not consider it a ***material*** breach, conceding that his lawyers "would have advised me if they felt it would have been worthwhile to do anything with it" in the days following January 9, 2006.  (Trial Tr. 88:8-12 (Weldon Redirect)).

What Weldon and Deyo did, in fact, do in the two weeks following January 9, 2006 was to meet with Guidant's CEO and General Counsel twice, correspond with the Guidant's CEO twice, and speak with Guidant's General Counsel three times in order to negotiate amendments to its contract with Guidant and increase, each time, the termination fee due J&J if Guidant accepted the competing Boston Scientific bid.  This course of conduct undermines J&J's position that it was precluded from obtaining the substantial benefits of its contract with Guidant by any

alleged breach associated with Abbott's access to due diligence following Boston Scientific's unsolicited bid,  see Smith v. State Lottery Comm'n of Indiana, 812 N.E.2d 1066, 1072 (Ind. Ct. App. 2004) (reversing award of summary judgment on issue of material breach because "[i]t is for the fact-finder to decide whether the conduct of the Lottery precluded purchasers who tendered their prize-winning tickets *from obtaining a substantial benefit of the contract*" (emphasis added)), or that it was prevented from enjoying the underlying purpose of the contract, see Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis, 723 F.2d 512, 517 (Ind. Ct. App. 1983) ("[A] material breach of a contract is one which defeats the object or underlying purpose of the contract.").

Guidant's performance did not deprive J&J of the benefit of its bargain in any way—J&J was able to fully evaluate and respond to Boston Scientific's offer with not one but two counter-offers, and J&J did not react to Guidant's alleged breach by seeking injunctive relief, warning shareholders of the risk of contract litigation, or even providing Guidant a breach notice.

Both J&J's CEO and General Counsel conceded that they could think of nothing J&J would have done differently had Guidant disclosed Abbott's involvement in the Boston Scientific bid to J&J any earlier.  (Weldon Dep. 58:14-59:4; Deyo Dep. 145:7-13, 146:6-8). Throughout the bidding contest, J&J prepared and exchanged correspondence with Guidant and released statements to the public in which a variety of "risks and uncertainties" associated with Boston Scientific's bid were outlined in an effort to demonstrate the superiority of the J&J bid, and persuade Guidant shareholders to reject the Boston Scientific bid. J&J never mentioned potential liability for multiple billions of dollars in damages for breach of the Merger Agreement—not even in a draft.

The contemporaneous actions of J&J contradict its claim of material breach and lead to two possible conclusions, both fatal to J&J's claim: (1) J&J believed that any alleged breach was *not* material, or (2) J&J is estopped from asserting a material breach because its actions were a calculated effort to obtain a negotiating advantage that, *inter alia*, twice increased the termination fee ultimately paid to J&J while preserving an unannounced claim for breach.  See MDG Int'l. Inc. v. Austl. Gold, Inc., 606 F. Supp. 2d 926, 933 (S.D. Ind. 2009) (when a party has "by deed or conduct . . . induced another to act in a particular manner," it will be estopped from adopting "an inconsistent position, attitude, or course of conduct that causes injury to such other" (citation omitted)).  Had Guidant received a breach notice from J&J, it could have negotiated for a release of any claims in negotiating the amendments to the Merger Agreement on January 11 and 13, or in connection with payment of the $705 million termination fee.

J&J failed to prove a material breach because the evidence shows that J&J got what it bargained for.  J&J bargained for, and received, a promise from Guidant that its board of directors would recommend to Guidant's shareholders approval of J&J's proposal to acquire Guidant unless it received a superior, unsolicited, "Takeover Proposal," in which case J&J would receive notice of the proposal, and an opportunity to review the details of the proposal, so that J&J could consider whether or to what extent to modify its own bid.  That is exactly what happened.  Guidant kept J&J apprised of the material terms of Boston Scientific's Takeover Proposal.  The Boston Scientific announcement explicitly referenced Boston Scientific's intention to divest Guidant's endovascular solutions and vascular intervention products, and J&J and others almost immediately inferred that Abbott would be the most likely of a small number of potential divestiture candidates to seek to acquire that portion of Guidant's business.  As soon as Boston Scientific reached an agreement with Abbott, Guidant disclosed the agreement to

J&J.  J&J was not surprised by the competing bid, had more than a month to formulate its

strategy for responding to Boston Scientific's competing bids, and made *two competing bids*

prior to receiving a $705 million termination fee from Guidant.

**J&J has failed to prove that "but for" Guidant's alleged breach of Section 4.02, J&J**

**would have actually acquired Guidant—let alone operated it profitably.**  J&J has failed to

meet its burden to show that Guidant's alleged breaches were what prevented J&J from acquiring

Guidant at any price, let alone $63 per share.  J&J's own witnesses, including its former CEO

and CFO, admitted that J&J's offer was unlikely to succeed once Boston Scientific made its

December 5th announcement.  Conceding that "you really don't know until they vote" (Trial Tr.

84:14-85:1 (Weldon Redirect)), J&J CEO William Weldon summarized the consensus view of

J&J executives that once Boston Scientific announced an intention to counter J&J's $63 per

share bid for Guidant with a $72 bid (prior to any alleged breach), the $63 per share J&J bid

would be "inadequate."  (Darretta Dep. 70:15-71:8 (J&J "determined that [the $63] bid would be

deemed inadequate" in December 2005); Rosenberg Dep. 55:22-56:7 (after Boston Scientific

announced its $72 per share bid on December 5, 2005, "we believed we did need to increase our

offer to improve the chances of it being approved"); Caruso Dep. 197:8-13, 197:18-19 ("[I]n the

light of Boston Scientific's $72 bid announced on December 5, if J&J in fact wanted to acquire

Guidant, J&J would have to offer more than $63 a share.")).

J&J cannot satisfy its burden through speculation or conjecture, yet it has presented no

evidence proving that it would have been able to acquire Guidant for $63.08 per share once

Boston Scientific announced on December 5, 2005 that it intended to acquire Guidant for $72 per

share.

**J&J has failed to prove that it has suffered any damages through its failure to acquire Guidant.**  Proof of damages is an essential element of a claim for breach of contract. J&J's failure of proof of damages compels a verdict in Guidant's favor independent of any other legal or factual issue in dispute.  J&J has presented no evidence that it suffered any damages recognized under Indiana law.  J&J has presented no evidence that, had it acquired Guidant, it had a management plan that could have achieved the "synergies" underlying its forecasted Guidant cash flows, or avoided the subsequent and unavoidable losses that Guidant actually suffered.  Instead, in direct contravention of Indiana law, J&J argues that it should be awarded a multi-billion dollar windfall untethered to any actual harm suffered.

Before agreeing to purchase Guidant for $63.08 per share, J&J determined that Guidant had suffered "material" and unresolved "adverse events" that could "adversely affect the valuation" of the acquisition, posing "risks not accounted for in [J&J's] valuation model." (Caruso Dep. 102:4-16, 128:4-24.).  The uncontroverted evidence demonstrates that J&J's hopes were an over-optimistic and patently inaccurate forecast of future reality—had J&J acquired Guidant, it would have lost billions of dollars.  J&J urges the Court to "put blinders on and [only] accept what was known and knowable" at the time of the alleged breach in 2005 (Trial Tr. 382:21-24 (Jarrell Cross)), as if the Court were conducting an appraisal or dissolution proceeding to determine a fair *sale* price for Guidant in 2006, rather than measuring the "loss actually suffered by the breach"—*i.e.*, the alleged loss of not *owning and operating* Guidant since 2006. See Country Contractors, Inc. v. A Westside Storage of Indianapolis, Inc., 4 N.E. 3d 677, 694 (Ind. Ct. App. 2014).

In place of the mere hopes on which J&J predicates its claim for damages, Indiana law requires the Court to consider evidence J&J failed to produce—namely, the actual value that the

contract would have generated for J&J had it been performed.  E.g., Country Contractors, Inc., 4 N.E. 3d at 695-96 (reversing damages award as speculative and uncertain when the trial court calculated damages using income projections based on assumptions instead of available post-breach evidence of lower income); Indianapolis City Mkt. Corp. v. MAV, Inc., 915 N.E.2d 1013, 1020 (Ind. Ct. App. 2009) (calculating lost restaurant profits caused by delay in opening premises based on post-breach profits earned after opening); Connersville Wagon Co. v. McFarlan Carriage Co., 76 N.E. 294, 297-98 (Ind. 1905) (holding damages to be too speculative and noting relevance of whether there has been "an efflux of time making that [loss] capable of ascertainment which was wholly conjectural before."); Sinclair Ref. Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933) (holding that post-breach discovery concerning valuation was relevant to damages for breach of contract).

Contrary to Indiana law, J&J has sought to measure damages as if the Court were appraising shareholder rights because when post-alleged breach evidence is considered the evidence is incontrovertible that J&J suffered no damages.  The undisputed evidence presented at trial demonstrates that J&J is in a better position than it would have been had it acquired Guidant.  Far from suffering damage as a result of the alleged breach, J&J truly "dodged a bullet," as Professor Cornell testified, because macro-economic and industry specific events all but eliminated the growth J&J predicted (through 2014 and beyond) for Guidant's CRM business.  (Trial Tr. 1509:12-14 (Cornell Redirect) ("[I]t's my view that the loss Johnson & Johnson suffered because they didn't buy Guidant ten years ago is negative.  They actually dodged a bullet."); id. 1530:7-1531:5 (Cornell Recross) ("[T]ypically, the growth rate depends on overall economic conditions, and here, we had a great recession, and the nature of the product and the public's demand for it.")).  Replacing J&J's hopes, as reflected in its contemporaneous

projections, with the reality of what transpired, establishes that J&J would have suffered billions

of dollars in operating losses and balance sheet impairments had it, as opposed to Boston

Scientific, actually acquired and operated Guidant.  (DX0164 (Cornell Direct) ¶ 53 ("[U]sing the

sensitivities documented by J&J, the expected NPV would have decreased by approximately

$16.0 billion to **_negative_** $11.3 billion at an acquisition price of $63.08 per share if J&J had

modeled CRM growth at 0.7% per year (the growth rate that actually materialized).")).  There is

no evidence to the contrary.  Awarding damages to J&J would produce a windfall that would

place it in a better position than it would have enjoyed if the alleged breach had not occurred and

J&J had not collected its $705 million termination fee.  See, e.g., L.H. Controls, Inc. v. Custom

Conveyor, Inc., 974 N.E.2d 1031, 1052 (Ind. Ct. App. 2012) (rejecting damages award that

"would improperly allow CCI to be placed in a better position than they would have enjoyed if

LH had not breached the contract").

In sum, having failed to offer any evidence that Guidant—relying on the advice of

Skadden—ever believed it was breaching or had breached the Merger Agreement, and despite

the powerful evidence that even J&J did not consider Guidant to have committed a material

breach, J&J now seeks to be compensated despite the fact that it has suffered no harm by

Guidant's actions.  It is not entitled to those damages, because it has not met its burden of proof

on any element of its claim.

8

# FINDINGS OF FACT[1]

## I.   Background

1.      Guidant Corporation, now Guidant LLC[2] ("Guidant") is an Indiana company and a wholly owned subsidiary of Boston Scientific Corporation ("Boston Scientific").  (Joint Proposed Stipulations of Fact and Law ("JPS") ¶ 2).  Guidant was created as an independent company from Eli Lilly & Company's medical device and diagnostics division in 1994.  Guidant manufactured a broad range of medical devices for the treatment of coronary arrhythmia, heart failure, and peripheral vascular disease, including products in the fields of vascular intervention ("VI"), drug-eluting stents ("DES"), and cardiac rhythm management ("CRM").  (JPS ¶ 2).  Guidant's CRM business included the development of implantable defibrillator systems, which are used to detect and treat abnormally fast heart rhythms.  (JPS ¶ 2).  Guidant became a wholly owned subsidiary of Boston Scientific on April 26, 2006.  (DX0051).

2.      Johnson & Johnson ("J&J") is a New Jersey corporation.  In 2005, J&J had more than 230 operating companies in 57 countries.  (JPS ¶ 1).  J&J had sales of over $50 billion in 2005.  (DX0018 at 28)  It was organized into three business segments:  Consumer, Pharmaceutical, and Medical Devices and Diagnostics.  The Medical Devices and Diagnostics segment included Cordis Corporation ("Cordis"), a Florida corporation that became a wholly owned subsidiary of J&J in 1996.[3]  (JPS ¶ 1; Rosenberg Dep. 149:17-19).  A manufacturer of

---

[1] To the extent that any finding of fact reflects a legal conclusion, it should to that extent be deemed a conclusion of law, and vice versa.

[2] On February 19, 2010, Guidant Corporation was converted from an Indiana corporation to an Indiana limited liability company.

[3] https://www.sec.gov/Archives/edgar/data/200406/0000950123-96-000764.txt.

DES, Cordis held approximately 38% share of the U.S. market and 57% of the foreign market at the start of 2005, with over one million of its stents implanted into patients.[4]

3.    Boston Scientific is a Delaware corporation that develops, manufactures and markets a range of medical devices and procedures.  (JPS ¶ 6).  In 2005, Boston Scientific had net sales of $6.3 billion.  (DX0196 at 1).

4.    Abbott Laboratories ("Abbott") is an Illinois corporation that purchased the VI and endovascular solutions ("ES") business from Guidant on April 21, 2006.  (JPS ¶ 7; DX0051).  Before then, Abbott had three reportable lines of business:  pharmaceutical and drug products; diagnostic, testing, and screening products; and nutritional products.  (JPS ¶ 7).

5.    Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") represented Guidant in its negotiations with J&J, Boston Scientific, and Abbott.  (JPS ¶ 4).  Skadden was known for its expertise in corporate work and M&A transactions.  Skadden was involved in eight of the top twenty mergers and acquisitions announced in 2005, and that year handled 92 transactions valued at $100 million or more.[5]  Skadden's client base in 2006 included nearly half of the Fortune 500.[6]  That same year The American Lawyer ranked Skadden "first among law firms in handling the greatest number of the largest M&A transactions" for the fourteenth consecutive

---

[4] Glenn Singer, "Cordis Sets Sights on Stent Lead," Sun Sentinel (Jan. 16, 2005) available at http://articles.sun-sentinel.com/2005-01-16/business/0501140731_1_cordis-corp-cordis-cardiology-stent.

[5] http://www.skadden.com/news-events/corporate-control-alert-ranked-skadden-first-2005-announced-ma-transactions.

[6] Andrew Longstreth, "How Skadden Does It," The American Lawyer (May 2006) available at http://www.skadden.com/sites/default/files/ckeditor/files/How_Skadden_Does_It.pdf.  See also https://www.skadden.com/news-events/survey-ranks-skadden-top-go-law-firm.

year.[7]  Charles Mulaney was the lead Skadden partner in the firm's representation of Guidant in

its merger negotiations with J&J and Boston Scientific, and Neal Stoll was the lead Skadden

partner for related antitrust issues.

6.      Shearman & Sterling LLP ("Shearman") was Boston Scientific's mergers and

acquisitions counsel in connection with its acquisition of Guidant.  Founded in 1873, Shearman

was a global law firm with an established and reputable M&A practice with experience in

billion-dollar transactions.[8]  In 2005, Shearman acted as M&A counsel to investment advisors in

37 deals, with a total value of $127 billion.[9]

## II.    The Initial Merger Agreement Between J&J and Guidant

### A.    J&J Expresses Interest in a Potential Acquisition of Guidant

7.      In July 2004, J&J initiated discussions with Guidant—then an independent

company—about J&J's potential acquisition of Guidant.  (JPS ¶ 8).  J&J expressed particular

interest in acquiring Guidant's CRM business, and Guidant's implantable electronic medical

device business.  (Weldon Dep. 110:7-14;[10] Harris Dep. 109:24-110:11; Hilton Ex. 3; Hilton

Dep. 44:21-45:12; Darretta Dep. 111:8-24).

---

[7] http://www.skadden.com/news-events/skadden-ties-top-position-ithe-american-lawyeris
-2005-corporate-scorecard-survey.

[8] http://www.shearman.com/~/media/Files/NewsInsights/Publications/2006/01/MA-
Brochure/Files/View-Full-Text/FileAttachment/MABrochure2006.pdf.

[9] "The Corporate Scorecard 2006," The American Lawyer available at http://www.
americanlawyer.com/id=900005548390/The-Corporate-Scorecard-2006?slreturn=
20140829210218.

[10] Deposition testimony from William Weldon and Russell Deyo is admissible pursuant
to Federal Rule of Civil Procedure 32(a)(3) and Federal Rule of Evidence 801(d)(2).  At the time
of the depositions, Weldon was J&J's CEO (PX0021 at ¶ 1) and Deyo was J&J's Vice President
and general counsel (PX0016 at ¶ 1).

### B.     J&J and Guidant Negotiate the Terms of the Initial Merger Agreement

8.     Guidant retained Skadden to represent it in connection with the potential merger with J&J.  Guidant's general counsel Bernard Kury selected Skadden "based on Skadden's and Mr. Mulaney's outstanding reputation and well-known experience and expertise in the M&A field."  (DX0166 (Kury Direct) ¶ 4).  Guidant had a small legal department—its Indianapolis headquarters staffed "something like four or five lawyers, but even there, they weren't people who were necessarily available to [Kury] to do work on things such as [the] Johnson & Johnson Merger."  (Trial Tr. 1224:7-11 (Kury Redirect)).  Accordingly, Kury "looked to [Skadden] to advise [him] about what to do and when to do it, to act as [his] liaison, and to let [him] know if there were issues or problems that required [his] attention."  (DX0166 (Kury Direct) ¶ 5).

9.     In the initial J&J–Guidant merger discussions, J&J's board of directors focused on valuation and pricing issues.  (Weldon Ex. 9; Caruso Dep. 14:3-15:8).[11]

10.    Guidant, however, was focused on preserving its ability to obtain the best deal for its shareholders.  As Skadden noted in a "Key Deal Points" outline dated July 2, 2004, Guidant required the "ability to respond to superior offers" and the "ability to terminate [the merger] agreement and pay a break-up fee to accept a superior offer."  (DX0034).

11.    This was because Guidant had not tested the market and had not been "shopped" to other potential bidders.  (DX0166 (Kury Direct) ¶ 7 ("Before entering into merger negotiations with J&J, Guidant had not 'tested the market' with other potential purchasers."); DX0167 (Mulaney Direct) ¶ 4 ("[A]t the time of its discussions with J&J in the summer-fall

---

[11] J&J declined to present Dominic Caruso—a current J&J officer and Head of Group Finance at the time of the merger—for live testimony at trial. "Senior Management," Johnson & Johnson website, http://www.jnj.com/our-news-center/senior-management/dominic-caruso (last visited January 16, 2015).

2004 time period, Guidant was dealing only with J&J and had not been engaged in a process to test the market and seek out other potential bidders for Guidant.")).  Guidant therefore communicated to J&J more than once that the companies' Merger Agreement would have to preserve Guidant's ability to consider and respond to potentially superior offers.

a. On July 31, 2004, Michael Dormer, the Worldwide Chairman of J&J's Medical Devices division, e-mailed J&J Chairman and CEO William Weldon, the CFO of J&J's medical device and diagnostics group Dominic Caruso, and J&J Vice Chair and CFO Robert Darretta to communicate what he described as Guidant's "conditions," including Guidant's "condition" that the agreement be structured "with [Guidant] being able to consider higher offers."  (Weldon Ex. 9; see also DX0035 (fax from Scharf (Guidant) to Mulaney (July 23, 2004) ("The agreement will contain an appropriate 'fiduciary out' allowing G to consider superior offers.")).

b. On October 15, 2004, Skadden's Michael DeFranco sent J&J associate general counsel James Hilton a memorandum "detailing more significant issues" for the proposed transaction, stating that Guidant "expects that the agreement will include a 'superior proposal out,' allowing [Guidant] to terminate the agreement in the event of a 'superior proposal.'"  (Hilton Ex. 6 at JJE00143696, -98-99).

12.    J&J and its outside counsel in these negotiations, Cravath, Swain & Moore LLP ("Cravath"), did not object to Guidant's requirement that it be permitted to "consider higher offers."  (Weldon Dep. 106:24-107:7; DX0167 (Mulaney Direct) ¶ 19 ("Mr. Townsend, however, never expressed or suggested a view that Guidant could not fully respond to a Takeover Proposal from a party that intended to raise financing or solve an antitrust problem by

selling certain Guidant assets.  Such a position would have been unacceptable to Guidant as inconsistent with the 'passive market check' for which it had expressly negotiated.")).  To the contrary, Weldon acknowledged that "a superior proposal out, an ability to consider other offers, was an important part of Guidant's willingness to enter into this discussion" regarding a potential merger.  (Trial Tr. 38:9-40:10 (Weldon Cross)).  Weldon did not consider the "superior proposal out" to be unusual and did not object to it.  (Trial Tr. 42:5-25 (Weldon Cross)).

13.     During the negotiations with J&J, Skadden communicated to the Guidant board of directors that there were different approaches for Guidant to ensure that its shareholders received the best deal available.  The parties agreed to a "passive market check" that prevented Guidant "from soliciting other bids" but permitted it "to respond to bona fide superior proposals from third parties."  Skadden explicitly communicated this to the Guidant board of directors at meetings on October 18, 2004 (DX0064), October 27, 2004 (DX0037), and December 15, 2004 (DX0063).

14.     On August 4, 2004, J&J and Guidant entered into a confidentiality agreement (the "J&J-Guidant Confidentiality Agreement").  (JPS ¶ 9; Kury Ex. 2).

    a.   The first part of the Agreement defined the "Information" that would be covered
         by the agreement.  It defined "Information" to include information that Guidant
         and its subsidiaries would provide about themselves through their "officers,
         directors, employees, agents, advisors or representatives (collectively,
         'Representatives')," and information J&J would provide about itself through its
         "Representatives."  (Kury Ex. 2).

    b.   The second part of the Agreement governed how the "Information"—i.e., the
         information exchanged by the parties through their "Representatives"—would be

14

used:  It would be used "solely for the purpose of exploring possible negotiated business arrangements and not for any other business or competitive purpose," and it would be "kept confidential in accordance with the terms of" the J&J-Guidant Confidentiality Agreement.  (Kury Ex. 2).

15.     On December 15, 2004, J&J and Guidant signed a merger agreement (the "Initial Merger Agreement"), with a purchase price of $76 per Guidant share, which Guidant's shareholders approved on April 27, 2005.  (JPS ¶ 10; Kury Ex. 8).  Guidant was represented by Skadden, including Mulaney, in the negotiation of the agreement.  (JPS ¶ 4).  The Initial Merger Agreement included the following provisions:

    a.  <u>No Solicitation</u>:  Under Section 4.02, Guidant was prohibited from actively soliciting bids from third parties.  Section 4.02 provided that Guidant:

> [S]hall not, nor shall it authorize or permit any of its Subsidiaries or any of their respective directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative (collectively, "Representatives") retained by it or any of its Subsidiaries to, directly or indirectly through another person, (i) solicit, initiate or knowingly encourage, or take any other action designed to, or which could reasonably be expected to, facilitate, any Takeover Proposal or (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any person any information, or otherwise cooperate in any other way with, any Takeover Proposal.

Under the terms of this provision, it was in J&J's interest for the term "Representatives" to encompass any party working with Guidant that could potentially solicit or encourage a deal, to ensure that J&J had a robust protection against solicitation of competing bids.  (<u>See</u> Trial Tr. 933:9-21 (Mulaney Redirect)).

b. <u>Superior Offer Out</u>:  The Section 4.02 "No Solicitation" provision expressly

permitted Guidant to consider and respond to superior offers.  It provided:

> [I]n response to a bona fide Takeover Proposal that the Board of
> Directors reasonably determines (after consultation with outside
> counsel and a financial advisor of nationally recognized reputation)
> constitutes or is reasonably likely to lead to a Superior Proposal, and
> which Takeover Proposal was not solicited after the date hereof and
> did not otherwise result from a breach of this Section 4.02(a), the
> Company may . . . furnish information with respect to [Guidant] and
> its Subsidiaries to the person making such Takeover Proposal (and its
> Representatives) pursuant to a customary confidentiality agreement
> not less restrictive to such person than the confidentiality provisions of
> the [J&J-Guidant] Confidentiality Agreement.

The term "<u>Takeover Proposal</u>" was defined broadly under Section 4.02 to include:

> any inquiry, proposal or offer from any person relating to, or that could
> reasonably be expected to lead to, any direct or indirect acquisition or
> purchase . . . of assets (including equity securities of any Subsidiary of
> [Guidant]) or businesses that constitute 15% or more of the revenues,
> net income or assets of [Guidant] and its Subsidiaries, taken as a
> whole . . . .

c. <u>Termination</u>:  The parties agreed that, if there were a successful unsolicited

takeover bid, which the Guidant board reasonably determined to be a Superior

Proposal, Guidant could terminate its agreement with J&J.  If Guidant elected to

terminate the agreement in accordance with the terms of the Initial Merger

Agreement, it would be required to pay a termination fee to J&J.

d. <u>Limitation of Liability</u>: The parties agreed that, after the termination fee had been

paid, the Initial Merger Agreement would become null and void, with no liability

running between the parties except for breaches that were both "wilful" (i.e., for

breaches a party committed "with knowledge that breach would ensue") and

"material" (i.e., breaches that went to the heart of the Initial Merger Agreement).

e. <u>Injunctive Relief</u>:  The parties agreed that "irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached."  (Townsend Ex. 1, § 8.10).  Section 8.10 provided that "the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement," in addition to any other relief.  (<u>Id.</u>).  Thus, the Initial Merger Agreement contemplated that if either party believed the other was in material breach, it would seek injunctive relief to prevent harm from that material breach.

f. <u>Material Adverse Change</u>:  The parties agreed, in Sections 3.01 and 6.02, that they would not be obligated to close the merger if Guidant suffered a "Material Adverse Effect or Material Adverse Change" prior to the closing of the transaction.  Section 8.03(c), in turn, defined those terms to include "any change, effect, event, occurrence, state of facts or development which individually or in the aggregate would reasonably be expected to result in any change or effect, that is materially adverse to the business, financial condition or results of operations of [Guidant] and its Subsidiaries, taken as a whole."

16.    Although the parties re-negotiated the Initial Merger Agreement in November of 2005, the above-described terms of the Initial Merger Agreement would remain "largely unchanged" throughout the parties' dealings.  (Korbich Ex. 10 at JJE00134552).

17.    The Initial Merger Agreement did not guarantee that J&J would purchase Guidant for $76 per share.  (Trial Tr. 97:1-4 (Deyo Cross) ("Q.  But am I correct that once that agreement

17

was executed on December 5th [*sic*], you'd agree with me, it didn't guarantee that the merger

was going to close; isn't that right?  A. That's correct."); Trial Tr. 212:20-23 (Coates Cross)

("Q. . . .  Executing a merger agreement doesn't guarantee to a party that they will acquire a

target, isn't that right?  A. That's correct.")).  Rather, under the agreement, Guidant would be

permitted to consider unsolicited competing bids, and the transaction's ultimate approval would

be left to Guidant's shareholders.  (Trial Tr. 97:5-7 (Deyo Cross) ("Q.  The closing was

conditioned on shareholder approval from Guidant, right?  A. Yes.")).

      18.    J&J understood that the Initial Merger Agreement was not a guarantee that the

deal would close.  (Trial Tr. 97:1-4 (Deyo Cross); Deyo Dep. 15:7-25;  Caruso Dep. 75:23-76:13

(acknowledging "there [was] a possibility that it didn't necessarily have to be consummated,"

and that Guidant could decide to proceed with another purchaser)).  And prior to the scheduled

closing, J&J acknowledged on many occasions that a transaction between J&J and Guidant

might not, in fact, be consummated under the terms of the Initial Merger Agreement, and that

Guidant was entitled to consider competing offers:

    a.  J&J acknowledged in a January 5, 2005 "Final GDT Deal Summary" document

        prepared by Caruso, that one of the "principal" terms of the Initial Merger

        Agreement was that Guidant was permitted to "negotiate, and terminate

        transaction in response to, unsolicited superior bid."  (Caruso Ex. 5 at

        JJE00092028; Caruso Dep. 75:6-76:21).

    b.  On September 2, 2005, Caruso, who had by then become the head of group

        finance, stated in a document titled "Decision making process" that the Initial

        Merger Agreement "May result in no acquisition" of Guidant by J&J.  (Caruso

        Ex. 6).

C.     **J&J Considers Divesting Guidant Assets**

19.     J&J understood when it negotiated the Initial Merger Agreement that it might be required to divest certain Guidant assets to obtain antitrust approval from the FTC and European regulators reviewing the transactions.  (Harris Dep. 37:12-22; Harris Dep. 43:9-18; PX0020 (Townsend Direct) ¶ 6; Rosenberg Dep. 114:24-115:3; Caruso Dep. 114:18-25; Caruso Dep. 116:2-8).  In contemporaneous documents, J&J acknowledged that "[w]e are assuming that we must divest DES [i.e., Guidant's drug-eluting stent business]."  (Harris Ex. 4).  J&J further understood that "any third parties that would purchase Guidant assets" or licenses to such assets would expect to conduct due diligence.  (Hilton Dep. 170:24-171:14; Hilton Dep. 183:4-17; Hilton Dep. 186:6-21; Trial Tr. 55:2-56:4 (Weldon Cross); Korbich Dep. 158:9-23).

20.     To address potential antitrust hurdles, J&J considered several potential divesture partners for Guidant's assets, including Abbott, St. Jude, Medtronic, and Conor.  (Harris Dep. 52:9-53:5).  J&J engaged in discussions about the potential divestiture with some of these companies, including Abbott and Medtronic.  (Rosenberg Dep. 116:16-117:5; Weldon Dep. 80:6-81:8).  J&J "understood that Abbott would undertake due diligence" regarding the proposed transaction, and J&J entered into a confidentiality agreement with Abbott "so that Abbott could get information about Guidant."  (Hilton Dep. 173:17-174:15).

21.     Specifically, on April 15, 2005, J&J's subsidiary Cordis entered into a confidentiality agreement with Abbott (the "ABT-Cordis Confidentiality Agreement"), allowing each party to provide nonpublic information to the other entity, including "certain non-public information relating to Guidant," subject to certain confidentiality provisions.  (Morano Ex. 3). The ABT-Cordis Confidentiality Agreement defined each party's "Representatives" as including "its directors, officers, employees, agents or advisers (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors)."  It further provided that "[i]n no event

shall Representatives include Guidant."  (Morano Ex. 3 at JJH00094466).  On May 27, 2005,

J&J and Abbott executed a "Non-Binding Term Sheet," outlining the terms of Abbott's license

to certain rapid exchange ("RX") stent and DES products from J&J if J&J acquired Guidant.

(DX 0161).

      22.     On July 25, 2005, Guidant (through its agent JP Morgan) entered into a

confidentiality agreement with Abbott in connection with Abbott's possible purchase of

Guidant's Cardiac Surgery Group as part of the J&J transaction.  (Kury Ex. 27).

In a license agreement dated August 12, 2005 (the "J&J-ABT License Agreement"), J&J agreed

to grant Abbott a non-exclusive license to certain patents in the DES field if J&J acquired

Guidant.  (JPS ¶ 12; DX0162).  The J&J-ABT License Agreement allowed J&J to terminate only

if the license was deemed an inadequate antitrust remedy, the Initial Merger Agreement "as it

may have been amended, is terminated" (DX0162 § 9.2 at JJH00029810), or if Abbott materially

breached the J&J-ABT License Agreement in certain ways (DX0162 § 9.3 at JJH00029810-11).

The J&J-ABT License Agreement further provided that failure to perform any obligation under

the agreement would not constitute grounds for termination until the issue was resolved pursuant

to dispute resolution procedures set forth in the agreement and a party had "failed to act in

accordance with a final resolution therefrom."  (DX0162 § 9.4 at JJH00029811).  J&J could not

terminate the J&J-ABT License Agreement without cause, and Abbott's separate negotiations

with Boston Scientific and Guidant did not constitute cause.  (DX0162 § 9.5 at JJH00029811).

      23.     On September 23, 2005, Guidant (through its agent JPMorgan) entered into

another confidentiality agreement with Abbott in connection with Abbott's possible purchase of

Guidant's ES business within the European Economic Area, also as part of the J&J transaction.

(Kury Ex. 26).

**D.     J&J Declares That Guidant Has Suffered a Material Adverse Change**

24.     In June 2005, Guidant recalled certain defibrillator models due to manufacturing defects.  Guidant also announced that it would replace up to 28,900 implanted defibrillators because of a potential product flaw.  (JPS ¶ 14).  The United States Food and Drug Administration advised patients to consult their physicians regarding the issue.  (JPS ¶ 14).

25.     On June 17, 2005, J&J publicly announced that "the events reported by Guidant [were] serious matters, and Johnson & Johnson [was] engaged in discussions with Guidant to help [J&J] understand the issues."  (JPS ¶ 15).

26.     On August 25, 2005, J&J issued a press release stating that it had received European Commission clearance to divest both its European Cordis business and Guidant's European ES business.  (JPS ¶ 16).  But it also announced that it was studying the issue of the Guidant recalls "to understand and evaluate the impacts."  (JPS ¶ 16).

27.     During its September 12, 2005 board meeting, Caruso told J&J's board that there had been a "change in valuation" of Guidant "since December 2004, when the merger agreement was signed."  (Caruso Ex. 7).  As a result, "J&J was of the view that Guidant had suffered a material adverse change" and that J&J "was no longer obligated to close the parties' merger agreement at $76 per share."  (Weldon Dep. 5:20-6:25).

28.     Following news of the product recalls, "there was significant speculation that [] J&J was going to either walk away from the transaction or try to renegotiate the transaction." (Trial Tr. 544:13-545:5 (Hartman Cross)).  Merrill Lynch later noted Wall Street "speculation that [J&J] will decrease its bid for [Guidant]" and that the "[t]ransaction may not be completed." (PX0029 at ML0000275).  On September 29, 2005, Weldon informed Guidant CEO James Cornelius that J&J wanted to renegotiate the Initial Merger Agreement.  (Kury Ex. 1 at GDT 00026957).

29.     On or about October 18, 2005, J&J announced that "[i]n light of these matters [the product recalls] and their impact," J&J was "continuing to consider the alternatives under our merger agreement."  (PX0004 at JJE00036994).  Lawrence Best, Boston Scientific's then CFO, testified that the news "was widely read by all of us in the medical device industry, and it was clear that there was some dispute, potential dispute or problems with that transaction."  (Best Dep. 11:18-22).

30.     On November 1, 2005, Boston Scientific's Chairman made an unsolicited call to Guidant's Chairman, asking for his availability to discuss a possible business combination. (DX0119).  Guidant declined the invitation, however, because Guidant already had a deal with J&J that had been approved by Guidant's shareholders.  (DX0166).  Guidant notified J&J in writing of the communication from Boston Scientific.  (DX0173).  While J&J has insinuated that JPMorgan solicited Boston Scientific on Guidant's behalf, it has offered no evidence of any solicitation.  Indeed, the only direct evidence—that Best expressed Boston Scientific's interest during a routine meeting between Boston Scientific and JPMorgan—is to the contrary.  (Best Dep. 12:23-25).

31.     On November 2, 2005, J&J announced that it had received FTC clearance for its proposed acquisition of Guidant, but that J&J nonetheless believed that the recent product recalls at Guidant gave rise to a "material adverse effect" under the Initial Merger Agreement, and that J&J was "not required" to complete the acquisition.  (JPS ¶ 18).

32.     On November 2, 2005, Kury gave notice to J&J's general counsel Russell Deyo by letter that "all conditions to Closing have been satisfied," and J&J's refusal to close would "constitute a breach of the Merger Agreement which will cause Guidant immediate irreparable harm" and that "Guidant intends to take all necessary steps to protect its rights under the Merger

Agreement." (Deyo Ex. 8). When J&J did not respond to this letter, Kury reiterated Guidant's position in a November 3, 2005 letter to Deyo: "J&J's failure to close in accordance with the Merger Agreement will constitute a breach of the Merger Agreement, which will cause Guidant immediate irreparable harm. Guidant will take all necessary steps to protect its rights under the Merger Agreement." (Deyo. Ex. 9).

33.    In a letter dated November 3, 2005, Deyo wrote to Kury claiming that Guidant had suffered a material adverse event and that these developments, in Deyo's words, "constitute breaches of a number of Guidant's representations and warranties in the Merger Agreement." (Deyo Ex. 10; Trial Tr. 105:19-25 (Deyo Cross)). Deyo's letter further advised that "Johnson & Johnson is prepared to take all necessary action to protect and enforce its rights under the Merger Agreement." (Deyo Ex. 10).

34.    In a November 7, 2005 press release, J&J reiterated its claim that it viewed the previously announced recalls at Guidant and the related regulatory investigations, claims, and other developments as serious matters affecting both Guidant's short-term results and long-term outlook. J&J "sincerely and honestly believed that Guidant had in fact suffered a . . . material adverse change," and that these changes "would have a substantial and long-term adverse effect on the value of Guidant." (Caruso Dep. 102:10-103:2). "J&J wasn't just posturing to renegotiate a lower deal price." (Caruso Dep. 102:10-22). Similarly, J&J wasn't attempting to acquire Guidant at a low price so that it could "turn around and sell Guidant to someone else." (Korbich Dep. 30:5-13).

35.    On November 7, 2005, Guidant filed a lawsuit in this Court, alleging that J&J's claim of a "material adverse effect" was without merit, and seeking "a judgment requiring J&J specifically to perform its obligations under the [Initial] Merger Agreement." (JPS ¶ 21). The

complaint in that case cited Section 8.10 of the Initial Merger Agreement for the proposition "that an award for specific performance and injunctions were the appropriate remedies for a breach of the [Initial] Merger Agreement and would be entered in the event of a breach of the [Initial] Merger Agreement."

## III.   J&J Lowers Its Offer and Boston Scientific Responds

### A.   J&J and Guidant Renegotiate the Merger Agreement

36.   As noted, J&J sincerely and honestly believed that Guidant had suffered a material adverse change that adversely impacted its long-term value.  Indeed, due to the "material adverse change," J&J was "just willing to walk away from the transaction" rather than pay more than $63.08 per share.  (Caruso Dep. 107:3-12).  J&J also acknowledged that there were, additionally, "risks that could adversely affect the valuation" of Guidant.  (Caruso Dep. 128:4-24).  These included risks that "there may be future recalls of the products that have not been recalled," and "risks not accounted for in [J&J's] valuation model."  (Caruso Dep. 128:4-19).

37.   A week later, on November 14, 2005, the parties settled Guidant's lawsuit and entered into an amended merger agreement with a purchase price of $63.08 per Guidant share (the "Merger Agreement").  (JPS ¶ 22; Kury Ex. 9).

38.   The Section 4.02 "No Solicitation" provision was unchanged between the Initial Merger Agreement and the Merger Agreement, and was summarized in the Guidant board materials for a November 14, 2005 meeting as follows:  "[Guidant] agrees not to solicit an alternative transaction.  [Guidant's board of directors may] (i) participate in discussions with a party presenting a proposal the board believes to be a 'superior proposal' and (ii) accept a superior transaction if [J&J] does not meet its terms."  (DX0174 at GDT 00304092).

39.     Kury testified that "Skadden explained to the Guidant Directors that the Merger Agreement continued to allow Guidant the ability to consider and respond to unsolicited potentially superior proposals as a means of helping the board to fulfill its fiduciary obligation to the Guidant shareholders to be fully informed with respect to potentially available alternatives." (DX0166 (Kury Direct) ¶ 42).

40.     Guidant believed that its ability to respond to potentially superior offers was an important right under the Merger Agreement, particularly in light of the renegotiated price of $63 per share.  (DX0166 (Kury Direct) ¶ 43 ("Having the option to explore potentially available alternatives was, if anything, more important to Guidant in the context of the Merger Agreement than in the Original Merger Agreement, since Guidant had agreed to a substantially lower price in the Merger Agreement and needed the opportunity to benefit from a 'passive market check' to test whether that substantially lower price was fair to Guidant and its shareholders.  In other words, Guidant's right to investigate unsolicited proposals was crucial to the board's acceptance of the renegotiated $63 per share price of the Merger Agreement.")).  J&J acknowledged that this "superior proposal out" was an important deal point for Guidant.  (Trial Tr. 38:9-40:10 (Weldon Cross)).

41.     J&J knew that if it learned of a breach between the signing of the Merger Agreement and the closing of a competing transaction it could sue for specific performance under Section 8.10.  (Trial Tr. 326:16-23 (Townsend Cross)).

42.     In response to J&J's re-negotiation of the deal, Guidant's shareholders expressed their dissatisfaction at the new price, threatening to "vote against the deal and come out publicly against it."  (Weldon Ex. 1; Weldon Ex. 2; Trial Tr. 361:24-362:7 (Jarrell Cross) ("[M]ajor Guidant shareholders and analysts . . . reacted negatively to the Johnson & Johnson $63.08 a

share bid.")).  Weldon was aware of this dissatisfaction.  (Weldon Dep. 27:6-16).  J&J was also

aware that the renegotiated transaction might "result in no acquisition" of Guidant by J&J, and

explicitly considered that possibility as part of its written "[d]ecision making process."  (Caruso

Ex. 6).

> **B.**      **Boston Scientific Submits an Unsolicited Competing Bid for Guidant**

43.      Like J&J, Boston Scientific was also aware that J&J's $63 per share offer had

"not been enthusiastically received by certain stockholders and directors of Guidant," and that

this made the transaction "vulnerable to a superior competing offer."  (Knopf Ex. 3; Knopf Dep.

28:5-29:11).

44.      At a November 21, 2005 meeting, Boston Scientific's board of directors

considered entering into a "partnership" with another company to acquire Guidant, and to divest

certain Guidant assets to a divestiture partner "to minimize antitrust issues and raise cash."

(Knopf Ex. 6 at SS 00157867; Knopf Dep. 37:2-21).

45.      On December 5, 2005, Boston Scientific publicly announced an unsolicited

proposal to acquire Guidant for $72 per share, subject to due diligence.  (Best Ex. 12; DX0166

(Kury Direct) ¶ 44; DX0167 (Mulaney Direct) ¶ 9).  Boston Scientific's announcement stated

that Boston Scientific had "conducted a review of the antitrust issues" and was "prepared to

divest Guidant's vascular intervention and endovascular businesses."  (Best Ex. 12).  On an

analyst call that same day, Boston Scientific explained that it intended to use the proceeds of the

planned Guidant asset sales to help fund the proposed acquisition.  (Best Ex. 13 at BSC 28367).

46.      Boston Scientific's announcement stated that its "proposal provides Guidant

shareholders with approximately $3 billion of additional aggregate value over the revised

Johnson & Johnson offer, and represents a premium of approximately 14% over the revised

Johnson & Johnson offer."  (Townsend Ex. 3).

47.     Guidant's share price increased to $67.98 on the day Boston Scientific announced

its offer, and stayed above $63.08 for the remainder of the parties' negotiations.  (DX0226).  The

evidence establishes that Guidant's shareholders—who had threatened to 'vote against' a

transaction at a price less than $76 per share even before Boston Scientific had made a proposal

(see supra ¶ 42)—were highly likely to vote against J&J's $63.08 per share offer.  (Weldon Dep.

20:10-13 ("[Q.] [Y]ou were concerned that $63 would no longer be sufficient to get the deal

done?  A. Might not be."); Caruso Dep. 197:8-13, 197:18-19 ("[I]n the light of Boston

Scientific's $72 bid announced on December 5, if J&J in fact wanted to acquire Guidant, J&J

would have to offer more than $63 a share."); Darretta Dep. 70:15-71:8 (J&J "determined that

[the $63] bid would be deemed inadequate" in December 2005 following Boston Scientific's $72

announcement on December 5); Trial Tr. 1431:1-6 (Cornell Cross) ("Q. So do I take it that

you're suggesting that Professor Jarrell's assumption is likely wrong because Guidant's share

price traded at above $63? A. That is, in my opinion, evidence that the opinion is incorrect, yes,

or that the probability being, one, that it would be acquired at 63.08 is incorrect."); 1515:1-8

(Cornell Redirect) ("Q. Now, am I correct that, in your opinion, the market's reaction to the

announcement that Boston Scientific was going to make an offer tells you something about the

probability that the $63-a-share offer is likely to succeed? A. It does.  Q. And what does it tell

you?  A. That the $63-a-share offer is very unlikely to succeed. Something else is likely to

happen.")).

48.     After December 5, 2005, Kury remained in virtually daily contact with Mulaney

regarding Guidant's consideration of and response to Boston Scientific's offer.  (Trial Tr.

1225:6-9 (Kury Redirect); DX0166 (Kury Direct) ¶ 50; DX0167 (Mulaney Direct) ¶ 25).  Kury

had no in-house attorneys that he "thought would be of any significant help to [him] in analyzing

and dealing with the issues that were arising" (Trial Tr. 1224:14-17 (Kury Redirect)), but believed that Skadden was "the best law firm in the world that would advise [him] on this, not only because of their preeminence but because they'd been involved every step of the way for 16 months and worked on, negotiated and drafted all the relevant agreements." (Trial Tr. 1103:18-24 (Kury Cross)).

49.    On Skadden's advice, Kury sent Deyo a copy of Boston Scientific's December 5, 2005 proposal. Kury's informed Deyo that Guidant was "providing this copy pursuant to Section 4.02(c) of [the Merger Agreement]." (Townsend Ex. 3).

50.    At the time of Boston Scientific's proposal, M&A practitioners understood that financing sources (which, in the context of the proposed Boston Scientific transaction included divestiture partners) would be expected to receive due diligence on the target company:

a.  J&J understood that a financing source like a bank would not finance a transaction unless it first received due diligence on the target. (Caruso Dep. 161:15-162:2).

b.  Skadden and Guidant understood that a financing source would expect due diligence. On December 12, 2005, Skadden expressed this view by writing that the provision of due diligence to Boston Scientific financing sources would be "a customary condition given the lenders have not had access to Guidant for any due diligence." (Strain Ex. 6; DX0166 (Kury Direct) ¶ 65 ("I understood Skadden's advice that Boston's lenders should perform due diligence 'along with [Boston's] own prior to signing' to be informed by and consistent with the terms of the Merger Agreement. I did not understand there to be any problem – under Section 4.02 or otherwise – with furnishing due diligence information to Boston's

lenders."); DX0167 (Mulaney Direct) ¶ 15 ("[W]e understood that Boston

Scientific's financing sources would need to conduct due diligence of Guidant in

connection with their multi-billion-dollar financing commitments, as is customary

in such circumstances.")).

51.     On December 6, 2005, J&J issued a press release responding to Boston

Scientific's December 5, 2005 proposal.  J&J stated that it "continue[d] to believe that the

acquisition as agreed to by Johnson & Johnson and Guidant [at a price of $63.08 per share]

represents full and fair value based on extensive evaluation and due diligence."  J&J added:  "We

are committed to the long-term investment of resources that will be required to enable Guidant to

pursue a full and complete recovery in the cardiac rhythm management category." (Korbich Ex.

12 at JJH00037604).

52.     Boston Scientific's unsolicited proposal effectively meant that J&J's deal at $63

per share would not succeed.

    a.   Less than two weeks after Boston Scientific made its announcement, J&J's

         strategic advisors at Goldman Sachs noted that arbitrageurs had priced Guidant at

         $67 per share, $4 per share higher than J&J's $63 per share bid.  (Hitchner Ex. 8).

    b.   J&J's witness Gregg Jarrell has conceded that after Boston Scientific's $72 per

         share offer for Guidant "the typical consensus market view would have been that

         $63 a share at that point in time was not likely to be a transaction value for that

         company at that moment in time."  (Jarrell Dep. 53:3-54:9).

    c.   Guidant's expert witness, the economist Professor Bradford Cornell, citing a

         study showing that once a competitive bidder emerges the initial bidder acquires

         the target in only 17% of cases, agreed with this conclusion.  (DX0164 (Cornell

Direct) ¶ 21).  In his own empirical study of sample of similar bidding contests,

the initial bidder acquired the target in only 35% of cases.  (Id. at ¶

22).  Furthermore, Cornell's research showed even when the original bidder was

successful it was required to increase its original offer by an average of

19%.  (Id.).[12]

    d.   Even if Boston Scientific had never been able to make a definitive offer, Cornell

concluded that the fact of Boston Scientific's December 5, 2005 announcement

made it likely that Guidant shareholders would hold out for a higher offer and not

approve a $63.08 J&J merger:

> THE COURT: But just so I understand, so December 5th, an offer, non-binding to
> be sure, of $72 per share is made. For some reason, as part of this hypothetical, a
> formal offer is never made. Do you have a view as to whether or not the $63-a-
> share offer that was part of the Johnson & Johnson merger agreement would have
> been approved by shareholders?

> THE WITNESS: Well, I think -- that's why I was dancing around the answer,
> your Honor, because what do you mean by 'never'? Because the shareholders at the
> time that Boston Scientific was so-called walking away, they wouldn't know
> they were never going to make an offer. They may say they haven't made one
> today, but who's to say they wouldn't come back in a week or two? So how
> would the shareholders credibly know that Boston Scientific was going away
> forever, particularly if they valued the assets of Guidant at $72? It makes no sense
> for them to go away forever. They reached an impediment. They would have to
> get around it, but they wouldn't have to go away forever. I wouldn't believe that
> if I were a shareholder that they were gone forever.")

> (Trial Tr. 1388:18-1389:12 (Cornell Cross)).

---

[12] A contemporaneous article in the Wall Street Journal noted that among the 10 largest
deals receiving counterbids in 2005, eight original deals failed.  Dennis K. Berman et al. "Boston
Scientific Vies for Guidant," Wall Street Journal (Dec. 6, 2005) available at http://www.wsj.com
/articles/SB113378810656813971.  In other words, the emergence of Boston Scientific as a
competing bidder made it unlikely that J&J would complete the transaction at the $63 per share
price it had negotiated.

Q. Let me ask you to assume a couple of other things. Let me ask you to assume that rather than just walk away, they announced a continued interest in Guidant, but that they needed time to restructure or rethink the structure of their deal . . . . How does that hypothetical then impact the opinion you offered about the likelihood that the deal would have closed at $63 a share after Boston Scientific announced its intention to make a bid? A. Well, I think under that circumstance, it would be very unlikely that the 63.08 would be accepted because shareholders and other key parties, like the board of Guidant, would recognize that Boston Scientific truly believes the assets are worth 72 and they're willing to pay 72, but they have impediments to get around that may take a little time.").

(Trial Tr. 1512:9-23 (Cornell Redirect); <u>see also</u> DX0164 (Cornell Direct) ¶¶ 18-39)).

e.  The only evidence that J&J's $63 bid would succeed was a statement made at trial by Jarrell to the effect that, if Boston Scientific did not make a definitive offer on January 9, 2006, Guidant shareholders would have approved J&J's $63 bid.  (Trial Tr. 369:16-22 (Jarrell Cross)).  This statement, which first made at trial with no support or basis in Jarrell's affidavit or report, should be ignored.  Even if considered, it is not probative of the likely outcome of J&J's $63 offer, because there is evidence that the premise of Jarrell's conclusion was lacking: shareholders very well might have rejected J&J's $63 offer even in the absence of a Boston Scientific definitive offer.  (<u>See</u> <u>infra</u> ¶¶ 345-349; <u>see</u> <u>also</u> ¶¶ 327-338).  Additionally, in reaching his conclusion, Jarrell had assumed "that but for the breach Boston Scientific would not materialize" (Trial Tr. 371:3-7 (Jarrell Cross)) and Boston Scientific's December 5th announcement would "evaporate" (Trial Tr. 417:17-19 (Jarrell Recross)), however, there is evidence that these assumptions were also incorrect: Boston Scientific could have made a definitive offer but for the alleged breach.  (<u>See</u> <u>infra</u> ¶¶ 339-344).  In any case, insofar as Jarrell's statement is probative of the likelihood that J&J's $63 offer would succeed, it is inadmissible, since it was made for the first time at trial and if it were probative, would prejudice Guidant.  (<u>See</u> <u>infra</u> note 28).

31

53.     J&J also acknowledged, prior to any alleged breach by Guidant in late December 2005, that J&J's own $63 per share bid would be insufficient to acquire Guidant after Boston Scientific's December 5, 2005 unsolicited proposal.

     a.   Weldon acknowledged that J&J knew in December 2005 that J&J's $63 per share bid would "no longer be sufficient to get the deal done." (Weldon Dep. 20:10-13, 37:24-38:15, 39:18-22).

     b.   Caruso agreed that "in the light of Boston Scientific's $72 bid announced on December 5 . . . if J&J in fact wanted to acquire Guidant, J&J would have to offer more than $63 a share." (Caruso Dep. 197:8-19).

     c.   Darretta acknowledged that J&J determined in December 2005 "that [the $63] bid would be deemed inadequate." (Darretta Dep. 70:15-71:8).

     d.   J&J associate general counsel Steven Rosenberg testified that J&J believed on December 22, 2005 that "we did need to increase our offer to improve the chances of it being approved." (Rosenberg Dep. 55:22-56:7).

     e.   Not a single fact witness testified that anybody thought J&J could close its $63 offer after December 5, 2005.

54.     On December 7, 2005, the Guidant board met to consult with Skadden and its financial advisors from JPMorgan and Morgan Stanley. (JPS ¶ 24). The Guidant board discussed Boston Scientific's December 5, 2005 proposal and "asked numerous questions regarding the Boston Scientific proposal and [Guidant's] obligation under the [Merger Agreement]. A full discussion followed." (JPS ¶ 24; Strain Ex. 5).

55.     Skadden prepared materials for the Guidant board meeting explaining "Provisions of Agreement with Johnson & Johnson Regarding Third Party Offers and Related Termination

Rights."  This document explained that "if the [Guidant] Board . . . reasonably determines . . . that Boston Scientific's proposal constitutes or is reasonably likely to lead to a 'superior proposal' . . . Guidant may: furnish information to Boston Scientific . . . and participate in discussions or negotiations with Boston Scientific."  (DX0041).

56.    On December 7, 2005, after consultation with Skadden, Guidant determined that the Boston Scientific proposal, which would include a divestiture, "was reasonably likely to lead to a Superior Proposal" under the terms of the Merger Agreement.  (JPS ¶ 25).  Skadden drafted a letter notifying J&J of this development, and Kury reviewed and sent it.  It stated: "This letter is to inform you that the Guidant board of directors today determined, in accordance with Section 4.02(a) of the Merger Agreement, that Boston Scientific's proposal is reasonably likely to lead to a Superior Proposal (as defined in the Merger Agreement).  Guidant will, pursuant to a customary confidentiality agreement not less restrictive to Boston Scientific than the confidentiality provisions of the [J&J-Guidant] Confidentiality Agreement . . . furnish information to and participate in discussions with Boston Scientific regarding its proposal." (Kury Ex. 12; Mulaney Ex. 13).

57.    During a meeting on December 9, 2005, Skadden and Boston Scientific's antitrust counsel from Arnold & Porter entered into an oral joint defense agreement on behalf of their clients, Guidant and Boston Scientific.  (Stoll Dep. 44:21-45:5).  Such joint defense agreements allow parties to preserve privilege while planning for antitrust approval and provide a mechanism to limit which employees of a recipient party may access sensitive information of the other.  (Trial Tr. 1370:25-1372:12 (John Redirect)).

**C.     Boston Scientific Immediately Discloses Its Intent To Divest Guidant's VI and ES Businesses**

58.     Boston Scientific's December 5, 2005 public proposal contemplated that Boston Scientific would divest Guidant's VI and ES businesses.  It stated that Boston Scientific had "conducted a review of the antitrust issues that will be raised by the proposed transaction, and we are confident that we will be able to address these issues quickly.  To that end, we are prepared to divest Guidant's vascular intervention [VI] and endovascular [ES] businesses . . . ."  (Best Ex. 12 at ML0084823).  At the time, Boston Scientific had not yet determined who would purchase the divested assets (Best Dep. 34:10-15), but conceived that "there would be multiple components of one offer and that both parties [i.e., Boston Scientific and the divestiture buyer] would be instrumental to different components of that offer." (Knopf Dep. 39:11-23).

59.     As Boston Scientific's antitrust counsel at Arnold & Porter explained, the FTC approval process would proceed more quickly for Boston Scientific than it had moved for J&J due to the FTC's familiarity with the Guidant businesses at issue from its review of J&J's potential acquisition of Guidant.  (Feinstein Dep. 108:6-8; Kury Ex. 49 at GDT 00226195 (Letter from M. Sohn (Arnold & Porter) to Guidant board, describing "the FTC's in-depth understanding of the businesses and parties involved as a result of its investigation of the Johnson & Johnson/Guidant transaction" as basis for concluding that FTC review of the Boston Scientific deal "can be completed in two months").

60.     Although Boston Scientific did not identify a particular divestiture partner on December 5, J&J knew then that Abbott was one of the few contenders for the role.  (Trial Tr. 55:2-56:4 (Weldon Cross) ("I know that we felt it could have been one of three [possible divestiture candidates, including Abbott].");  Trial Tr. 136:10-24 (Deyo Cross) ("Q. Well, one thing you learned at this -- at or about January 6 was Medtronic was not the Boston Scientific

divestiture partner.  A. Yes.  THE COURT: But did you understand who the divestiture partner was in early January, before January 9, let's say?  Were you aware who the divestiture partner was?  THE WITNESS: I don't recall knowing.  THE COURT: Did you have an understanding as to what universe of potential divestiture partners was?  THE WITNESS: Pretty good understanding. THE COURT: And how big was that universe? THE WITNESS: Small. THE COURT: How small? THE WITNESS: Four, five, six companies at most.")).  J&J's then-head of group finance and current CFO testified that, as of December 2005, J&J had identified Abbott as a likely candidate to be Boston Scientific's divestiture partner.  (Caruso Dep. 173:10-177:14).

    a.  On December 6, 2005, J&J's project director William Korbich acknowledged in an e-mail to J&J's Vice President of Business Development Susan Morano, among others, that the potential purchasers of the divested assets could be "MDT [i.e., Medtronic], ABT [i.e., Abbott], STJ [St. Jude]."  (Morano Ex. 11; Morano Dep. 98:3-16; Caruso Dep. 177:9-14).[13]  Morano also discussed with Korbich the price Boston Scientific could potentially obtain for the divestiture.  (Morano Ex. 14; Morano Dep. 109:19-23).

    b.  On December 7, 2005, Korbich prepared a draft presentation regarding the Guidant transaction, which he sent to Morano and others, in which he noted that Boston Scientific was "willing to make the necessary divestitures that will allow them to obtain regulatory approvals quickly in order to close the deal 1Q'06." (Morano Ex. 15).

---

[13] Medtronic, Inc. ("Medtronic") and St. Jude Medical, Inc. ("St. Jude") both competed against Guidant in the CRM medical devices market.  (Best Ex. 10).

c. On December 12, 2005, J&J's strategic advisors at Goldman Sachs prepared a "Discussion Materials" presentation that considered a possible scenario where Boston Scientific "divests VI and endovascular businesses."  In a reference to the potential transaction, the document stated:  "Assumes pre-tax divestiture proceeds of ~$3.0bn to ~$4.0bn." (Hitchner Ex. 7 at JJH00029447; Hitchner Dep. 76:18-78:19).

d. On December 14, 2005, Caruso stated in his handwritten notes:  "Abbott willing to pay $3-$4B to buy entire from us."  (Caruso Ex. 20 at JJH00097739).

e. On December 16, 2005, J&J noted in a presentation titled "Finance Team Update to Strategy Team" that Abbott was among the most likely divestiture buyers for Guidant's VI/ES businesses.  (Korbich Dep. 177:2-15; Deyo Dep. 83:4-8; 83:13-20; Hilton Ex. 17).

f. On January 6, 2006, J&J associate general counsel James Hilton "hypothesized [the divestiture buyer of the IV/ES businesses] was Apple [i.e., Abbott]" on a call with Skadden.  (Harris Ex. 12).

61.    Although J&J was monitoring Boston Scientific's competing proposal throughout this period, J&J never requested that Boston Scientific or Guidant identify Boston Scientific's proposed divestiture partner.

### D.    Guidant and Boston Scientific Enter into a Confidentiality Agreement

62.    Two days after the December 5, 2005 announcement, Guidant determined, in consultation with its legal advisor Skadden and its financial advisors JPMorgan and Morgan Stanley, that Boston Scientific's unsolicited proposal was reasonably likely to lead to a Superior Proposal and that Guidant should therefore pursue negotiations and exchange due diligence. (Kury Ex. 65; DX0166 (Kury Direct) ¶¶ 51-54; DX0167 (Mulaney Direct) ¶ 29).  Mulaney

understood Section 4.02(a) to permit Guidant to take certain facilitative and cooperative actions after this determination had been made—namely negotiating, entering into discussions, and providing information.  (Tr. 798:19-799:7 (Mulaney Cross)).

63.    Skadden prepared a proposed confidentiality agreement between Guidant and Boston Scientific.  (Mulaney Ex. 12; Kury Ex. 15; DX0167 (Mulaney Direct) ¶¶ 11-22).  That agreement was modeled on the August 4, 2004 J&J-Guidant Confidentiality Agreement and added the words "financing sources" to the defined term "Representatives."  (Mulaney Ex. 12; DX0167 (Mulaney Direct) ¶ 15).

64.    Boston Scientific's counsel—Shearman & Sterling partner Clare O'Brien— requested of Skadden that the draft confidentiality agreement between Guidant and Boston Scientific make express that potential divestiture candidates were included within the definition of "Representatives."  (Duwe Ex. 1).  O'Brien believed that this was consistent with the "broad" definition of Representatives in the Merger Agreement.  (Trial Tr. 286:12-287:5 (O'Brien Cross); (Trial Tr. 288:8-15 (O'Brien Cross)).

65.    After considering Boston Scientific's request, Skadden partner Brian Duwe wrote to Kury that Skadden had reviewed and had no objection to Boston Scientific's request:

> Spoke with S&S [Shearman & Sterling] on the confi[dentiality agreement].  They had a couple of points on the no solicit [re: employee hiring] that just take it back to what was essentially agreed with J&J.  In addition, they would like to add to the term "Representatives" with whom they can share information third parties reasonably acceptable to Guidant who BSX identifies as potential purchasers of the assets to be divested (and I would add who execute a confi reasonably acceptable to us).  Finally, they would like to have us agree to jurisdiction in New York with Indiana law governing as we did in the Merger Agreement with J&J.  Ian [John] and Neal [Stoll] [Skadden attorneys] are OK with the addition to "representatives" described and the other changes are fine with me.  If you are ok with the changes we will get it wrapped up.

(Duwe Ex. 1).

66.     Mulaney discussed with Duwe Boston Scientific's request to make express the inclusion of potential divestiture candidates in the definition of "Representatives," and that the change was "permitted by the [M]erger [A]greement."  (Trial Tr. 751:5-752:3 (Mulaney Cross) ("That's my view having discussed the topic with Mr. Duwe at the time, yes."); see also DX0167 (Mulaney Direct) ¶ 22 ("Skadden believed . . . that the BSC–GDT Confidentiality Agreement was consistent with Guidant's obligations under the Merger Agreement."); id. ¶ 22).

67.     Later on December 7, Boston Scientific and Guidant entered into a confidentiality agreement (the "BSC-GDT Confidentiality Agreement").  (JPS ¶ 27; Kury Ex. 13).  In addition to "financing sources," the BSC-GDT Confidentiality Agreement added the following language to the definition of "Representatives" from the J&J-Guidant Confidentiality Agreement:  "third parties reasonably satisfactory to [Guidant] that are identified to [Guidant] as potential purchasers of assets to be divested and who execute a confidentiality agreement reasonably acceptable to [Guidant]."  (Kury Ex. 13).  The requirement that the confidentiality agreements with any potential purchaser be acceptable to Guidant was in accordance with Duwe's recommendation on learning of Boston Scientific's proposal to add the "potential purchasers" language.  (See Duwe Ex. 1).

68.     Kury relied on Skadden, as participants in the drafting of the Merger Agreement, to confirm that Guidant was complying with its terms.  (DX0166 (Kury Direct) ¶¶ 55-59).  Kury had a general understanding of Skadden's view and the rationale for that view:

> [M]y general understanding was that Skadden thought that while the words were being added to the agreement, it did not change their understanding of what the scope of the agreement was, and it was a matter of making clear that that was how they interpreted the agreement.  It was not that they had any intention or expectation that by putting these words in, they were in any way modifying the requirements of the Johnson & Johnson agreement. . . .  [M]y understanding was clear that they were comfortable with this arrangement and that they did not think they were -- or would be violating the Johnson & Johnson agreement by agreeing

to this. . . .  The rationale, I think, was that they would have interpreted that language that way anyway; that the original Johnson & Johnson agreement, without the addition of that, would have been properly interpreted to include those categories of parties.

(Trial Tr. 1063:19-1064:20 (Kury Cross); <u>see also</u> Trial Tr. 1068:22-1069:3, 1069:20-1070:10

(Kury Cross)).

69.     Mulaney expected and understood that Guidant was looking to and relying on

Skadden for legal advice and guidance in responding to Boston Scientific's proposal in a manner

that was consistent with and not prohibited by Guidant's obligations under the antitrust laws and

the Merger Agreement—and that Skadden's presentation of the BSC-GDT Confidentiality

Agreement to Kury for signature reflected Skadden's judgment and advice that "Skadden

approves this document and he can execute it."  (Trial Tr. 762:4-19 (Mulaney Cross) ("When a

partner of Skadden, Arps sends the general counsel of a client a document saying it's ready for

signature, let's get it wrapped up, that communication indicates that Skadden, Arps . . . is telling

Mr. Kury that Skadden approves this document and he can execute it. . . .  [Kury] would not

expect to get a document for his signature if Skadden didn't approve it."); Trial Tr. 1070:6-10

(Kury Cross) ("I didn't think that they were being cute here and trying to say, we're not

expressing any opinion on the overall advisability.  That would have been completely contrary to

my working relationship with Skadden.")).

70.     Kury relied on Skadden's advice that the Boston–Guidant Confidentiality

Agreement was appropriate because:

> [Skadden was] not foolish.  They did not think by putting words in here they were in any way amending, modifying or changing their obligations to Johnson & Johnson, and they were fully familiar with the Johnson agreement.  And I felt comfortable that, given their expertise, I could rely on their judgment for that.

(Trial Tr. 1071:6-11 (Kury Cross)).

71.   Kury understood and expected that Skadden was "mindful of all the relevant provisions, and they knew that whatever they did, Boston had to be compliant with the agreement with Johnson & Johnson."  (Trial Tr. 1080:24-1081:1 (Kury Cross)).

72.   Mulaney believed at the time that, under the terms of the Merger Agreement between J&J and Guidant, financing sources—including divestiture partners—were included within the definition of "Representatives."  (Mulaney Ex. 12; DX0167 (Mulaney Direct) ¶ 17 ("It was my belief and judgment that . . . the term 'Representatives' as used in Section 4.02(a) of the Merger Agreement was, in that context, broad enough to include and should properly be read to include an intervening bidder's financing sources, including a divestiture buyer . . . .")).

73.   On December 9, 2005, Skadden prepared a draft letter for Guidant to sign and send to J&J regarding the BSC-GDT Confidentiality Agreement.  (JPS ¶ 28).  This letter informed J&J that Guidant had "executed a confidentiality agreement with Boston Scientific consistent with [Guidant's] obligations under our Merger Agreement."  (Mulaney Ex. 14).  As Mulaney explained, Skadden believed the letter was accurate, and Skadden would not have presented it to Kury for his signature unless it believed that the letter was accurate and consistent with Guidant's obligations to J&J, and, moreover, believed that Kury understood that Skadden would not have presented the draft to him for signing unless Skadden believed the letter was accurate and consistent with Guidant's obligations to J&J.  (DX0167 (Mulaney Direct) ¶ 22). Kury signed the letter as drafted and sent it to J&J, understanding that it had been reviewed and approved by Skadden.  (JPS ¶ 28; Townsend Ex. 5; DX0166 (Kury Direct) ¶ 59).  J&J knew by December 9, 2005 that Guidant had entered into a confidentiality agreement with Boston Scientific, but did not request a copy of that agreement.  (Trial Tr. 122:2-4 (Deyo Cross)).

E.     **Boston Scientific and Abbott Arrange for a Proposed Divestiture**

74.     Shortly after Boston Scientific's December 5, 2005 announcement, Boston

Scientific and Abbott began discussing a potential divestiture of Guidant assets to Abbott:

a.   On December 5, 2005, Abbott's Vice President for New Business Development in

the Medical Products Group e-mailed Boston Scientific's investment bankers at

Merrill Lynch regarding Boston Scientific's proposed acquisition of Guidant, and

stated that "maybe a deal can be made as we talked about a few years ago

separating [Guidant] into two pieces." (DX0068). An internal Merrill Lynch e-

mail from the same day states that Merrill Lynch gave Boston Scientific's CFO

Lawrence Best a message regarding Abbott, and that Best would arrange a call

with Abbott's CEO Miles White. (DX0067).

b.   The next day, Best received a call from Abbott during which Abbott expressed

"interest[] in Guidant's VI business." (Best Ex. 16; Best Dep. 79:4-12).

75.     Between approximately December 6 and December 19, Boston Scientific and

Abbott negotiated between themselves the principal terms of a divestiture transaction for

Guidant's VI and ES assets. (See Knopf Ex. 25).

76.     On December 12, 2005, Boston Scientific and Abbott met to discuss the "broad

outlines of a possible transaction in which Abbott would acquire the vascular intervention and

endovascular solutions business of Guidant in connection with Boston's acquisition of Guidant."

(JPS ¶ 29). At a follow-up meeting on December 16, there was further discussion of specific

terms of Abbott's potential acquisition of the VI and ES businesses. (Gunther Dep. 31:17-35:9).

77.     On December 20, 2005, Boston Scientific informed Guidant that it had elected to

proceed with Abbott as the VI/ES divestiture buyer. (Best Ex. 18). After Boston Scientific

41

disclosed that Abbott was the intended divestiture buyer, Guidant considered Abbott's request for due diligence.

78.     On December 18, 2005, before Boston Scientific had identified Abbott to Guidant as the intended divestiture buyer, Guidant and Boston Scientific entered into an Addendum to the BSC-GDT Confidentiality Agreement (the "Addendum") to add further terms concerning the confidentiality of documents exchanged in the due diligence process.  (JPS ¶ 30; Kury Ex. 21). The Addendum included as an exhibit a form accession agreement.  (Kury Ex. 21 at GDT 00133826).  Accession agreements are used to provide a quick and easy way for third parties to be bound by previously agreed confidentiality protections when the principals to a transaction want to involve third parties in the due diligence process.  (DX0165 (John Direct) ¶ 20).  The form accession agreement attached to the Addendum contained standard language that would permit access to due diligence to third parties "retained by Boston Scientific or Guidant, as the case may be, to advise it in connection with a potential transaction."  (Kury Ex. 21 at GDT 00133826).  The form accession agreement further required that "each such firm and/or signatory agrees to be bound by the terms and conditions of the Addendum."  (Id.).  In other words, it was intended to ensure that any parties signing the form would be bound to respect the confidentiality of Guidant's due diligence materials.  (DX0165 (John Direct) ¶ 17 ("The proposed ground rules, including the requirement that Abbott sign the accession agreement to the Addendum, were entirely driven by antitrust considerations – namely, to ensure that the provision of competitively sensitive VI and ES information to Abbott (or any other potential competitor) would not violate Guidant's obligations under the antitrust laws.")).

79.     In a due diligence "ground rules" document Skadden prepared to set forth "the process we plan to follow for the third party due diligence" related to the Boston Scientific

proposal, Skadden observed that  Abbott had already received extensive due diligence from

Guidant in connection with its potential role as a licensee under the J&J Merger Agreement:

> ABT has significant knowledge of Grape's VI/ES businesses. With respect to the
> DES program, ABT's VP of Clinical Research was the former Director of
> Grape's DES Clinical Research program. In addition, ABT already has received a
> significant amount of information regarding Grape's DES IP in connection with
> its negotiation of the JNJ license mandated by the FTC. Thus, prior to Bean's
> entering into a definitive agreement to acquire Grape, ABT's DD with respect to
> Grape's DES program shall be limited to the information received by Bean during
> its DES DD. With regards to ABT's DD of Grape's ES business, we understand
> that ABT has conducted significant DD with respect to Grape's proposed EU ES
> divestiture. In fact, ABT already has conducted an extensive plant tour of Grape's
> Temecula facility. Since Temecula houses both VI and ES operations, we are not
> sure what additional physical DD is required."

(DX0057 at GDT 00345378-79).

80.     Mulaney advised Kury about the propriety under the Merger Agreement of

providing Abbott with due diligence information:

> I discussed with Mr. Kury the basis on which, in the context of the Boston
> Scientific proposal and considering the terms and negotiations of the Merger
> Agreement, the intent of the parties and the purposes of the no-solicitation clause
> of the Merger Agreement, Abbott was a "Representative" of Boston Scientific
> within the meaning of Section 4.02 and thus could be provided with due
> diligence.  Under the Merger Agreement, a Takeover Proposal could involve
> more than one person, more than one transaction and involve direct or indirect
> acquisitions.  I explained the analysis for this conclusion to Mr. Kury, and I
> understood and expected that Mr. Kury and Guidant were relying on my advice
> and judgment in proceeding.

(DX0167 (Mulaney Direct) ¶ 27; see also Trial Tr. 782:23-783:13 (Mulaney Cross), 918:10-17

(Mulaney Redirect), 1096:22-1097:3 (Kury Cross)).

81.     Mulaney was familiar with the terms of the Merger Agreement because he

negotiated and drafted it.  (DX0167 (Mulaney Direct) ¶¶ 4-8).  He advised Kury:

> [W]e had to be comfortable that we were acting appropriately in our dealings with
> J&J, Boston Scientific, and Abbott – including by complying with the Merger
> Agreement in our provision of due diligence.  Being involved in competing bids

> in a public transaction of this magnitude is like living in a fishbowl: all of
> Guidant's actions would be highly visible and subject to scrutiny.

(DX0167 (Mulaney Direct) ¶ 33; see also Trial Tr. 911:22-912:3 (Mulaney Redirect) ("[W]hen

Boston Scientific made a takeover proposal in December, it became clear that the transaction

was going to get a lot more publicity than it already had attracted, that there were two bidders for

Guidant, and one bidder was going to end the process very disappointed and potentially a tough

examiner of everything that went on in the interim.").

    82.    Mulaney advised Kury "that we were comfortable with providing due diligence to

Abbott because Abbott was providing financing to Boston Scientific through its purchase of the

Divestiture Businesses and therefore a 'Representative' under Section 4.02." (DX0167

(Mulaney Direct) ¶ 31).

    83.    Kury relied on Skadden's advice: "I was advised by Mr. Mulaney that, given

Abbott's role, it was proper under the Merger Agreement for Guidant to provide Abbott with due

diligence. I relied on Mr. Mulaney's advice, and I did not believe that allowing Abbott to

conduct due diligence was a violation of the Merger Agreement." (DX0166 (Kury Direct) ¶ 79).

    84.    Kury relied on Skadden's advice because, in his words:

> I thought it was an important issue [whether Abbott could receive due diligence
> information], but I thought I had the best law firm in the world that would advise
> me on this, not only because of their preeminence but because they'd been
> involved every step of the way for 16 months and worked on, negotiated and
> drafted all the relevant agreements, and I thought that they were in the best
> possible position to give me advice that I could rely on.

(Trial Tr. 1103:18-24 (Kury Cross)).

    85.    On December 21, 2005, Duwe wrote an e-mail to O'Brien to "confirm that

[Abbott employees] will be reviewing information as Representatives of Boston Scientific" and

that Abbott had entered into a confidentiality agreement regarding its review of due diligence

material.  (Knopf Ex. 32).  On the same day, Skadden attorney Ian John advised Guidant's in-house counsel John Lapke that Abbott could receive due diligence material only after it signed an accession agreement.  (John Ex. 18; DX0165 (John Direct) ¶¶ 20, 24).  This was a reference to the form accession agreement that had been attached to the Addendum, and Abbott's signature to that document would ensure that Abbott maintained the confidentiality of the Guidant due diligence materials that it would eventually receive.  (JPS ¶ 31).

86.     On or about December 22, 2005, Abbott, Boston Scientific, and Guidant signed an Accession Agreement with respect to Abbott's due diligence of Guidant's VI and ES assets.  (JPS ¶ 31; John Ex. 15).  The Accession Agreement contained provisions relating to Abbott's treatment of "Highly Confidential Material" in connection with Abbott's due diligence review of "the assets proposed to be acquired by Abbott" and required Abbott to maintain the confidentiality of Guidant's due diligence materials.

87.     Abbott had previously refused to sign the form accession agreement attached to the Addendum because it believed the Addendum, having not been negotiated with Abbott specifically in mind, was "too all encompassing,"and it had contained terms that would unnecessarily restrict Abbott employees' intra-company movements.  (DX0165 (John Direct) ¶ 19; DX0059).  In response, John advised Kury on December 22 that an alternative to "[w]ait[ing] for [Abbott's] draft markup of the accession agreement" would be to "[s]end [Abbott] a letter along the lines of the attached."  (DX0060).  John attached a proposed letter to Abbott that did not contain any language indicating that Abbott had been retained to advise Boston Scientific.  (Id.).  Although John viewed a signed agreement as providing "greater antitrust protection" and "somewhat lower business risk" than the letter, he considered the proposed letter "an acceptable option."  (Trial Tr. 1365:22-1366:7 (John Redirect)).

88.     Later on December 22, 2005, Abbott's in-house attorney Laura Gunther sent

Abbott's draft Accession Agreement to John.  (Gunther Ex. 15).  The Accession Agreement

stated that Abbott agreed to "be bound by the terms and conditions of the Addendum."  (Id.)  An

introductory paragraph included language that Abbott "has been retained by Boston Scientific to

advise it in connection with a potential transaction."  (Id.)  The "retained . . . to advise" language

had been carried over from the form accession agreement (Exhibit A) to the Addendum, where it

had been included because the "language was a standard part of the form that [John] had used in

past transactions."  (DX0165 (John Direct) ¶ 12; see also Trial Tr. 1307:24-1308:17 (John

Cross)).  John did not recall considering Section 4.02's requirements when preparing the form

accession agreement to the Addendum.  (DX0165 (John Direct) ¶ 12).

89.     There is no evidence this language was included in an effort to contrive or create

a basis on which to supply Abbott with due diligence or that any of Guidant, Abbott, or Boston

Scientific was misled about Abbott's role or the basis upon which it was being provided with due

diligence.

90.     Abbott signed the Accession Agreement on December 22, 2005.  (John Ex. 15).

Before signing the Accession Agreement, Skadden requested, and received, a copy of the

December 21, 2005 BSC-ABT Confidentiality Agreement, satisfying paragraph 7 of the

Accession Agreement (JPS ¶ 32).

91.     After signing the Accession Agreement, Abbott received due diligence material,

which it completed reviewing by Friday, December 30, 2005.  (Gunther Dep. 128:10-129:18;

133:10-13).

**F.    Boston Scientific Announces Its Firm Offer and Abbott's Involvement**

92.     On January 8, 2006, Boston Scientific and Abbott signed a Transaction

Agreement (the "BSC-ABT Transaction Agreement") providing for Abbott to purchase

Guidant's VI/ES businesses for $4.3 billion ($3.8 billion upfront, and $500 million in milestone payments).  (JPS ¶ 34; Kury Ex. 39).

93.     The BSC-ABT Transaction Agreement included the following terms:

a.  Section 2.01(c) provided that Boston Scientific and Abbott would "share all rights, benefits and obligations associated with investments by Guidant or any of its Affiliates in other Persons engaged in the vascular interventional or endovascular solutions businesses . . . ."  (Kury Ex. 39 at GDT 00133417).

b.  Section 5.08(a) of the BSC-ABT Transaction Agreement provided that Abbott and Boston Scientific were to act as co-owners of part of Guidant's business: "The parties hereby acknowledge that the spirit of this Section 5.08 and of the License and Technology Transfer Agreement is that Boston Scientific and its Affiliates will have access to the DES Intellectual Property as if they were co-owners thereof, including with respect to Boston Scientific's ability to supplement Abbott's PMA for DES Stents."  (Kury Ex. 39 at GDT 00133428).

94.     Later that same day, Boston Scientific made a definitive offer to Guidant of $72 per share.  (JPS ¶ 35; Knopf Ex. 49; Kury Ex. 38).

95.     In response to Boston Scientific's definitive offer, J&J issued a press release directed at Guidant shareholders.  It argued that the "Johnson & Johnson deal represents a better offer for Guidant" than the Boston Scientific offer.  (JPS ¶ 36).  J&J again stated that an acquisition of Guidant would ultimately require a significant investment by J&J, and that J&J intended to "dedicate the resources necessary to enable Guidant to achieve a full and complete recovery in the cardiac rhythm management market."  ((Korbich Ex. 12 at JJH00037604).

96.     There is no evidence that J&J sought to cut Abbott out of J&J's proposed acquisition of Guidant, that J&J took negative action under the J&J-ABT License Agreement, or that J&J otherwise attempted to influence Abbott after J&J learned of Abbott's involvement in Boston Scientific's offer in January 2006.

97.     On January 9, Best stated during an analyst call that Abbott had received due diligence material from Guidant.  (JPS ¶ 37; Best Ex. 31).  He stated that "[Boston Scientific] had the opportunity to do a certain level of due diligence," and Abbott, which had reviewed different material relating to the different assets it would be purchasing, "had the opportunity to do a much deeper dive on due diligence" regarding the assets it would be purchasing.  (Best Ex. 31).  Abbott's review was "deeper" in the sense that "Guidant was willing to show [Abbott] more information than they were willing to show [Boston Scientific] because [Abbott wasn't] competing with Guidant" in the field of "interventional cardiology."  (Best Dep. 174:23-175:12).

98.     Later that day, Deyo and J&J associate general counsel James Hilton called Kury to discuss Boston Scientific's announcement.  (JPS ¶ 38; Deyo Dep. 108:6-109:10).  Deyo testified that he and Hilton told Kury on the January 9 call that "we believed that Guidant had breached the Merger Agreement by providing due diligence to Abbott."  (PX 16 (Deyo Direct) ¶ 13).  By Deyo's account, Kury's reaction was "surprise"; Kury was purportedly "taken aback." (Trial Tr. 127:4-7 (Deyo Cross)).

99.     Kury did not recall J&J suggesting on the January 9 call that Guidant had breached the Merger Agreement.  (Kury Ex. 51).  Kury testified, "If I had had that message, I can assure you I would have been on the phone with Mr. Mulaney in five minutes."  (Trial Tr. 1160:10-11 (Kury Cross)).  "If they had told me, we think you can't do this, even if I thought they were crazy on that point, I would have immediately called Mr. Mulaney saying, hey,

they've raised this, what do we do?" (Trial Tr. 1233:11-14 (Kury Redirect)). Indeed, following Kury's receipt of J&J's January 23 letter raising concerns about the provision of information to Abbott, Kury promptly discussed J&J's professed concerns with Mulaney. (Mulaney Ex. 25 at GDT 00368734; Trial Tr. 836:8-21). The first Mulaney heard of J&J's professed concerns was on January 23, after Kury received J&J's letter raising concerns about the provision of information to Abbott. (Trial Tr. 836:19-21 (Mulaney Cross)).

100.   Kury recalled that on the call, Deyo and Hilton "wanted to make sure that J&J received all the same due diligence that Abbott had received – in particular with respect to Guidant's DES program." (DX0166 (Kury Direct) ¶ 100). Contemporaneous documents and communications corroborate Kury's recollection:

      a.   Kury sent an e-mail early in the afternoon of January 9 to Skadden and others at Guidant stating, "I'd like to draft an email to [J&J] telling them that we think they have all the data but we're happy to set up further conversations/access if that would be helpful." (DX0185). Kury testified that he sent this e-mail because he "wanted to be responsive to J&J." (Trial Tr. 1232:24 (Kury Redirect)).

      b.   Later on January 9, Skadden attorney Alison Rhoten drafted and sent to Kury for Kury's review "a brief e-mail from you [Kury] to Juice [J&J] addressing their questions with respect to the DES-diligence process." (DX0187). At Kury's request, Rhoten sent the message to Deyo, Hilton, and J&J's outside counsel, Robert Townsend of Cravath. (John Ex. 32).

101.   Deyo's recollection of the January 9 call was inconsistent. Although Deyo recalled at trial that he asked on the January 9 call that J&J be provided with due diligence

materials that had been provided to Abbott, he had a different recollection when he was first

asked that question at deposition:

> Q.  But as you sat at deposition August 18th, 2010, when you were asked the first
> time:  Do you recall that during the January 9th conversation, you also asked that
> Johnson & Johnson be provided with any due diligence materials that had been
> provided to Abbott?  You answered:  No, I don't.  I don't.  I don't recall that.
> A.  That's correct.

(Trial Tr. 158:12-18 (Deyo Cross)).  Only later in the deposition when he encountered a

contradictory document did Deyo acknowledge that he had in fact requested that J&J receive due

diligence materials that Guidant had furnished to Abbott, and that his "prior recollection was not

accurate."  (Trial Tr. 158:19-159:4 (Deyo Cross)).

　　　　102.　　Neither Deyo nor Hilton made any written record of the January 9, 2006 call with

Kury (Trial Tr. 126:18-127:17 (Deyo Cross)), nor did Deyo direct Hilton to memorialize it.

(Trial Tr. 159:9-21 (Deyo Cross)).  Nor by Deyo's own account did J&J suggest that "Guidant

should attempt to cure its breach of the merger agreement."  (Deyo Dep. 141:15-19).

　　　　103.　　Although Kury responded to Deyo and Hilton's call the same day (John Ex. 32),

Deyo testified that he "did not consider that a response entirely to the call.  It was a response to

part of the call."  (Trial Tr. 127:22-24 (Deyo Cross)).  Yet during the negotiations between J&J

and Guidant in the two weeks that followed—including two meetings between Deyo and Kury

(Trial Tr. 1235:24-1236:22 (Kury Redirect); see also Kury Ex. 37 at GDT 00093871-72)—there

was no further communication (oral or written, phone call or email) on either issue—indeed no

memos or follow-up letters of any kind—until Deyo's ostensible "follow up" letter on January

23.  (Trial Tr. 161:13-14 (Deyo Cross); Trial Tr. 161:22-162:1 (Deyo Cross) ("Q. There was no

further communication on that issue…until your letter of January 23, right?  A. …I did write him

on the 23rd.  I'm not aware of anything in between.").

104.    Mulaney testified that if Guidant had received notice on January 9 that J&J thought Guidant had breached the Merger Agreement, "those possible breaches would have been addressed in the process of amending the merger agreement on January 11th or January 13th." (Trial Tr. 920:15-17 (Mulaney Redirect)).

105.    By January 9, 2006, Deyo had advised Weldon of the facts constituting the alleged breach.  (Trial Tr. 174:15-23 (Deyo Cross) ("[THE COURT:] Do you know when Mr. Weldon was aware of facts that would indicate Guidant had breached the merger agreement? THE WITNESS: I think it would have -- I believe it would have been in that time frame, after the -- THE COURT: And what do you base that on?  THE WITNESS: When the events of January 9th that Mr. Hilton advised me about and we called Mr. Kury about, I would have advised Mr. Weldon about.").  However, Weldon did not discuss a possible breach with the J&J board after the January 9, 2006 "deep dive" statement.  (Trial Tr. 67:7-68:10 (Weldon Cross)). Weldon similarly did not discuss a possible breach with Goldman Sachs, nor did J&J instruct Goldman to incorporate a breach into the Guidant valuations.  (Trial Tr. 71:11-19 (Weldon Cross)).

**G.    J&J Elects to Proceed Under the Merger Agreement**

106.    Weldon and Deyo were unable to identify anything that J&J would have done differently had Abbott's involvement or receipt of due diligence been announced in December 2005.  (Weldon Dep. 58:14-59:23; Deyo Dep. 145:7-8, 146:6-8).  The fact that Abbott's identity and its receipt of due diligence were not disclosed until January 8, 2006 had no effect on J&J's behavior.  The "last look" J&J bargained for was provided in a timely manner, and gave J&J ample opportunity to evaluate its own position and respond with its own counter-offer.

107.    In response to Boston Scientific's proposal, on January 9 J&J suggested to Guidant "that [Guidant] defer Board action on the [Boston Scientific] offer in order to give [J&J] more time to consider its position."  (Hilton Ex. 20).

108.    There is no contemporaneous evidence demonstrating that J&J formed or communicated a belief on January 9, 2006 that Guidant had breached the Merger Agreement.  To the contrary, J&J's behavior in the following weeks indicates that it did not form or communicate such a belief.

109.    J&J was aware that either party could seek specific performance under the Merger Agreement if the other party had committed a breach.  (Trial Tr. 106:7-15 (Deyo Cross)).

110.    To the extent that J&J may have privately believed that Guidant had breached the Merger Agreement, J&J concealed its intent to seek "damages down the road" (at a time after the BSC deal had closed and could not be unwound) by avoiding threats of "proactive litigation" during the negotiation process.  (Trial Tr. at 131:2-17 (Deyo Cross)).  Deyo's later testimony that J&J did not threaten litigation because, as the acquirer it needed to preserve relationships with the target, is belied by his November 3, 2005 notice of breach under the Initial Merger Agreement and accompanying threats to "take all necessary action."  (Deyo Ex. 10).

111.    Deyo testified at trial that J&J was "no stranger" to using legal processes to prevent counterparties from taking actions that J&J believes are not permitted.  (Trial Tr. 180:22-181:1 (Deyo Recross)).  But even though J&J amended the Merger Agreement twice, developed talking points, had face-to-face meetings with Guidant, and outlined the risks of the Boston Scientific proposal, J&J did not threaten litigation or raise the possibility of such litigation to Guidant's shareholders between January 9, 2006 and January 23, 2006.  (Trial Tr. 159:23-161:2

(Deyo Cross)).  J&J did not take any action in this time period to enjoin the closing of the Boston

Scientific transaction.  (Trial Tr. 71:21-72:1 (Weldon Cross)).

112.    After the January 9, 2006 announcement, J&J began "strategizing and preparing

arguments as to why there were risks and uncertainties associated with the Boston Scientific

bid," but did not communicate in those arguments that it believed Guidant had breached the

Merger Agreement.  (Trial Tr. 145:11-19 (Deyo Cross)).  Throughout this process, J&J

attempted several times to convince Guidant to reject Boston Scientific's offer and to

communicate "the full value" of J&J's offer.  (Darretta Dep. 79:5-10).  These communications

were shared with Guidant's shareholders.  (Caruso Dep. 212:5-21).  J&J's strategy at the time

was to list the most significant risks of a Boston Scientific proposal, which J&J believed

Guidant's management should consider in assessing the Boston Scientific proposal.  In these

communications, J&J conveyed that it might file patent infringement lawsuits concerning stent

drug coatings against Boston Scientific or Abbott if J&J did not successfully acquire Guidant's

business.  (Harris Dep. 11:14-13:6).  J&J communicated these threats through a "back-channel"

to sources in the media.  (Townsend Ex. 6).  J&J's threatened patent litigation was designed "to

alert shareholders to risk," but J&J did not mention the possibility that it might file a multi-

billion dollar claim alleging that Guidant breached the Merger Agreement.  (Trial Tr. 152:11-

153:5 (Deyo Cross)).

113.    J&J also never sought injunctive relief or specific performance under the Merger

Agreement to prevent the merger of Guidant and Boston Scientific.  Although J&J allegedly

considered seeking injunctive relief, it ultimately did not pursue that option (Trial Tr. 329:3-9

(Townsend Cross)) and did not even threaten Guidant or Boston Scientific with a lawsuit for

injunctive relief (Trial Tr. 330:10-17 (Townsend Cross)).[14]  As J&J attorney Eric Harris recalled, there were only "limited" discussions within J&J about the possibility of injunctive relief (Harris Dep. 93:5-94:8), and Deyo could not recall at all reviewing the Merger Agreement at any point "to see what remedies would be available to Johnson & Johnson if there had been a breach in January 2006" (Deyo Dep. 140:2-10).

114.    Instead of seeking to enforce the agreement it already had, J&J twice voluntarily increased its offer and amended its agreement with Guidant after Boston Scientific's January 8 offer, doing so with full knowledge of what it now claims was Guidant's breach.

    a.  On January 11, before Guidant responded to Boston Scientific's $72 offer, J&J increased its offer to $68.06 per share.  (JPS ¶ 39; Deyo Ex. 23; Weldon Dep. 54:11-56:20).  Guidant accepted this offer, and the parties amended the Merger Agreement to reflect this new price term and to increase the termination fee (from $625 to $675 million).  (Kury Ex. 43; Deyo Ex. 24; Deyo Dep. 160:9-14).

    b.  On January 12, Boston Scientific made a revised offer to Guidant that, among other things, increased the proposed purchase price from $72 to $73 per share. (JPS ¶ 40; Deyo Dep. 161:15-21).

    c.  On January 13, J&J increased its offer to $71 per share. (JPS ¶ 41; Hilton Ex. 24; Weldon Dep. 75:15-77:15). Guidant accepted this offer and the parties again amended the Merger Agreement to reflect this new price term and to further increase the termination fee (from $675 to $705 million). (Kury Ex. 47; Weldon Ex. 4; Weldon Dep. 76:11-18).

---

[14] Although J&J discloses that it did consider injunctive relief (or at least its "strategic value"), J&J shielded the substance of those communications from discovery and trial by asserting privilege.  (See Trial Tr. 330:18 331:24, 351:15–352:4 (Townsend Cross)).

    d.  On January 16, Boston Scientific and Abbott amended their Transaction Agreement to increase the upfront purchase price for the to-be-divested businesses (from $3.8 to $4.1 billion), and to provide for Abbott's purchase of $1.4 billion of Boston Scientific common stock upon the closing of the Boston Scientific-Guidant merger.  (Knopf Ex. 54; Gunther Ex. 41 at JJH 87799-806).

    e.  On January 17, Boston Scientific offered Guidant $80 per share.  (JPS ¶ 42; Knopf Ex. 54; Kury Ex. 49).  Later on January 17, Guidant determined that Boston Scientific's $80 offer was superior to J&J's $71 offer and advised J&J of its intention, in the absence of a further proposal from J&J before expiration of the five-day period specified in the Merger Agreement, to terminate the Merger Agreement and to enter into an agreement with Boston Scientific.  (JPS ¶ 42; Deyo Ex. 28; DX0049; DX0200).  Abbott supplied most of the value accounting for the increase in Boston Scientific's bid, from $72 on January 8 to $80 on January 17.  (Knopf Ex. 1 at BSC 00001793; DX0002 at 1; DX0008 at 1).

115.    Although Townsend was aware of the January 9, 2006 conference call between Deyo and Kury, and participated in the subsequent negotiations to increase the termination fee payable by Guidant, Townsend never discussed with Skadden or Guidant the possibility of a lawsuit over the Merger Agreement.  (Trial Tr. 323:16-324:16 (Townsend Cross)).  Townsend testified that he participated in discussions with J&J over the strategic value of claiming a breach under Section 4.02, but was unable to discuss the substance of those discussions at trial due to claims of privilege.  (Trial Tr. 330:18-331:24 (Townsend Cross)).  Mulaney testified that he would have expected Townsend say so during the course of negotiations if Townsend thought there was a breach:

> If Mr. Townsend was of the view that we had breached the agreement and he was negotiating an amendment to that agreement, not once but twice, in each case the breakup fee being increased, the breakup fee was a percentage of the deal value, and he was of the view that we had breached the agreement and had no legitimate basis to ever terminate it and never to pay Johnson & Johnson a breakup fee, then as a forthright negotiator, he should have said so.  He did not.

(Trial Tr. 1021:13-20 (Mulaney Recross); see also Trial Tr. 920:23-921:2 ("I would have expected him [Townsend] to raise an allegation of breach if he thought there had been one, or if he had any serious concern that there might have been one.  Q.  Did he ever do so?  A.  He did not.").

116.    Throughout the bidding process, J&J actively tried to protect its rights under the Merger Agreement and to persuade Guidant and its shareholders that they should accept J&J's offer over Boston Scientific's.  But J&J never asserted publicly that Guidant had breached the Merger Agreement because J&J did not actually believe that Guidant had breached the Merger Agreement.  Among the many communications that show no trace of J&J's purported view that Guidant had breach the Merger Agreement are the following:

a.  On January 9, 2006, Hilton and Kury exchanged e-mails regarding possible modification or amendment of the Merger Agreement, as well as timing issues related to the January 19, 2006 expiration of Boston Scientific's proposal.  (Hilton Ex. 20).  Hilton did not suggest that Guidant may have breached the Merger Agreement.

b.  On January 10, 2006, J&J held a telephonic "special meeting of the board of directors."  There was no discussion on this call "that Guidant had breached the merger agreement."  (Deyo Dep. 157:12-16).

c.  On January 10, 2006, in a letter from J&J to Cornelius, drafted by J&J's counsel at Cravath and edited by Goldman Sachs, J&J summarized the reasons why the

J&J offer was purportedly superior to the Boston Scientific offer.  (Darretta Ex. 3; Hitchner Ex. 12; Darretta Dep. 92:11-18, 93:8-22).  J&J did not mention any litigation risk related to breach of the Merger Agreement.  On the same day, J&J also held a special meeting of its board of directors to discuss the possibility of increasing its bid for Guidant.  (Hilton Ex. 21; Hilton Ex. 22; Deyo Dep. 157:12-16).  J&J did not suggest in either forum that Guidant may have breached the Merger Agreement.

d.   Also on January 10, 2006, J&J and Guidant exchanged e-mail correspondence regarding a potential amendment to the Merger Agreement.  (DX0053; DX0052).  J&J did not suggest that Guidant may have breached the Merger Agreement.

e.   On January 11, 2006, in a letter from Weldon to Cornelius, J&J explained several risks to Guidant as a result of the Boston Scientific offer, but did not mention any litigation risk that Guidant would potentially face by accepting Boston Scientific's offer.  (Deyo Ex. 23).  On the same day, Weldon and Cornelius spoke, but Weldon did not suggest that Guidant may have breached the Merger Agreement.  (Hilton Ex. 22; Weldon Dep. 50:16-52:13).

f.   On January 13, 2006, in a letter from Weldon to Cornelius accompanying J&J's increased bid of $71 per share, Weldon again explained that J&J's offer was superior because it did not suffer from the "risks and uncertainty" that accompanied Boston Scientific's offer.  But again, Weldon did not mention any litigation risks associated with Boston Scientific's proposal.  (Hilton Ex. 24).  Weldon did not mention the possibility of a breach to Cornelius at a meeting they had later the same day.  (Weldon Ex. 4; Weldon Dep. 73:3-10; 74:7-22).

g.   A January 14, 2006 document for a management presentation to the J&J Board of Directors discussed the possibility of increasing J&J's offer to $75 per share, but did not address any potential breach by Guidant.  (Korbich Ex. 27).

h.   On January 15, 2006, in a talking points memo for communication with the markets and Guidant investors, J&J stated that it believed the "Guidant Board has performed its fiduciary duty" in connection with its responses to the competing bids of J&J and Boston Scientific.  It further added that Guidant "has been transparent in its process and kept the interests of its shareholders in focus," enabling Boston Scientific "to conduct full and fair due diligence."  Moreover, Guidant has "continued to exercise their fiduciary duty by demonstrating a willingness to consider bona fide offers."  The memo, however, did not claim a potential breach of the Merger Agreement by Guidant.  (Caruso Ex. 21; Hitchner Ex. 13; see also Trial Tr. 63:22-64:18, 65:14-24 (Weldon Cross)).  On the same day, Goldman Sachs' Kenneth Hitchner wrote to J&J CFO Robert Darretta that the Boston Scientific proposal has opened a "can of worms," and that Darretta has probably been "bombarded" with talking points listing the various problems facing the proposal.  Hitchner then listed some of the risks that he believed should affect the value of the Boston Scientific proposal, which he thought the Guidant board should be considering.  Litigation risk due to breach of the Merger Agreement was not mentioned.  (Darretta Ex. 2).

i.   On January 17, 2006, J&J drafted a presentation outlining the risks of the Boston Scientific deal, but did not list litigation exposure due to breach.  (Rosenberg Ex. 2).  On the same day, J&J issued a press release, claiming that Boston Scientific's

competing proposal was "a highly dilutive leveraged transaction based on extremely aggressive business projections."  (Kury Ex. 74).

j.   On January 20, 2006, in an article titled "Abbott, Boston shares off on J&J patent threat," Reuters reported that shares of Abbott and Boston Scientific both fell due to J&J's "claims that two of its patents may be infringed if a company tries to launch a drug-eluting stent coated with a derivative of rapamycin."  The article did not mention any other threats of litigation by J&J.  (Harris Ex. 1).

k.   On January 21, 2006, in an article from Bloomberg titled "J&J Tries to Cast Doubt on Boston Scientific's Bid for Guidant," an analyst stated that "J&J is communicating with the Street that Boston Scientific's $80-a-share offer for Guidant is fraught with uncertainty."  The article also says that "Johnson & Johnson told analysts it may file patent infringement lawsuits over stent drug coatings to keep Boston Scientific and its partner in the bid, Abbott Laboratories, from profiting from the new Guidant devices."  (Harris Ex. 2).  Again, the article did not mention any claim by J&J that Guidant had breached the Merger Agreement.

l.   On January 25, 2006, Guidant delivered a letter to J&J terminating the Merger Agreement under Section 7.01(f), which was permitted only "in accordance with the terms and subject to the conditions of Section 4.02(b)."  (Kury Ex. 53).  J&J acknowledged the termination and demanded that Guidant pay the $705 million termination fee required by the Merger Agreement on or before January 26, 2006.  (Hilton Ex. 25; Rosenberg Ex. 31; Deyo Dep. 183:25-184:7).  J&J never communicated to Guidant or Skadden that Guidant was not entitled to terminate

59

the transaction pursuant to Section 7.01(f), and believed that it was "proper to terminate" under that provision.  (Deyo Dep. 184:25-185:13).  This is because J&J did not believe that Guidant had actually breached the Merger Agreement.

117.     On January 17, 2006, Kury sent a letter to Deyo indicating that if the Boston Scientific offer remained a superior one as of 12:01a.m. on January 25, 2006, the Guidant board intended to terminate the Merger Agreement and enter into a merger agreement with Boston Scientific.  (DX0199; DX0119 at 55).

118.     On January 18, 2006, the J&J board determined that it would not make another bid in response to Boston Scientific's offer of $80 per share.  (Deyo Dep. 167:4-16).

119.     Even after J&J decided it would not complete the acquisition of Guidant, J&J continued to insist on Guidant's performance under the Merger Agreement.  On January 25, 2006, the Wall Street Journal quoted a J&J spokesman as saying that Guidant was not permitted to "walk away . . . until the end of the fifth business day after a competing offer is deemed superior."  (Deyo Ex. 32).  During this time period, J&J did not increase its bid or seek injunctive relief.

### H.     J&J Requests Analysis from Guidant and Accepts the Termination

#### 1.     Deyo's January 23 Letter to Kury

120.     On January 23, 2006, Deyo wrote to Kury, copying Mulaney.  Mulaney recalled that he received the letter "after 5:00 Central time" on January 23.[15]  Deyo's letter stated that J&J had been surprised to learn on January 8, 2006 that Guidant had provided due diligence information to Abbott.  (JPS ¶ 43).  Deyo stated that J&J "continues to be troubled" by the

---

[15] Documents produced in the case but not offered into evidence show that Deyo e-mailed the letter to Kury, copying Mulaney, at 5:42 p.m. Eastern Time on January 23.  (E.g., GDT 00258429-31.)

announcement.  (Kury Ex. 50).  In contrast to the letters exchanged between Guidant and J&J in November 2005, this letter did not state that Guidant was in breach of the Merger Agreement, nor did it state that J&J was "prepared to take all necessary action to protect and enforce its rights under the Merger Agreement."  (Compare Kury Ex. 50 with Deyo Exs. 8-10).  When asked why J&J sent this letter on January 23, Deyo testified, "I don't recall.  We clearly were no longer involved in bidding."  (Deyo Dep. 170:18-24).

121.    Indeed, by the time that letter was sent, Abbott had become a clear maker of a Takeover Proposal, through the January 8 agreements, J&J had participated in robust negotiation and bidding with full knowledge of Abbott's involvement, Abbott's role had changed such that it not only provided financing through its role as a divestiture candidate, but also by directly financing the acquisition by purchasing $1.4 billion in Boston Scientific stock, and J&J had affirmatively ceded the transaction without ever threatening a lawsuit for breach of the Merger Agreement.

## 2.    Kury's Reaction:  Kury Believed J&J's Position in the January 23 Letter Was "Lame"

122.    Less than an hour after receiving Deyo's January 23 letter, Kury wrote to Mulaney and Duwe:  "This is so lame, not only on the merits but also because JNJ will never get the [shareholder] vote to approve its $71 offer."  (Kury Ex. 83).  Kury believed "that Mr. Deyo's position was . . . meritless."  (DX0166 (Kury Direct) ¶ 111).

## 3.    Mulaney's Proposed Response, Following Conversation with Kury

123.    About 90 minutes after Kury called Deyo's letter "lame," Kury received Mulaney's proposed response.  Mulaney's proposed response describes Kury's recollection of the January 9th call with Deyo:

My recollection of our conversation on January 9, 2006 is that it concerned your desire to be assured that Johnson & Johnson was getting all information supplied

> to Boston Scientific or Abbott and not previously shared with Johnson & Johnson and that you asked me to look into the matter and confirm that this was being done.

(Mulaney Ex. 25 at GDT 00368734).

124.    Mulaney testified that his understanding of Kury's recollection (as expressed in the draft letter) came from a conversation he had with Kury:

> The letter I'm responding to references a conversation on January 9th, as to which Mr. Kury told me he had absolutely no recollection of Mr. Deyo saying that information had been given to Abbott in violation of the merger agreement, as distinct from asking to be assured that any information given to Boston Scientific or its representatives had not previously been provided to Johnson & Johnson.

(Trial Tr. 836:11-17).

**4.  Kury's Request for a "Technical Analysis"**

125.    Around the same time Kury received Mulaney's proposed response, he asked Mulaney and Duwe, "But seriously folks, what's the technical analysis of whether [Abbott] is a bidder?"  (Kury Ex. 57).

126.    In both its Pre-Trial Proposed Findings of Fact and Conclusions of Law (¶¶ 65, 111) and in its opening argument (Trial Tr. 12:16-19), J&J inaccurately claimed that Kury sent the e-mail requesting a "technical analysis of whether [Abbott] is a bidder" to Skadden <u>after</u> sending his January 23 response to Deyo, ostensibly "[q]uestioning the very rationale he just gave to Mr. Deyo."  (Trial Tr. 12:19).  But when, during his cross examination, Mulaney stated that he did not recall the sequence of events as J&J was suggesting, J&J admitted that its asserted sequencing relied on unreliable time-stamps:  "the time stamps on these are uneven.  This might be Greenwich Mean Time."  (Trial Tr. 872:16-21).

127.    Adjusting Kury's request for a "technical analysis" to Eastern Standard Time (7:56 p.m. on January 23), it is clear that this e-mail was sent half an hour **<u>before</u>** Kury replied to Deyo at 8:26 p.m. (Kury Ex. 51).

128.    As Kury explained, his e-mail request for "technical analysis" was not expressing

doubt as to the merits of Guidant's position that Abbott was entitled to receive due diligence:

> I think my view had been all along that Abbott was a representative.  I thought
> that the mention at the end of one of those paragraphs of the possibility of them
> being another bidder or a joint bidder was not the basis on which I had been
> relying, and I don't think it was the basis on which Mr. Mulaney and Skadden
> were relying on making the decision to give the information to Abbott.

(Trial Tr. 1239:6-16 (Kury Redirect)).

### 5.  Kury's January 23 Reply to Deyo

129.    Within a few hours of having received Deyo's letter, Kury sent Deyo the response

that was drafted by Mulaney.  Kury stated, "I have no recollection of any concern on your part

that providing information to Abbott was somehow a violation of our 'no solicitation'

obligations under the merger agreement with Johnson & Johnson.  If it was of any concern,

Johnson & Johnson has been strangely silent on the matter since January 9."  Kury further

explained that "Boston Scientific brought Abbott into the transaction as part of Boston

Scientific's 'Takeover Proposal,'" and that it was "perfectly reasonable and appropriate" to

provide due diligence to Abbott.  (Kury Ex. 51; Mulaney Ex. 25).

### 6.  Guidant Board Meeting on January 24

130.    At a meeting of the Guidant board of directors on January 24, Mulaney advised

the Guidant board that J&J had written Guidant a letter suggesting that Section 4.02 had been

breached, and further advised Guidant that the letter was "without merit" and that "the timing of

it, following a total absence of any communication to that effect from [C]ravath since January

9th, and following the formal notice under the merger agreement from January 9th until January

23rd . . . seemed to undercut the credibility of the concerns expressed in the letter."  (Trial Tr.

927:21-928:3 (Mulaney Redirect)).  Mulaney testified that he would have told the Guidant board

if he had "any doubt about whether or not Guidant complied with all of its obligations to Johnson

& Johnson," but he did not express "any doubt at all to the Guidant board."  (Trial Tr. 928:17-24 (Mulaney Redirect)).

131.    On the morning of January 25, Guidant delivered a termination notice to J&J, advising that Guidant was exercising its right under Section 7.01(f) of the Merger Agreement to terminate the Agreement to accept a competing Superior Proposal.  (JPS ¶ 45; Kury Ex. 53; Deyo Ex. 32).  J&J did not claim in response that Guidant had breached the agreement.  Rather, J&J issued a press release later that day acknowledging receipt of the notice and declaring: "Guidant Corporation is required to pay Johnson & Johnson a fee of $705 million on or before January 26 as per the merger agreement."  (Hilton Ex. 25).

132.    On January 26, Guidant wired J&J the $705 million termination fee required by the Merger Agreement (as amended on January 13).  (JPS ¶ 46; Weldon Ex. 7).

133.    After receiving the termination fee on January 26, J&J filed a Form 8-K with the SEC stating that the Merger Agreement had been "terminated in accordance with its terms by Guidant in order for Guidant to enter into a merger agreement with Boston Scientific Corporation."  (Rosenberg Ex. 31).

134.    Boston Scientific and Guidant signed their merger agreement (the "BSC-GDT Merger Agreement") on January 25 (Kury Ex. 54).

135.    As part of the transaction, Abbott committed $3.8 billion in cash (Kury Ex. 39, Section 2.03 at GDT 00133418), providing "[a]lmost over 20% of the consideration" (Best Dep. 187:9-12).

136.    Abbott purchased Guidant's divested ES and VI businesses directly from Guidant. (DX0051; DX0054; Gunther Dep. 86:22-87:5).

137.    The businesses Abbott acquired represented more than 15% of Guidant's business.  Johnson & Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 343 (S.D.N.Y. 2007) ("The parties agree that the portion of Guidant's business purchased by Abbott constituted more than 15% of Guidant's business."); (Feb 28 2007 MTD Hrg Tr. at 11- 12; Best Ex. 10 at BSC 123857-58).

## IV.    Post-Termination

### A.    J&J Waits Eight Months and Then Files Its Lawsuit

138.    On March 6, 2006, J&J associate general counsel Steven Rosenberg wrote in a personal e-mail that "We [J&J] think Boston grossly overpaid for Guidant and will likely choke on the debt and liabilities they are taking on . . . .  I do think it was the right outcome for J&J. (Rosenberg Ex. 21; Rosenberg Dep. 95:14-15).

139.    On  September 25, 2006, J&J filed this la    wsuit,  seeking  billions of  dollars  in alleged damages due to its failure to acquire Guidant.

### B.    Guidant's CRM Business Declines

140.    The assumptions underlying J&J's purported $75 per share valuation of Guidant have proven to be incorrect, including J&J's projections of CRM market sales.

141.    Weldon called Guidant's CRM business the heart of the Merger Agreement. (Weldon Dep. 109:23-110:14).  Guidant's CRM business was, according to J&J's own valuation analyses, the most significant and valuable aspect of Guidant, and presented J&J with an opportunity to enter into a new line of business.  J&J projected that cash flows from the CRM business would account for between 72% and 76% of the value it would derive from owning and operating Guidant, aside from synergies.  (DX0164 (Cornell Direct) ¶ 49).  According to J&J's internal valuations, if the CRM market's compound annual growth rate fell by only 1% from the

13% growth rate that J&J had predicted, the net present value anticipated to be realized from an acquisition at $63 per share would fall by $1.3 billion.  (DX0164 (Cornell Direct) ¶ 51).

142.    Since 2006, Guidant has recorded over $6.2 billion in goodwill impairments related to its CRM business:

a.  In 2009, due to its acquisition of Guidant and, in part, reductions in market demand for CRM products in the U.S., Boston Scientific recorded a $2.613 billion goodwill impairment charge.  (DX0147 at 39).

b.  In 2010, Boston Scientific recorded a $1.817 billion goodwill impairment charge associated with the U.S. CRM business.  (DX0151 at 54).

c.  In 2011, Boston Scientific recorded a $697 million goodwill impairment charge associated with the U.S. CRM business.  (DX0152 at 47).

d.  In 2012, Boston Scientific recorded a $748 million goodwill impairment charge associated with the U.S. CRM business.  (DX0153 at 48).

e.  In 2013, Boston Scientific recorded a $423 million goodwill impairment charge associated with the global CRM business.  (DX0154 at 48).

143.    The CRM business that Boston Scientific purchased from Guidant has also been the subject of several lawsuits.  These lawsuits were related to the problems that led J&J to declare a material adverse change in November 2005 and renegotiate a reduced purchase price of $63 per share.

a.  On May 23, 2005 and June 17, 2005, Guidant issued communications to physicians regarding a failure of its implantable defibrillator products.  (JPS ¶ 13).  During the summer and fall of 2005, Guidant was named as a defendant in product liability lawsuits, and became the subject of various governmental

investigations.  Many such lawsuits would ultimately be consolidated into a single

multidistrict litigation in Minnesota (the "Minnesota MDL").

b.  On November 19, 2007, Boston Scientific reached an agreement to settle the

Minnesota MDL by paying a total of up to $240 million.  (DX0145 at 121).

c.  On January 12, 2011, the Department of Justice announced that Guidant had been

sentenced "to pay more than $296 million in criminal fines" due to a defect in

implantable defibrillators manufactured by Guidant's CRM division.  See

Judgment in a Criminal Case, United States v. Guidant LLC, No. 10-MJ-00067

(D. Minn. Jan. 13, 2011).  This was the same division that J&J had unsuccessfully

attempted to acquire.

d.  On September 26, 2011, the Department of Justice announced that Guidant had

agreed to pay $9.25 million to settle False Claim Act allegations, arising from

government claims that the company had "inflated the cost of replacement

pacemakers and defibrillators to federal health care programs by knowingly

failing to grant warranty credits and rebates to hospitals for pacemakers and

defibrillators that were explanted while covered under a product warranty or

another credit program."  (DX0194).

e.  On October 17, 2013, the Department of Justice announced that "Boston

Scientific Corp. and its subsidiaries, Guidant LLC, Guidant Sales LLC and

Cardiac Pacemakers Inc. (Guidant), have agreed to pay $30 million to settle

allegations that, between 2002 and 2005, Guidant knowingly sold defective heart

devices to health care facilities that in turn implanted the devices into Medicare

patients."  (DX0195).

144.     Shortly after J&J declined to increase its bid for Guidant, <u>Money</u> magazine reported on January 31, 2006 that "J&J is fortunate not to have succeeded in acquiring Guidant."[16]   According to another <u>Fortune</u> article from October 5, 2006, Boston Scientific's acquisition of Guidant was "the biggest M&A blunder since AOL/Time Warner," and "Boston Scientific paid too high a price to snatch Guidant away from archrival Johnson & Johnson."  The article stated that "the single-minded pursuit of victory can blind even brilliant execs to the true costs of a deal," and that if J&J had acquired Guidant for a price of $76 per share, it would be "paying a huge multiple of almost 50 times Guidant's earnings."[17]

145.     The assumptions underlying J&J's valuations, and supporting J&J's current claims of damages, were incorrect.  As explained by Guidant's expert Professor Bradford Cornell:

> [U]sing the sensitivities documented by J&J, if a 3.6% compound annual growth rate is used – a rate derived from an October 2010 Wedbush analysis of the worldwide CRM market – J&J's expected NPV decreases by approximately $12.2 billion to ***negative*** $7.5 billion at an acquisition price of around $63 per share. . . . The expected NPV would have been even more negative had J&J modeled the growth in the CRM market at 0.7% per year, i.e., the *actual* growth rate of the CRM market.  Specifically, using the sensitivities documented by J&J, the expected NPV would have decreased by approximately $16.0 billion to ***negative*** $11.3 billion at an acquisition price of $63.08 per share if J&J had modeled CRM growth at 0.7% per year (the growth rate that actually materialized) as opposed to 13 percent per year.  Thus, when actual figures are used in place of J&J's incorrect predictions, J&J's own modeling indicates that it would have incurred a loss had it purchased Guidant at $63.08.

(DX0164 (Cornell Direct) ¶¶ 51, 53 (internal citations omitted)).

---

[16] Michael Sivy, "Johnson & Johnson: A deal well lost," Money (Jan. 31, 2006) <u>available at</u> http://money.cnn.com/2006/01/31/commentary/mkcommentary/sivy/index.htm?postversion =2006013109.

[17] Shawn Tully, "The (second) worst deal ever," <u>Fortune</u> (Oct. 5, 2006) <u>available at</u> http://archive.fortune.com/magazines/fortune/fortune_archive/2006/10/16/8390284/index.htm.

146.     J&J's valuations of Guidant accepted that there was a high degree of uncertainty inherent in the value of Guidant's business.  (DX0164 (Cornell Direct) ¶¶ 40-58).  J&J's valuations of Guidant fluctuated dramatically over a relatively short period of time, changing by $4.7 billion in the course of little more than a year.  (DX0164 (Cornell Direct) ¶¶ 41-43).  J&J's internal discounted-cash-flow models also indicated a high level of uncertainty, with the resulting valuation varying widely on the basis of small changes in the projected values assigned to inputs like future sales in Guidant's lines of business, relevant growth rates, and expenses. (DX0164 (Cornell Direct) ¶¶ 44-53, 56).  Analysis undertaken by J&J's financial advisor, Goldman Sachs using J&J's own projections, similarly demonstrated a broad range—from $55.16 per share to $106.67 on November 13, 2005.  (DX0164 (Cornell Direct) ¶¶ 54-55).

147.     If J&J had actually acquired Guidant's CRM business, it would have suffered a significant loss.  As Hilton testified, J&J believed "it was a good thing [J&J] didn't acquire Guidant" because it would "not have been a good deal" for J&J at a price of even $71 per share. (Hilton Dep. 255:21-258:18).  Moreover, J&J had planned for "alternative uses of capital," and could now put its capital "to other uses" in pursuit of other business opportunities.  (Darretta Dep. 237:3-17).

### C.     J&J Acquires Conor

148.     Conor Medsystems, Inc. ("Conor") is a cardiovascular device corporation based in California which manufactures DES technology.  (DX0197).  In February 2007, J&J acquired Conor.

149.     On November 16, 2006, Townsend prepared, and J&J signed, a merger agreement to acquire Conor.  (DX0 215).  The "No Solicitation"  clause at Section 4.02 of that agreem ent

was, in Townsend's words, "very similar" to Section 4.02 of the Merger Agreement between J&J and Guidant.  (Trial Tr. 339:22-340:1 (Townsend Cross)). [18]

150.    In summarizing the "Deal Protections" provided in the Conor merger agreement, J&J identified three key provisions :  (1) the prohibition on soliciting a competing offer; (2) the ability to respond to an unsolicited competing offer; and (3) the availability of a termination fee in the event that the target selects the unsolicited competing offer.  (DX0214 at CON001915). J&J did not include in its summary of the "Deal Protections" any details regarding permitted recipients of information once a potentially superior proposal had been received.

### D.    Procedural History of This Litigation

151.    On September 25, 2006, J&J filed this lawsuit against Guidant, asserting claims for breach of contract and breach of the common law implied covenant of good faith and fair dealing.  J&J's complaint also asserted tortious interference claims against Abbott and Boston Scientific.  All three defendants moved to dismiss the complaint.  Johnson & Johnson v. Guidant Corp., 525 F. Supp. 2d 336 (S.D.N.Y. 2007).  In an August 29, 2007 opinion, Judge Lynch dismissed all of the claims against Abbott and Boston Scientific, and also dismissed J&J's claim against Guidant for breach of the implied covenant of good faith and fair dealing.  On October 10, 2007, Judge Lynch denied J&J's motion for partial reconsideration of the court's order dismissing J&J's tortious interference claims.  Johnson & Johnson v. Guidant Corp., No. 06-cv-7685-RJS (S.D.N.Y. Oct. 10, 2007), ECF No. 42.

152.    On February 20, 2009, J&J filed a motion to amend its complaint to re-assert its tortious interference claims, and add further allegations that Guidant had breached the Merger

---

[18] A blackline comparison of Section 4.02 of the J&J–Conor Merger Agreement and Section 4.02 of the Merger Agreement is attached hereto as Exhibit A.

Agreement by, among other things, entering a joint defense agreement with Boston Scientific

(and, later, Abbott) and by providing documents to the FTC.  On February 16, 2010, this Court

denied J&J's motion.  Johnson & Johnson v. Guidant Corp., 2010 WL 571814 (S.D.N.Y. Feb.

16, 2010).

      153.    On June 20, 2011, Guidant filed a motion for summary judgment, arguing that

(1) J&J's allegation of breach was clearly not "wilful" as required by the Merger Agreement;

(2) J&J's allegation of breach was clearly not "material" as required by the Merger Agreement;

and (3) J&J's causation argument was based on mere speculation.  Although the Court found

there to be triable issues of fact on all three points in a July 7, 2014 order denying Guidant's

motion, this Court adopted an interpretation of the word "wilful" that places the burden on J&J

to demonstrate at trial that Guidant committed its alleged breach with "knowledge that breach

would ensue." Johnson & Johnson v. Guidant Corp., 2014 WL 3728598, at *14 (S.D.N.Y. July

22, 2014).  With J&J facing this standard of proof, the Court found that there remained "material

issues of fact" regarding "the reasonableness of Kury's reliance on Skadden's advice that Abbott

was entitled to due diligence."  Id. at 19.

      154.    Judge Lynch had previously found that "[t]here might be a genuine issue of fact

as to whether such a breach was material; defendants might be able to persuade the factfinder

that Guidant's provision of due diligence was at bottom a part of its response to BSC's Takeover

Proposal, and therefore not in conflict with the heart of the parties' agreement that Guidant

would not solicit bids."  Johnson & Johnson v. Guidant Corp., 525 F. Supp. at 355.  "A

reasonable factfinder might conclude that the [Merger] Agreement was not violated in any

crucial respect if Guidant responded to a request from BSC on Abbott's behalf by simply

sending the materials to Abbott, instead of telling BSC to tell Abbott to ask Guidant directly for the due diligence." Id. at 357.

## CONCLUSIONS OF LAW

155.     J&J's sole remaining claim against Guidant is for wilful and material breach of the Merger Agreement.  Specifically, J&J alleges that Guidant violated Section 4.02(a) of the Merger Agreement by providing confidential information about certain of its own businesses to Abbott.  (Compl. ¶ 55).

156.     The elements of a breach of contract claim under Indiana law—which the parties chose to govern the Merger Agreement and therefore also J&J's claim—are the existence of a contract, the defendant's breach of the contract, and damages caused by the defendant's breach.  (See JPS ¶ 50).  J&J has the burden to prove each of those elements by a preponderance of the evidence.  Gared Holdings, LLC v. Best Bolt Prods., Inc., 991 N.E.2d 1005, 1012 (Ind. Ct. App. 2013).  Because the Merger Agreement has been terminated, J&J must prove by a preponderance of the evidence that any alleged breach by Guidant was wilful and material.  (Kury Ex. 9 at SA 00026243).

## I.     J&J Has Not Met Its Burden to Prove That Guidant Breached the Merger Agreement

157.     J&J has failed to meet its burden to prove that Guidant breached the Merger Agreement.  As further explained below, (A) Guidant was permitted to provide diligence to Abbott as a Representative of Boston Scientific, (B) Guidant's notice to J&J of Abbott's role in the transaction was sufficiently prompt to provide J&J with the benefit of that notice provision; (C) Guidant was not prohibited by the Merger Agreement from responding to a request by the FTC; and (D) Guidant was not prohibited by the Merger Agreement from entering into joint

defense agreements concerning discussions of antitrust issues with Boston Scientific and later Abbott.

### A.   Abbott Was a Permissible Recipient of Guidant Information under Section 4.02

158.    J&J failed to prove by a preponderance of the evidence that Abbott was not a permissible recipient of Guidant information pursuant to Section 4.02.  As a financing source and potential purchaser of a significant portion of Guidant's business Abbott was a party working closely with Boston Scientific in its effort to acquire Guidant, and therefore within the scope of the term "representative" as that term is used in Section 4.02.[19]  Evidence of relevant industry usage confirms that parties that do not "represent" in the traditional dictionary sense of an agent-principal relationship, but are working with a principal to accomplish a deal are within the category of "representative" as used in Section 4.02.  (See infra ¶ 167; see also ¶ 163).

159.    J&J concedes that Abbott was entitled to receive confidential information about Guidant if Abbott were a Representative of Boston Scientific as that term is used in Section 4.02(a) of the Merger Agreement.  (Compl. ¶ 55; J&J Pre-Trial Proposed Conclusions of Law ¶ 74).

160.    The definition of "Representatives" in Section 4.02(a) is ambiguous because it is circular ("directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or **representative**").  This definition was included in

---

[19] Judge Lynch's decision on Guidant's motion to dismiss does not preclude the Court from concluding now on the factual record before it that Abbott was a Representative.  See RSL Commc'ns, PLC v. Bildirci, 2009 WL 454136 (S.D.N.Y. Feb. 23, 2009) (Sullivan, J.) (declining to apply the "law of the case" doctrine, and stating that, "as a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case, such ruling will not preclude a subsequent ruling in favor of a defendant on the same issue") aff'd sub nom. RSL Commc'ns PLC, ex rel. Jervis v. Fisher, 412 F. App'x 337 (2d Cir. 2011).

Cravath's initial draft of the Merger Agreement, and was never a subject of negotiation or discussion between the parties.  (Kury Ex. 4 at GDT 00122373).

161.    The evidence at trial shows that the term has a broader meaning in the context of Section 4.02, as Kury testified he was advised by Skadden:

> THE COURT:  Okay.  So any reason why representative should mean something other than the dictionary definition of the term?
>
> THE WITNESS:  My understanding was that based on Skadden's interpretation of the agreement, that the word representative, with the lower case R, was not necessarily hard and fast in its meaning, and it had to be interpreted in the light of --
>
> THE COURT:  You had that conversation with someone from Skadden?
>
> THE WITNESS:  That was my understanding.  My understanding, sir, even at this point --
>
> THE COURT:  Based on something that someone at Skadden told you, or that was your understanding based on the cosmos?
>
> THE WITNESS:  That was based on my understanding of what I was being told by Skadden.

(Trial Tr. 1241:8-25 (Kury Redirect)).

162.    J&J's own M&A expert, Professor John Coates, after his engagement with J&J, wrote an article and prepared a presentation in which he recognized that contracts can include "lingo," which is "[d]ifferent than English in a common language" (Trial Tr. at 229:6-8 (Coates Cross)), or "not English that ordinary people would understand" (id. at 229:17:20).  Coates also acknowledged that the definition of "Representative" in Section 4.02 "creates some lack of clarity because it defines itself with respect to itself."  (Trial Tr. 224:13-15 (Coates Cross)) (emphasis added)).

163.    "Although it may appear that the language of some agreements is so clear and plain that no doubt can be raised about its meaning, in fact, extrinsic evidence may support an

unusual interpretation in some cases. 'A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.' . . . There is nothing in the law of contracts that prevents the parties from ascribing an uncommon meaning to their words." Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 n.4 (2d Cir. 1988) (quoting Towne v. Eisner, 245 U.S. 418, 425 (1918) (Holmes, J.)).  "Evidence of industry practice is admissible to construe terms of art or ambiguous agreements."  Allstate Ins. Co. v. Dana Corp., 759 N.E.2d 1049, 1059 (Ind. 2001); see also St. Paul Fire & Marine Ins. Co. v. Schilli Transp. Servs., 2012 U.S. Dist. LEXIS 160904, at *13 (N.D. Ind. Nov. 9, 2012); Brewington v. State Farm Mut. Auto. Ins. Co., --- F. Supp. 3d. ----, 2014 WL 4569507, at *3 (D. Nev. Sept. 16, 2014) ("[C]ircular definitions are inherently ambiguous").

164.     Guidant's interpretation of "representatives" is supported by canons of construction.  The Court has previously suggested that Guidant's interpretation of "representatives" violates the canon of construction *ejudem generis*.  Johnson & Johnson, 525 F. Supp. 2d at 347.  But as other authorities have recognized, application of different canons of construction may often lead to competing results.  See, e.g., Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1037 n.2 (7th Cir. 1998) (observing that canons of interpretation will not necessarily settle the meaning of an ambiguous contractual provision); Natural Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 98 (2d Cir. 2001) (observing, in the statutory context, that even though "the canons of statutory interpretation provide a court with numerous avenues for supplementing and narrowing the possible meaning of ambiguous text," canons of interpretation may not resolve the meaning of an ambiguous provision).  Contrary to the canon against surplusage, J&J's interpretation renders "representatives" surplusage because J&J has not

identified any entity that would be a "representative" that would not otherwise be specified in the definition of "Representatives."  See Sunburst Chem., LLC v. Acorn Distributors, Inc., 922 N.E.2d 652, 654 (Ind. Ct. App. 2010) ("A court should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. . . . [I]f we were to accept Sunburst's argument that the agreement does not address venue, it would render the reference to Marion County meaningless . . . . [W]e must presume that Acorn placed the provision in the agreement for a purpose and that the reference to the courts of Marion County is intended to have meaning. Therefore, we conclude the agreement establishes venue in Marion County" (citations and quotation marks omitted)); Fischer v. Heymann, 943 N.E.2d 896, 900–01 (Ind. Ct. App. 2011) ("[W]e read the contract as a whole . . . [and] make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. . . . In accordance with the rules of contract interpretation, we interpret the purchase agreement to mean the Heymanns had the right to terminate the purchase agreement if they reasonably believe[d] the defects were major defect[s] so long as the reasonableness of their belief is evaluated objectively, as opposed to subjectively . . . If the reasonableness of the Heymanns' belief were evaluated subjectively, . . . [t]his would render meaningless the clause barring termination for merely minor repairs" (quotation marks omitted)).  Where canons of construction point to opposite results, courts choose the interpretation that is supported by the evidence.  Bourke, 159 F.3d at 1037 & n.2 (where the application of canons of construction do not resolve the meaning of a contractual provision, the court turns to extrinsic evidence).  As shown below, that interpretation is Guidant's.

165.     Skadden understood that the term "representatives" was a broad, catch-all provision that encompassed financing sources and divestiture partners.  (DX0167 (Mulaney

Direct) ¶ 8.b ("The definition of Representatives in the Merger Agreement is very broad and open-ended, encompassing any 'other advisor, agent or representative.' . . . It was my understanding that the parties did not intend that the definition of 'Representatives' in either the Merger Agreement or the J&J–Guidant Confidentiality Agreement would operate as a limitation or impediment on the type of 'Takeover Proposals' that could be considered and responded to by Guidant as reasonably likely to lead to a 'Superior Proposal.'")).

166.    Contemporaneous documents show that J&J understood that "Representatives" had an expansive meaning in this context.  In arranging for Guidant diligence for Abbott to resolve its antitrust issues with a Guidant acquisition, J&J's subsidiary Cordis entered into a confidentiality agreement with Abbott regarding the exchange of "certain non-public information relating to Guidant."  The Abbott-Cordis agreement defined a party's Representatives as "its directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors)."  While, under J&J's theory, Guidant could not be considered a Representative, the contract nevertheless expressly excluded Guidant: "In no event shall Representatives include Guidant . . . ."  (Morano Ex. 3; see also Rosenberg Ex. 30 (Cordis-Medtronic Confidentiality Agreement with same carve-out)).  Rosenberg testified that he could think of no reason to exclude Guidant from this definition of "Representatives" unless Guidant might otherwise be considered a "Representative" of Cordis.  (Rosenberg Dep. 164:2-165:25).  Coates acknowledged that, from a practitioner's standpoint, it was "certainly a possibility" that Guidant was expressly excluded from the Cordis agreement to make clear it was not a Representative.  (Trial Tr. 232:12-16 (Coates Cross)).

167.   Experienced practitioners testified that they viewed Abbott as a "representative" as that term is used in Section 4.02, providing evidence of relevant industry practice to construe an ambiguous term.  For example:

a.   Mulaney testified that he understood "representative" to encompass the "broad concept" of "anyone working with" a party.  "It's a use of the term representative that is not meant to convey an ambassador or someone necessarily representing someone."  (Trial Tr. 930:15-931:7 (Mulaney Redirect)).

b.   Clare O'Brien testified that Shearman & Sterling "looked at [the] definition of [R]epresentatives" and "thought it was a pretty broad provision in the sense that it obviously included at the end a category of other advisers, agents or representatives."  (Trial Tr. 286:7-16 (O'Brien Cross)).  "[W]e felt that the words lower case agent or other representative must mean something. . . .  We read it as being in this case being involved in the transaction with Boston Scientific."  (Trial Tr. 292:17-25 (O'Brien Cross)).

c.   Duwe testified:

Q.  Well, did you conclude at the time that third-party divestiture candidates were included within the definition of representatives in the Johnson & Johnson/Guidant Merger Agreement or are you just looking at it now and making that -- taking that position?

A.  I think I said I don't recall exactly what we concluded at the time or what the discussions were.  We certainly must have concluded at the time that we were comfortable that this fit within that provision. And as I look at it today, I think it does.

(Duwe Dep. 34:17-35:5).

168.   The evidence at trial reflects a number of additional factors supporting the term "representatives" as encompassing a "broad concept" in Section 4.02:  (1) the bargain negotiated

between J&J and Guidant was that Guidant would not solicit offers or facilitate unsolicited

offers, but would be permitted "a robust, full-throated, uninhibited, passive market check" (Trial

Tr. 797:4-8 (Mulaney Cross)); (2) J&J equally had an interest in having "Representatives"

construed broadly to ensure that no party working with Guidant, even if not representing it in a

classic agent-principal manner, could solicit a Takeover Proposal; (3) the expressly enumerated

parties in the definition of "Representatives" make clear that the term is not limited to parties that

fit the dictionary meaning of "representatives"; (4) when understood in the context of the J&J–

Guidant Confidentiality Agreement, a broad reading of "representatives" makes more sense than

a narrow reading; and (5) similarly to Abbott, Boston Scientific's lenders, Merrill Lynch and

non-investment-bank Bank of America, were entitled to due diligence information in their

capacities as financing sources.  Each of these factors is discussed in greater detail below.

### 1.    Guidant Bargained for a Robust "Passive Market Check"

169.    Mulaney testified that in negotiating the Merger Agreement and specifically of

Section 4.02 he communicated the importance to Guidant of being able to respond to a higher

bid:

> In the negotiation of the merger agreement, Mr. Townsend of [C]ravath,
> representing Johnson & Johnson, and I discussed the flexibility and freedom of
> action Guidant wanted, once it signed the merger agreement with Johnson &
> Johnson.  The initial draft provided by Johnson & Johnson did not give Guidant
> the ability to terminate a Johnson & Johnson merger agreement to accept a higher
> offer.  We said to them, the basis upon which we are discussing a transaction with
> you on an exclusive basis, Johnson & Johnson, is that once we sign an agreement,
> we get a robust, full-throated, uninhibited, passive market check.  We're not going
> to solicit, but we want to be able to respond to any higher bid that might be out
> there, and if there is, you will have the last look.  We will keep the information
> that we give to the intervenor confidential, but we want to be able to respond to a
> higher bid, if it's out there.  That's the bargain that we made, that's why you're
> dealing with us exclusively.

(Trial Tr. 796:23-797:15 (Mulaney Cross)).

170.     Although J&J's divestiture candidates did not receive due diligence until after J&J signed the Initial Merger Agreement, Mulaney explained that the question of whether Guidant could or would provide due diligence to an intervening bidder's divestiture partners was not analogous:  "the circumstances in the Johnson & Johnson/Guidant courtship . . . are quite different than when Boston Scientific approaches Guidant with a signed deal between Guidant and Johnson & Johnson."  (Trial Tr. 709:15-19 (Mulaney Cross)).  "Under the J&J-Guidant Confidentiality Agreement, *prior to the execution of the Initial Agreement*, J&J was not permitted to share Guidant's nonpublic information with third parties that might want to purchase certain Guidant assets that J&J might be required to divest."  (PX0020 (Townsend Direct) ¶ 6) (emphasis added).  The motivation for non-disclosure—to avoid revealing that a company is "for sale"—disappears following the execution of a merger agreement with a public target because "the fact that a publicly held target has agreed to be acquired must be disclosed promptly after the agreement is reached" and "[p]otential competing bidders thus know that the target company has put itself up for sale."  (PX0015 (Coates Direct ¶ 22).

171.     Townsend did not testify that J&J had intentionally negotiated the definition of "Representative" to preclude divestiture candidates or financing sources from receiving due diligence.  Moreover, Mulaney testified that while an acquirer like J&J may want "an agreement that says, you can't share these things with potential divestiture partners in the event of antitrust considerations," such an agreement would have been "totally unacceptable to Guidant, and we wouldn't have entered into an agreement with any such reflection."  (Trial Tr. 941:9-21 (Mulaney Redirect); see also DX0166 (Kury Direct) ¶ 18.b ("Had anyone suggested to me that 'other advisor, agent or representative' might not include an unsolicited bidder's potential financing sources or divestiture partners, I would have been concerned that Guidant would be

significantly impeded from reasonably investigating whatever unsolicited proposals it was likely to receive.")).

172.     While it may have been possible for a rival bidder to make an offer for Guidant without Guidant providing due diligence to financing sources or a potential divestiture buyer, such a constraint may have interfered with Guidant's right to a full passive market check and prevented Guidant from receiving the benefit of its bargain.  Further, given the restrictions on the Guidant board of directors' ability under the Merger Agreement to terminate—namely, the requirement of a determination by the Guidant board (after consultation with outside counsel and financial advisors) of the existence of a Superior Proposal "reasonably capable of being completed, taking into account all financial, legal, regulatory, and other aspects of such proposal"—a limitation on the provision of due diligence as J&J now suggests would have significantly impeded the board's ability to make that determination and unreasonably impeded the interested bidders capable of assembling a Superior Proposal for Guidant from doing so— both of which would have been antithetical to the deal that J&J and Guidant struck in negotiating the Merger Agreement and the board's duties to Guidant shareholders.

173.     Contemporaneous documents show that Guidant's ability to meaningfully consider unsolicited offers was a fundamental term of Guidant's agreement with J&J:

        a.    A July 2004 list of four conditions and "basic principles" that Guidant transmitted
              to J&J, one of which was Guidant's "being able to consider higher offers."
              (Weldon Ex. 9; Trial Tr. 38:9-40:10 (Weldon Cross)).

        b.    A July 2004 Skadden summary of Guidant's "Key Deal Points," which included
              "[Guidant] to have ability to respond to superior offers" and "[Guidant] to have

ability to terminate agreement and pay a break up fee to accept a superior offer."

(DX0034; DX0167 (Mulaney Direct) ¶ 8).

### 2. J&J Had an Interest in Having "Representative" Construed Broadly, and It Desired and Benefited from that Construction

174.    Section 4.02 first defines the term "Representatives" to identify the class of parties, related to Guidant, that are prohibited from soliciting a Takeover Proposal. By J&J's own account, "the purpose of Section 4.02 was to protect J&J's binding agreement from being used by Guidant as a stalking horse to attract other bids before the Merger Agreement was put to a shareholder vote." (J&J Pre-Trial Proposed Conclusions of Law ¶ 127).

175.    In order for J&J's protection to be meaningful, "Representatives" as used in the first part of Section 4.02—in which the term is defined—must be understood broadly to prohibit any party working with Guidant "(i) to solicit, initiate or knowingly encourage, or take any other action designed to, or which could reasonably be expected to, facilitate, any Takeover Proposal or (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish any information , or otherwise cooperate in any way with, any Takeover Proposal." (Kury Ex. 9 at SA 00026226).

176.    Mulaney testified that he understood the prohibition against solicitation to be broad and protective of J&J's right to preclude Guidant from any form of solicitation—and that in construing the term "Representatives" later in Section 4.02 when dealing with Guidant's right to furnish information, the term should be understood the same way:

> THE WITNESS: . . .  We did not so understand Johnson & Johnson to, if you will, create a very weak piece of Swiss cheese for a non-solicitation provision. We understood it intended to be broad, not capable of facile or, you know, disingenuous end running.
>
> THE COURT:  I mean, broad is a two-way street, right?

> THE WITNESS:  Yes, and the other way of the street is when it's next used with respect to whom Guidant can give information.  But in this part of the street, the first time it's used in this agreement is facilitating Johnson & Johnson getting what Johnson & Johnson wanted, which is, Guidant, neither you nor any person working with you can go out and solicit proposals.

(Trial Tr. 933:9-21 (Mulaney Redirect)).  J&J presented no evidence at trial to rebut this reasonable interpretation of "Representatives" to include parties working with Guidant beyond those acting as Guidant's agents as within the category of parties prohibited from soliciting a competing bid, and would no doubt have treated an act of solicitation of a competing proposal by any such party on its own initiative as prohibited by Section 4.02.

### 3. Section 4.02's Definition of "Representatives" Includes Parties Who Are Not "Representatives" Under a Dictionary Definition of the Term

177.    Section 4.02 defines "Representatives" as "directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative."  (Kury Ex. 9 at SA 00026226).  As Mulaney testified, a number of the parties within this litany are not "representatives" within the dictionary definition of the term:

> If you look at the litany of people, an accountant, an independent public accountant does not consider itself a representative of its client.  An investment banker, their engagement letters say they're independent contractors; not necessarily a representative.  The investment banker is providing underwriting service.  They're clearly not your representative.  They're someone across the table buying your securities.  So I think within this litany of categories, there are professionals who do not consider themselves representing the company in this sense, but they are working with that party and the intent of a purchaser is that people working with you can't solicit either.

(Trial Tr. 1033:1-14 (Mulaney Redirect)).  As J&J's expert testified, such lists of terms evolve and expand over the course of many agreements and, if not "focused on and therefore negotiated in a specific deal" may be the product of inertia.  (Trial Tr. 228:23-229:2 (Coates Cross)).  The litany of Representatives evolves over time not to exclude items not specifically expressed but to make painfully obvious that particular categories

are included.  (Trial Tr. 228:18-22 (Coates Cross) ("I think that often happens over time.

If the terms involved in effect are related to each other in that way.")).

> ### 4. When Understood in the Context of the J&J–Guidant Confidentiality Agreement, a Broad Interpretation of "Representatives" Makes More Sense than a Narrow Reading

178.    Like the Merger Agreement, the J&J–Guidant Confidentiality Agreement

contains a defined term "Representatives."  (Kury Ex. 2).  Unlike the Merger Agreement, the

defined term "Representatives" in the J&J–Guidant Confidentiality Agreement does not define

the class of parties to which information may be disclosed.  Rather, it operates by its plain terms

to define the class of exchanged information (the defined term "Information") that will be the

subject of the subsequent provisions of the agreement:

> In connection therewith you [J&J] may receive certain . . . information . . . from
> our [Representatives], and we may receive certain . . . information concerning
> Johnson & Johnson . . . from your Representatives.  All such information
> furnished to you or your Representatives or to us and our Representatives . . . are
> hereinafter referred to as "Information."

(Kury Ex. 2 at GDT00016136; see also Trial Tr. 1028:11-15 (Mulaney Redirect) ("Q.  Is

representative there being used to define what the confidential information is; that is, it is the

confidential information furnished by one party or its representatives to another party or its

representatives.  Is that correct?  A.  Yes.")).  Because a broader definition of "Representatives"

expands the scope of what qualifies as "Information" subject to the terms of the agreement, and

expands the class of parties bound by the obligations of Representatives under the agreement, an

expanded definition of "Representatives" would, if anything, make the Boston–Guidant

Confidentiality Agreement more, not less restrictive.

179.    The J&J–Guidant Confidentiality Agreement does not restrict the class of parties

to which information may be disclosed through the definition of "Representatives," but it

effectively does so in the second paragraph of the agreement, which limits the use of the

Information to "exploring possible negotiated business arrangements and not for any other business or competitive purpose."  It also provides that "the Information will be kept confidential in accordance with the terms of this agreement."  (Kury Ex. 2 at GDT00016136).  Thus, under the terms of the J&J–Guidant Confidentiality Agreement, information could only be shared if it was "for the purpose of exploring possible negotiated business arrangements," and only if kept confidential.  This does not, as J&J seems to suggest, allow Guidant to disclose information to any "Joe Smith"—but it does, as Mulaney explained in his testimony, permit sharing of information "with anyone that is working with them toward formulating a business transaction, protected by confidentiality provisions, not used for business or competitive purpose."  (Trial Tr. 732:18-21 (Mulaney Cross)).  Rosenberg also recalled that, in relation to its own potential acquisition, J&J had "identified . . . some of the business units that may need to be divested," considered that "companies that would be likely acquir[e]rs of those businesses . . . would need information about the businesses to be divested," and concluded that "[J&J] would be able to disclose Guidant information."  (Rosenberg Dep. 143:11-144:8).

180.    In other words, the J&J–Guidant Confidentiality Agreement permitted information related to Guidant to be disclosed potentially to multiple divestiture candidates, as J&J itself recognized when in April 2005 it entered into confidentiality agreements with multiple divestiture candidates—Abbott, Medtronic, and Conor—that contemplated that J&J's subsidiary, Cordis "may disclose . . . certain non-public information relating to Guidant."  (Morano Ex. 3 (Abbott) at JJH00094466; Rosenberg Ex. 30 (Medtronic) at 1; Harris Ex. 6 (Conor) at 2).  J&J has suggested that "what Johnson & Johnson did [with divestiture candidates] after it had signed the merger agreement is beside the point," but as Mulaney testified, it is "[n]ot beside the point because whatever they did, they had to do pursuant to the [J&J–Guidant] confidentiality

85

agreement." (Trial Tr. 771:10-16 (Mulaney Cross)). Indeed, Townsend described the

Confidentiality Agreement's prohibition on J&J "shar[ing] Guidant's nonpublic information with

third parties that might want to purchase certain Guidant assets that J&J might be required to

divest" as applying "prior to execution of the Initial Agreement"—not after the Initial Merger

Agreement was signed (and thus public). (PX0020 (Townsend Direct) ¶ 6). His understanding

was expressly notwithstanding that "[t]hose third parties were not included within the definition

of 'Representatives' in the J&J-Guidant Confidentiality Agreement." (Id.).

181.    Other confidentiality agreements in this case show that where parties wish to

flatly prohibit any further disclosure, that intent is expressed in the terms of the agreement. For

example:

  a.   An August 25, 2005 confidentiality agreement among Guidant,

       PricewaterhouseCoopers LLP ("PWC"), and J&J provided:

           As a condition of Guidant providing Information to PWC, J&J and
           PWC agree that, in addition to the confidentiality requirements set
           forth in the [J&J–Guidant] Confidentiality Agreement, any Guidant
           Confidential Information . . . that is or has been furnished to PWC
           shall not be shared or disclosed by PWC or any of its Representatives
           to J&J or any other person prior to the completion of the Transaction
           without the prior written consent of Guidant, which will not be
           unreasonably withheld.

       (Rosenberg Ex. 29 at JJE00151580 (emphasis added)). If the J&J–Guidant

       Confidentiality Agreement had by its terms barred any further disclosure of

       Guidant confidential information by PWC, the provision quoted above would

       have been unnecessary surplusage.

  b.   JPMorgan's confidentiality agreements with Abbott and other potential

       purchasers of Guidant's European ES business in connection with the J&J deal

       provided:

> To maintain the confidentiality of the Evaluation Material, you and each individual or entity with access to the Evaluation Material agree . . . not to disclose any Evaluation Material other than to those of your officers, directors, employees, advisors and representatives (collectively, "Representatives") with a need to know the information contained therein . . . .

(Rosenberg Ex. 27 at GDT 00243431).

182.    When viewed against the backdrop of the parameters of the J&J–Guidant Confidentiality Agreement, a broader reading of "Representatives" under the Merger Agreement is more functional, as Mulaney testified:

> [S]ection 4.02 of the agreement says, Guidant can give information to the person making the takeover proposal and its representatives.  Once information is in the hands of the person making the takeover proposal, under the confidentiality provisions of the confidentiality agreement, Boston Scientific could give that information to another party, so long as it's being used for the formulation of a business transaction and is otherwise kept confidential and not used for business or competitive purpose.  So that if, as in the course -- if in the course of the information exchanges between Guidant, Boston Scientific and Abbott, Boston Scientific said to Guidant, would you give Abbott this information about the VI and ES business, I would think Guidant could give the information to Abbott because Guidant can give the information to Boston Scientific, and then Boston Scientific can give the information to Abbott, provided that all those provisions of information are covered by confidentiality agreements to keep the information confidential, used only for the purposes of formulating a business transaction and not used for competitive or business purpose.

(Trial Tr. 730:5-25 (Mulaney Cross)).

183.    Townsend testified that he did not draft the J&J-Guidant Confidentiality Agreement and did not recall reviewing it when drafting the Merger Agreement.  (Trial Tr. 322:2-323:5 (Townsend Cross); 350:6-16 (Townsend Re-Cross)).  Townsend testified that regardless of the specific restrictions of the J&J–Guidant Confidentiality Agreement, his focus

was "[t]o make sure that any competing bidder would [end][20] up having to agree to whatever the same rules were that J&J had to agree to in terms of confidentiality disclosures."  (Trial Tr. 341:1-5 (Townsend Redirect)).

184.    Townsend's lack of focus on what the specific rules for a competing bidder would be demonstrates that Townsend and J&J were not concerned in negotiating the Merger Agreement about whether the J&J–Guidant Confidentiality Agreement limited disclosure of information solely to a defined set of "Representatives" or whether it permitted disclosure to any appropriate parties "for the purpose of exploring possible negotiated business arrangements." According to Townsend, so long as an intervening bidder agreed to "whatever the same rules were that J&J had to agree to," J&J was comfortable.

> **5.     Boston Scientific's Lenders Were Entitled to—and Received—Due Diligence in Their Capacities as Financing Sources Without Objection from J&J.**

185.    Boston Scientific's lenders, Merrill Lynch and Bank of America, were entitled to—and received—due diligence information in their capacities as financing sources, as stated in contemporaneous written advice from Skadden to Kury.

186.    Boston Scientific's December 5, 2005 announcement of its intent to offer $72 per share for Guidant stated that Boston had "received commitment letters from Bank of America, N.A. and Merrill Lynch & Co., for all the financing we need to consummate the proposed transaction" and that Boston's proposal "was not subject to any financing condition."  (Best Ex. 12 at ML0084823).  The announcement did not say, or suggest, that Merrill Lynch and Bank of America's financing was not conditioned on completion of satisfactory due diligence.

---

[20] The parties have agreed to the bracketed correction to the original trial transcript, which states "any competing bidder would up having to agree . . . ." (Trial Tr. 341:3-4).

187.     Merrill Lynch and Bank of America's December 5, 2005 commitment letter was expressly conditioned on "the opportunity to conduct, and Guidant [having] cooperated reasonably in the conduct of, a customary legal, regulatory, tax, environmental, accounting and business due diligence investigation of Guidant and its subsidiaries."  (Kury Ex. 11 at GDT 00113142).

188.     In its analysis of the commitment letter, Skadden advised Guidant that the due diligence condition was "a customary condition given the lenders have not had access to Guidant for any due diligence.  We should be clear to [Boston Scientific] that we expect their lenders' diligence to be completed along with their own prior to signing and this condition to be eliminated in an amended commitment letter."  (Strain Ex. 6 at GDT 00346207).

189.     On January 5, 2006, Skadden sent J&J a collection of documents sent to Guidant by Boston Scientific, including a draft of Merrill Lynch and Bank of America's financing commitment letter, including the condition to financing that the lenders must have the opportunity to conduct customary due diligence.  (DX0219 at JJE00163567).

190.     When Merrill Lynch and Bank of America issued an amended commitment letter on January 8, 2006 in connection with Boston Scientific's firm offer, the due diligence condition had been eliminated, consistent with Skadden's advice to Guidant.  (DX0213).

191.     J&J has suggested that Merrill Lynch and Bank of America were entitled to due diligence information only because in addition to being lenders, both were retained as "financial advisors" (in Bank of America's case, its affiliate Banc of America Securities was retained, not Bank of America, N.A.) and therefore fell within the enumerated terms in the definition of Representatives in Section 4.02.  (E.g., Trial Tr. 1016:8-9 (Mulaney Recross)).

192.     J&J's attempted rationalization of its double-standard (complaining about

providing due diligence materials to Abbott, but not to Boston Scientific's lenders) ignores the

fact that while Merrill Lynch and Bank of America (at least when conflated with its affiliate)

were perhaps acting in multiple capacities in connection with the transaction (see Trial Tr.

548:20-549:5 (Hartman Cross)), the customary due diligence information provided to satisfy the

condition of Merrill Lynch and Bank of America's commitment letter was provided to those

parties in their capacities as financing sources for the transaction, which is clear both from the

plain terms of the commitment letter (Kury Ex. 11) and from the advice Skadden provided to

Guidant about furnishing due diligence pursuant to the commitment letter (Strain Ex. 6).

193.     J&J has not met its burden of proving that Abbott was not entitled to receive due

diligence as a "Representative" under Section 4.02(a) of the Merger Agreement.

### B.     Guidant Provided Sufficient Notice of Abbott's Takeover Proposal

194.     As the Court has noted, Section 4.02(c) includes certain notice obligations.

"[U]pon Guidant's receipt of a party's Takeover Proposal, Section 4.02(c) obligated it to

'promptly advise [J&J] orally and in writing . . . of . . . the material terms and conditions.'"

Johnson & Johnson, 2014 WL 3728598, at *21.  The Merger Agreement does not define what

constitutes "prompt" notice of a competing Takeover Proposal.

195.     Boston Scientific announced on December 5, 2005 when it made its Takeover

Proposal that it was prepared to seek a divestiture partner for certain Guidant businesses.  (Best

Ex. 12).  Guidant was not aware at the time that Abbott would ultimately be the divestiture

partner on Boston Scientific's Takeover Proposal.

196.     Guidant did not learn until December 20, 2005 that Boston Scientific had elected

to proceed with Abbott as the potential divestiture buyer.  (Best Ex. 18).  Abbott's due diligence

review was conducted and completed by December 30, 2005.  (Gunther Dep. 128:10-129:18).

One week later, on January 8, 2006, Boston Scientific and Abbott signed the BSC-ABT

Transaction Agreement to specify the terms for their agreement to acquire Guidant.  (JPS ¶ 36).

On January 8, 2006, Guidant announced Abbott's involvement to J&J.

197.    This notice was sufficiently prompt.  J&J bargained for a "last look" in the event

that a competing bidder challenged J&J's $63 per share bid.  (DX0167 (Mulaney Direct) ¶ 30

("In my view, J&J had bargained for the right to get a 'last look' – that is, if Guidant received a

'Takeover Proposal' that could lead to a 'Superior Proposal,' J&J would be given adequate

information about the offer so it could decide, before Guidant could terminate the Merger

Agreement, whether to increase its own price.")).  To this end, the Merger Agreement provided

that J&J would receive notice of a competing bidder, should one appear, so that J&J would have

the opportunity to consider increasing its own bid.  As Deyo testified, Section 4.02 of the Merger

Agreement was structured so that when a competing proposal was submitted, J&J would have a

five-day waiting period to "collect [its] thoughts" and contemplate making a competing bid of its

own.  (Trial Tr. 129:3-7 (Deyo Cross)).  Townsend similarly understood that the five-day waiting

period was designed "to give J&J an opportunity to respond with a counterbid."  (Trial Tr.

325:10-13 (Townsend Cross)).  If J&J decided after the five-day waiting period that it did not

want to submit a competing bid, it would be entitled to a "significant" termination fee.  (Trial Tr.

129:8-16 (Deyo Cross)).

198.    That is precisely what happened, and that is precisely what J&J bargained for.

J&J had more than a month (from December 5, 2005 to January 9, 2006) to formulate its strategy

for responding to Boston Scientific's competing bid.  The fact that Boston Scientific announced

that its specific divestiture would be to Abbott on January 9, 2006 did not cause any damages to

J&J, and did not cause any prejudice to J&J's bidding strategy.  In fact, J&J has admitted that it would not have behaved any differently if Abbott's involvement and receipt of due diligence had been announced at an earlier date.  (Weldon Dep. 58:14-59:23; Deyo Dep. 145:7-13, 146:6-8).

199.    The phrase "promptly advise" is not defined in the Merger Agreement.  Indiana courts typically require prompt notice to occur within a reasonable amount of time.  Askren Hub States Pest Control Servs., Inc. v. Zurich Ins. Co., 721 N.E.2d 270, 278 (Ind. Ct. App. 1999) (finding that "'promptly notified' means notice within a reasonable time").  The amount of time that is "reasonable" depends upon the circumstances of the case, and the purpose for which the notice was required.  Oxford Fin. Grp., Ltd. v. Evans, 795 N.E.2d 1135, 1143 (Ind. Ct. App. 2003).  The purpose of the Section 4.02(c) notice provision was to permit J&J adequate time to respond to a competing Takeover Proposal—to give J&J a "last look."  The "promptly advise" provision was not intended to prevent access to due diligence materials or to otherwise impede a competing Takeover Proposal, which would have been inconsistent with Guidant's expressed intent that it be permitted to consider unsolicited Takeover Proposals.

200.    It is undisputed that Guidant did not breach its obligations to promptly advise J&J orally and in writing of the material terms and conditions of Boston Scientific's Takeover Proposal, which Boston Scientific publicly announced would involve a divestiture of Guidant's assets.  Guidant notified J&J upon learning of Boston Scientific's competing bid for Guidant.  This was more than sufficient time for J&J to adequately consider the competing Takeover Proposal and prepare its own counter-bid.

201.    Even if a Takeover Proposal were considered to have occurred on the date that Abbott signed the Accession Agreement, Guidant still would not have breached its obligations to promptly advise J&J orally and in writing of the material terms and conditions of Abbott's

Takeover Proposal.  Guidant notified J&J just one day after Boston Scientific and Abbott signed the BSC-ABT Transaction Agreement, and approximately two weeks after receiving Abbott's initial inquiry about Guidant's business.  This was more than sufficient time for J&J to adequately consider the competing Takeover Proposal and prepare its own counter-bid within a reasonable timeframe.  In any event, J&J was aware on December 5, 2005 of Boston Scientific's Takeover Proposal, including the price to be offered for Guidant, and that a divestiture buyer was contemplated.  And J&J was in fact able to formulate and make <u>two</u> bids for a "superior proposal," while producing no evidence whatever that these would have been any different if it had known Abbott's identity any sooner.

### C. Cooperating with the FTC's Regulatory Review of Boston Scientific's Proposed Transaction Was Not a Breach

202.    In its proposed amended complaint, J&J alleged that Guidant "breached Section 4.02(a) of the Merger Agreement by providing confidential information . . . to the FTC in connection with the Boston Scientific's [*sic*] proposal to acquire Guidant."  (Prop. Am. Compl. at ¶ 83).  J&J has alleged that Guidant was not permitted to provide any information to the FTC because doing so would "facilitate regulatory approval of Boston Scientific's Takeover Proposal," and the FTC was not a "Representative" of Boston Scientific.  (Prop. Am. Compl. ¶ 59).

203.    FTC review is conducted "[t]o prevent business practices that are anticompetitive or deceptive or unfair to consumers."[21]

---

[21] FTC Mission Statement, Federal Trade Commission (last visited Jan. 14, 2015) http://www.ftc.gov/about-ftc.

204.    There is no contemporaneous evidence or testimony indicating that the prohibitions of Section 4.02 extended so far as to bar Guidant from responding to requests from the FTC.

205.    The Merger Agreement explicitly provides that Guidant would have the ability to execute its "superior offer" out by addressing "all financial, legal, [and] regulatory" aspects of a proposal that it deems to be a "Superior Proposal." (Kury Ex. 9 at SA 00026226-7).  As J&J knew from its own experience in obtaining FTC approval for its earlier transaction, this necessarily includes responses to the FTC.  J&J's suggestion that Guidant had contracted away the right to respond to regulatory agencies such as the FTC is insupportable.

**D.      Guidant's Entry into Joint Defense Agreements Did Not Breach the Merger Agreement Because Such Agreements Were Customary and Preserved Confidentiality**

206.    J&J has claimed that "Guidant entered into a joint defense agreement with Boston Scientific and Abbott to strategize about how to obtain FTC approval of a merger between Boston Scientific and Guidant" and has questioned whether such action was allowed under the Merger Agreement  (Trial Tr. 14:1-5 (J&J Opening); J&J Opening Demonstrative at 33 (item 6)).

207.    While Boston Scientific, Abbott and Guidant did, on February 2, 2006, sign a written joint defense agreement, memorializing prior oral agreements, (DX0166 (Kury Direct) ¶ 120), any JDAs were permissible under the Merger Agreement.  And there is no question that the written JDA, which was executed *after* the Merger Agreement was terminated, was not a breach.

208.    Section 4.02(a) allowed Guidant to facilitate (via negotiations and furnishing information) a Takeover Proposal reasonably likely to lead to a Superior Proposal, pursuant to a customary confidentiality agreement.  A JDA, which "partakes of the nature of a confidentiality

agreement" (Trial Tr. 1013:19-20 (Mulaney Recross) is allowable under 4.02(a) and entirely expected given the antitrust concerns at issue.  The JDA provided a mechanism to enhance confidentiality by restricting the disclosure of sensitive information to particular employees or groups of each party.  (Trial Tr. 1370:25-1371:21 (John Redirect)).

209.    The JDA did not violate Section 4.02(b) of the Merger Agreement's prohibition on Guidant entering into "Acquisition Agreements" (such as letters of intent, memoranda of understanding, agreement in principal, merger agreement, acquisition agreement, etc.).  The JDA was meant to protect privileged and sensitive information, and thus constituted a "confidentiality agreement,"  (Trial Tr. 1013:19-20 (Mulaney Recross)), that was expressly exempted by Section 4.02(b) from the definition of Acquisition Agreements.

## II.    J&J Has Not Met Its Burden To Prove that Any Alleged Breach Was Wilful

210.    Even if J&J were to prove that Guidant breached the Merger Agreement, it can recover only if it also proves that Guidant's breach was wilful.  J&J bears the burden of demonstrating that the breach was "wilful," as this is an element of its breach of contract claim. (JPS ¶ 53).  For a breach to be "wilful" under Section 7.02 of the Merger Agreement, the breaching party must act with knowledge that a breach would ensue.  Johnson & Johnson, 2014 WL 3728598, at *15.

211.    J&J has presented no direct evidence of wilfulness—that is, no evidence that Guidant provided due diligence to Abbott with "knowledge that a breach would ensue" from its conduct.  See Johnson & Johnson, 2014 WL 3728598, at *15.  To the contrary, the evidence shows that Guidant acted in good faith.  Guidant was aware of its contractual obligations to J&J and was careful to honor them.  Kury testified:

> I think we were, at all times, mindful of the requirements of the Johnson & Johnson agreement. . . .

THE COURT:  What's your basis for saying that?

THE WITNESS:  My basis for saying that is that I think throughout the process, both I and Skadden Arps were always mindful of the fact that we had agreements with Johnson & Johnson, and we didn't want to take any action which would present any risk of a violation because that could have serious consequences for us.  So that was always the background against which the other things were being evaluated.

(Trial Tr. 1094:25-1095:10 (Kury Cross); see also DX0166 (Kury Direct) ¶ 2 ("I do not believe that Guidant breached the Merger Agreement with J&J.  At no point in time during the course of my involvement in Guidant's merger and sale discussions did I ever believe that Guidant breached the Merger Agreement.")).

212.    After J&J accused Guidant of wilful breach of the Merger Agreement, Guidant waived privilege with respect to Skadden's legal advice, and fully disclosed Skadden's advice and the otherwise privileged communications of its general counsel.  This voluminous document discovery, days of lawyers' depositions and testimony at trial, yielded J&J no evidence at all indicating that Guidant provided due diligence to Abbott with the knowledge that it was breaching the Merger Agreement.  Significantly, despite hundreds of e-mails and other communications related specifically to Abbott's due diligence and the restrictions placed on it by Guidant's antitrust counsel, there is not a single document suggesting that anyone at Skadden or Guidant even had a concern—let alone knew or believed—that providing Abbott due diligence was a violation of the Merger Agreement.

213.    In fact, Guidant's contemporaneous internal—and at the time, privileged—documents further demonstrate that Guidant did not view its actions as a breach.  In an e-mail dated January 23, 2006, Kury wrote to Mulaney and Duwe that J&J's expressed concern was "so lame, not only on the merits but also because JNJ will never get the [shareholder] vote to approve its $71 offer."  (Kury Ex. 83).

96

214.     If Guidant had had any concern about whether it had breached the Merger Agreement, it could have addressed that issue in its negotiation and amendment of the Merger Agreement in connection with J&J's increasing bids in January 2006.  Mulaney testified:  "if Bernie Kury thought someone was making allegations about possible breaches of a merger agreement, those possible breaches would have been addressed in the process of amending the merger agreement on January 11th or January 13th."  (Trial Tr. 920:13-17 (Mulaney Redirect)).

215.     Even accepting J&J's account—contrary to all other evidence—that J&J raised concerns on its January 9 call with Kury that furnishing information to Abbott was a possible breach, Deyo's testimony acknowledges that Guidant itself did not think it had breached the Merger Agreement:  Deyo testified that Kury was "surprised" and "taken aback" on the January 9 call.  (Trial Tr. 127:4-7 (Deyo Cross)).

### A.     Guidant Reasonably Relied on Skadden's Advice

216.     Any alleged breach by Guidant could not have been "wilful" because Guidant relied in good faith on the advice of its outside counsel, Skadden, in determining that Abbott was entitled to due diligence as a "Representative" of Boston Scientific under the Merger Agreement.  Specifically, Guidant reasonably relied on Skadden's advice that Guidant could allow financing sources and third-party divestiture candidates to conduct due diligence, and that it did not have to disclose Abbott's identity to J&J before Abbott entered into the Transaction Agreement on January 8.

217.     Reasonable reliance on the advice of counsel, if it is based on non-frivolous advice and is informed by the necessary relevant facts, negates wilfulness.  See Martin v. Monumental Life Ins. Co., 240 F.3d 223, 239 (3d Cir. 2001) (no "wilful" breach of a contract because the defendant had a "good faith" belief that he was not in breach, informed in part by the fact that his "attorney advised him that he was justified in ceasing performance"); Hamilton

97

Cnty. Bank v. Hinkle Creek Friends Church, 478 N.E.2d 689, 691 (Ind. Ct. App. 1985)

(reversing punitive damages award in part because "the fact that a party procures and acts upon

the advice of an attorney is competent evidence tending to rebut malice and bad faith.").

218.     Even in Federal statutory contexts, where wilfulness may be established on a less

demanding showing than is required under the Merger Agreement, defendants' reliance on

advice of counsel negates wilfulness.   See, e.g., Lexion Med., LLC v. Northgate Techs., Inc., 292

F. App'x 42, 51 (Fed. Cir. 2008) (affirming the decision that plaintiff's showing of "willful"

patent infringement was negated by defendant's reliance on the oral opinion of counsel); Sony

Electronics, Inc. v. Soundview Techs., Inc., 2005 WL 1661696, at *8 (D. Conn. July 13, 2005)

(finding that the plaintiff had failed to prove "bad faith" in 35 U.S.C. § 285 patent attorney-fees

claim, where defendant had relied on counsel's advice regarding the reasonableness of its

investigation); Wi-Lan Inc. v. LG Electronics, Inc., 2013 WL 2322483, at *7 (S.D.N.Y. May 10,

2013) (same).

219.     In evaluating reasonable reliance here, the Court need not find that Skadden's

advice was ultimately correct, provided that Guidant reasonably and honestly relied on it.   See

Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc., 1999 WL 108739, at *3

(S.D.N.Y. Mar. 3, 1999), aff'd sub nom. Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger

U.S.A., Inc., 205 F.3d 1323 (2d Cir. 2000) ("In many cases, courts have disagreed with counsel's

opinion in trademark infringement matters, but not found defendants to have acted in bad

faith.").

220.     The familiarity of the defendant's counsel with the factual predicates relating to

the legal question on which it advised the defendant—for example, Skadden's familiarity with

M&A in general, and the Merger Agreement in particular—weighs in favor of finding reasonable

reliance. See Q–Pharma, Inc. v. Andrew Jergens Co., 360 F.3d 1295, 1302 (Fed. Cir. 2004)

(finding that counsel's personal familiarity with underlying issues weighed in favor of finding

reasonable reliance on the advice of counsel, and rendered a more formal analysis unnecessary);

Windsurfing Int'l, Inc. v. Fred Ostermann GmbH, 668 F. Supp. 812, 815 (S.D.N.Y. 1987)

(finding that reliance on advice of counsel rebutted allegation of wilful patent infringement

where counsel "was intimately knowledgeable as to both the history of the [plaintiff's] patent

proceedings and the legal issues involved"; "a formal, written legal opinion" was unnecessary).

221.    Where the advice of counsel addresses a close legal question, courts generally

find a defendant's reliance on the advice in issue to be reasonable.  See, e.g., Sands, Taylor &

Wood Co. v. Quaker Oats Co., 978 F.2d 947, 962 (7th Cir. 1992) ("A party who acts in

reasonable reliance on the advice of counsel regarding a close question of trademark law

generally does not act in bad faith.") (emphasis added); Int'l Star Class Yacht Racing Assoc. v.

Tommy Hilfiger U.S.A., Inc., 1999 WL 108739, at *2 (S.D.N.Y. March 3, 1999) (defendant had

not infringed trademark in bad faith, where it acted on advice of counsel and the legal issue

addressed "was a 'close question'"), aff'd sub nom. Int'l Star Class Yacht Racing Ass'n v.

Tommy Hilfiger U.S.A., Inc., 205 F.3d 1323 (2d Cir. 2000).

222.    Even where reliance on advice of counsel can negate an element of the plaintiff's

prima facie case, the burden of proof always remains on the plaintiff.  See Indianapolis Traction

& Terminal Co. v. Henby, 97 N.E. 313, 318 (Ind. 1912) (in the malicious prosecution context,

"[w]hile it might be necessary for the defendant to introduce evidence of acting under the advice

of counsel in order to obtain the benefit of that defense, such duty to introduce evidence does not

shift the burden of proof to the defendant."); Int'l Star Class Yacht Racing Assoc. v. Tommy

Hilfiger U.S.A., Inc., 1999 WL 108739, at *4 (S.D.N.Y. Mar. 3, 1999), ("plaintiff has not carried

its burden of proving by a preponderance of the evidence that defendant acted in bad faith" where the defendant acted on the advice of counsel), aff'd sub nom. Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 205 F.3d 1323 (2d Cir. 2000).

223.    Here, J&J has not carried its burden of proving wilfulness because the evidence shows that Guidant reasonably and honestly relied on Skadden's advice.  Kury testified:  "I never had any reason to doubt the bona fideness and diligence, knowledge and competence of Skadden."  (Trial Tr. 1125:19-20 (Kury Cross)).

224.    As of December 2005 when Boston Scientific made its announcement, Kury had been personally working with Mulaney and Skadden for "about 16 months," and Kury regarded Mulaney as "a wonderful lawyer.  I was happy to have him.  I felt very comfortable with him. . . .  He always steered me in the right direction, so far as I could tell, and I built up a lot of confidence in him."  (Trial Tr. 1223:5-16 (Kury Redirect)).  Kury testified that Skadden and Mulaney had never given him any reason to doubt their advice.  (Trial Tr. 1223:17-19 (Kury Redirect)).

225.    Guidant was particularly reliant on Skadden's advice because Guidant had a relatively small in-house legal department:

Q. . . .  How large was your law department in December of 2005?

A.  It was roughly 25 [lawyers], but the vast majority of them were not at headquarters.  I was at headquarters in Indianapolis, and Guidant had a decentralized corporate structure.  And most of the business operations were handled by subsidiaries who were located elsewhere, in particular, in St. Paul and Minneapolis and also out on the West Coast, and most of the lawyers were assigned to those subsidiaries.  They reported directly to the CEO of the subsidiary.  Most of them, maybe all of them, only had a dotted-line connection to me.  In Indianapolis, I don't remember exactly, there may have been something like four or five lawyers, but even there, they weren't people who were necessarily available to me to do work on things such as this Johnson & Johnson merger.  They may have been there because they were lawyers for the HR department or something of that kind.  And by the time of December 5, I don't

think there was anybody there that I thought would be of any significant help to
me in analyzing and dealing with the issues that were arising.

(Trial Tr. 1223:21-1224:17 (Kury Redirect)).

226.    Skadden understood that Guidant was relying on it.  Mulaney testified that he

understood that Guidant was looking to Skadden to provide it with legal advice, and Mulaney

took that obligation "very seriously."  (Trial Tr. 911:12-21, 928:25-929:2 (Mulaney Redirect)).

Mulaney testified that he would have brought to Guidant's attention any doubt about whether

Guidant was fulfilling its obligations to J&J, and he understood that Guidant was "counting on"

Skadden to do that.  (Trial Tr. 912:4-14; 929:3-6 (Mulaney Redirect)).

227.    Skadden was fully informed of the terms of the Merger Agreement and the J&J-

Guidant Confidentiality Agreement, having negotiated the terms of the merger in December

2004, and then re-negotiated them in November 2005 (see DX0167 (Mulaney Direct) ¶¶ 4-8),

and having prepared the initial draft of the J&J-Guidant Confidentiality Agreement in 2004 (see

id. ¶ 7).  Since Skadden had been responsible for negotiating the "superior offer out" provision,

which permitted Guidant to respond to competing Takeover Proposals, they were familiar with

the purpose and intent of the provision.  See Q–Pharma, Inc. v. Andrew Jergens Co., 360 F.3d at

1302; Windsurfing Int'l, 668 F. Supp. at 815.  Kury, in turn, was aware of Skadden's

competence in this key area, and relied on Skadden at all times to ensure compliance with the

specific details of this provision:

> I thought I had the best law firm in the world that would advise me on this, not
> only because of their preeminence but because they'd been involved every step of
> the way for 16 months and worked on, negotiated and drafted all the relevant
> agreements, and I thought that they were in the best possible position to give me
> advice that I could rely on.

(Trial Tr. 1103:18-24 (Kury Cross)).

101

228.     Fully informed of the terms of the Merger Agreement and Boston Scientific's

desire to provide due diligence materials to Abbott, Skadden concluded and advised Guidant that

it was permitted under the Merger Agreement to provide due diligence materials to Abbott.:

> A.  I can tell you that I was advised by Mr. Mulaney very clearly that we could do
> this.  My understanding at the time was, and always was throughout the
> transaction, that the basis of reliance was it's Skadden's view that Boston and its
> divestiture partners and financing sources could be provided with information,
> and in the case of Abbott or Bank of America, the basis was that they were
> representatives.
>
> THE COURT:  Do you remember him saying that in December?
>
> THE WITNESS:  I cannot say in conversation or conversations with him that he
> specifically said, "And I'm telling you, Bernie, they're representatives," but that
> was the clear message I was taking away from the conversation.
>
> THE COURT:  You had that kind of familiarity with the agreement?
>
> THE WITNESS:  Yes.
>
> THE COURT:  You were focused on the language of 4.02?
>
> THE WITNESS:  Yes.

(Trial Tr. 1096:22-1097:14 (Kury Cross); see also Trial Tr. 782:23-783:24, 805:4-807:22

(Mulaney Cross)).

229.     The record is clear that Kury relied heavily on Skadden's expertise, resources, and

advice —in part because of Skadden's outstanding reputation, in part because of the confidence

Kury developed in course of their 16-month working relationship, in part because of Skadden's

role in negotiating and drafting Guidant's agreements with J&J, and in part because Guidant's

small legal department required Kury to rely on his team of outside counsel.  (DX0166 (Kury

Direct) ¶¶ 4–5; Trial Tr. 1103:18-24 (Kury Cross); 1223:5-19 (Kury Redirect); 1224:7-11 (Kury

Redirect)).  But the record is also clear that Kury personally focused on the language of Section

4.02 during this period of time.  For example, in response to a Morgan Stanley e-mail about the

possibility of having discussions with Boston Scientific on January 12, after Guidant had

renegotiated an amendment to the Merger Agreement the day before, Kury wrote to Morgan

Stanley and others at Guidant:

> [T]he basic rule is very simple and clear:  Thou shall not "directly or indirectly …
> solicit, initiate or knowingly encourage, or take any other action designed to, …
> facilitate, any Takeover Proposal…."  Merger Agreement Section 4.02.  If and
> when BSX submits another written proposal, the rules loosen somewhat.

(DX0188).

230.    Kury testified that he would not have provided information to anyone, including

Abbott, without getting Skadden's advice.  (Trial Tr. 1246:15-18 (Kury Redirect)).  Kury was

"absolutely sure" that he got Skadden's advice before giving information to Abbott, "based on

the way I do things."  (Trial Tr. 1246:19-24 (Kury Redirect)).

231.    Kury explained in addition to Mulaney's advice that Guidant could furnish due

diligence information to Abbott, "Skadden was involved at every step of the way.  And in terms

of selecting the due diligence, getting it over to them, putting any appropriate legends on them

for antitrust purposes.  They were throughout acting as if this was completely proper and not a

problem."  (Trial Tr. 1107:10-16 (Kury Cross); see also 1108:15-18 ("[P]roviding these

documents with the blessing and help of Skadden made it clear to me that they were on board,

fully on board with this process of providing information . . . .")).

232.    Skadden also advised Kury that it was not necessary to disclose Abbott's identity

to J&J at any time prior to when Abbott's identity was in fact disclosed to J&J:  "Up until the

time the disclosure was made, my understanding based on a conversation at some point with Mr.

Mulaney, is that it was not necessary to disclose Abbott to that point to Johnson & Johnson under

those provisions."  (Trial Tr. 1128:17-20 (Kury Cross)).  "They [Skadden] were comfortable that

we did not need to disclose it prior to the time that we did."  (Trial Tr. 1132:6-7 (Kury Cross);

see also Trial Tr. 870:15-19 (Mulaney Cross) ("I'm very clear at the time I didn't think there was

any requirement to give Johnson & Johnson notice of possible divestiture purchasers because I

did not think it a material term or material change in the Boston Scientific proposal.")).  Nothing

in the Merger Agreement required disclosure of a party's Representatives.  (See Kury Ex. 9 at

SA 00026228).

233.    Contemporaneous written evidence reflects Skadden's judgment that disclosure of

Abbott's identity was not required at the time.  Handwritten notes of a Skadden attorney from a

December 14, 2005 conference call listing Kury and Mulaney as participants, state next to the

initials "CM":  "Want thinking on buyers—whether names need to be disclosed to J&J /

preliminarily don't think we need to disclose."  (DX0218).  Mulaney testified that these notes are

"consistent with [his] belief at the time."  (Trial Tr. 980:25-981:1 (Mulaney Redirect)).

234.    Mulaney testified unequivocally that he never had "any doubt as to whether

Guidant was acting consistently with its obligations under the merger and other agreements for

Johnson & Johnson."  (Trial Tr. 910:13-17 (Mulaney Redirect); see also Trial Tr. 1101:5 (Kury

Cross) ("I don't think he thought it was a close question" whether Guidant could furnish

information to Abbott)).[22]

235.    Mulaney testified that when he received a letter from J&J on January 23, 2006

suggesting a possible violation of the Merger Agreement, his "fundamental reaction to that letter

---

[22] Even assuming that Skadden and Guidant were incorrect in their view that Guidant was
uncontroversially entitled to furnish information to Abbott as a Representative of Boston
Scientific under the Merger Agreement, the issue was, at a minimum, a sufficiently close
question that Kury could reasonably rely on Skadden's advice, for the reasons set forth in
paragraphs 157 to 209.  See, e.g., Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947,
962 (7th Cir. 1992) ("A party who acts in reasonable reliance on the advice of counsel regarding
a close question of trademark law generally does not act in bad faith." (emphasis added)).

was one of disbelief and surprise and shock." (Trial Tr. 1034:3-4 (Mulaney Redirect)). The following day, on January 24, Mulaney advised the Guidant board that he considered the letter "without merit" and thought the timing of the letter—essentially on the eve of termination of the Merger Agreement, after J&J had twice increased its bid for Guidant rather than seeking enforcement of its $63 per share offer—"undercut the credibility of the concerns expressed in the letter." (Trial Tr. 927:19-928:3 (Mulaney Redirect)). Mulaney did not undertake any formal legal research or prepare a formal written opinion because he did not consider it necessary: "I had negotiated the agreement, and I believed I understood its intent and provisions and I had [advised] Guidant, in accordance with that set of provisions, to act in compliance with them." (Trial Tr. 928:4-16 (Mulaney Redirect)).

> Q. If you had had any doubt about whether or not Guidant had complied with all of its obligations to Johnson & Johnson, would you have told the Guidant board of those doubts?
>
> A. Yes, I would have.
>
> Q. Did you express any doubt at all to the Guidant board as to your conclusion that Guidant had not violated any of the obligations of Johnson & Johnson?
>
> A. I did not.
>
> Q. How seriously did you take your role as advisor, legal advisor to the Guidant board?
>
> A. Very seriously.
>
> Q. And did you understand that the Guidant board and the Guidant general counsel were depending on you for your legal advice in this area?
>
> A. Yes, I did.

(Trial Tr. 928:17-929:6 (Mulaney Redirect)).

### B.   None of J&J's "Circumstantial Evidence" Suggests That Guidant Wilfully Breached the Merger Agreement

236.   J&J can point to no documents or testimony to contradict the evidence that (1) Kury was advised by Skadden that Guidant was permitted to furnish due diligence to Abbott, (2) Kury relied on Skadden's advice, and (3) Kury did not believe that Guidant's actions breached the Merger Agreement.  Tacitly acknowledging that it lacks any direct evidence of wilfulness, and asking the Court to discredit Guidant's direct evidence of its good faith and reliance on Skadden's advice, J&J relies on what it claims to be "circumstantial evidence" of Guidant's wilful breach.  (Trial Tr. 7:2-11 (J&J Opening)).  As detailed below, none of J&J's putative "circumstantial evidence" supports its claim.

### 1.   J&J Wrongly Asserts a Lack of Evidence Corroborating Mulaney's Advice to Kury

237.   J&J has claimed that there is "No evidence corroborating Mulaney's claim that he advised Kury that providing diligence to Abbott was permissible under the Merger Agreement." (Trial Tr. 14:1-5 (J&J Opening); J&J Opening Demonstrative at 33 (item 1)).  J&J is wrong. Moreover, that Skadden did not prepare a formal written opinion or memo is hardly surprising, given that Skadden did not consider it a controversial or difficult question—even after J&J raised the issue in Deyo's January 23, 2006 letter.

238.   The record contains myriad examples of corroborative written advice from Skadden that it was permissible to provide diligence to Abbott.  (See Trial Tr. 1143:4-14 (Kury Cross) (understanding that Skadden's legal advice was implicit in its provision of written correspondence for signature); Trial Tr. 1226:4-18 (Kury Redirect) ( "[w]hen Skadden drafted [a] document and presented it . . . to sign," Kury's "clear understanding" was that "Skadden was advising [him] that this was an appropriate document for [him] to sign")).  Such evidence includes:

a.  A December 6, 2005, letter drafted by Skadden for Kury to transmit to J&J to notify J&J that "Guidant will, pursuant to a customary confidentiality agreement not less restrictive to Boston Scientific than the confidentiality provisions of the Confidentiality Agreement (as defined in the Merger Agreement), furnish information to and participate in discussions and negotiations with Boston Scientific regarding its proposal."  (Mulaney Ex. 13 (Skadden draft); Kury Ex. 12 (executed letter));

b.  Skadden, on December 7, 2005 requesting that Kury sign the signature page to the BSC-Guidant Confidentiality Agreement, to be held in escrow prior to its finalization, and then subsequently confirming that Skadden was "OK" with BSC's request to "add to the term 'Representatives'" potential divestiture purchasers, so long as the divestiture parties were also required to sign a confidentiality agreement (Duwe Ex. 1);

c.  A December 9, 2005, letter drafted by Skadden for Kury to transmit to J&J to notify J&J that Guidant "executed a confidentiality agreement with Boston Scientific consistent with our obligations under the Merger Agreement" (Mulaney Ex. 14 (Skadden draft); Kury Ex. 14 (executed letter));

d.  Written advice from Skadden, on December 12, 2005, that Guidant should require Boston Scientific's lenders to complete their due diligence of Guidant prior to signing a merger agreement (Strain Ex. 6 at GDT 00346207 ¶ 3);

e.  Handwritten notes of a December 14, 2005 teleconference with Kury reflects that Skadden, and Boston Scientific counsel "preliminarily don't think we need to

disclose" the names of divestiture buyers to J&J (DX0218 at SS 00039976; <u>see also</u> Trial Tr. 978:20-981:2 (Mulaney Redirect));

f.  In anticipation of Guidant providing Abbott with due diligence information, December 21, 2005, "due diligence ground rules" prepared and provided by Skadden to Kury, evincing that Skadden's consideration of the issues surrounding the due diligence process was careful and thorough (DX0057; <u>see also</u> DX0166 (Kury Direct) ¶ 80.a);

g.  A December 21, 2005 message from Skadden to Kury, discussing certain sales projections, information related to clinical trials, and other information, stating that Skadden was "okay with this being presented to [Abbott], as [Boston's] Representative" (DX0178; <u>see also</u> DX0166 (Kury Direct) ¶ 80.b);

h.  A December 21, 2005, Skadden message to Kury outlining the highlights of a conference call with Abbott's counsel and stating among other things, "We agreed to have the Chicago data room scrubbed so anyone from [Abbott] could go in the room. Essentially, we will have two rooms – one with everything in it (that [Merrill Lynch] is in now) and another for [Abbott's] review" (John Ex. 20; <u>see also</u> DX0166 (Kury Direct) ¶ 80.d);

i.  A December 22, 2005 message from Skadden—in response to a query from Kury about complaints from Simpson Thacher (Abbott's counsel) and Merrill Lynch that the flow of due diligence information was "quite constricted"—providing "two choices" to allow for the provision of diligence to Abbott  (Kury Ex. 72; <u>see also</u> DX0166 (Kury Direct) ¶ 80.e);

j.   A December 23, 2005 message from William McConnell of Guidant, copying

numerous Skadden attorneys, summarizing the due diligence information that

Guidant had provided to Abbott, explaining that "We could not have done all that

got done without tremendous help and hospitality from Skadden" (Kury Ex. 72;

see also DX0166 (Kury Direct) ¶ 80.f).

239.    Skadden's active involvement and direct participation in facilitating Abbott's

diligence are further evidence that it told Kury by word and action that it was appropriate to

provide such materials to Abbott.  As Kury testified, "Skadden was involved at every step of the

way.  And in terms of selecting the due diligence, getting it over to them, putting any appropriate

legends on them for antitrust purposes.  They were throughout acting as if this was completely

proper and not a problem."  (Trial Tr. 1107:10-16 (Kury Cross); see also 1108:15-18

("[P]roviding these documents with the blessing and help of Skadden made it clear to me that

they were on board, fully on board with this process of providing information . . . ."); 1108:2-5

("[T]hey were heavily involved throughout, and I don't think they would have been heavily

involved throughout, your Honor, if they thought this wasn't permitted.").

240.    Kury and Mulaney had near-daily telephone communications following Boston

Scientific's proposal.  (Trial Tr. 1225:6-9 (Kury Redirect); DX0167 (Mulaney Direct) ¶ 25;

DX0166 (Kury Direct) ¶ 50)).  Though Skadden occasionally provided formal memos to

Guidant, the legal advice conveyed in these calls was "not often" the subject of written analysis.

(Trial Tr. 1103:9 (Kury Cross)).  This was the case regarding Skadden's advice that diligence

could be provided to Abbott, which Kury believed to be a basic "go/no-go decision" that did not

require a written opinion.  (Trial Tr. 1103:7-13 (Kury Cross)).  Kury believed Mulaney did not

think the matter was a close question, but rather that "it was very much OK."  (Trial Tr. 1100:23-

1101:8 (Kury Cross)).  Kury trusted that Skadden's oral advice could be relied on not only

because Skadden was "the best law firm in the world" to address the issue, but also because

Skadden had "been involved every step of the way for 16 months and worked on, negotiated and

drafted all the relevant agreements."  (Trial Tr. 1103:16-24 (Kury Cross)).

### 2.  Kury Signed the Boston Scientific–Guidant Confidentiality Agreement Based on Skadden's Reasonable Advice

241.    J&J has claimed that "Kury signed the BSC-GDT Confidentiality Agreement,

though it was obviously less restrictive than the confidentiality provisions of the J&J-Guidant

Confidentiality Agreement."  (Trial Tr. 14:1-5 (J&J Opening); J&J Opening Demonstrative at 33

(item 2)).

242.    First, J&J is simply wrong that the Boston–Guidant Confidentiality Agreement is

less restrictive than the J&J-Guidant Confidentiality Agreement—much less "obviously" less

restrictive.  J&J's argument is focused on the addition of the terms "financing sources" and

"potential purchasers of assets to be divested" to the definition of "Representatives" in the BSC-

GDT Confidentiality Agreement.  The definition of "Representatives" is not among the

agreement's "confidentiality provisions." (DX0167 (Mulaney Direct) ¶ 8.a)).  Moreover, the

additional terms in the definition of Representatives in the BSC-GDT Confidentiality Agreement

do not expand the category of parties permitted to receive information, because the restrictions

on the category of parties permitted to receive information are set forth in a different place

altogether: namely paragraph 2 of both agreements.  Paragraph 2 provides that "The Information

will be used solely for the purpose of exploring possible negotiated business arrangements and

not for any other business or competitive purpose." (Kury Ex. 2; Kury Ex. 13).  In fact, the BSC–

GDT Confidentiality Agreement additionally provides that the Information may not be used "in

any manner that is detrimental to the other party" (Kury Ex. 13)—a restriction that is not

included in the J&J-Guidant Confidentiality Agreement (Kury Ex. 2).

243.    Moreover, Kury received written advice from Skadden that the language at issue

was acceptable.  In an e-mail on December 7, 2006, Duwe wrote to Kury about Boston

Scientific's proposed addition of "potential purchasers of the assets to be divested."  Duwe

advised:  "Ian [John] and Neal [Stoll] are OK with the addition to 'representatives' described and

the other changes are fine with me.  If you are ok with the changes, we will get it wrapped up."

(Duwe Ex. 1).

244.    On its face, Duwe's e-mail focused on the definition of "Representatives," adding

the modifier "reasonably acceptable to Guidant" to Boston Scientific's requested addition of

divestiture candidates.  (Duwe Ex. 1).  While J&J attempts to limit this advice to mean that only

"Skadden's antitrust lawyers were okay with the addition of divestiture candidates."  (Trial Tr.

8:15-16 (J&J Opening)).  No witness agreed with J&J's strained interpretation of the e-mail.

(See Duwe Dep. 28:16-18 ("That's one way of interpreting those words, although I think you're

parsing it fairly finely."); Trial Tr. 762:4-12 (Mulaney Cross) ("Q.  It suggests that Mr. Duwe

was not opining on the addition from [a Section] 4.02 perspective, right?  A.  No, I don't agree

with that.  When a partner of Skadden, Arps sends the general counsel of a client a document

saying it's ready for signature, let's get it wrapped up, that communication indicates that

Skadden, Arps -- in this instance knowing Mr. Duwe, knowing my discussions with Mr. Duwe at

the time -- Mr. Duwe is telling Mr. Kury that Skadden approves this document and he can

execute it."); Trial Tr. 1070:6-10 (Kury Cross) ("I do think about these things, but I didn't think

that they were being cute here and trying to say, we're not expressing any opinion on the overall

advisability.  That would have been completely contrary to my working relationship with

Skadden."); see also Trial Tr. 1068:9-1069:3 (Kury Cross)).

245.    Although Kury could not recall specifically a conversation on this issue, he

recalled having a general sense of the reasoning why the changes were acceptable:

> I can't relate it to a specific conversation, but my general understanding was that Skadden thought that while the words were being added to the agreement, it did not change their understanding of what the scope of the agreement was, and it was a matter of making clear that that was how they interpreted the agreement.

(Trial Tr. 1063:18-23 (Kury Cross)); see also Trial Tr. 1071:6-11 ("They did not think

that by putting words in here they were in any way amending, modifying or changing

their obligations to Johnson & Johnson, and they were fully familiar with the Johnson

agreement.  And I felt comfortable that, given their expertise, I could rely on their

judgment for that.")).

246.    Kury also testified as to why it was "inconceivable" to him that Skadden had not

analyzed whether the proposed changes were consistent with the Merger Agreement:

> Q.  And you don't know if Skadden did any analysis to determine whether this change was consistent with the J&J merger agreement?
>
> A.  It's inconceivable to me that they did not. . . . given who they were . . . I thought I would have had, if they hadn't told me, every right to assume that they had done what they thought was necessary and that would have included, since they were fully familiar with all the agreements, making a determination that this language was sufficiently compliant or consistent, whatever, so that there would not be a problem with Johnson & Johnson and --
>
> Q.  But you don't know if they did any analysis, is that the answer to my question?
>
> A.  I think I could say I don't recall specifically someone telling me, yes, we've done the analysis, but I don't think that was a question I needed to ask.

(Trial Tr. 1071:12-1072:16 (Kury Cross)).

247.    Kury's expectation that Skadden had analyzed the BSC–Guidant Confidentiality

Agreement for compliance with the Merger Agreement was reasonable not only in light of

Kury's working relationship with Skadden and Skadden's role in the transaction, but also

because of letters Skadden drafted for Kury during this period:

a.    On December 6, 2005, Skadden drafted for Kury a letter dated as of December 7,

notifying J&J that the Guidant board had determined that Boston Scientific's

proposal was "reasonably likely to lead to a Superior Proposal" and stating:

"Guidant will, pursuant to a customary confidentiality agreement not less

restrictive to Boston Scientific than the confidentiality provisions of the

Confidentiality Agreement (as defined in the Merger Agreement), furnish

information to and participate in discussions and negotiations with Boston

Scientific regarding its proposal."  (Mulaney Ex. 13 (Skadden draft); Kury Ex. 12

(executed letter)).

b.    On December 9, 2005, Skadden drafted for Kury a letter notifying J&J that

Guidant "executed a confidentiality agreement with Boston Scientific consistent

with our obligations under the Merger Agreement."  (Mulaney Ex. 14 (Skadden

draft); Kury Ex. 14 (executed letter)).

248.    In short, nothing about the drafting and execution of the J&J-Guidant

Confidentiality Agreement supports J&J's claim of wilful breach.

**3.      Kury Signed the Addendum Based on Skadden's Reasonable Advice
That It Was Necessary to Address Antitrust Concerns and Was
Permissible**

249.    J&J has claimed that that Guidant's breach was wilful because "Kury signed the

Addendum agreeing not to disclose the identity of potential divestiture candidates even if

Guidant was required to do so by the Merger Agreement."  (Trial Tr. 14:1-5 (J&J Opening); J&J

Opening Demonstrative at 33 (item 3)).

250.    The Addendum was a document created to address antitrust concerns.  (Trial Tr.

1351:15-1352:5 (John Redirect) ("Q. As an initial matter, what was the motivation of the

addendum to the Boston Scientific Guidant confidentiality agreement? A. My understanding the

motivation was Boston was seeking certain information in due diligence that was competitively

sensitive Guidant information . . . . The purpose of the addendum was to set forth the metes and

bounds of how that competitively sensitive information would be exchanged such that the

exchange was done in a way consistent with Guidant's obligations under the antitrust laws.").  It

was a document drafted and negotiated by Skadden for Kury's signature, with the understanding

that Kury was relying on Skadden to ensure that the document was consistent with Guidant's

obligations under the antitrust laws and the merger agreement.  (Trial Tr. 1226:4-18 (Kury

Redirect) ("Q. With respect to the joint defense agreement and what was referred to as the

addendum and the accession agreement and the other documents that you were asked about, who

drafted those documents?  . . . . A. It would have always have been, so far as I can recall,

Skadden. Q. When Skadden drafted the document and presented it to you to sign, what was your

understanding of whether or not Skadden was advising you that this was an appropriate

document for you to sign? A. That was my clear understanding.").

251.    Mulaney testified as to why the Addendum did not create, in Skadden's view, a

conflict with the Merger Agreement:

> [T]he language [of the Accession Agreement] talks about a potential purchaser,
> not an actual purchaser, and until an actual purchaser agrees to be part of Boston
> Scientific's takeover proposal, it's not a material term of the Boston Scientific
> takeover proposal. . . . because their potential interest hasn't fundamentally
> changed Boston Scientific's proposal, which is their offering of consideration and
> they're seeking to find a divestiture purchaser.  Until someone becomes a

> divestiture purchaser, nothing material has changed in Boston Scientific's
> proposal.

(Trial Tr. 867:16-868:5 (Mulaney Cross)).

252.    Mulaney's testimony is consistent with the contemporaneous handwritten notes

from a December 14, 2005 conference call that included both Mulaney and Kury:  "Want

thinking on buyers—whether names need to be disclosed to J&J / preliminarily don't think we

need to disclose."  (DX0218).

253.    Kury testified to a similar understanding (though at trial—about nine years after

the fact—he did not recognize that the use of the term "potential purchaser" rather than "actual

purchaser" removed the risk of a "potential violation"):

> We would only have a potential violation if and when we thought we were
> obligated to disclose to . . . Johnson & Johnson the involvement of Abbott.  And
> my understanding was we never reached that point.  Up until the time the
> disclosure was made, my understanding based on a conversation at some point
> with Mr. Mulaney, is that it was not necessary to disclose Abbott to that point to
> Johnson & Johnson under those provisions.

(Trial Tr. 1128:13-20 (Kury Cross)).

254.    Skadden had not considered that issue of whether Abbott could be considered the

maker of a Takeover proposal at the time it was advising Guidant as to the Addendum, because it

had already reached the conclusion that Abbott was participating as a representative.  (See, e.g.,

DX0167 (Mulaney Direct) ¶ 31 ("I do not recall advising Mr. Kury in late December 2005 that

Abbott was permitted to receive due diligence because it was a person making a 'Takeover

Proposal' or part of such a person, because we never had to reach an answer to that question as

part of our analysis.")).

255.    Moreover, as Kury testified, Guidant retained the option to disclose Abbott's

identity if it ever concluded it had to do so under the Merger Agreement:

We had a choice.  We could have gone and gotten their consent, or we could have walked away.  We didn't have to proceed with Boston, and we weren't -- we didn't want to be in a position of being in default with Johnson & Johnson. . . . We had no intention or expectation that we would be violating the agreement with Johnson & Johnson, either because we would not have a legal disclosure obligation under our agreement, or if we thought we needed a legal -- we had a legal obligation to disclose, we could have gone to them and said, you have to consent to this or we can't do the deal with you.

(Trial Tr. 1134:13-1135:2 (Kury Cross) (emphasis added)).

### 4. The Accession Agreement Was Not Drafted or Executed To Provide a Basis Under Section 4.02 To Furnish Information to Abbott

256.    Kury did not believe that the Accession Agreement changed or affected Guidant's obligations under the Merger Agreement.  (Trial Tr. 1110:4-12 (Kury Cross)).  Thus, J&J's suggestion that the "retained . . . to advise" language of the Accession Agreement constitutes circumstantial evidence of Guidant's wilful breach has no support.  While J&J has characterized the Accession Agreement as a "sham," (Prop. Am. Compl. ¶ 14), there is no evidence to suggest that Guidant used the Accession Agreement to justify its provision of due diligence to Abbott or that anyone was deceived regarding Abbott's role in the transaction.

257.    J&J has claimed that "Kury signed the Accession Agreement falsely representing that Abbott had been retained as an advisor to Boston Scientific in connection with the Guidant Transaction.  Skadden told Abbott the language was 'non-negotiable.'"  ((Trial Tr. 14:1-5 (J&J Opening); J&J Opening Demonstrative at 33 (item 4)).  There is no evidence that anyone at Skadden or Guidant classified Abbott as an "advisor" to justify (falsely or otherwise) Abbott's receipt of due diligence under Section 4.02 of the Merger Agreement.

258.    The evidence shows that the language in the Accession Agreement stating that Abbott was "retained . . . to advise" Boston Scientific was not drafted or executed to provide a basis under Section 4.02 to furnish information to Abbott.  The "retained . . . to advise" language was initially drafted as part of an exhibit to the Addendum, more than a week before Boston

Scientific announced to Guidant that Abbott would be the divestiture partner on the transaction. (Stoll Ex. 10).  The language was included in that document (Exhibit A to the Addendum) because the "language was a standard part of the form that [Skadden attorney Ian John] had used in past transactions."  (DX0165 (John Direct) ¶ 12; Stoll Dep. 133:11-134:3; see also Trial Tr. 1307:24-1308:17 (John Cross)).  John did not recall considering Section 4.02's requirements when preparing the form accession agreement to the Addendum.  (DX0165 (John Direct) ¶ 12).  Rather, the form Accession Agreement was drafted to provide a "quick, straightforward and effective way for third parties (or specific individuals) to be bound by previously agreed confidentiality protections" in the Addendum.  (DX0165 (John Direct) ¶ 12).

259.    The purpose of the Accession Agreement with Abbott was "to ensure that Guidant's provision of competitively sensitive information to Abbott as part of the due diligence process would not violate the antitrust laws."  (DX0165 (John Direct) ¶ 22).  John does not recall Section 4.02 being a factor in his review and consideration of the Accession Agreement. (DX0165 (John Direct) ¶ 22).

260.    Contemporaneous documents and testimony further show that Guidant did not insist on the "retained . . . to advise" language in the Accession Agreement, and considered an alternative approach that did not include that language.  John proposed sending a letter to Abbott memorializing Guidant's understanding of the limitations that would apply to Abbott's access to Guidant's confidential business information.  (DX0060; DX0165 (John Direct) ¶ 20).  This approach was not pursued because Abbott decided to use the Accession Agreement, but its existence, even as a proposal, belies the existence of a conspiracy to fabricate a basis for its receipt of due diligence or to conceal Abbott's identity (while still complying with the Merger

Agreement by providing Johnson & Johnson with the documents Abbott reviewed) through the language of the Accession Agreement.

261.    J&J relies on Abbott in-house attorney Laura Gunther's deposition testimony that she recalled discussing the "retained . . . to advise" language with Skadden's John, and being told that "the language needed to be there."  (J&J Pre-Trial Proposed Findings of Fact ¶ 39).  There is no contemporaneous documentation of this discussion.  Gunther's complaint concerned language that Abbott had included in its original draft proposed Accession Agreement that it sent to Guidant.  (See Gunther Ex. 15).  Moreover, Gunther was unable to corroborate that anyone else had "any recollections of this particular provision or discussions about this particular provision," and she had no recollection as to why the phrase might have been required by Skadden.  (Gunther Dep. 115:8-16).  Gunther did not know why the provision was included, or who had drafted it.  (Gunther Dep. 112:7-13).  As Gunther recalls, there were "multiple conversations" at the time about various changes Abbott had requested for from the form Accession Agreement.  (Gunther Dep. 116:2-10).

262.    John does not recall discussing the phrase with Gunther, and did not believe that the "retained . . . to advise" language was "non-negotiable."  (DX0165 (John Direct) ¶ 24).  Rather, the only term that John viewed as "non-negotiable" was Abbott's agreement to be bound by the confidentiality provisions of the Addendum.  (Id.).

263.    Abbott signed the Accession Agreement on December 22, 2005.  (John Ex. 15).  The next day, December 23, Shearman & Sterling's Clare O'Brien sent an e-mail to John stating that she "would not characterize Abbott as having been 'retained by Boston Scientific.'"  (Duwe Ex. 9).  John testified that, although the language could have been amended "from a word processing perspective" at that point, he was also mindful that the issue was being raised

immediately before Christmas, on Friday December 23, 2005, and that the document had already

been signed by Abbott "after a lot of effort."  (Trial Tr. 1304:9-1305:5 (John Cross)).  In light of

the parties' desire to provide due diligence to Abbott quickly, Abbott having already signed the

agreement, and John's judgment that the preamble's phrase was not "central to the main purpose

of the agreement," John did not believe that it was advisable to amend the document.  (Trial Tr.

1304:9-1305:5 (John Cross)).

      264.    O'Brien testified that she viewed the "retained . . . to advise" language as a

mistake, that Abbott's role was clearly understood and obvious from the face of the Accession

Agreement (which referred to "assets proposed to be acquired by Abbott," (Knopf Ex. 34 at BSC

00127641)), and that the language was not drafted as a "sham" or to conform the description of

Abbott to the terms of Section 4.02 of the Merger Agreement.  (Trial Tr. 273:3-6; 299:3-301:13

(O'Brien Cross)).  Boston Scientific signed the agreement.  (Knopf Ex. 34).

      265.    Kury viewed the "retained . . . to advise" language in the Accession Agreement as

a non-material, form description of Abbott's role.  (Trial Tr. 1110:24 (Kury Cross) ("There was

no substance involved there.")).  He understood that both Abbott and Boston Scientific "knew

what they were doing" in regard to the potential transaction and that "[i]f [there] were drafting

peculiarities or they were using a form that they filled in blanks or whatever, it didn't change

anything and no one was misled."  (Trial Tr. 1110:24-1111:4 (Kury Cross)).  Nevertheless, Kury

did ask Skadden to confirm that the "advise" language would not create any substantive issues

and was told "it didn't make any difference."  (Trial Tr. 1111:8-14 (Kury Cross); see also Trial

Tr. 1113:4-12 (Kury Cross) ("[T]he basic advice I received was . . . not to worry about it, it was

not a problem, and I went along with that."); Kury Direct ¶ 82.a).

266.    J&J also characterized Guidant's letters transmitting to J&J due diligence that had been provided to Abbott as Boston Scientific's unidentified "advisor" as an attempted cover-up. (Trial Tr. 13:18-23 (J&J Opening) ("Kury and Skadden repeatedly used the mischaracterization of Abbott's role that they had set forth in the accession agreement as an advisor to mislead J&J and [C]ravath, telling them that diligence had been provided – that had actually been provided to Abbott had been given to Boston or to Boston and its, quote, advisors."); J&J Opening Demonstrative at 32; John Ex. 30).  However, the language in these letters had been drafted by a Skadden associate before Guidant knew Abbott's identity, making use of "language from the Addendum." (DX0223).  The Addendum had not yet been finalized when John transmitted these instructions on December 16, 2005, but the short form Accession Agreement had already been incorporated into the draft Addendum as of that date. (John Ex. 2; Trial Tr. 1363:21–1364:5 (John Redirect)).  Therefore, there is no evidence to suggest that the "advisor" language was included as part of a scheme to mask a knowing breach of the Merger Agreement.

### 5.    Kury Reasonably Relied on Skadden's Advice Regarding the Co-Promotion Agreement

267.    J&J has claimed that "Kury authorized Guidant to disclose the confidential material terms of the Co-Promotion Agreement without J&J's approval, which was plainly required by the [Co-Promotion] agreement."  (Trial Tr. 14:1-5 (J&J Opening); J&J Opening Demonstrative at 33 (item 5)).  J&J has not asserted an independent claim that Guidant caused harm to J&J by breaching the Co-Promotion Agreement.  Rather, J&J argues that Guidant's disclosure of information contained in the Co-Promotion Agreement is part of a pattern of disregard for its rights.  The evidence does not support this argument.

268.    J&J's argument is premised on the position that Guidant breached the Co-Promotion Agreement by disclosing that Abbott was included on the schedule of parties to whom

a sale of Guidant would trigger Cordis's right to terminate the Agreement.  In order for disclosure to have been a breach, Abbott's inclusion on the schedule would have to be a "material term[]" of the Co-Promotion Agreement.  (See John Ex. 23 (Co-Promotion Agreement) § 6, at SS00019770 ("Each Party and its Affiliates will maintain in confidence the Confidential Information of the other Party or . . . . Except as provided in this Agreement, each of the Parties shall not communicate any portion of the Confidential Information of the other Party or its Affiliates to any other person, firm, corporation or entity without first obtaining prior written permission from the other Party . . ."); id. § 1.5, at SS00019753 ("As used herein, 'Confidential Information' shall also include the material terms of this Agreement . . . .")).  J&J has not proved that by disclosing Abbott's inclusion on the schedule, Guidant was divulging a "material term" of the Co-Promotion Agreement.

269.    Kury was advised by Skadden that disclosure was permissible because "[t]he confi provisions of the copromote are more general and do not expressly apply to the terms of the agreement or schedules."  (PX0009 at GDT 00345018).  Kury's testimony made clear that he relied on Skadden's advice as to the disclosure of terms in the Co-Promotion Agreement:

> I relied on Skadden for this issue.  This was not an issue that I personally invested a lot of time in.  I did not critique all the arguments.  I left it to Skadden.  If I thought there was an initial question, I put it to Skadden.  Mr. Duwe, who was a partner there working with Mr. Mulaney, addressed it and thought it was appropriate, and I relied on that.

(Trial Tr. 1123:12-18 (Kury Cross)).

270.    Kury testified as to why he relied on Skadden to resolve this issue:

> There were many things in this transaction where I had to rely very heavily on Skadden both because I didn't have a lot of time, I was a busy general counsel, and I didn't have any particular expertise on the subject matter.  I turned it over to Skadden.  I thought I was in good hands.

(Trial Tr. 1124:1-5 (Kury Cross)).

121

271.   Contemporaneous documents are consistent with Kury's testimony.  For example, in a December 15, 2005 e-mail discussing whether disclosure of IP license agreements to Boston Scientific's lawyers at Howrey was permissible, Kury wrote: "I defer to Skadden on this one. Please decide what's appropriate."  (DX0177).

272.   J&J tries to make much of an e-mail from Guidant's William McConnell in which McConnell says that he is "sure there is a confidentiality protection that prevents us from giving them the schedule."  (PX0009).  Kury testified that McConnell's e-mail did not give him any reason to think there was a problem with Skadden's advice:

> Q.  Mr. McConnell in his email pretty much told you that we couldn't tell them this because of the confidentiality provisions of the agreement, didn't he?
>
> A.  Mr. McConnell is not a lawyer.  He was a businessman.  I had said while I think he is a very competent executive, I don't look to him for legal advice.  My legal advisor was Skadden. . . .  And whatever Mr. McConnell may have thought, that was neither here nor there for me.

(Trial Tr. 1124:8-1125:3 (Kury Cross)).  Indeed, after receiving Skadden's advice, far from expressing any doubt or concern, McConnell replied, "Thanks for getting this addressed!"  (PX0009).

**6.    Guidant Reasonably Entered a Joint Defense Agreement with No Intent To Breach the Merger Agreement**

273.   As explained above, Guidant's entry into the oral JDA did not breach the Merger Agreement. Even had it, however, such a breach would not have been wilful.

274.   Skadden's purpose in entering into the joint defense agreements on behalf of Guidant was not to effect an acquisition, but rather to create circumstances in which Guidant would be able fully to consider the terms of an unsolicited offer without violating confidentiality agreements or the antitrust laws.  (Trial Tr. 1370:25-1371:21 (John Redirect) ("Q. From an antitrust perspective, what is the purpose of entering into a joint defense agreement? A. Well,

there are a couple of purposes. The ones that are most prominent in my mind are, one, in the joint defense agreement you can categorize information in different levels of sensitivity and detail exactly who would have access to that information. Most importantly is information exchanged on an outside-counsel-only basis such that the lawyers for the parties receiving the information would have an obligation not to share that information with their client, which competitively sensitive information can be the primary purpose of that, and the other is to make clear that, to the extent that Boston -- that the parties, whether it's J&J and Guidant, Boston and Guidant, are discussing potential arguments, strategies of engaging with the FTC or other regulators in connection with a potential transaction and legal theories, that each of those two -- that each party to the agreement might have -- it might bring to bear in connection with that engagement that exchanging those legal theories doesn't – to the extent they were privileged beforehand, doesn't destroy the privilege by virtue of the exchange.")).

275.    J&J has introduced no evidence indicating that Skadden or Guidant ever believed that entering into a joint defense agreement with Boston Scientific and later Abbott, would constitute a breach of the Merger Agreement.  To the contrary, Mulaney testified that this agreement did not breach any of Guidant's duties under the Merger Agreement.  (Trial Tr. 815:16-817:1 (Mulaney Cross)).

276.    There is no evidence suggesting that Guidant believed or had reason to believe that the oral JDA was a violation of the Merger Agreement.  And with regard to the written JDA, the record shows that Kury relied on Skadden's judgment that he should sign the document. (Trial Tr. 1148:21-25 (Kury Cross); Trial Tr. 1226:10-18 (Kury Redirect)).

### 7.   Kury Had No Reason on January 9 To Articulate a Basis for Furnishing Information to Abbott

277.   J&J has claimed that "Kury did not say that Abbott was Boston Scientific's 'Representative,' or that he had received advice from Skadden, during his January 9 call with J&J's Deyo and Hilton."  (Trial Tr. 14:1-5 (J&J Opening); J&J Opening Demonstrative at 33 (item 7)).

278.   Kury had no reason to articulate a basis for furnishing information to Abbott on January 9, 2006 because, as the contemporaneous documents and testimony at trial have shown, J&J did not object to the provision of information to Abbott on that date.  Kury explained in his letter to Deyo on January 23, 2006 that his memory of the January 9, 2006 conversation was that J&J had requested Kury to confirm that all information supplied to Boston Scientific or Abbott was also supplied to J&J.  (Kury Ex. 51).  As Kury testified, if Deyo and Hilton had stated on the January 9, 2006 call that Guidant was not permitted to provide information to Abbott, "even if I thought they were crazy on that point, I would have immediately called Mr. Mulaney saying, hey, they've raised this, what do we do?"  (Trial Tr. 1233:11-14 (Kury Redirect)).  "If I had had that message, I can assure you I would have been on the phone with Mr. Mulaney in five minutes."  (Trial Tr. 1160:10-11 (Kury Cross)).

279.   Rather, Kury recalls that on the January 9, 2006 call, Deyo and Hilton "wanted to make sure that J&J received all the same due diligence that Abbott had received – in particular with respect to Guidant's DES program."  (DX0166 (Kury Direct) ¶ 100).  Contemporaneous documents and communications are consistent with Kury's recollection, showing Kury consulting with Skadden to confirm that J&J had received all of the due diligence Abbott had received.  (E.g., DX0185; John Ex. 32).

280.    J&J relies on Deyo's and Hilton's accounts of that call to argue that the January 9, 2006 call concerned J&J's objection to Guidant supplying due diligence to Abbott.  (PX0016 (Deyo Direct) ¶ 13; Hilton Dep. 220:5-14).  Deyo's initial recollection of that call at his deposition completely omitted J&J's request to receive the same due diligence Abbott had reviewed.  (Trial Tr. 158:12-18 (Deyo Cross)).  It was only after Deyo saw a contradictory document that he admitted that he had in fact requested that J&J receive due diligence materials that Guidant had furnished to Abbott, and that his "prior recollection was not accurate."  (Trial Tr. 158:19-159:4 (Deyo Cross) (emphasis added)).

281.    Neither Deyo nor Hilton made any written record of the January 9, 2006 call with Kury (Trial Tr. 126:18-127:17 (Deyo Cross)), nor did Deyo direct Hilton to memorialize the January 9, 2006 call with Kury (Trial Tr. 159:9-21 (Deyo Cross); Hilton Dep. 222:4-12).  By Deyo's own account, J&J did not suggest that "Guidant should attempt to cure its breach of the merger agreement" on the call.  (Deyo Dep. 141:15-19).  Moreover, despite the extensive negotiations between J&J and Guidant in the following weeks—including two meetings between Deyo and Kury (see Trial Tr. 1235:24-1236:22 (Kury Redirect); Kury Ex. 37 at GDT 00093871, -72)—Deyo was "not aware of anything in between" this January 9, 2006 call and his self-styled "follow up" letter on January 23, 2006 where the issue was raised.  (Trial Tr. 161:22-162:1 (Deyo Cross)).  Hilton was likewise unaware of any conversations with Guidant regarding the alleged breach between January 9, 2006 and January 23, 2006.  (Hilton Dep. 227:3-11).  This behavior is not consistent with the account of the January 9, 2006 call that J&J advanced at trial.

282.    J&J has tried to suggest that a January 17, 2006 e-mail from Kury to a Guidant PR employee, Doug Hughes, shows that Kury knew from J&J's January 9 call that J&J thought Guidant had breached the Merger Agreement.  The e-mail chain begins with a J&J press release

in which J&J says it "will consider its alternatives under the existing merger agreement with Guidant." (Kury Ex. 74). Hughes asks Kury, "What are their options . . . other than increase their bid [or] walk," and Kury replies, "Claim we breached." (Id.). Kury's answer "was basically an academic answer to a question"—Kury "did not, in writing that, have in [his] head there was a conversation with Mr. Deyo on the 9th and that's what I'm worried about. That was not it at all." (Trial Tr. 1163:22-1165:3(Kury Cross)). Moreover, Kury's e-mail "was not to tell [Hughes] that [Kury] thought there was a substantial possibility that [Guidant was] going to be in breach, or that there was any possibility." (Id.).

283.    In sum, J&J's suggestion that Kury's response on January 9 is somehow circumstantial evidence of a wilful breach is not supported by the evidence.

### 8.    Kury's January 23 E-mails Provide No Evidence of Wilful Breach of the Merger Agreement

284.    J&J has claimed that "Kury did not say that Abbott was Boston Scientific's 'Representative' in his January 23 e-mail to Deyo and then after sending it questioned the validity of the rationale given in that e-mail for furnishing information to Abbott." (Trial Tr. 14:1-5 (J&J Opening); J&J Opening Demonstrative at 33 (item 8)). J&J's position is factually incorrect and does not support its claim of wilful breach.

285.    Guidant notified J&J on January 17, 2006 that Guidant would terminate the Merger Agreement at 12:01 a.m. on January 25, 2006 if J&J did not make an offer superior to Boston Scientific's $80 per share offer. After close of business on January 23, 2006—less than 31 hours before the anticipated termination of the Merger Agreement[23]—J&J sent a letter to

---

[23] Mulaney recalled that he received Deyo's letter "after 5:00 Central time" on January 23, 2006. (Trial Tr. 974:3-7 (Mulaney Redirect)). Documents produced in the case but not

Guidant stating for the first time that it was "troubled" by Guidant's provision of due diligence information to Abbott.  (Kury Ex. 50).

286.    Less than an hour after receiving Deyo's letter,[24] Kury's reaction in a then-privileged e-mail to Mulaney and Duwe, was "This is so lame, not only on the merits . . . ." (Kury Ex. 83).  About 90 minutes later,[25] Kury received Mulaney's draft proposed response. (Mulaney Ex. 25).  At almost the same moment,[26] Kury wrote to Mulaney and Duwe, "But seriously folks, what is the technical analysis of whether A is a bidder?"  (Kury Ex. 57).  Half an hour after that,[27] Kury sent his response e-mail to Deyo.  (Kury Ex. 51).  Kury's response was sent less than three hours after receiving the letter from Deyo.

287.    Unlike Deyo's January 23 letter, Kury's response e-mail is not a formal document on letterhead with internally defined terms, and does not directly quote the Merger Agreement or refer to the term "Representative."  Instead, it simply and directly sets forth the factual basis for Abbott's entitlement to receive information from Guidant:

> Abbott is providing financing for Boston Scientific's proposal through a purchase of certain Guidant assets . . . .  It is perfectly reasonable and appropriate for Boston Scientific's financing sources to have access to due diligence information under an appropriate confidentiality agreement.

(Kury Ex. 51).  This statement is no different in substance than the advice Mulaney recalls giving to Kury:

---

offered into evidence show that Deyo e-mailed the letter to Kury, copying Mulaney, at 5:42 p.m. Eastern Time on January 23.  (E.g., GDT 00258429-31.)

[24] 11:34 p.m. GMT; 6:34 p.m. EST.

[25] 12:55 a.m. GMT; 7:55 p.m. EST.

[26] 12:56 a.m. GMT; 7:56 p.m. EST.

[27] 8:26 p.m. EST.

> I had advised Mr. Kury that we were comfortable with providing due diligence to Abbott because Abbott was providing financing to Boston Scientific through its purchase of the Divestiture Businesses and therefore a "Representative" under Section 4.02.

(DX0167 (Mulaney Direct) ¶ 31).

288.    The relative informality of Kury's response e-mail makes sense in light of the timing of Deyo's letter—arriving practically on the eve of the termination of the Merger Agreement, after J&J had already twice increased its offer for Guidant after having learned of the now-"troubling" provision of information to Abbott—combined with the fact that neither Kury nor Skadden considered Deyo's purported concern meritorious, as articulated in the response itself:

> Russ, if this were a matter to which Johnson & Johnson ascribed any importance, you would have raised it much earlier.  In light of our continued relationship of cooperation and disclosure, I am seriously perplexed as to how Johnson & Johnson could be raising this point in good faith at this stage in the course of our protracted discussions, bids and counter-bids.

(Kury Ex. 51).

289.    Far from supporting J&J's claim of wilful breach, Kury's January 23 e-mail response to Deyo's letter reflects that Guidant did not believe it had breached the Merger Agreement by furnishing information to Abbott.

290.    J&J also asserted in its opening statement that Kury's request to Skadden for a "technical analysis of whether A is a bidder" came after Kury's response to Deyo, "[q]uestioning the very rationale that he just gave to Mr. Deyo."  (Trial Tr. 12:19 (J&J Opening)).  When pressed, J&J admitted that it was aware that the time on the document "might be Greenwich Mean Time."  (Trial Tr. 872:18-19 (Mulaney Cross)).  When that correction is applied to the e-mail chain (see supra ¶¶ 125-128), J&J's timing claim is meritless.

291.     As Kury explained, his e-mail request for "technical analysis" was not expressing

doubt as to the merits of Guidant's position that Abbott was entitled to receive due diligence:

> I think my view had been all along that Abbott was a representative. I thought
> that the mention at the end of one of those paragraphs of the possibility of them
> being another bidder or a joint bidder was not the basis on which I had been
> relying, and I don't think it was the basis on which Mr. Mulaney and Skadden
> were relying on making the decision to give the information to Abbott.

(Trial Tr. 1239:6-16 (Kury Redirect)).

### 9.     Guidant Reasonably Furnished Information to the FTC Based on Skadden's Advice

292.     Nothing in the record indicates that Guidant ever believed that furnishing

information about its business to the FTC would violate the terms of the Merger Agreement.

Furnishing information to a government agency such as the FTC is not "solicitation" or

"facilitation" under Section 4.02 of the Merger Agreement.  There is no contemporaneous

evidence or testimony indicating that the prohibitions of Section 4.02 extended so far as to bar

Guidant from responding to requests from the FTC.  Moreover, there is no contemporaneous

document or testimony indicating that Guidant believed that furnishing information to the FTC

would breach Section 4.02 of the Merger Agreement.  To the contrary, contemporaneous

documents and testimony have shown that Guidant's counsel at Skadden was comfortable with

providing these documents to the FTC and informing J&J of the production.  (DX0224;

DX0225; Trial Tr. 1369:17-1370:4 (John Redirect)); (DX0165 (John Direct) ¶¶ 27-29).

Accordingly, Kury "did not consider Guidant's provision of documents to the FTC to be a

violation or a potential violation of Guidant's responsibilities, including under the terms of the

Merger Agreement."  (DX0166 (Kury Direct) ¶ 118).

### 10.    Guidant Promptly Disclosed Abbott's Involvement as Soon as Skadden Advised It To Do So

293.    J&J has claimed that "Guidant concealed from J&J the fact that it was providing due diligence to Abbott."  (Trial Tr. 14:1-5 (J&J Opening); J&J Opening Demonstrative at 33 (item 10)).

294.    Contrary to J&J's suggestion, Guidant took no measures to "conceal" its provision of due diligence to Abbott.  Rather, Guidant did not affirmatively disclose Abbott's receipt of due diligence for the period from when Abbott began receiving due diligence, around December 22, 2005, until Abbott signed the Transaction Agreement on January 8, 2006 (one week of which was between Christmas and New Year's) because Guidant did not consider such disclosure necessary based on Skadden's advice that Abbott's involvement was not yet a material term of the deal.  (Trial Tr. 870:15-19 (Mulaney Cross).

295.    The morning after Guidant disclosed Abbott's agreement with Boston Scientific to J&J, Boston Scientific's CFO Lawrence Best openly stated that Abbott had received due diligence.  (JPS ¶ 37; Best Ex. 31).  Mulaney, an experienced M&A attorney, was well aware that Guidant could not expect to conceal Abbott's receipt of due diligence:  "Being involved in competing bids in a public transaction of this magnitude is like living in a fishbowl:  all of Guidant's actions would be highly visible and subject to scrutiny."  (DX0167 (Mulaney Direct) ¶ 33; see also Trial Tr. 911:22-912:3 (Mulaney Redirect) ("[I]t became clear that . . . one bidder was going to end the process very disappointed and potentially a tough examiner of everything that went on in the interim.")).

296.    Mulaney was "very clear at the time" that he "didn't think there was any requirement to give Johnson & Johnson notice of possible divestiture purchasers because [he] did not think it a material term or material change in the Boston Scientific proposal."  (Trial Tr.

870:15-19 (Mulaney Cross)).  Kury received that advice from Skadden:  "[I]n Skadden's view,
they were not required to disclose this to Johnson & Johnson. . . .  They were comfortable that
we did not need to disclose it prior to the time that we did."  (Trial Tr. 1132:3-7 (Kury Cross)).

297.    Although J&J has tried to depict Guidant as capitulating to "tremendous pressure"
from Boston Scientific to furnish information to Abbott, the very documents J&J relies upon to
support that story show that Guidant's operating principles were to be "responsive yet
responsible" and to "do what we can without . . . shooting ourselves in the foot."  (John Ex. 21).
Guidant applied those principles both in dealing with antitrust issues and in dealing with its
obligations under the Merger Agreement.  (Trial Tr. 1227:12-1230:7 (Kury Redirect)).

298.    Indeed, once Abbott had entered the Transaction Agreement with Boston
Scientific, and Guidant, with Skadden's advice, had determined that disclosure of the terms
surrounding Abbott's involvement was then required under the Merger Agreement, Guidant
made all of the disclosures it thought necessary, even over the objection of Boston Scientific's
lawyers.  In an e-mail to Kury on January 9, 2006, Skadden reported to Kury, "We spoke with
Shearman and noted their objection to providing the [Abbott] agreement to [J&J].  We let them
know that we thought it best to send the agreement to [J&J] and did so this evening.  Shearman
wanted its objection duly noted but understood our concerns as well."  (DX0183).

## III.    J&J Has Not Met Its Burden To Prove That Any Alleged Breach Was Material

299.    Even if J&J were to prove that Guidant wilfully breached the Merger Agreement,
it can recover only if it also proves that Guidant's breach was material.  J&J has not carried its
burden of proving materiality, that is, of proving that any of the alleged breaches—Guidant's
provision of due diligence to Abbott, Guidant's alleged delay in notifying J&J of Abbott's
participation as Boston Scientific's divestiture partner, or Guidant's cooperation with the FTC's
regulatory review of the Boston Scientific proposed transaction—deprived J&J of the heart of its

bargain.  Moreover, denying due diligence to parties like Abbott was clearly not at the heart of the parties' bargain because, even under J&J's interpretation of Section 4.02, there were permissible ways to provide the documents to Abbott.

### A.    Providing Diligence to Abbott Was Not a Material Breach of the Merger Agreement

300.    Even if the Court were to find that Guidant breached the Merger Agreement by providing confidential information to Abbott, J&J cannot recover unless it has proved that the breach was material.  (Kury Ex. 9, § 7.02; JPS ¶ 53).

301.    Under Indiana law, "a material breach of a contract is one which defeats the object or underlying purpose of the contract."  Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis, 723 F.2d 512, 517 (Ind. Ct. App. 1983); see also Johnson & Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 354 (S.D.N.Y. 2007) (the "well-defined" standard is whether or not the breach "goes to the very heart of the agreement") (quoting City of Indianapolis v. Twin Lakes Enter., Inc., 568 N.E.2d 1073, 1080 (Ind. Ct. App. 1991)); JPS ¶ 54.

302.    The parties do not dispute that Section 4.02 is an important provision of the Merger Agreement.  However, in deciding whether or not a breach is material, the proper inquiry is not whether the breached provision in its entirety was important to the parties.  Rather, the inquiry for the factfinder to decide is whether the actual conduct of the breaching party deprived the non-breaching party of the substantial benefit of the bargain.  Smith v. State Lottery Comm'n of Indiana, 812 N.E.2d 1066, 1072 (Ind. Ct. App. 2004) (reversing award of summary judgment on issue of material breach because "[i]t is for the fact-finder to decide whether the conduct of the Lottery precluded purchasers who tendered their prize-winning tickets from obtaining a substantial benefit of the contract." (emphasis added)).  For example, even where the disputed provision states on its face that it is "of the essence" to the agreement, courts will still examine

factors such as the parties' expectations and potential prejudice to determine if a breach of that provision is material.  Sahadi v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi., 706 F.2d 193, 196-97 (7th Cir. 1983) (even where a contract explicitly states that timeliness of payment is "of the essence" to the agreement, a breach of that provision will not necessarily be "material").  Therefore, even assuming that Guidant breached Section 4.02, it does not follow that the breach was material.  Johnson & Johnson, 525 F. Supp. 2d at 356.

303.    The fact that Guidant did not actively solicit Abbott's involvement weighs in favor of finding that the alleged breach is not material.  See Johnson & Johnson, 525 F. Supp. 2d at 355 (more difficult to find that the breach is material if Abbott was not solicited by Guidant).  As this Court has twice noted previously, there is "'considerable force' to Defendants' fundamental argument that Plaintiff's claim was based on no more than a technicality."  Johnson & Johnson v. Guidant Corp., No. 06-CV-7685, 2010 WL 571814, at *3 (S.D.N.Y. Feb. 16, 2010) (quoting Johnson & Johnson, 525 F.Supp.2d at 344 (finding that J&J's claim of material breach survived at the motion to dismiss stage "because the Agreement makes clear that Guidant was not allowed to solicit bids" and "[a]t this point it cannot be said as a matter of law that this is not what happened")).

### 1.    Section 4.02's Non-Facilitation Provision Was Not at the Heart of J&J's Bargain

304.    Assuming that Guidant has breached the Merger Agreement, the breach was not material under Indiana law.  As an initial matter, J&J has presented no evidence indicating that it contemporaneously viewed the "no-facilitation" provision under Section 4.02 as forming the "heart of the bargain."  This is particularly the case for the facilitation of unsolicited Takeover Proposals that the Guidant Board determined were "reasonably likely to lead to a Superior Proposal."

305.     Contemporaneous documents show that Skadden communicated to J&J the importance of the superior proposal out (Weldon Ex. 9), and that it advised Guidant of this requirement (DX041).  The record developed at trial has shown that J&J did not object to Guidant's requirement that it be permitted to "consider higher offers."  (Weldon Dep. 106:24-107:7; DX0167 (Mulaney Direct) ¶ 19 ("Mr. Townsend, however, never expressed or suggested a view that Guidant could not fully respond to a Takeover Proposal from a party that intended to raise financing or solve an antitrust problem by selling certain Guidant assets.  Such a position would have been unacceptable to Guidant as inconsistent with the 'passive market check' for which it had expressly negotiated.")).  J&J acknowledged that "a superior proposal out, an ability to consider other offers, was an important part of Guidant's willingness to enter into this discussion" regarding a potential merger.  (Trial Tr. 38:9-40:10 (Weldon Cross)).  This right was particularly important to Guidant at the time that the transaction's price was reduced to $63 per share.  (DX0166 (Kury Direct) ¶ 43 ("Having the option to explore potentially available alternatives was, if anything, more important to Guidant in the context of the Merger Agreement than in the Original Merger Agreement, since Guidant had agreed to a substantially lower price in the Merger Agreement and needed the opportunity to benefit from a 'passive market check' to test whether that substantially lower price was fair to Guidant and its shareholders.  In other words, Guidant's right to investigate unsolicited proposals was crucial to the Board's acceptance of the renegotiated $63 per share price of the Merger Agreement.")).  Therefore, J&J did not consider the "superior proposal out" to be unusual and did not object to it.  (Trial Tr. 42:5-25 (Weldon Cross); Weldon Ex. 9; Hilton Ex. 6; Weldon Dep. 106:24-107:7).

306.     The trial record demonstrates that the essence of Section 4.02's "deal protection" mechanism was that Guidant was prohibited from soliciting a competing offer, but could respond

to an unsolicited Takeover Proposal as long as J&J received a "last look" and, if such a proposal were ultimately accepted by Guidant, J&J would receive a termination fee in excess of $600 million.  As J&J itself has stated, "the purpose of Section 4.02 was to protect J&J's binding agreement from being used by Guidant as a stalking horse to attract other bids before the Merger Agreement was put to a shareholder vote."  (J&J Pre-Trial Proposed Findings of Fact ¶ 127); see also (PX0015 (Coates Direct) ¶ 27(a) ("Without such provisions, an initial bidder would have reason to worry that a target would negotiate an initial M&A agreement with the initial bidder and then immediately turn around and use the initial bidder as a 'stalking horse'— that is, as a way of stalking bigger prey, in the form of a higher rival bid.")).  Although J&J argues that Section 4.02's prohibition on facilitation precluded everything Guidant did (including responding to information requests from the FTC), all of the language that J&J relies on concerns prohibitions that apply before a potentially Superior Proposal has been made.  In fact, J&J shared Guidant's view of Section 4.02's "deal protection" structure when it summarized the terms of Section 4.02 of the Conor merger agreement, which was negotiated by Cravath for J&J after this dispute had ripened and J&J's complaint had been filed.  According to J&J, the "very similar" language[28] in that agreement (Trial Tr. 339:22–340:1 (Townsend Cross)) operated to effect three principal terms:  (1) a prohibition on the target soliciting a competing offer; (2) the ability of the target to respond to an unsolicited competing offer; and (3) the availability of a termination fee in the event that the target selected the unsolicited competing offer.  (DX0214 at CON001915).

307.    In its contemporaneous actions, J&J acted consistently with this understanding of the "deal protection" structure.  On January 9, 2006, J&J was aware that Abbott had conducted

---

[28] A blackline comparison of Section 4.02 of the J&J–Conor Merger Agreement and Section 4.02 of the Merger Agreement is attached hereto as Exhibit A.

due diligence regarding Guidant's businesses.  (Trial Tr. 174:15-23 (Deyo Cross)).  However, J&J did not allege a breach of the Merger Agreement in the coming weeks, and did not pursue injunctive relief under Section 8.10.  (Trial Tr. 131:2-17 (Deyo Cross)).  Rather, J&J requested copies of the due diligence materials Abbott had reviewed, and used the contractual five-day waiting period to exercise its "last look" rights and increase its own bid.  (DX0166 (Kury Direct) ¶ 100); Trial Tr. 160:7-9 (Deyo Cross)).  In fact, J&J even prepared a talking points memo on January 15, 2006 stating that it believed the "Guidant Board has performed its fiduciary duty" in connection with its responses to the competing bids of J&J and Boston Scientific, and has enabled Boston Scientific "to conduct full and fair due diligence."  The memo, however, did not claim a potential breach of the Merger Agreement by Guidant.  (Caruso Ex. 21; Hitchner Ex. 13; see also Trial Tr. 63:22-64:18, 65:14-24 (Weldon Cross)).

308.    On January 23, 2006, after J&J had decided not to submit any further bids, J&J's letter to Kury requested only an explanation for "the rationale behind[] the disclosure of Guidant's business information to Abbott" (Kury Ex. 50), and a day later on January 24, 2006 offering "observations" on the explanation Kury had provided by e-mail (Kury Ex. 52).  In contrast to the letters exchanged on November 2, 2005 (Deyo Ex. 8) and November 3, 2005 (Deyo Ex. 10), neither of the January letters from Deyo accused Guidant of breach or otherwise constituted a formal notice of breach, or threatened legal action.  Indeed, J&J's outside counsel, Cravath, never referred to the alleged breach at all.  (Trial Tr. 351:15–352:4 (Townsend Cross)). The absence of any assertion that giving information to Abbott was a breach, particularly in light of J&J's prior conduct, is further evidence that J&J did not consider such disclosure material.

### 2.    Providing Diligence to Abbott as Boston Scientific's Representative Was Not a Material Breach Because Abbott Was a Joint Bidder or Could Have Been the Maker of a Takeover Proposal

309.    Preventing Guidant from providing due diligence materials to a potential divestiture candidate could not have constituted a substantial benefit of the Merger Agreement from J&J's perspective.  This is because Guidant had alternative means of producing documents to Abbott that would have been permissible under the Merger Agreement.  See Frazier v. Mellowitz, 804 N.E.2d 796, 802 (Ind. Ct. App. 2004) (breaches that can be cured are not "material" breaches).  As the Court noted, "[i]f Abbott and BSC had made a joint bid or had each bid separately for complementary portions of Guidant, Guidant would clearly have been entitled to provide due diligence materials to Abbott." Johnson & Johnson, 525 F. Supp. 2d at 344.  The parties do not dispute that this was permissible.  (PX 20 (Townsend Direct) ¶ 13 ("[I]f a rival bidder wanted its divestiture buyer to receive diligence earlier, the rival bidder would have been free to make a joint takeover proposal along with that divestiture buyer.")).

310.    Although Guidant subjectively understood that Abbott was a representative of Boston Scientific, Abbott could have objectively met the requirements for a party making a Takeover Proposal (as a joint or separate bidder).  This is true regardless of whether Guidant subjectively characterized the transaction as a Takeover Proposal or disclosed Abbott's identity to J&J.  The fact is that Abbott sought to purchase more than 15% of Guidant's revenues, net income or assets.  As the Court has previously noted, "the definition of 'Takeover Proposal' is unquestionably a broad one, encompassing 'any inquiry, proposal or offer from any person relating to, or that could reasonably be expected to lead to, any direct or indirect acquisition or purchase, in one transaction or a series of transactions, of assets . . . or businesses that constitute 15% or more of the revenues, net income or assets' of Guidant." Johnson & Johnson, 2014 WL 3728598, at *20 (emphasis in original).

137

311.    Abbott could have been making a Takeover Proposal no later than when it signed the Accession Agreement, which constituted a written inquiry by Abbott that would have been reasonably expected to lead to the "direct or indirect acquisition" of businesses constituting 15% or more of Guidant's revenues, net income or assets.  The Accession Agreement, by its terms, concerns information relating to "the assets proposed to be acquired by Abbott."  (Kury Ex. 22 at SA 00013588).

312.    The parties agree that Abbott ultimately purchased more than 15% of Guidant's revenues, net income or assets.  (Feb 28, 2007 MTD Hrg Tr. at 11- 12; Best Ex. 10 at BSC 123857-58). Abbott ultimately acquired Guidant's VI and ES assets not through Boston Scientific, but through a purchase agreement directly with Guidant on April 21, 2006.  (DX0054 at SS 00102346 ("WHEREAS . . . Guidant wishes to sell, or cause to be sold, to the Purchasers [Abbott and affiliates], and the Purchasers wish to purchase from Guidant and the Sellers [Guidant affiliates] . . . all right, title and interest in and to all assets of the [VI and ES] Business . . . .")).

313.    The fact that Guidant could have produced documents directly to Abbott as either a bidder or joint bidder demonstrates that the alleged breach of producing documents to Abbott was not "material."  This is because as the Guidant board had already determined that the Boston Scientific proposal would likely lead to a superior proposal, Guidant's provision of due diligence to Abbott itself would have been proper.  (see ¶¶ 15(b), 56)

314.    J&J has failed to prove that the heart of the bargain reached in Section 4.02 was that Guidant would not be able to provide due diligence to the divestiture candidate identified by the maker of a Takeover Proposal without identification of that divestiture candidate to J&J. Instead, all of the relevant evidence, including the parties' conduct, indicates the opposite.

3.     **Alternatively, Providing Diligence Directly to Abbott Was Not a Material Breach Because It Was Permissible for Guidant To Provide Diligence to Boston Scientific Which in Turn Was Permitted To Provide Diligence to Abbott.**

315.    Alternatively, Guidant could have produced due diligence material to Abbott indirectly through Boston Scientific without breaching the Merger Agreement.  It is undisputed that Guidant was permitted to provide due diligence materials to Boston Scientific.  E.g., Compl. ¶ 55.  Although Boston Scientific was thereafter bound by the terms of the BSC-GDT Confidentiality Agreement, and could use Guidant's confidential business information "solely for the purpose of exploring possible negotiated business arrangements and not for any other business or competitive purpose" (Kury Ex. 2), Boston Scientific could have provided Guidant's due diligence information to Abbott as a part of its exploration of a negotiated business arrangement.  (Trial Tr. 732:13–21 (Mulaney Cross)).  Therefore, any purported breach by providing the information directly to Abbott was not "material."

B.  **J&J Received Sufficiently Timely Notice of Abbott's Role; Any Delay Was Immaterial and Not Actionable Because of Guidant's Substantial Compliance**

316.    J&J argues that "Guidant's failure to so advise J&J [of Abbott's Takeover Proposal] was not just a technical oversight but was a material breach."  J&J Pre-Trial Proposed Conclusions of Law ¶ 131.  This is incorrect.  The notice provision was designed so that J&J would be able to compete on an equal footing with any potential competitor.  (Trial Tr. 942:22 – 943:3 (Mulaney Redirect) ("[T]he purpose of the notice provisions are to keep Johnson & Johnson reasonably informed about material developments as to a proposal . . . [a]nd then Johnson & Johnson has five business days to decide what it wants to do.")).  The five-day waiting period was further designed so that J&J would have the time it needed to consider that information, weigh its options and actively participate in negotiations.  (Trial Tr. 129:3-7 (Deyo Cross)).  The notice provision was not created so that J&J would have the opportunity to

interfere with a competing proposal.  See Cirrus Holding Co. v. Cirrus Indus., Inc., 794 A.2d

1191, 1208-09 (Del. Ch. 2001) (fiduciary out provisions "must not be so restrictive that, as a

practical matter, it would be impossible to satisfy the conditions").  In view of the actual purpose

of the notice provision, any breach of the notice provision was not "material" because J&J has

conceded that it would not have behaved any differently if it had been notified earlier of Abbott's

involvement.  (Weldon Dep. 58:14-59:4; Deyo Dep. 145:7-13, 146:6-8).  In fact, the terms of the

license agreement between J&J and Abbott would have prevented J&J from terminating Abbott's

rights even if Abbott's participation in a competing bid displeased J&J.  (DX0162 (J&J-ABT

License Agreement), §9.5 at JJH00029811).

317.    Even when a competing proposal results from improper contact with a competing

bidder, it does not constitute a "material" breach where the breaching party has substantially

complied with the relevant agreement.  Cirrus Holding Co. v. Cirrus Indus., Inc., 794 A.2d 1191,

1208-09 (Del. Ch. 2001) (it was not a material breach where defendant improperly continued

discussions with a competitor, but otherwise "substantially complied" with stock purchase

agreement).  This is particularly the case where the defendant has already determined in good

faith that a competing proposal would constitute a "Superior Proposal," and the plaintiff seeks

"onerous" relief that would inhibit the full consideration of that competing proposal.  (Id.).  As in

the Cirrus case, Guidant has substantially complied with its contractual duties, and J&J cannot

pursue the vastly more "onerous" relief of $5 billion in damages.

318.    Guidant substantially performed under the terms of the Merger Agreement.

Guidant did not actively solicit the participation of either Boston Scientific or Abbott.  Promptly

after Abbott was provided due diligence materials, those same materials were submitted to J&J.

(John Ex. 31; DX0185; DX0187; John Ex. 32).  Nothing in the contemporaneous record or

testimony indicates that Abbott had the opportunity to review materials that J&J did not also

have the opportunity to review.  (Id.).  J&J also had the full benefit of its contractual "last look"

rights, and the five-day waiting period before Guidant accepted Boston Scientific's bid.  Guidant

even agreed twice during the negotiation process to increase the termination fee by tens of

millions of dollars.  (Trial Tr. 141:13-18 (Deyo Cross); Deyo Ex. 23; Hilton Ex. 24)

**C.      Guidant's Cooperation with the FTC's Regulatory Review of Boston
          Scientific's Proposed Transaction Was Not a Material Breach**

319.    For the reasons described above (supra ¶¶ 202-205), J&J has not proved that

Guidant's provision of documents to the FTC constituted a breach of the Merger Agreement.

Even were it a technical breach, however, it would not be material.

320.    There is no evidence that J&J bargained for the ability to block Guidant from

responding to a government request for information, which all parties knew was highly likely

here.  Similarly, there is no evidence that Guidant understood or agreed to such a provision.

321.    There is no evidence that any of the parties believed that preventing regulatory

review of potential superior offers from third parties was the "heart" of the Merger Agreement.

To the contrary, J&J always understood and expected that there would be antitrust review of

competing Takeover Proposals.  Permitting Guidant to consider superior proposals, which

necessarily required FTC review, was at the heart of the agreement.

322.    Moreover, the provision of information to the FTC postdated Boston Scientific's

January 8, 2006 firm offer (DX0165 (John Direct) ¶ 28) and therefore could not have been a

cause of that offer.

IV.     **J&J Has Not Met Its Burden To Prove Causation—That "But For" Guidant's Alleged Breach of Section 4.02, J&J Would Have Been Able To Purchase Guidant at $63 per Share**

323.    Even if Guidant had committed a wilful, material breach of the Merger Agreement, J&J could only recover if Guidant's breach caused injury to J&J.  See Shepard v. State Auto. Mut. Ins. Co., 463 F.3d 742, 744 (7th Cir. 2006) (Indiana law).  J&J has defined its injury as being prevented from purchasing Guidant.

324.    As the plaintiff, J&J "must prove that the alleged breach of contract was a cause in fact of [its] loss, which requires a showing that the breach was a 'substantial factor' in bringing about the plaintiffs' damages."  Id. at 745.  This requires "at a minimum" that J&J's alleged loss would not have occurred "'but for' the defendant's conduct."  Wright v. St. Mary's Med. Ctr. of Evansville, Inc., 59 F. Supp. 2d 794, 799 (S.D. Ind. 1999) (citation omitted).

325.    J&J cannot satisfy its burden through speculation or conjecture, yet it has failed to adduce any admissible evidence proving that it would have been able to acquire Guidant for $63.08 per share once Boston Scientific announced on December 5, 2005 that it intended to acquire Guidant for $72 per share.  Even J&J's own witnesses, including its former CEO and CFO, admitted that J&J's offer was inadequate once Boston Scientific made its December 5th announcement—i.e., prior to any alleged breach.  In fact, the overwhelming weight of the evidence establishes that J&J's $63.08 offer was unlikely to succeed.

A.     **J&J Cannot Prove That "But For" the Alleged Breach, J&J Would Have Been Able To Purchase Guidant at All, Let Alone for $63 per Share**

326.    J&J has not met its burden to prove that it would have acquired Guidant but for Guidant's alleged breach of the Merger Agreement.

1. **J&J Has Not Met Its Burden To Prove That Its $63 Offer Would Have Been Approved by Guidant's Shareholders**

327.    J&J has not met its burden of proving that Guidant's shareholders would have approved J&J's bid to acquire Guidant for $63.08 per share but for Guidant's alleged breach through provision of due diligence to Abbott.  Without Guidant shareholder approval of the J&J $63.08 per share offer, J&J could not have acquired Guidant.

328.    The Merger Agreement did not guarantee consummation of J&J's $63 per share offer.  (Trial Tr. 212:20-23 (Coates Cross) ("[Q.]  Executing a merger agreement doesn't guarantee to a party that they will acquire a target, isn't that right? A. That's correct."); see also, e.g., Frontier Oil v. Holly Corp., 2005 WL 1039027, at * 27 (Del. Ch. Apr. 29, 2005) ("The Merger Agreement, of course, was not an ordinary contract.  Before the Merger could occur, the shareholders of Holly had to approve it."); NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614, 622 (1996) ("[C]onsummation of the Merger Agreement represented no more than a hope that Central shareholders holding at least two thirds of the outstanding capital stock would in fact approve the transaction.")).

329.    Guidant's shareholders had to approve the proposed transaction before it could be consummated.  (Kury Ex. 9 at § 6.01(a) ("Conditions Precedent . . . Shareholder approval shall have been obtained"); Trial Tr. 359:24-360:1 (Jarrell Cross) ("Q. And that merger agreement would have required shareholder approval to close, right?  A. Yes.")).  At the time of the alleged breach, shareholder approval had not yet been obtained.  (Trial Tr. 97:1-10 (Deyo Cross)).

330.    Even before Boston Scientific's December 5, 2005 announcement, Guidant shareholders were unhappy that J&J had slashed its bid from $76 to $63 per share, and would have been reluctant to accept that price.  (DX0164 (Cornell Direct) ¶ 30; Trial Tr. 50:22-51:19 (Weldon Cross) ("Q. But even before the Boston Scientific intent to offer was announced in

December you started hearing from Guidant shareholders who said we're not going to vote for this agreement at this price, isn't that right? A. We heard from some that they weren't, we heard from some that they would."); Weldon Ex. 1 (September 22, 2005 email forwarded to Weldon, et al., discussing call from Guidant shareholder group announcing intent to oppose any lowered price for Guidant); Weldon Ex. 2 at 2 (October 21, 2005 letter to Weldon, et al., from shareholder group announcing intent "wait until the fallout passes" rather than "accept a materially lower merger value").  J&J's damages witness conceded that "major Guidant shareholders and analysts . . . reacted negatively to the Johnson & Johnson $63.08 bid."  (Trial Tr. 361:24-362:7 (Jarrell Cross)).

331.     Once Boston Scientific announced on December 5, 2005 that it was willing to pay $72—prior to any alleged breach—shareholder opposition to J&J's reduced offer increased. (Trial Tr. 1516:15-1517:13 (Cornell Redirect) ("Q. And, finally, Professor, let me show you a question the Court asked William Weldon, who was the CEO of Johnson & Johnson at the time of this transaction. It's at Page 84 of the transcript, Line 17, and it continues on to Page 85, Line 1. And the question is: 'Are you confident that shareholders would have taken it at 63?' And the witness answers: 'Once again, it's hard to say. The discussions -- you know, to say whether they would have voted. As I say, the documents that I saw, there were people that liked the 76 better, but would have supported 63, and there were others that said they wouldn't have supported it. So I don't know if it would or would not have. We felt it would have in discussions that we had, but you don't know -- you don't really know until they vote.' Now, if you assume that Mr. Weldon gave that testimony, how does that testimony affect your opinion that $63 was not likely to be the winning bid after the Boston Scientific announcement on December 5th? A. I think it's consistent with what I've said, and I would even take a somewhat stronger, I think, position that

once they've seen a valuation by Boston Scientific indicating 72 is a minimum amount, who

knows? It could pay more. If I had been a shareholder, I would have been very reticent to take

63.").

332.    At the time of a shareholder vote on the Merger Agreement, a significant block of

Guidant shares would have been held by shareholders who had acquired their shares for more

than $63 per share.  These shareholders would have been likely to reject a J&J bid at $63 per

share.  (DX0164 (Cornell Direct) ¶¶ 32-38).

333.    Historical analysis of M&A transactions shows that once a competitive bidder

emerges, the initial bidder is successful in only 17% of cases.  (DX0164 (Cornell Direct) ¶ 21).

In Cornell's empirical analysis of bidding contests like the one here, the initial bidder acquired

the target in only 35% of cases.  (Id. at ¶ 22).  Furthermore, even when the original bidder was

successful, Cornell's research showed that on average it had to increase its original offer by 19%.

(Id. at ¶ 22).  J&J presented no evidence to suggest that its chances for success would have been

any better than those averages.

334.    J&J's own witnesses conceded that, once Boston Scientific announced its

significantly higher bid, J&J might well lose the auction.  (DX0164 (Cornell Direct) ¶¶ 25-31)

(collecting designated testimony)).  Weldon understood that J&J's $63 per share bid would "no

longer be sufficient to get the deal done" after Boston Scientific made its December 5, 2005

proposal (Weldon 20:10-13 ("[Q.] [Y]ou were concerned that $63 would no longer be sufficient

to get the deal done?  A. Might not be."); Weldon 37:24-38:15 ("Q. Okay. But the point is

simply that this is a -- J&J recognized, as of January 6th, that the Guidant board might deem the

$72 offer from Boston Scientific to be a superior to – to J&J's $63 offer? A. Okay. We -- we

would always assume that they could go make decisions and that we should be prepared for

whatever the decision would be. Q. All right. And you were recognizing that one possible

decision – I mean, it wasn't outside the realm of – of reasonableness, was it, for Guidant to

conclude that the $72 offer was superior to 63? A. We -- we were recognizing that that was an

option they had to consider, absolutely."); Weldon Dep. 39:18-22 ("Q. So my -- my question

simply was: J&J recognized as of January 5th, January 6th time period that the Guidant board

might conclude the $72 bid was superior to J&J's 63? A. Yeah, I think -- yes."); Trial Tr. 52:23-

53:12 (Weldon Cross) ("Q. I just want to know if this refreshes your recollection. Mr. Gueli

asks: 'Okay, and was there a concern that the $63 price would no longer be a viable price in

order to get the deal done? 'A. We went back to assess whether we would be willing to pay

more. 'Q. Because you were concerned that $63 would no longer be sufficient to get the deal

done? 'A. Might not be.' That's consistent with your recollection of what you believed at the

time? A. Yes. Q. And there were others at Johnson & Johnson who shared that belief, isn't that

right? A. I assume.").

335.    At trial, Weldon conceded that it was impossible to predict whether Guidant

shareholders would have approved the $63 J&J offer, and that he would not "really know until

they [had] vote[d]."  (Trial Tr. 84:14-85:1 (Weldon Redirect) ("Q. What was the plan had Boston

Scientific not made a definitive offer? A. We would have gone forward at $63. THE COURT:

And you're confident that shareholders would have taken it at 63? THE WITNESS: Once again,

it's hard to say. The discussions -- you know, to say whether they would have voted. As I say,

the documents that I saw, there were people that liked the $76 better, but would have supported

63. And there were others that said they wouldn't have supported it. So I don't know if it would

or would not have. We felt that it would have, in the discussions that we had, but you don't really

know until they vote.").

336.     J&J's then-head of group finance and current CFO, Dominic Caruso, testified that "in the light of Boston Scientific's $72 bid announced on December 5, if J&J in fact wanted to acquire Guidant, J&J would have to offer more than $63 a share." (Caruso Dep. 197:8-13, 197:18-19).

337.     J&J's Vice Chair and CFO Robert Darretta agreed that J&J "determined that [the $63] bid would be deemed inadequate" in December 2005 following Boston Scientific's $72 announcement on December 5.  (Darretta Dep. 70:15-71:8).

338.     J&J's in-house counsel, Steven Rosenberg, testified that after Boston Scientific announced its $72 per share bid on December 5, 2005, "we believed we did need to increase our offer to improve the chances of it being approved."  (Rosenberg Dep. 55:22-56:7).

339.     Guidant has also shown that, even if the alleged breach had not occurred, the most likely outcome was not that Boston Scientific and Abbott would have abandoned any effort to complete what both viewed as a valuable opportunity, but that they would have explored other options that would have made it "extremely unlikely that J&J would have successfully completed its acquisition of Guidant at only $63.08 per Guidant share, even if Abbott had not been furnished due diligence information."  (Trial Tr. 1426:4-1427:2 (Cornell Cross) ("Q. Because one scenario was that Boston Scientific do what Johnson & Johnson did, right, which was sign a definitive deal and then handle the divestiture issues, right? A. I would imagine that would be a possibility. Q. Or another possibility could be that subsequent to December 5, Boston Scientific lines up a joint bidder, and together with this joint bidder they make a public offer, a takeover proposal that includes a divestiture party as a joint bidder. That's another scenario that could have played out, right? A. It seems like that's another possibility. Yes. THE COURT: I guess another one would be that Abbott would be willing to sign on the dotted line without due

diligence. THE WITNESS: Yes. And another one I could think of -- THE COURT: Is this

Eleanor Roosevelt flying? Is that where we're going with this? THE WITNESS: Maybe. If we all

get to put forth possibilities, another one I thought of is you let them know that you are putting a

definitive $72 offer together, and you let the vote go ahead, and the shareholders can say, well,

we're willing to take the $72 chance and we'll vote no on the $63.")).  Boston Scientific and

Abbott could have made an offer subject to the condition that Abbott receive diligence materials,

which Guidant could have concluded was a Superior Proposal and, on that basis, terminated its

Merger Agreement with J&J.  (See PX0015 (Coates Direct) ¶¶ 63-64 ("If Guidant had received a

superior bid and met other conditions specified in the agreement, it could have terminated the

J&J/Guidant Merger Agreement . . . After complying with those termination provisions of the

agreement, Guidant would have been able to provide information to any third party, including

potential purchasers of assets required to be divested in order to permit the superior rival bid to

obtain antitrust clearance.").  Alternatively, Boston Scientific could have made a tender offer

directly to Guidant shareholders.  (See Trial Tr. 125:19-24 (Deyo Cross) ("Q. In fact, you could

actually try to acquire the company without even reaching an agreement with the company,

couldn't you? A. Make a hostile takeover. Q. Tender offer? A. Sure.").

    340.    Boston Scientific also might have made a definitive offer without a pre-

determined divestiture partner, with the divestiture to be arranged afterward.  (Trial Tr. 1426:4-7

(Cornell Cross) ("Q. Because one scenario was that Boston Scientific do what Johnson &

Johnson did, right, which was sign a definitive deal and then handle the divestiture issues, right?

A. I would imagine that would be a possibility."); Trial Tr. 235:9-11 (Coates Cross) ("They

could have waited until after Boston Scientific had acquired Guidant, and then bought the assets

as part of a tail-end divestiture cure, which the FTC sometimes permits.").  Boston Scientific's

CFO Lawrence Best did express a preference for a committed divestiture partner.  (Best Dep. 32:17-20 ("Did you feel you needed to have a buyer of the assets committed prior to making a definitive proposal to Guidant? A. It was our preference.")).  But Best also testified that Boston Scientific could have made a definitive offer without a prearranged divestiture partner.  (Best Dep. 33:17-23 ("Q. When you made the definitive proposal to Guidant in January 2006, could you have made a proposal to them that essentially said you would divest whatever assets you were required to divest by the FTC without having somebody lined up to purchase those assets? A. We could have.")).

341.    Among many possible avenues to its participation with Boston Scientific without the alleged breach, Abbott might have agreed to negotiate to be Boston Scientific's divestiture buyer without receiving due diligence from Guidant, having already received Guidant information as part of its participation in the J&J offer.  (Trial Tr. 1426:15-18 (Cornell Cross) ("THE COURT: I guess another one would be that Abbott would be willing to sign on the dotted line without due diligence. THE WITNESS: Yes.").  Contemporaneous documents show that Abbott already had "significant knowledge of Guidant's VI/ES business" and had already "received a significant amount of information regarding Guidant's DES IP in connection with its negotiation of the JNJ license mandated by the FTC."  (DX 0057 at GDT 00345378).  In particular, because Abbott had "already . . .  conducted an extensive plant tour of [Guidant's] Temecula facility," which housed its VI and ES operations, Guidant was "not sure what additional physical DD [wa]s required."  (Id. at GDT 00345379).  Moreover, J&J introduced no evidence showing that any material Abbott reviewed in the Boston Scientific transaction was any different from what Abbott knew from the J&J–Guidant transaction, or that the availability of this material had any meaningful effect on Abbott's willingness to enter into the transaction with

Boston Scientific.  The one item that J&J discusses in connection with Abbott's due diligence review (J&J Proposed Findings of Fact ¶¶ 44-46), a Co-Promotion Agreement, positively indicated that Abbott was a prohibited assignee who would be "excluded" from receiving certain benefits if the Boston Scientific transaction were completed.  (PX09; John Ex. 23 at SS00019772).  If anything, a review of this document would make it <u>less</u> likely that Abbott would enter into the transaction with Boston Scientific.  Nonetheless, Abbott agreed to the transaction, further indicating that its continuing desire to participate was not contingent on its review of any new due diligence materials.

342.    Although John reported that Abbott indicated in a single communication that it would "walk" from the deal if it did not receive further due diligence, John testified that he did not view that threat as credible because it was consistent with Abbott's practice of blustering that he had observed over their course of dealing, a view he expressed contemporaneously in the same communication.  (Trial Tr. 1293:3-7 (John Cross); 1354:10-22 (John Redirect) ("Q. You were shown earlier . . . a document marked as John Exhibit 20. . . . I want to direct your attention to is your statement that 'Apple called having this access critical and said if they were not given this access, they would walk from the deal, but then they said that about a lot of things.'" . . . Can you explain what you meant in this comment? A. That Abbott had suggested that if they didn't get access to the information, that they would cease participation and discussions and totally walk away, but my parenthetical suggests that I viewed that with some skepticism; just their course of dealing during this time frame was one of absolutes that weren't necessarily consistent with their behavior.").  Abbott would not have had any reason to "walk" if its identity were disclosed, because under the J&J-ABT License Agreement, J&J could not terminate the agreement based on Abbott's consideration of a deal with Boston Scientific.  J&J had the right to

terminate only if the license was deemed an inadequate antitrust remedy or if the Initial Merger

Agreement "as it may have been amended" was terminated (DX0162 § 9.2 at JJH00029810]), or

under limited circumstances in which Abbott materially breached the J&J-ABT License

Agreement (DX0162 § 9.3 at JJH00029810-11]).  J&J has not proved that it could have punished

Abbott for negotiating with Boston Scientific, let alone that Abbott was motivated by a fear of

J&J.

343.    As J&J's M&A expert opined, "divestiture [buyers] frequently are willing to

engage in negotiations without getting confidential information."  (Trial Tr. 234:18-235:3

(Coates Cross) ("Q. They could have structured a different proposal? A. Again, hypothetically, a

divestiture bid. In fact, usually a divestiture bidders don't insist on confidential information.

That's the normal run. So if that's what you mean, yes, of course. . . .  So, hypothetically, yes,

divestiture [buyers] frequently are willing to engage in negotiations without getting confidential

information.").  As Coates testified, "[t]here's lots of ways that Boston Scientific and Abbott

eventually could have ended up with the deal they did, if they'd been willing to take the risk."

(Trial Tr. 235:16-18 (Coates Cross)).

344.    Given the multi-billion dollar value Boston Scientific and Abbott saw in the

acquisition of Guidant's business, it is not credible for J&J to argue that upon encountering an

alleged contractual barrier, Boston Scientific would have "evaporated," as Jarrell assumed, rather

than pursuing non-breaching alternatives that both Boston Scientific and Abbott agree could

have existed or simply stating that it would remain interested at the $72 level if Guidant's

shareholders rejected J&J's $63 offer.  (Trial Tr. 1516:7-14 (Cornell Redirect) ("[A.] [B]etween

63 and 72, that's a $9 gap involving, I think, four or five billion dollars. So that's a lot of money

for people to be able to divide up to get the deal done.  And I think what Mr. Best is saying is,

given that gap, we could have gotten something done to get our deal through.  The shareholders

would be very foolish to accept 63 because we can get them more, even if we have to not use

Abbott but use some secondary route.")).

345.    Even if Boston Scientific had never been able to make a definitive offer on

January 8, 2006, the fact of Boston Scientific's December 5, 2005 announcement made it

unlikely that Guidant shareholders would approve a $63.08 J&J merger. (Trial Tr. 1388:18-

1389:12 (Cornell Cross) ("THE COURT: But just so I understand, so December 5th, an offer,

non-binding to be sure, of $72 per share is made. For some reason, as part of this hypothetical, a

formal offer is never made. Do you have a view as to whether or not the $63-a-share offer that

was part of the Johnson & Johnson merger agreement would have been approved by

shareholders? THE WITNESS: Well, I think -- that's why I was dancing around the answer, your

Honor, because what do you mean by 'never'? Because the shareholders at the time that Boston

Scientific was so-called walking away, they wouldn't know they were never going to make an

offer. They may say they haven't made one today, but who's to say they wouldn't come back in

a week or two? So how would the shareholders credibly know that Boston Scientific was going

away forever, particularly if they valued the assets of Guidant at $72? It makes no sense for them

to go away forever. They reached an impediment. They would have to get around it, but they

wouldn't have to go away forever. I wouldn't believe that if I were a shareholder that they were

gone forever."); 1512:9-23 (Cornell Redirect) ("Q. Let me ask you to assume a couple of other

things. Let me ask you to assume that rather than just walk away, they announced a continued

interest in Guidant, but that they needed time to restructure or rethink the structure of their deal .

. . . How does that hypothetical then impact the opinion you offered about the likelihood that the

deal would have closed at $63 a share after Boston Scientific announced its intention to make a

bid? A. Well, I think under that circumstance, it would be very unlikely that the 63.08 would be

accepted because shareholders and other key parties, like the board of Guidant, would recognize

that Boston Scientific truly believes the assets are worth 72 and they're willing to pay 72, but

they have impediments to get around that may take a little time."); DX0164 (Cornell Direct) ¶¶

18-39)).[29]

346.    Contrary to J&J's assumption that its $63 offer would have been approved but for

the alleged breach, the jump in Guidant's stock price following Boston Scientific's December 5

proposal shows that J&J's $63 offer had been rendered inadequate.  Guidant's share price rose

---

[29] Jarrell stated at trial that he believed J&J would have closed at $63 if Boston Scientific
had never made a definitive offer, but he acknowledged that this "opinion" was asserted for the
first time at trial.  (Trial Tr. 370:13-16 ("THE COURT: But there's nothing in your report that
says that, right? THE WITNESS: No, sir. I'm responding to your question.")).  To the contrary,
Jarrell testified in his direct affidavit that he was assuming—not opining—that but for a breach,
J&J would have acquired Guidant for $63.08 per share.  (PX0019 (Jarrell Direct) ¶ 7 ("My
calculations are predicated . . . on the assumption that, but for that breach, J&J would have
completed its acquisition of Guidant at $63.08 per share."); Trial Tr. 359:14-20 (Jarrell Cross)).
At his deposition, Jarrell expressly disclaimed having any opinion about whether J&J would
have closed at $63.08 but for a breach.  (Jarrell Dep. 51:8-22 ("Q. Now, were you asked to
investigate or look into whether after Boston Scientific made its December 5th announcement,
whether it was likely that Guidant shareholders would, in fact, ever vote for a $63.08 Johnson &
Johnson deal? A. Was I asked to – Q. Look into that.  A. No.").  Accordingly, because Jarrell
was not offered as an expert on the likelihood that J&J would have closed a $63.08 merger and
because any opinions on this topic were not disclosed prior to trial such that Guidant would be
prejudiced by their admission, they are not admissible.  Fed. R. Civ. P. 37(c)(1); In re Complaint
of Kreta Shipping, S.A., 181 F.R.D. 273, 275 (S.D.N.Y. 1998) (striking expert testimony that
exceeded reports and prejudiced opponent; "[e]xpert testimony exceeding the bounds of the
expert's report is excludable pursuant to Rule 37(c)(1)"); Rowe Entm't, Inc. v. William Morris
Agency, Inc., No. 98 CIV. 8272 (RPP), 2003 WL 22272587, at *1 n.3 (S.D.N.Y. 2003) ("Absent
substantial justification or a showing of harmlessness, expert testimony exceeding the bounds of
the expert's report must be excluded pursuant to Rule 37(c)(1)."); Air Turbine Tech., Inc. v.
Atlas Copco AB, 410 F.3d 701, 711, 713 (Fed. Cir. 2005) ("[W]e do not think the district court
abused its discretion in excluding Dr. Catz's testimony under Fed. R. Civ. P. 37(c)(1) insofar as
his testimony exceeded the material disclosed in his expert report.").

well above J&J's $63 offer and never declined to that price again during the relevant period. (Trial Tr. 369:11 (DX0226).  Beyond this conclusion—which directly undercuts J&J's injury claim—the movement of Guidant's stock price is not a reliable indicator of the market's view of the ultimate outcome of a bidders' war.  (Trial Tr. 1515:1-8 (Cornell Redirect) ("Q.  Now, am I correct that, in your opinion, the market's reaction to the announcement that Boston Scientific was going to make an offer tells you something about the probability that the $63-a-share offer is likely to succeed?  A.  It does.  Q.  And what does it tell you?  A.  That the $63-a-share offer is very unlikely to succeed. Something else is likely to happen.").

347.    Guidant's stock price movement shows a market consensus that Guidant would be acquired by some party at a price above $63 per share.  (Trial Tr. 1431:1-6 (Cornell Cross) ("Q. So do I take it that you're suggesting that Professor Jarrell's assumption is likely wrong because Guidant's share price traded at above $63? A. That is, in my opinion, evidence that the opinion is incorrect, yes, or that the probability being, one, that it would be acquired at 63.08 is incorrect."); 1515:1-8 ("Q. Now, am I correct that, in your opinion, the market's reaction to the announcement that Boston Scientific was going to make an offer tells you something about the probability that the $63-a-share offer is likely to succeed? A. It does.  Q. And what does it tell you?  A. That the $63-a-share offer is very unlikely to succeed. Something else is likely to happen.")).

348.    Contrary to J&J's argument that the market endorsed its $63 offer as more likely than what J&J says was the only other choice—the Boston Scientific $72 proposal—Guidant's stock price following Boston Scientific's December 5 announcement reflected market consideration of many other potential outcomes: "It's not a binary consideration . . . there could be a bidding war, neither could happen, one of them, Johnson & Johnson, could go away, like I

said, and then Boston could reduce its offer.  The market is trying to weigh all the possibilities."

(Trial Tr. 1440:8-17 (Cornell Cross)).

349.   Guidant's market price also took into account the potential existence of

undisclosed conditions on Boston Scientific's bid—like Boston Scientific's need for a divestiture

buyer—since it was publicly known that Boston Scientific was seeking to address anticipated

antitrust issues.  (Trial Tr. 1431:22-1432: 9 (Cornell Cross) ("Q. And based on your experience,

if a number of conditions like that were then to enter the bloodstream of the market, would that

tend to depress the market's view about whether the Boston Scientific is likely to occur or

enhance the expectations? A. Well, you know, I can't say for sure because the market price

hasn't gone up to 72 either. So to use an investment banking term, the market is aware that all

these deals are very complex and, quote, have a lot of hair on it. In this case, the hair would be,

among other things, the two things you bring up. So the market is putting in discounts for the fact

that there may be things that we don't know that are complex that could derail this deal.")).

### 2.   J&J Has Not Proved That, Without Immediately Providing Due Diligence to Abbott, Boston Scientific Could Not Have Made a Superior Proposal or Joint Bid.

350.   J&J has not met its burden to prove that Boston Scientific would not have made a

Superior Proposal, as defined in the Merger Agreement, without providing Abbott with diligence

materials.

351.   Boston Scientific publicly announced its $72 per share offer for Guidant before

entering into discussions with Abbott about its potential role as a divestiture candidate.

352.   J&J failed to present credible evidence to meet its burden to prove that Abbott

would not have agreed to negotiate to be Boston Scientific's divestiture partner without receiving

due diligence.  In fact, Abbott was dissatisfied with the diligence it did receive, yet went forward

with the deal anyhow.  (Gunther Dep. 39:24- 40:2, 40:17-41:2 ("Abbott didn't believe that the

diligence it obtained was particularly helpful in preparing the financial model. . . . Q. Okay. You said that Abbott did not find or did not believe the due diligence was particularly helpful in preparing the financial model. What do you mean by that? A. Abbott's perception of the diligence was that a lot of the information that was provided was publicly available information and Abbott didn't receive the nature or quantity of information that it typically receives in conducting a due diligence process for an acquisition.")).

353.    J&J presented no evidence that Boston Scientific would have walked away if it were not able to provide diligence materials to Abbott.  Rather, the evidence shows that Boston Scientific, a rational economic actor contemplating multi-billion dollar gains from the acquisition, would likely have made a competitive bid for Guidant anyway.  (Trial Tr. 1515:9-1516:14 (Cornell Redirect) ("[Q.] Now, you were shown a portion of Mr. Best's deposition yesterday. Let me show you a couple other questions and answers from that deposition . . . . How does that testimony effect your opinion about the likelihood that $63 a share would have been the winning bid for Guidant, once Boston Scientific made its announcement on December 5th? A. Well, I hadn't seen this before today, but now seeing it, it's exactly consistent with what I testified to Mr. Coffey yesterday, which is between 63 and 72, that's a $9 gap involving, I think, four or five billion dollars. So that's a lot of money for people to be able to divide up to get the deal done. And I think what Mr. Best is saying is, given that gap, we could have gotten something done to get our deal through. The shareholders would be very foolish to accept 63 because we can get them more, even if we have to not use Abbott but use some secondary route.")).

354.    Further, Abbott could have agreed to act as the maker of a Takeover Proposal of its own or Co-bidder with Boston Scientific.

355. Guidant presented persuasive and unrebutted evidence that Boston Scientific had options other than Abbott. (Best Dep. 68:10-12, 68:21 ("We did receive calls from a number of private equity types that wanted to discuss acquiring the assets . . . [N]o doubt a lot of interest."); Knopf Dep. 37:5-12 ("Q: Mr. Tobin said that management is thinking of terms of a partnership with one of three companies, which he named. Do you recall which companies he named? A: I believe I do. Q: And what were they? A: Medtronic, St. Jude, and Abbott, I believe.")).

**B. J&J Has Not Met Its Burden To Prove That But For Guidant's Alleged Breach of the Notice Obligation, J&J Would Have Purchased Guidant for $63 per Share**

356. J&J admitted that it would not have behaved any differently if it had received notice of Abbott's involvement at an earlier date. Therefore, J&J has failed to prove any injury suffered from not receiving earlier notice. (Weldon Dep. 58:14-59:23 ("Q. Can you identify for me anything that J&J would have done differently, in connection with the -- the Guidant transaction, during the period between December 5, 2005 and January 8, 2006, if during that period of time J&J had known that Abbott was Boston Scientific's preferred divestiture party in connection with its bid for Guidant? A. I -- I couldn't even begin to speculate on what we would have done differently. Q. So the answer is: You cannot, you cannot identify anything that you would have done differently? A. I can't, no. Q. Okay. Can you identify anything that J&J would have done differently during that same time period, if during that time it had known that Guidant was permitting Abbott to conduct due diligence in connection with the Boston Scientific proposal? A. You're asking -- ask that question again. Q. I am asking you, sir, if you are able to identify for me anything that J&J would have done differently during the period from December 5, 2005 to January 8, 2006, if J&J had known during that period of time that Guidant was permitting Abbott to conduct due diligence in connection with Boston Scientific's bid? A. I -- I -- I've never engaged in that question, so I don't know what the answer -- I don't have any answer

for that question."); Deyo Dep. 145:7-146:8 ("[Q.] What I'm asking now is whether you can tell

me whether the company would have done anything differently if it had learned on December

21st, before any definitive agreements were reached in connection with the Boston Scientific

transaction, that Abbott was the proposed divestiture candidate? . . . . A. I don't know.  Q. You

don't know?  A. I don't know.").

357.     Moreover, J&J immediately recognized that Abbott was one of three or four

possible divestiture buyers.  (Trial Tr. 55:15-24 (Weldon Cross) ("Q.  Now, you did learn on

December 5, though, that your team, Johnson & Johnson team, believed Abbott was the most

likely divestiture candidate for those assets?  A.  We knew, as you stated, there was at least three

candidates that may have been considered, Abbott being one of them.  Q.  And because you all

knew the business, knew the industry, knew the parties, you rather quickly came to that

conclusion, isn't that right?  A.  I know we felt it could have been one of three.  I don't know if

we reached that conclusion specifically.")).

358.     J&J bargained for a "last look" if a competitive bidder emerged, and the

opportunity to respond to that competing bid by increasing its own bid.  (Trial Tr. 942:21-943:3

(Mulaney Redirect) ("[T]he purpose of the notice provisions are to keep Johnson & Johnson

reasonably informed about material developments as to a proposal, as to which, at some point in

time, they may get formal notice from us that we are now prepared to terminate the Johnson &

Johnson agreement and take the other offer.  And then Johnson & Johnson has five business days

to decide what it wants to do.")).

359.     J&J received the full benefit of the "last look" for which it bargained.  J&J made

its first counter-offer on January 11, just three days after Boston Scientific's January 8 offer (JPS

¶ 39; Deyo Ex. 23; Weldon Dep. 54:11-56:20), and J&J made its second counter-offer on

January 13, just one day after Boston Scientific increased its bid on January 12 (JPS ¶ 41; Hilton Ex. 24; Weldon Dep. 75:15-77:15).  Thereafter, it decided not to outbid Boston Scientific $76 offer.[30]

C.     **J&J Has Not Met Its Burden To Prove That Any Alleged Breach by Guidant's Participating in a Joint Defense Agreement, Cooperating with the FTC, or Identifying Abbott in the Co-Promote Agreement Caused J&J Any Harm**

360.    J&J has not proved that it was injured by any alleged breach by Guidant derived from its participation in a Joint Defense Agreement, its cooperation with the FTC, or identifying Abbott as a prohibited assignee in the J&J Co-Promotion Agreement.

361.    The purposes of the Joint Defense Agreement were to allow the parties to preserve privilege while planning for antitrust approval and to limit access to sensitive competitive information of the parties from one another.  (Trial Tr. 1370:25-1372:12 (John Redirect)).  J&J has proved no injuries resulting from Guidant's efforts to comply with the antitrust laws.

---

[30] J&J has alleged alternative, mutually exclusive Guidant breaches of the Merger Agreement—i.e., providing diligence to Abbott or not notifying J&J of a joint takeover proposal. Because J&J has admitted that it would have done nothing differently had it received one satisfactory form of performance (notice), J&J is not entitled to billions of dollars in damages it never had the right to expect from the alleged loss of alternative performance.  See, e.g., Irving v. Ort, 146 N.E.2d 107, 110 (Ind. Ct. App. 1957) (holding that a contract allowed for multiple forms of performance, and therefore in an action for breach "the award of damages appealed from was excessive in that it was based on the performance of work not required of the appellants by the terms of the lease"); W.J. Holliday & Co. v. Highland Iron & Steel Co., 87 N.E. 249, 253 (Ind. Ct. App. 1909) ("Where a contract is entered into between parties, giving to one of them an alternative, and the party having the right of such alternative breaches the contract, in estimating the measure of damages for a breach of such contract that alternative must be accepted which will be least injurious to the party having the right to exercise the choice.").

362.    The FTC already had an "in-depth understanding of the businesses and parties involved as a result of its investigation of the Johnson & Johnson/Guidant transaction" when Guidant furnished information to the agency.  (Kury Ex. 49 at GDT 00226195).

363.    Moreover, Guidant's cooperation with the FTC post-dates Boston Scientific's January 8, 2006 offer for $72 per share.  (DX0165 (John Direct) ¶ 28).  J&J has offered no proof that it would have been able to acquire Guidant at $63.08 per share, as it contends, once Boston Scientific made its $72 offer.

364.    With respect to the Co-Promotion Agreement, Guidant's McConnell understood that Abbott was listed on a schedule of prohibited assignees and that Abbott was "excluded" from obtaining the benefits of that agreement.  (PX0009; John Ex. 23 at SS00019772). Revealing that Abbott was a prohibited assignee under the Co-Promotion Agreement did not make it more likely that Abbott would enter into the Guidant transaction.  If anything, it made it less likely.

## D.    Indiana Law Does Not Shift the Burden of Proof on Causation to Guidant

365.    J&J argues that because of Guidant's alleged breach in providing confidential information to Abbott, Guidant should bear the burden to prove that it did not cause J&J's alleged injury in not acquiring Guidant.  (Trial Tr. 17:12-18 (J&J Opening Statement) ("Guidant's argument that Professor Jarrell's use of the $63 number as the bottom is inappropriate because J&J can't prove that once Boston's tentative proposal was made, the Guidant shareholders would not approve a deal at that price is wrong on several counts. First, Guidant has the burden of proving that. They prevented that vote, that shareholder vote from ever taking place because of their breach")).

366.    J&J relies upon an inapplicable legal doctrine cited in a Delaware case.  (J&J Pre-Trial Proposed Conclusions of Law ¶ 135 (citing WaveDivision Holdings LLC v. Millenium

160

Digital Media Systems LLC, No. 2993-VCS, 2010 WL3706624 (Del. Ch. Sept. 17, 2010)).

Under this principle (known as the "Hamlin doctrine" in Indiana and the "prevention doctrine" in

Delaware), the defendant bears the burden to disprove *breach* (not causation) when the defendant

claims that its performance was excused by the non-occurrence of a condition precedent if the

defendant's wrongful conduct prevented the condition from occurring.  The doctrine simply has

no bearing on the plaintiff's burden to prove that its alleged damages were caused by a breach.

See AquaSource, Inc. v. Wind Dance Farm, Inc., 833 N.E.2d 535, 539 (Ind. Ct. App. 2005)

("[T]he Hamlin doctrine requires that '[w]hen a party retains control over when the condition

will be fulfilled, it has an implied obligation to make a reasonable and good faith effort to satisfy

the condition.' . . . [A] party may not rely on the failure of a condition precedent to excuse

performance where that party's own action or inaction caused the failure." (quoting Hamlin v.

Steward, 622 N.E.2d 535, 540 (Ind.Ct.App.1993) (emphasis added)).

367.    Guidant has not argued that its performance of the nondisclosure condition was

excused by the absence of a shareholder vote on J&J's $63 offer.  J&J is therefore mistaken in

citing the Hamlin or "prevention" doctrine as shifting the burden to Guidant to disprove

causation.

368.    Not only does this legal doctrine not support any burden-shifting here, but also to

apply it on the basis J&J proposes would effectively—and absurdly—require the defendant to

disprove causation in nearly all breach of contract cases where a causation question exists.

**V.    J&J Has Not Met Its Burden To Prove the Existence and Amount of Any Damages
        Caused by the Alleged Breach**

369.    J&J has not met its burden of proving the existence and the extent of damages

caused by any alleged Guidant breach of the  Merger Agreement.

370.    "Under Indiana law, a plaintiff carries the burden to plead and prove damages."

Shepard v. State Auto. Mut. Ins. Co., 463 F.3d 742, 745 (7th Cir. 2006) (Indiana law).  "The

damages claimed also must be the natural, foreseeable, and proximate consequence of the

breach."  L.H. Controls, Inc. v. Custom Conveyor, Inc., 974 N.E.2d 1031, 1043 (Ind. Ct. App.

2012).  "[D]amages cannot be based on mere speculation and conjecture.  Rather, a plaintiff must

have adequate evidence to allow a jury to determine with sufficient certainty that damages in fact

occurred, and, if so, to quantify such damages with some degree of precision.  Shepard, 463 F.3d

at 745.

**A.     Under Indiana Law, the Measure of Damages Is the Actual Loss J&J Suffered by the Alleged Breach, Not J&J's Hopes When It Made the Contract**

371.    The measure of expectation damages under Indiana law is "the loss actually

suffered by the breach."  Country Contractors, Inc. v. A Westside Storage of Indianapolis, Inc., 4

N.E. 3d 677, 694 (Ind. Ct. App. 2014) (emphasis added).

372.    J&J is limited to damages that would result in it "being put in as good of a

position as [it] would have been in had the contract been performed."  (JPS ¶ 55 (citing

Restatement (Second) of Contracts § 344)).  The stipulated-to Restatement section further

explains, "*[t]he expectation interest is not based on the injured party's hopes when he made the

contract but on the actual value that the contract would have had to him had it been performed*."

Restatement (Second) of Contracts § 344 cmt. b & illus. 5 (emphasis added).

373.    An award in excess of actual losses is an impermissible windfall.  Bank One, Nat.

Ass'n. v. Surber, 899 N.E.2d 693, 704 (Ind. Ct. App. 2009) (trial court abused its discretion by

"plac[ing] [the plaintiff] in a better position than she would have been in" but for the breach,

thereby awarding a "windfall"); Sheek v. Mark A. Morin Logging, Inc., 993 N.E.2d 280, 289

(Ind. Ct. App. 2013) ("[T]he law disfavors a windfall"); L.H. Controls, Inc. v. Custom Conveyor,

Inc., 974 N.E.2d 1031, 1052 (Ind. Ct. App. 2012) (rejecting damages award that "would improperly allow CCI to be placed in a better position than they would have enjoyed if LH had not breached the contract").

374.    Under Indiana law, "a party injured by a breach of contract may not be placed in a better position than it would have enjoyed if the breach had not occurred."  E.g., L.H. Controls, Inc. v. Custom Conveyor, Inc., 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012); Shepard, 463 F.3d at 745 ("[A] plaintiff is limited to recovering only the losses actually suffered from the breach, and an injured party may not be placed in a better position than he would have enjoyed if the breach had not occurred."); Irving v. Ort, 146 N.E.2d 107, 110 (Ind. Ct. App. 1957) ("The fundamental rule of damages applicable to breach of contract cases is that the party injured by the breach is limited in recovery to the loss actually suffered by the breach; and he is not entitled to be placed in a better position than he would have been if the contract had not been broken."). Because Indiana law disfavors a windfall, post-breach evidence is relevant to determine what damages, if any, were *actually* caused by the contract not having been performed.  Country Contractors, Inc., 4 N.E. 3d at 695-96 (reversing damages award as speculative and uncertain when the trial court calculated damages using income projections based on assumptions instead of available post-breach evidence of lower income); Indianapolis City Mkt. Corp. v. MAV, Inc., 915 N.E.2d 1013, 1020 (Ind. Ct. App. 2009) (calculating lost restaurant profits caused by delay in opening premises based on post-breach profits earned after opening); Connersville Wagon Co. v. McFarlan Carriage Co., 76 N.E. 294, 297-98 (Ind. 1905) (holding damages to be too speculative and noting relevance of whether there has been "an efflux of time making that [loss] capable of ascertainment which was wholly conjectural before."); Sinclair Ref'g Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933) (post-breach discovery concerning valuation

was relevant to damages in a breach of contract case).[31]  As the Court stated concerning J&J's motion in limine "in a nutshell, plaintiffs want to exclude from the trial any damages evidence that concerns conduct or events that are subsequent to the breach by Guidant . . . . I'm not inclined to do that; it seems to me that Indiana law does permit a court to consider post-breach evidence . . ." Docket No. 151, Hearing Tr. 4:13-5:7; Minute Order (Nov. 6, 2014) ("The Court denied Plaintiff's motion in limine to exclude post-breach damages evidence.").

375.     "To correct uncertain prophecies in such circumstances [as when post-breach evidence is available] is not to charge the offender with elements of value nonexistent at the time of his offense.  It is to bring out and expose of light the elements of value that were there from the beginning."  Sinclair, 289 U.S. at 698.

### B.     J&J Was Not Injured by Not Purchasing Guidant, Which Suffered Losses Much Larger Than J&J's Claimed Damages in the Decade Following the Merger

376.     J&J contends that but for a breach of the Merger Agreement, it would have acquired, owned, and operated Guidant's business for the past decade and indefinitely going forward.  (Korbich Dep. 30:5-13 ("Q. Did you -- as far as you're aware, was a potential strategic reason for acquiring Guidant ever thought to be to possibly turn around and sell Guidant to someone else? A. Not that I'm aware of. Q. You never heard anything like that, right? A. No.")).  J&J alleges that Guidant's alleged breach cost J&J the opportunity to earn future profits from a J&J-operated Guidant.  J&J's burden to prove damages must therefore be met with proof of damages necessary to put J&J "in as good of a position as [it] would have been in had the

---

[31] See also Fishman v. Wirtz, 807 F.2d 520, 551-52 (7th Cir.1986) (approving use of post-breach evidence in calculating federal antitrust damages and stating that the court knew "of no case that suggests that a value based on expectation of gain is more relevant and reliable than one derived from actual gain").

contract been performed"—i.e., the damages necessary to compensate J&J for the profits (if any) that it would have received from owning and operating Guidant's business.  (JPS ¶ 55).

377.    Although J&J contends that its valuations were reasonable in light of what was known at the time of the breach, the reasonableness of J&J's valuations or its bidding decisions are not at issue in this case.  As the finder of fact, the Court is charged with deciding whether J&J has satisfied its burden to prove that it is economically worse off than it would have been had the contract been performed because of that breach.  See Country Contractors, Inc., 4 N.E. 3d at 695-96.  Whether J&J was reasonable in hoping that the contract would be lucrative has no bearing on the Court's decision of whether J&J would in fact have been better off had the contract been performed.  See Restatement (Second) of Contracts § 344 cmt. b & illus. 5.

378.    J&J failed to present any evidence that an award of damages would be necessary to put J&J "in as good of a position as [it] would have been in had the contract been performed." (JPS ¶ 55).

379.    The unrebutted evidence presented at trial shows that J&J is in a *better* position than it would have been in had it acquired Guidant.  (Trial Tr. 1509:12-14 (Cornell Redirect) ("[I]t's my view that the loss Johnson & Johnson suffered because they didn't buy Guidant ten years ago is negative.  They actually dodged a bullet."); Trial Tr. 1525:17-18 (Cornell Recross) ("Johnson & Johnson, in fact, by not acquiring Guidant received a benefit, not a harm.")).  J&J has presented no evidence to the contrary.

380.    At the time of the Merger Agreement, Guidant had recently experienced changes that "would have a substantial and long-term adverse effect on Guidant's value," which have proven to be costly.  (Caruso Dep. 102:4-103:20; DX0147 at 39; DX0151 at 54; DX0152 at 47; DX0153 at 48; DX0154 at 48).

381.    J&J's hopes that acquiring Guidant would be a lucrative acquisition were based to a large extent on what turned out to be an overly optimistic prediction of the growth rate of the overall CRM market.  J&J understood that its projections were highly sensitive to the assumption of high growth of the CRM market, since approximately three-fourths of the value it hoped to reap from acquiring Guidant was attributable to gains from the CRM business.  (DX0164 (Cornell Direct) at ¶ 49).  As explained by Cornell in unrebutted testimony, "using the sensitivities documented by J&J, if a 3.6% compound annual growth rate is used – a rate derived from an October 2010 Wedbush analysis of the worldwide CRM market – J&J's expected [net present value ("NPV")] decreases by approximately $12.2 billion to *negative* $7.5 billion at an acquisition price of around $63 per share. . . . The expected NPV would have been even more negative had J&J modeled the growth in the CRM market at 0.7% per year, i.e., the *actual* growth rate of the CRM market.  Specifically, using the sensitivities documented by J&J, the expected NPV would have decreased by approximately $16.0 billion to *negative* $11.3 billion at an acquisition price of $63.08 per share if J&J had modeled CRM growth at 0.7% per year (the growth rate that actually materialized) as opposed to 13 percent per year.  Thus, when actual figures are used in place of J&J's incorrect predictions, J&J's own modeling indicates that it would have incurred a loss had it purchased Guidant at $63.08."  (DX0164 (Cornell Direct) ¶¶ 51, 53 (internal citations omitted)).

382.    After acquiring Guidant, Boston Scientific bore the consequences of the negative forces impacting the CRM market.  Boston Scientific announced multi-billion dollar write-downs of its goodwill resulting from the losses incurred in operating Guidant, indicating that it had overpaid for Guidant in 2006.  (Trial Tr. 467:9-469:7 (Bicknese Cross) ("[Q.] Now, can you explain, what's a goodwill impairment charge? A. It means that they could no longer justify the

carrying value of the asset on the balance sheet. So in this particular case, I'm not familiar with the specific issues that they went through, but it seems that they're suggesting that they no longer believe that the future projections that were in – or the basis upon which they acquired the company were no longer the same, that they had declined, and therefore, that would have represented a decline in value of the asset. Q. So stated slightly differently, is it fair to say that the goodwill impairment charge, and this explanation for it, suggests to you, as a sophisticated user of financial statements at least, that Boston Scientific paid more for Guidant than Guidant was worth in 2006? . . . A. I think what it says to me is that, at this point in time, they no longer think it was worth what they had paid for it in 2006. Q. They don't think it's worth what they paid for it in 2006? A. They can no longer justify the carrying value of the asset on their balance sheet.")).

383.    J&J has offered no evidence that Guidant's performance in J&J's hands would have significantly differed from its performance since Boston Scientific's acquisition of the business, much less that J&J would have been able to extract earnings from operating Guidant's business that would have overcome the $11.3 billion loss predicted by J&J's own models when the actual CRM market growth rate is used rather than J&J's inaccurate prediction of that rate. (See DX0164 (Cornell Direct) ¶ 53).  J&J presented no evidence of a business plan for Guidant that could have generated a different result under J&J management or evidence that it had a specific business plan for the CRM business at all.  J&J presented no witness who would have been specifically charged with implementing such a plan if it existed.  J&J has offered no specific evidence concerning Boston Scientific's management of the Guidant businesses post-merger that J&J suggests were bad business decisions particular to Boston Scientific that it

would not have made.  In short, J&J has not carried its burden on this issue and its silence on the issue is telling.

384.    The only evidence offered at trial concerning whether Guidant's business would have performed better under J&J's stewardship was Cornell's testimony that Guidant's poor post-merger performance was largely dictated by factors outside of J&J's (or Boston Scientific's) control.  (Trial Tr. 1530:7-1531:5 (Cornell Recross) ("[T]ypically, the growth rate depends on overall economic conditions, and here, we had a great recession, and the nature of the product and the public's demand for it.")).

385.    Cornell also testified that there was no basis for contending that Boston Scientific's debt burden affected the CRM market growth rates that fell so far short of J&J's hopes when it bid on Guidant.  (Trial Tr. 1530:7-1531:5 (Cornell Recross) ("THE COURT: Sorry.  Do you have any basis for knowing whether the debt burden of Boston Scientific contributed to the growth rates or lack of growth rates in the CRM market? . . . . THE WITNESS:  I would kind of doubt it because that's the whole point of having such a deep and wonderful capital market in this country.  If you have good opportunities, you can get them financed.  So if the market thinks it's a good opportunity, you can get the money, and if the market doesn't think it's a good opportunity, you should think twice about getting the money.")).

**C.  J&J Offered No Relevant Evidence of Damages Because Its Expert, Professor Jarrell, Did Not Provide Relevant or Reliable Testimony**

386.    J&J relies entirely on its proffered expert, Professor Jarrell, to prove its damages case.

387.    At trial, J&J offered no business plans or other evidence to prove how J&J intended to realize its hoped-for profits from owning and operating Guidant, and it offered no witnesses knowledgeable about the J&J documents Jarrell relied upon in his testimony.  J&J

produced no evidence supporting the projections underlying J&J's damages claim.  Nor did J&J

offer any financial documents evidencing any actual economic harm to J&J.

388.    J&J's wholesale reliance on Jarrell's testimony is fatal to its damages case

because Jarrell failed to apply controlling law, ignored evidence that J&J was not harmed, relied

upon unsupported assumptions, and failed to conduct any independent analysis that would aid

the finder of fact.  J&J has therefore failed to prove it is entitled to damages.

### 1.    Jarrell Failed To Apply Controlling Law and Ignored Evidence That J&J Was Not Harmed

389.    Jarrell testified that his calculations of damages were limited by a policy of "no-

peeking": "you're not allowed to go forward and look at what actually happened.  You have to

put blinders on and accept what was known and knowable at the time when you do [the]

valuation analysis."  (Trial Tr. 382:21-24 (Jarrell Cross)).

390.    When asked by the Court about the origins of his "no-peeking" approach, Jarrell

explained that his methodology was derived from "Delaware Chancery Court proceedings where

the judges have to make a judicial evaluation and give shareholders a judiciary value . . . for

example, a freeze-out merger where the majority shareholders buy out the minority shareholders,

and the minority shareholders, rather than taking the deal, they petition the court to do an official

appraisal proceeding."  (Trial Tr. 421:12-14, 17-20 (Jarrell Cross)).

391.    Jarrell's approach to calculating damages was incorrect both as a legal and a

factual matter.

392.    Jarrell's decision not to "look at what actually happened" is inconsistent with

Indiana law's mandate that damages must be equal to "the loss actually suffered by the

breach."  Country Contractors, 4 N.E. 3d at 694.  Likewise, the decision to "put blinders on and

accept what was known and knowable" in 2005 cannot be squared with legal principles the

parties have stipulated to applying in this case. See Restatement (Second) of Contracts § 344 (cited in JPS ¶ 55) cmt. b & illus. 5 ("The expectation interest is not based on the injured party's hopes when he made the contract but on the actual value that the contract would have had to him had it been performed.").

393.    As Cornell testified, the economics underlying the inquiry in a shareholder appraisal action from which Jarrell adopted his "no-peeking" approach is fundamentally different from this case.  In a shareholder appraisal action, the appraiser's task is to determine at what price an asset or business would have *sold* in the but-for world.  (Trial Tr. 1467:1-9 (Cornell Cross) ("THE WITNESS: . . . the minority shareholder is out.  They're not going to own the stock, in any event.  It's just a question of making sure that when they were taken out, they got a fair price at the time they were taken out.  THE COURT:  Right, but everything that happens subsequent to that is sort of speculative, right?  THE WITNESS:  And it wouldn't matter to them because they're out, in any event.")).

394.    In contrast, J&J contends that but for an alleged breach, it would have *acquired and owned*—not sold—Guidant, and therefore J&J would have been impacted by events that took place in the past decade.  (DX0164 (Cornell Direct) ¶ 12 ("Professor Jarrell states that the best measure of J&J's alleged damages is based on the 'investment value' of Guidant to J&J.  In the context of a merger or acquisition, the investment value (sometimes referred to as 'strategic value') to an acquirer of acquiring a target typically refers to the value of the target when operated by the acquirer")).  The alleged loss J&J seeks to measure through its damages claim is the value of anticipated future earnings that it hoped to earn on an ongoing basis after acquiring Guidant.

395.     The synergistic benefits J&J hoped to gain through acquiring Guidant could only be monetized over time—if ever—through J&J's continued operation of Guidant's business. (Trial Tr. 1537: 9-17 (Cornell Redirect) ("Q. In fact, synergies are a prediction, aren't they?  A. They're a predicted benefit.  At the time that you do a transaction, you are predicting you are going to get these benefits of synergy.  Q. They're not something you can monetize on the day of an acquisition?  A.  Typically not, no, because to monetize it you'd have to flip the asset and the synergies are unique to you, and so you can't flip it."); Trial Tr. 378:2-14 (Jarrell Cross) ("Q. And this investment value in part derives from something we've heard reference to called synergies, is that right? A. In the case of mergers and acquisitions synergies can play a role in determining a bidder's reservation price which is another way of talking about their investment value.  Q. And at the time that a deal like this is being evaluated or contemplated those synergies haven't yet occurred, right?  A. No.  Q. They're something that's going to occur in the future? A. They're part of the projections and part of the anticipated benefits from the deal but you don't know if they're going to occur or not until time passes and you integrate the companies and so forth."); Trial Tr. 203:1-3, 204:16-20 (Coates Cross)  ("Q. Well, synergies, you can't realize a synergy until you close the merger, right? A. That part I agree with, yes. . . . [Q.] [T]hose synergies can come only post closing as a result of operational changes by the bidder that at the time of a breach will remain in the future and be subject to many contingencies, isn't that right? A. Can be the case, yes."); Trial Tr. 202:1-10 (Coates Cross) ("Q. And the value -- well, it's difficult in many cases for a strategic bidder to prove damages with any certainty if there's been a breach of a merger agreement, isn't that right? A. It can be, depending on the circumstances. Certainly difficult to prove all of the damages. Q. And that's one of the reasons why damages in cases that involve strategic bidders can be speculative and unavailing, isn't that right, dollar

damages? A. Again, it can be the case that part of the advantage of the deal is something that would be difficult to prove.")).

396. The Supreme Court has cautioned that "[f]ormulas of measurement declared alio intuitu [i.e. under a different aspect] may be misleading if wrested from their setting and applied to new conditions." Sinclair, 289 U.S. at 699. To that end, the Court held that "an imaginary bid by an imaginary buyer, acting upon the information available at the moment of the breach"—i.e., Jarrell's "blinders" approach—is not the appropriate measure of damages for claims against "sellers in default." Id. The Court explained that a would-be buyer's damages are not "fair compensation if the criterion of value is the price that he would have received if he had disposed of it at once, irrespective of the value that would have been uncovered if he had kept it as his own. Id.

397. Thus, by applying a "no-peeking" approach that Jarrell derived from appraisal cases where damages are based on a but-for sale of a business to J&J's claim alleging damages based on but-for ownership of Guidant, Jarrell used the wrong method to measure damages.

398. Jarrell's analysis would not even pass muster were this lawsuit a shareholder appraisal action—i.e., the context from which Jarrell purports to have adopted his "no-peeking" approach. As Professor Cornell testified, "Professor Jarrell actually did not do an appraisal. We've talked a lot about appraisals, but independent appraisals require the appraiser to do all the vetting and due diligence. He did not do an independent appraisal. He either relied on the bids directly or indirectly on Johnson & Johnson's appraisals." (Trial Tr. 1504:9-14 (Cornell Redirect)); see also Trial Tr. 422:16-20 (Jarrell Recross) ("THE COURT: All right. But you

didn't do [a valuation].[32] You basically just accepted the bidding history and the fairness opinions from Goldman Sachs? THE WITNESS: Just the bidding behavior of Johnson & Johnson is my No. 1 thing that I'm relying on, yes.")).

399.    Furthermore, in a Delaware appraisal, the Court would not be permitted to include in its damages award "any element of value arising from the accomplishment or expectation of the merger" (Del. Code Ann. tit. 8, § 262(h)), which "requires the Court to exclude any synergistic value, that is, the amount of any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a stand-alone going concern, but as a part of a larger enterprise, from which synergistic gains can be extracted." Gearreald v. Just Care, Inc., No. CIV.A. 5233-VCP, 2012 WL 1569818, at *3 (Del. Ch. Apr. 30, 2012) (quotations omitted).  Thus, had Jarrell actually performed an appraisal, he would have excluded the very components of value unique to J&J that J&J contends give rise to its "investment value" damages.  See id.; Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 268 (2d Cir. 2002) (affirming exclusion of expert testimony where the expert "failed to apply his own methodology reliably.").

400.    Jarrell's decision to ignore the considerable and unrebutted evidence that J&J suffered no actual loss as a result of any alleged breach is without legal justification and undermines the entirety of his testimony.  Jarrell's "gaping omission of real world events that were highly material to [Guidant's] vitality and unrelated to [Guidant's alleged breach]" leave his testimony "irretrievably unreliable and indefensible," and require that it be excluded.  See Point Prods. A.G. v. Sony Music Entm't, Inc., No. 93 CIV. 4001 (NRB), 2004 WL 345551, at *7

---

[32] The parties have agreed to the bracketed correction to the original trial transcript, which states "an evaluation." (Trial Tr. 422:16-17).

(S.D.N.Y. Feb. 23, 2004) (excluding expert testimony due to damages expert's failure to account for predominantly post-breach "real world facts and events" affecting the plaintiff's profitability, instead "adopt[ing] possibly speculative assumptions and predictions that are vital to his projections.").

### 2.   J&J's Unexpressed Claimed Willingness To Bid Is Not Reliable Evidence of Damages

401.   Jarrell testified that in calculating damages, he relied upon J&J's alleged planned offer of $75.00 per share as the "best evidence of Guidant's investment value to J&J." (PX0019 (Jarrell Direct) ¶ 8). Jarrell refers to this figure as J&J's "revealed preference." (Id.). But J&J did not make such an offer to Guidant.

402.   Jarrell assumed that J&J would prove that J&J was prepared to offer $75 per share. (PX0019 (Jarrell Direct) ¶ 8). However, as Jarrell conceded, J&J never bid $75 per share for Guidant. (Trial Tr. 381: 11-14 (Jarrell Cross) ("Q. There never was a $75 bid, was there? A. Well, I'm assuming that – Q. There wasn't, was there? A. No.")).

403.   The evidence does not support Jarrell's assumption that J&J was prepared to offer $75 per share. Goldman Sachs never issued a fairness opinion to support a $75 per share offer, and J&J never asked Goldman Sachs to do so. (Hitchner Dep. 146:22-25 ("Q. Do you recall ever being asked by Mr. Weldon to actually attempt to get a formal fairness opinion in the range of $75? A. No.")). Goldman Sachs never told the J&J Board that it would be able to deliver a fairness opinion in the range of $75 per share, which exceeded the range included in its previous fairness opinion of $61-$65. (Hitchner Dep. 147:8-15 ("Q. Do you remember discussing with the board that Goldman Sachs would be able to deliver a fairness opinion in – in the range of about $75 per share . . . ? . . . . A. I don't remember having a conversation with the board."); Hitchner Ex. 9 at GG-JJ_015219).

404.    Even had J&J proved that it was prepared to offer $75 per share for Guidant,

Jarrell would not have reliably applied the principle of "revealed preference" to J&J's alleged

intention to offer $75 per share because, as Cornell explained, "revealed preference usually

means revealed by an actual action," and it is undisputed that J&J never bid $75 per share for

Guidant.  (Trial Tr. 1446:20-1447:2 (Cornell Cross); 1447:14-25 (Cornell Cross); 1449:14-22

(Cornell Cross).  See FRE 702).

405.    Jarrell was likewise wrong to rely upon J&J's actual bids for Guidant as reliable

evidence of damages because J&J's bidding behavior was necessarily informed by its estimates

of Guidant's investment value to J&J.  The bids are at best only as informative of Guidant's

investment value as the estimates upon which the bids were based.  (DX0164 (Cornell Direct)

¶ 57; Trial Tr. 1452:12-17 (Cornell Cross) ("Q. Well, isn't what J&J was looking to pay for

something the best evidence of what it -- how it valued Guidant?  A. Well, it's just evidence that

they relied on their underlying economics.  I don't see how you can use someone's bid as a

measure of damages without understanding where that bid came from.")).

406.    The evidence shows that J&J management's bidding decisions could have been

influenced by factors other than its estimate of the value of acquiring Guidant.  (Trial Tr. 208:24-

209:18 (Coates Cross) ("Q. Right. And one of the things that you identify as a distortion is what

you call agency costs, right?  A. Yes.  Q. And that's a situation where bidder managers, people

making bids, take actions that are not necessarily in the interests, the best interest of their firm,

but they are designed to act on their preference to get bigger, right, to maximize size or stability,

isn't that right? A. That's a short summary, but yes, that's one element of that theory that other

people have advanced and we were bringing to bear here as a possible explanation, yes. Q. So in

theory, that suggests that sometimes companies pursue and continue to pursue and pay for deals

175

not because of value but because they value getting bigger. A. I think as a general matter there are going to be instances for public companies where the managers of those companies make decisions that are not in the best interests of their shareholders. That's generally true, and one thing specifically might be to make an acquisition for other, non-shareholder related reasons."); Trial Tr. 393:3-394:10 (Jarrell Cross) ("Q. The separation of risk variant from managerial functions in large corporations can induce managers to make decisions that are not necessarily in the best interests of the shareholder, right?  A. It can happen, yes, sir. Q. And that's because those managers have broad discretionary powers, don't they? A. That's one potential cause, yes. . . . Q. In theory, though, you've studied and you agree that there are sometimes behaviors that distort the relationship between bid behavior and valuation, right?  A. You can -- we can, yeah, we can come up with hypothetical circumstances talking about agency costs and so forth where the interests of managers and shareholders can deviate under certain conditions, yes, sir. Theoretically, yes, sir."); Trial Tr. 1508:13-16 (Cornell Redirect) ("Q.  Are there reasons why management would be willing to bid higher than the investment value of an asset? A.  There are possible reasons, yes.  I think Professor Coates discussed some of those.")).  Accordingly, J&J's bidding decisions are not reliable indicators of J&J's estimates of Guidant's investment value.

407.    J&J's bidding—and more so, its claimed willingness to bid—is therefore "simply inadequate to support the conclusions [Jarrell] reached, [and] Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony.  Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005).

###### a.    Jarrell's Uncritical Adoption and Recitation of J&J's Unproven Valuations Do Not Aid the Finder of Fact

408.    Although Jarrell testified that he was chiefly relying on J&J's alleged bidding behavior as his basis for calculating damages, Jarrell also claimed to rely on J&J's internal

estimates of the value of acquiring Guidant circa 2005 and early 2006 as further evidence of Guidant's investment value to J&J. (PX0019 (Jarrell Direct) ¶ 11 (citing Korbich Ex. 28 at GG-JJ_018855, GG-JJ_018862)).

409.    J&J's valuations were performed using a discounted cash flow ("DCF") model based on J&J's ten-year projections of factors including the growth rate of the CRM market and Guidant's future market share. (Korbich Ex. 26; Korbich Ex. 28). It is undisputed that a DCF valuation is only as reliable as its underlying projections. (Trial Tr. 1473:13-24 (Cornell Cross) ("Q. Would you agree that the discounted cash flow method of valuation is considered by experts to be the preeminent valuation methodology? A. I think the discounted cash flow framework is really the standard valuation framework. I say framework because the real result of any DCF analysis is the inputs that you put into it, but the framework itself is probably the preeminent framework, yes. Q. If the inputs are reasonable, then the output is deemed to be among the most credible ways of valuing an asset, right? A. Yes. The dispute is typically with regard to the reasonable nature of the inputs."); Trial Tr. 459:7-10 (Bicknese Cross) ("Q. Now, in the discounted cash flow analysis if the assumed growth rate assumption is wrong, then the output of the DCF would be wrong, right? A. Correct.").

410.    The only evidence J&J offered at trial concerning these estimates was the testimony of Jarrell, who testified that he simply "read" J&J's valuations. (Trial Tr. 364:12-25 (Jarrell Cross) ("Q. So you made no effort to determine whether the Johnson & Johnson valuations were reasonable at the time they were prepared, isn't that right? A. Correct. Q. And then you made no effort to determine after the fact whether any or all of the assumptions underlying those valuations were reasonable, reliable or even accurate? A. Well, yeah. I don't know how you do that, but no, I didn't do it. Q. You didn't even check for arithmetic errors, did

you? A. I don't remember checking for -- I didn't see any, but I don't remember checking for

arithmetic errors. I didn't replicate their analysis. I didn't put it in my computer and replicate the

DCF analysis.")).  Jarrell was unaware that the only J&J valuation document referenced in his

direct testimony was a "working draft" prepared by junior personnel.  (Trial Tr. 388:14-390:4

(Jarrell – Cross)).

411.    Jarrell testified that "generally it's expected of the valuation expert to do some

high level what I call kicking of the tires and testifying for just general reasonableness of the

projections."  (Trial Tr. 384:18-385:11 (Jarrell Cross) ("Q. Would you agree with me, Professor,

that one of the obligations of a valuation expert is to test the projections that they use to form

their opinions as best they can for reasonableness?  A. Generally, yes. . . . generally it's expected

of the valuation expert to do some high level what I call kicking of the tires and testing for just

general reasonableness of the projections.  For example, to check whether -- the growth rates that

are projected relative to historical growth rates. So there is an expectation that the expert do

something to check the reasonableness when you're doing DCF valuation analysis, which of

course I'm not doing in this case.")).

412.    However, Jarrell conceded that he did not test the assumptions and projections

underlying J&J's DCF valuation models.  (Trial Tr. 384:18-385:20 (Jarrell Cross) ("Q. And

again, just so we're clear, you didn't kick any tires with respect to the Johnson & Johnson

valuations?  A. No, I didn't do DCF valuation analysis at all in this case, no.")).

413.    Jarrell agreed that the projections underlying J&J's valuations were "subject to

risk and uncertainty," including risk that "projections could be affected by changes in regulatory

climates at the FDA" and that "the business underlying those projections could be impacted by

state budgetary woes and their impact on Medicare and Medicaid payment," but he could not

"testify as to whether any of these models or those models that [he] read exhibit substantial uncertainties and volatilities that call into question their validity as predictors and estimates of future value."  (Trial Tr. 363:4-24, 365:10-14); see Schonfeld v. Hilliard, 218 F.3d 164, 174 (2d Cir. 2000) ("[T]he court properly held that [plaintiff] failed to establish a foundation for the existence of lost profits" when plaintiff's damages expert "failed to account for the effects of *any* general market risks on the [business's] probability of success." (emphasis in original)).

414.    Jarrell did not undertake any independent analysis of the J&J valuations he relied upon; instead, he accepted J&J's valuations as accurate.  (Trial Tr. 422:16-20 (Jarrell Recross) ("THE COURT: All right. But you didn't do [a valuation].[33] You basically just accepted the bidding history and the fairness opinions from Goldman Sachs? THE WITNESS: Just the bidding behavior of Johnson & Johnson is my No. 1 thing that I'm relying on, yes.")).

415.    Expert testimony is insufficient to support a claim for damages when the expert simply adopts and recites plaintiff's data.  Cap Gemini Am., Inc. v. Judd, 597 N.E.2d 1272, 1283 (Ind. Ct. App. 1992) (California law) (finding damages estimate too speculative, and thus inadequate to support an award for lost profits, where expert assumed the veracity of profit rates projected for plaintiff, "based only upon [plaintiff's] statements that he could obtain [these profits]"); Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 428-29 (S.D.N.Y. 2009) (striking expert opinions that "are merely a restatement of [defendant's] views and are not the product of independent analysis."); Gary Price Studios, Inc. v. Randolph Rose Collection, Inc., 2006 WL 1319543, at *8 (S.D.N.Y. May 11, 2006) (excluding testimony of expert who

---

[33] The parties have agreed to the bracketed correction to the original trial transcript, which states "an evaluation." (Trial Tr. 422:16-17).

uncritically assumed correctness of facts provided by plaintiff and merely "parrot[ed]" back facts to which plaintiff could have testified).

416.    Professor Jarrell did nothing more than apply basic arithmetic to J&J's valuations, which does not aid the Court as the finder of fact.  See Fed. R. Evid. 702(a); Trial Tr. 422:21-25 (Jarrell Recross) ("THE COURT: And then after that, once you decided that 63.08 is the baseline and that the bidding history is reflective of value, this is pretty much just using a calculator, right?  THE WITNESS: Yes, sir.").  As a result, Jarrell's testimony should be excluded.

> **D.     If They Were Relevant—And They Were Not—J&J's "Investment Value" and "Fair Market Value" Damages Calculations Fail To Prove Damages**

417.    Even were the Court—contrary to Indiana law—to disregard all of the evidence post-dating the alleged breach, J&J's would still fail to meet its burden to prove the existence and extent of damages.

> **1.     J&J Failed To Show Even Potentially Calculable Losses and Instead Seeks Speculative Multi-Billion Dollar Hypothetical Profits**

418.    The damages J&J seeks in this case are the long-term profits it at one time projected that it would have earned from owning and operating Guidant based on hoped-for synergies and optimistic business outcomes.  (E.g., Weldon Dep. 110:18-25 ("Q.  And -- and can you then tell me, to your mind, how was J&J harmed by not being able to acquire Guidant? A. How was J&J harmed by not being able to acquire Guidant? We were not able to gain access to - - to technologies and products that we would be able to develop and grow over a protracted period of time.")).

419.    J&J does not seek direct or general damages for the value of the performance that it contends was not provided under the contract, i.e., forbearance from facilitating competing offers.  3 Dobbs Law of Remedies § 12.2(3) (2d ed. 1993) ("[G]eneral damages are based on the value of the very performance contracted for. . . . [C]onsequential or 'special' damages are not

based on the capital or present value of the promised performance but upon benefits it can

produce or losses that may be caused by its absence")).

420.    J&J has offered no evidence of any general damages, such as proof of the

negotiating value of a non-facilitation clause.  (Trial Tr. 366:6-367:4 (Jarrell Cross) ("You didn't

calculate the  value of a promise not to solicit competing bids in connection with the merger

agreement like this? A. No.").

421.    J&J did not present evidence of harm to J&J's existing businesses as a result of an

alleged breach.  CRM would have been a new business for J&J.  (Trial Tr. 82:12-21 (Weldon

Redirect) (J&J was "not competing at all in the CRM business" in December 2005)).  Likewise,

the small (and undefined) portion of J&J's damages attributable to anticipated DES-related

profits were based not on any harm to an existing J&J business, but rather J&J's failure to

acquire and market a new, second-generation stent product to replace its own outdated product,

for which J&J had failed to develop a successor.  (See Trial Tr. 89:5-7 (Weldon Redirect) ("[W]e

have exited the business because of the inability to have a second generation stent, which this

would have given us.")).

422.    Alleged injuries based on the projected performance of a new business are viewed

skeptically because they are inherently more speculative than claims of lost profits concerning an

established enterprise.  See Kenford Co. v. Erie Cnty., 493 N.E.2d 234, 235 (N.Y. 1986) ("If it is

a new business seeking to recover for loss of future profits, a stricter standard is imposed for the

obvious reason that there does not exist a reasonable basis of experience upon which to estimate

lost profits with the requisite degree of reasonable certainty").  J&J chose not to pursue a

damages claim for harm to any existing J&J business, and instead seeks impermissibly

speculative projections of profits from a new, integrated J&J-Guidant CRM business based on

synergies that had no track record.  See id. (even using "business and industry's most advanced and sophisticated method for predicting the probable results of contemplated projects," plaintiff's projection of new facility's income based on operation of other similar businesses was inadequate to prove lost profits); Dupont Flooring Sys., Inc. v. Discovery Zone, Inc., No. 98 CIV. 5101 (SHS), 2004 WL 1574629, at *7 (S.D.N.Y. July 14, 2004) (rejecting damages as speculative when the business was, among other things, "streamlining its operations, and preparing to enter a new market with newly remodeled stores, new prices, and new services. It was also trying to enter new segments of the market.").

423.    J&J did not present evidence of any reliance or other out-of-pocket damages.

424.    Instead, J&J contends that as a consequence of an alleged breach, shareholders did not vote in favor of J&J's $63.08 offer, causing J&J not to acquire Guidant at that price, and thereby forego future operating profits from various synergies it anticipated it could realize over the years and decades following the acquisition.

## 2.    J&J Did Not Prove That the Parties Intended That J&J's Future Operating Profits or Resale Profit Could Be Recoverable Consequential Damages

425.    Indiana courts have adopted the rule from the famous English case of Hadley v. Baxendale, which provides that the non-breaching party must prove that the consequential damages sought were within the mutual contemplation of the parties at the time they entered into the agreement.  See Johnson v. Scandia Assocs., Inc., 717 N.E.2d 24, 31 (Ind. 1999) ("Consequential damages may be awarded on a breach of contract claim when the non-breaching party's loss . . . was contemplated by the parties when the contract was made.  This follows the rule of Hadley v. Baxendale, 156 Eng. Rep. 145 (1854)" (citations omitted)); Kenford Co. v. Cnty. of Erie, 537 N.E.2d 176, 180 (N.Y. 1989) ("[T]he constant refrain which flows throughout the legion of breach of contract cases dating back to the leading case of Hadley v Baxendale

provides that damages which may be recovered by a party for breach of contract are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed.").

426.    Indiana law classifies a claim for future profits that may be realized only through operation of the acquired company, such as J&J's alleged "investment value" damages, as consequential damages.  See, e.g., Indianapolis City Mkt. Corp. v. MAV, Inc., 915 N.E.2d 1013, 1024 (Ind. Ct. App. 2009) ("Consequential damages may include lost profits"); 3 Dobbs Law of Remedies § 12.2(3) (2d ed. 1993) ("Usually these consequential benefits are somewhat peculiar to the plaintiff individually . . . . The clear case of damages truly based on lost profits that also count as consequential damages is the case of lost operating profits of a business.").[34]

427.    J&J has offered no evidence—no testimony, no documents—to satisfy its burden to prove that J&J and Guidant contemplated that in the event of a breach of the Merger Agreement, J&J would be entitled to sue for billions of dollars of synergies it hoped to monetize over decades if Guidant's shareholders approved the proposed merger.

428.    "Where the contract is silent on the subject [of consequential damages], the court must take a common sense approach, and determine what the parties intended by considering the nature, purpose and particular circumstances of the contract known by the parties as well as what

---

[34] The New York Court of Appeals recently articulated a narrow exception under New York law, holding that where "[t]he purpose of the agreement was to resell" and is in fact "much closer to [a] joint venture," lost profits expected from such "clearly contemplated" reselling are direct damages, not consequential.  Biotronik A.G. v. Conor Medsystems Ireland, Ltd., 22 N.Y.3d 799, 808-09 (March 27, 2014).  Although there is no similar exception under Indiana law, the Merger Agreement in any event was not a resale agreement and the relationship between Guidant and J&J was in no sense similar to the distribution agreement at issue in Biotronik.  The future operating profits J&J seeks in this action are at least "one step removed from the naked performance promised by [Guidant]" and therefore "cannot fairly be termed general damages." PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc., No. 12 CIV. 8570 PAE, 2014 WL 7146357, at *13 (S.D.N.Y. Dec. 15, 2014) (distinguishing Biotronik).

liability the defendant fairly may be supposed to have assumed consciously."  Schonfeld v.

Hilliard, 218 F.3d 164, 172 (2d Cir. 2000).

429.    Here, however, the contract is not silent.  The parties contemplated within the

Merger Agreement that in the event of a breach, "the parties would not have any adequate

remedy at law" and instead, "the parties shall be entitled to an injunction or injunctions to

prevent breaches of this Agreement and to specifically enforce the terms and provisions of this

Agreement . . . ."  (Kury Ex. 9 § 8.10 at SA 00026247; see Kenford Co. v. Erie Cnty., 493

N.E.2d 234, 236 (N.Y. 1986) (plaintiff failed to demonstrate that liability for lost profits was

contemplated by the parties where "provisions in the contract providing remedy for a default do

not suggest or provide for such a heavy responsibility on the part of the [defendant]")).[35]

430.    Even were the Merger Agreement silent, J&J's failure to present any evidence

that lost profit damages were contemplated by the parties sinks its damages claim.  See

Spheronomics Global Contact Centers v. v Customer Corp, 427 F. Supp. 2d 236, 252 (E.D.N.Y.

2006) ("Spheronomics has introduced no evidence beyond that silent contract from which I could

conclude that the parties intended to indemnify Spheronomics for its lost profits in the event that

[defendant breached]."); Safka Holdings LLC v. iPlay, Inc., No. 12 CIV. 7301 RJS, 2013 WL

9636959, at *4 (S.D.N.Y. May 20, 2013) (Sullivan, J.) (striking claim for "consequential

damages—specifically, lost profits"—because the complaint "[did] not plead that those damages

---

[35] Like the plaintiff in Schonfeld v. Hilliard, J&J "is not seeking profits that would have
accrued under [the Merger Agreement].  Rather, [J&J] wants to recover lost profits that [it]
might have received from the operation of [Guidant].  Further, the profitability of [Guidant] was
highly uncertain" at the time of the alleged breach.  See Schonfeld, 218 F.3d at 175.  "Nor did
[J&J and Guidant] exercise near exclusive control over the profitability of the venture."  Guidant
therefore "cannot be supposed to have assumed liability for [billions of dollars] in lost profits
that might have been garnished in the future by non-existent," hoped-for synergies.  See id.

were the natural and probable consequences of the breach, and were contemplated at the time the contract was executed.").

431.    Furthermore, mere "hope or expectation" that J&J's acquisition of Guidant would be profitable does not "necessarily or logically lead[] to the conclusion that the parties contemplated that the [defendant] would assume liability for" the alleged consequential loss.  See Kenford Co. v. Cnty. of Erie, 537 N.E.2d 176, 179 (N.Y. 1989).

432.    Likewise, to recover lost profits based on market value, J&J must prove that the parties contemplated that in the event of a breach, Guidant could be liable for the profit J&J could earn from reselling Guidant at market price.  However, the undisputed evidence shows that J&J did not contemplate reselling Guidant.  (Korbich Dep. 30:5-13 ("Q. Did you -- as far as you're aware, was a potential strategic reason for acquiring Guidant ever thought to be to possibly turn around and sell Guidant to someone else? A. Not that I'm aware of. Q. You never heard anything like that, right? A. No.")).

433.    J&J furthermore offered no evidence that the parties contemplated that the Merger Agreement would grant J&J the right to acquire Guidant for approximately 20% below its market value.  (See PX0019 (Jarrell Direct) ¶ 10)).

### 3.    J&J's Alleged "Investment Value" Damages Are Fatally Speculative

434.    J&J cannot recover damages based on the alleged investment value to J&J of acquiring Guidant because these damages are based on speculative projections and hoped-for synergies that J&J has failed to substantiate.  Damages based on the alleged loss of speculative and contingent future gains are not recoverable under Indiana law.  See L.H. Controls, 974 N.E.2d at 1043.

435.    J&J primarily seeks damages based on the "investment value" of Guidant to J&J. (PX0019 (Jarrell Direct) ¶ 11 ("In my opinion, my first calculation, based on J&J's revealed

preference — its preparedness to pay $75.00 per share for Guidant — is the most appropriate measure of J&J's lost benefit of the bargain because it measures what Guidant was worth to J&J and does so based on J&J's actual behavior.")).  In the context of a merger or acquisition, "investment value" typically refers to the value of the target when operated by the acquirer, including any incremental value the acquirer expects to realize from the change in ownership and control of the target assets.  This incremental value added by the acquirer comes from expected opportunities to improve the expected future cash flows of the combined businesses, which may include expected improvements in revenue growth, higher margins, more efficient utilization of capital, and a lower cost of capital, among other things.  (DX0164 (Cornell Direct) ¶ 12).

436.    J&J's "investment value" damages are similar to lost profits damages because they are based on the future income J&J contends it could have realized over time from integrating, improving, and operating Guidant's business as part of J&J.  3 Dobbs Law of Remedies § 12.2(3) (2d ed. 1993) ("The clear case of damages truly based on lost profits that also count as consequential damages is the case of lost operating profits of a business.").

437.    As with any damages claim, J&J must prove the existence and extent of its claimed "investment value" damages with "reasonable certainty."  Marathon Oil Co. v. Collins, 744 N.E.2d 474, 482 (Ind. Ct. App. 2001).  J&J's damages based on Guidant's alleged "investment value" must be proved though evidence that is "sufficient to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness."  L.H. Controls, 974 N.E.2d at 1043 (quotations and citations omitted).

438.    Furthermore, like lost profits, J&J's claim for lost "investment value" must be based on more than a plaintiff's assertion of business prospects or expert projections on the basis of such assertions.  L.H. Controls, 974 N.E.2d at 1045 (reversing award of damages where award

was based on plaintiff's stated expectation of 10% profit rate on transaction, but presented "no basis upon which [it] could reasonably expect" this profit); Connersville Wagon Co. v. McFarlan Carriage Co., 76 N.E. 294, 297 (Ind. 1905) ("[I]t is a matter of common occurrence that schemes which prudent, cautious, and experienced business men have formulated with the utmost care, failed in the accomplishment of the expected rewards.  It is usually laid down, therefore, in both England and America, that speculative, contingent, and uncertain profits cannot be recovered as damages." (internal quotation marks omitted)).

439.    Projections like J&J's valuations, which assume a certain developmental course for changing market conditions, are not reasonably certain.  See Dupont, 2004 WL 1574629, at *7 ("Courts repeatedly have rejected claims for lost profits that rest on a series of assumptions and projections.") (quotations omitted); DX0164 (Cornell Direct) ¶ 59.

440.    J&J's damages come from estimated future profits from synergies that were subject to considerable uncertainty.  Jarrell conceded that projections of unrealized synergies are necessarily "subject to . . . risk and uncertainty," and are largely based on the assumptions of management.  (Trial Tr. 378:7-379:1 (Jarrell Cross).)  J&J's M&A witness, John Coates, testified that synergies cannot be realized until after the merger is closed, and that one of the reasons specific performance clauses are common in merger agreements is because damages arising out of synergies "can be speculative and unavailing" and therefore difficult to prove.  (Trial Tr. 202:1-18, 203:1-3 (Coates Cross)).  J&J's CEO William Weldon acknowledged that J&J management's projected synergies are "not always - always realized."  (Trial Tr. 91:18-21 (Weldon Cross)).

441.    Guidant presented persuasive evidence that J&J's valuations were highly sensitive to inputs that were dependent upon uncertain predictions made by J&J's management.  (DX0164

(Cornell Direct) ¶¶ 40-58).  During the months leading up to Boston Scientific's acquisition of Guidant, J&J's valuations of a Guidant acquisition were frequently revised to reflect significantly different values.  (DX0164 (Cornell Direct) ¶¶ 41-43).  Goldman Sachs' analyses likewise changed frequently, varying in value considerably and including a large range of estimated values at any given point in time.  (DX0164 (Cornell Direct) ¶¶ 54-55).  Indeed, Goldman Sachs' analyses estimated Guidant's investment value to J&J could be lower than $63.08 per share.  (DX0164 (Cornell Direct) ¶ 56).  As a result, J&J's valuations are too speculative to support a viable claim for damages.  See, e.g., L.H. Controls, 974 N.E.2d at 1043.

442.    The speculative nature of J&J's projections is further evidenced by the fact that the predictions underlying J&J's valuation models have proved incorrect in a way that vastly overstated the value of Guidant.  In fact, when the models' assumptions are replaced with the actual facts observed in the years since Boston Scientific acquired Guidant the models show that J&J would have suffered a loss if it had acquired Guidant.  (DX0164 (Cornell Direct) ¶¶ 51-53).

443.    Furthermore, when damages are predicated on projections of future business circumstances or environments, they are too speculative unless the projections are substantiated. Cap Gemini Am., Inc. v. Judd, 597 N.E.2d 1272, 1283 (Ind. Ct. App. 1992) (California law) (finding damages estimate too speculative, and thus inadequate to support an award for lost profits, where expert assumed the veracity of profit rates projected for plaintiff, "based only upon [plaintiff's] statements that he could obtain [these profits]").

444.    J&J offered no evidence at trial to support the projections on which its valuation models were based.  J&J produced no witnesses to testify about how the valuations were prepared and who prepared them, how the projections underlying the valuations were created, the information considered in preparing the valuations, or to provide context for and

authentication of the few documents cited by Professor Jarrell in calculating J&J's alleged

damages.

445.    J&J presented evidence of various bankers' fairness opinions with respect to J&J

and Boston Scientific's offers to acquire Guidant, but the fairness opinions are not opinions

about the actual value of Guidant.  (See, e.g., Trial Tr. 571:21-23, 572:4-7 (Hartman Cross)

("THE COURT:  Did you form an opinion as to the value of Guidant?  THE WITNESS:  No. . . .

[Q.] So as a general matter…the question posed in a fairness opinion is not whether the

transaction price is the actual value of the asset, right?  A. That's right."); Trial Tr. 454:1-12

(Bicknese Cross) ("[Q] Any estimates contained in the analyses performed by Merrill Lynch and

Bear Stearns are not necessarily indicative of actual values or future results, which may be

significantly more or less favorable than those suggested by the analyses. Now, that was true,

right? A. That's correct. Q. And the next sentence says: Additionally, estimates of the value of

businesses or securities do not purport to be appraisals or to reflect the prices at which these

businesses or securities might actually be sold. That's also true, right, sir? A. That's correct.");

Trial Tr. 457:10-17 (Bicknese Cross) ("Q. Okay. Now, within this range of $61 per share, we'll

call it $88 per share in the base case. Bear Stearns didn't express a view as to where precisely the

value of Guidant was, right? A. Correct.  Q. Just somewhere within this range?  A. Correct.  Q. It

could be as low as 61?  A. Correct.")).  Even if the bankers' fairness opinions purported to be

estimates of Guidant's value, they would be merely estimates, subject to superior proof of

Guidant's *actual* value to an acquirer.

446.    In light of J&J's failure to substantiate the projections on which it based its

investment value damages claim, such damages are too speculative to be permissible under

Indiana law.  See, e.g., Connersville Wagon, 76 N.E. 294, 297; L.H. Controls, 974 N.E.2d at

1043.[36]

### 4.    J&J Failed To Prove the Existence of Market Value Damages

447.    J&J has failed to prove the existence of market value damages because: (1) J&J

did not intend to sell Guidant and thereby realize any market value; (2) J&J's supposed evidence

of market value damages is improperly based on increases in Guidant's market price after the

alleged breach; and (3) J&J's $63.08 per share purchase would have been market price, so its

damages would be zero.

448.    The "fair market value" evidence offered by J&J to prove Guidant's value does

not measure the losses specifically suffered by J&J because J&J does not allege it was deprived

of the ability to sell Guidant at market price.  (Korbich Dep. 30:5-13 ("Q. Did you -- as far as

you're aware, was a potential strategic reason for acquiring Guidant ever thought to be to

possibly turn around and sell Guidant to someone else? A. Not that I'm aware of. Q. You never

heard anything like that, right? A. No.")).  Market value is therefore not a proper basis for

---

[36] To the extent J&J contends it could have used its financial resources to rebuild
Guidant's business following a J&J acquisition, J&J's damages calculations fail to account for
those expenditures.  (Trial Tr. 391:9-391:19 (Jarrell Cross) ("Q. Now, your calculations and your
opinion don't account for any expenditures that Johnson & Johnson claimed were necessary to
rebuild Guidant's business, does it?  A. My damages calculations depend upon their bidding
behavior which presumably accounts for all factors including those.  So I guess beyond that I
don't know how to respond.  Q. Well I can't – there's nowhere in your affidavit where you
discuss or account for any expenditures that are going to be necessary to rebuild Guidant's
business, isn't that right?  A. The bid factors in, the bid is what Johnson & Johnson is willing to
pay.")).  In generating its valuations, J&J did not anticipate the problems that ultimately afflicted
the CRM market, therefore the vast sums J&J claims it would have invested in Guidant's
businesses in light of these problems would not have been anticipated in J&J's valuations.  It is
possible the total acquisition and operating cost would have swallowed whatever profits J&J now
contends it would have made.

determining whether J&J suffered any damages.  See Country Contractors, N.E. 3d 677, 694

("The measure of expectation damages under Indiana law is 'the loss actually suffered by the

breach.'"); DX0164 (Cornell Direct) ¶¶ 60-63.

449.    In any event, J&J has failed to prove the existence of any market value damages.

450.    The only evidence of market value J&J offers is Boston Scientific's April 21,

2006 acquisition of Guidant at a price of $80 per share, but this post-dates the alleged breach,

and does not measure any loss specific to J&J.  (PX0019 (Jarrell Direct) ¶ 10)).

451.    It is undisputed that market prices change over time, sometimes quickly.  See

DX0226.  Jarrell, however, testified that he did not consider the date of the alleged breach in

arriving at his damages opinions.  (Trial Tr. 359:4-6 (Jarrell Cross)).

452.    Market value damages must be based on the date of the alleged breach because,

unlike when calculating lost future profits, market value damages posit a hypothetical but-for

sale at market price on the date of the alleged breach. E.g., Oscar Gruss & Son, Inc. v. Hollander,

337 F.3d 186, 198 (2d Cir. 2003) (holding that plaintiff's loss from undelivered stock warrants is

measured using the market price of underlying stock on the day of the breach).

453.    Furthermore, J&J may not base market value damages on Boston Scientific's

transaction, which J&J contends would not have occurred but for a breach.

454.    Market value must be based on transactions that the parties would be able to carry

out.  (DX0164 (Cornell Direct) ¶ 12).  Accordingly, if J&J's predicate for its damages claim is

correct—i.e., that Boston Scientific would not have acquired Guidant without breaching the

Merger Agreement—to award J&J damages based on Boston Scientific's transaction would

constitute an impermissible windfall because it would put J&J in a better position than it would

have been in had there been no alleged breach.  See Pigman v. Ameritech Pub., Inc., 641 N.E.2d

1026, 1033 (Ind. Ct. App. 1994) ("A plaintiff's damages in a breach of contract action is limited to the amount that would place the plaintiff in the same position he would have been had the contract been fulfilled.").

455.    While the price to acquire Guidant moved considerably over the course of the period from late 2004 through early 2006, the highest price offered to acquire Guidant in late December 2005 when a breach is alleged to have occurred was, according to J&J, $63.08 per share.  This was the market price for Guidant at that time—were it not, J&J could not contend that it would have acquired Guidant at that price but for an alleged breach.  (See JPS ¶ 35).

456.    Another court in this District addressed a similar claim and concluded that the damages were zero.  In Kovens v. Paul, the plaintiff sought damages for the defendant's alleged breach of an agreement to sell a controlling block of stock in a corporation.  Kovens v. Paul, No. 04 CIV. 2238 (TPG), 2009 WL 562280 (S.D.N.Y. Mar. 4, 2009) aff'd, 358 F. App'x 228 (2d Cir. 2009).  The court held that damages would be equal to the difference between the fair market value of the stock and the contract price.  Id. at *5.  The court rejected the plaintiff's argument that a post-breach stock price should be used to determine fair market value and instead, the court held that the allegedly breached contract was the best evidence of the fair market value of the control block of stock.  Id. at *6.[37]  The court held—and the Second Circuit

---

[37] The court declined to use the price of the stock on the open market as proof of the fair market value of the control block.  The court held, "[t]he price agreed upon by Kovens and Paul, by contrast, does offer evidence of the actual value of the block of stock. That price accounts for the parties' expectations that the purchase would allow Kovens to regain control of USI, as well as for the difficulty that Kovens would have faced if he had attempted to acquire such a large block of shares on the open market. It also accounts for the value to Kovens of Paul's assistance in calling a special shareholders' meeting. It is therefore consistent with the Second Circuit's definition of fair market value as the price at which property would change hands between a willing buyer and a willing seller."  Kovens, 2009 WL 562280, at *6 (citing Schonfeld, 218 F.3d

later affirmed—that "an expectation damages award in this case requires the court to calculate damages as the difference between the contract price and the fair market value of the shares at the time of the breach.  Because the best evidence of the shares' fair market value was the contract price, plaintiff's damages are zero."  Id. at *7; see also Kovens v. Paul, 358 F. App'x 228, 229 (2d Cir. 2009) ("[T]he best indicator of the shares' market value at the time of breach is the contract price, and therefore Kovens is owed zero damages").

457.    J&J has therefore failed to prove that it suffered any market value damages from not acquiring Guidant at was then the market price.

**E.     J&J's Failures To Mitigate Damages Preclude Recovery**

458.    J&J is precluded from recovering damages because it failed to mitigate the damages.

459.    Assuming J&J has suffered some damages, the Court must consider whether J&J made a reasonable effort to mitigate them.  See Fischer v. Heymann, 12 N.E.3d 867, 871 (Ind. 2014) ("[T]he duty to mitigate damages is a common law duty independent of the contract

---

at 178.).  Here, it is likewise improper to use Guidant's stock price at the time of the alleged breach as evidence of fair market value.  Guidant's standalone stock value was well below J&J's $63.08 per share offer.  (Deyo Ex. 6 ("Guidant Update," October 10, 2005) at JJE00179275 ("Requested independent view of stand alone valuation - $48-$50")).  Following the signing of the Merger Agreement, Guidant's stock market price rose above $63.08 only after Boston Scientific's December 5, 2005 announcement, and this was due to market belief that Guidant would sell for more than $63.08.  (Trial Tr. 1515:1-8 (Cornell Redirect) ("Q. Now, am I correct that, in your opinion, the market's reaction to the announcement that Boston Scientific was going to make an offer tells you something about the probability that the $63-a-share offer is likely to succeed? A. It does.  Q. And what does it tell you?  A. That the $63-a-share offer is very unlikely to succeed. Something else is likely to happen.")).  J&J would receive an impermissible windfall were it awarded damages based on the market's prediction that J&J's $63.08 offer would not be sufficient.

terms" that requires "a non-breaching party [to] make a reasonable effort to act in such a manner as to decrease the damages caused by the breach.").

460.    A non-breaching party must make a reasonable effort to mitigate damages arising from a breach.  Fischer v. Heymann, 12 N.E.3d 867, 871 (Ind. 2014).  If the breaching party proves that the non-breaching party did not use reasonable diligence to mitigate its damages, the Court must reduce plaintiffs' damages by the amount plaintiffs failed to mitigate.  Id.

461.    The Merger Agreement expressly provided that, were either party to breach, the non-breaching party would lack an adequate remedy at law.  Kury Ex. 9 § 8.10.  Guidant invoked this provision when J&J declared a material adverse effect under the Initial Agreement, and the parties were quickly able to come to terms on an amended agreement.  In contrast here, J&J accepted a $705 million termination fee and then several months later sought billions in monetary damages after the Boston Scientific deal had closed.

462.    All of J&J's supposed "harm" could have been avoided had it sued to prevent the closing of the Boston Scientific-Guidant merger.  That merger did not close until April 21, 2006. In the context of a $25 billion merger – especially one in which J&J admittedly knew at the time of the facts that supposedly constituted the breach and gave rise to its supposed harm – it was unreasonable for a sophisticated and well-counseled party like J&J to forego injunctive relief, await the closing of the merger, and then sue for billions in damages. J&J is therefore precluded from seeking lost profits.

**F.     Any Damages Must Be Offset Against the $705 Million Termination Fee**

463.    The $705 million paid to J&J as a termination fee must be offset against any damages award.  (J&J Mot. in Opp'n to SJ at 27 n.7 ("At most, Guidant would be entitled to offset the termination fee against any recovery by J&J since it would not have been paid in the 'but for' world."); Johnson & Johnson, 2014 WL 3728598 at *20 at *10 n. 9 ("J&J does

concede, however, that if J&J prevails on its damages claim, 'Guidant would be entitled to offset the termination fee against any recovery by J&J since it would not have been paid in the 'but for' world.' The Court agrees.")).

## VI. J&J Is Estopped from Claiming Breach

464. Under Indiana law, when a party has "by deed or conduct . . . induced another to act in a particular manner," it will be estopped from adopting "an inconsistent position, attitude, or course of conduct that causes injury to such other." MDG Int'l. Inc. v. Austl. Gold, Inc., 606 F. Supp. 2d 926, 933 (S.D. Ind. 2009) (citation omitted). Estoppel can arise from silence or acquiescence when good faith requires a party to speak or to act. See, e.g., Sheraton Com. of Am. v. Kingsford Packing Co., 319 N.E.2d 852, 856 (Ind. Ct. App. 1974); Erie-Haven, Inc. v. First Church of Christ, 292 N.E.2d 837, 842 (Ind. Ct. App. 1973). In a contractual setting, "[c]ommon honesty gives rise to a duty to speak . . . when a party knows that another is acting upon an understanding that differs with its own." In re The Sassi Corp., 51 B.R. 534, 544 (Bankr. S.D. Ind. 1983) (quotation marks and emphasis omitted). Where "in good conscience an honest dealing person ought not to be permitted to gainsay his previous conduct," Indiana law holds that "the doctrine of equitable estoppel shuts the door against the assertion of a right." Id. at 543.

465. "The linchpin of negotiation is not that one side capitulates to the other, but that there is a good faith, honest, articulation of interests, positions, or understandings." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011) (quoting Penguin Grp. (USA) Inc. v. Steinbeck, No. 06 CV 2438 (GBD), 2009 WL 857466 (S.D.N.Y. March 31, 2009)). Accordingly, a "duty to disclose may arise . . . . where the relationship between the parties is that of buyer and seller because . . . one party may be in the unique possession of knowledge not possessed by the other." Am. United Life Ins. Co. v. Douglas, 808 N.E.2d 690, 701 (Ind. Ct.

App. 2004).  Pursuant to a doctrine known in some states as the "forthright negotiator" principle,

Indiana law instructs that where one contractual party "knew or had reason to know the

meaning" that the other party "in fact gave to" the first party's "words," then the second party's

"understanding shall be given effect.  This is explained as being the result of securing the

realization of expectations reasonably induced by the expressions of agreement."  Adams v.

Reinaker, 808 N.E.2d 192, 196 (Ind. Ct. App. 2004); see Bd. of Directors, Ben Davis

Conservancy Dist. v. Cloverleaf Farms, Inc., 359 N.E.2d 546, 549 (Ind. Ct. App. 1977) (same);

see also United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810, 836 (Del. Ch. 2007) ("[T]he

forthright negotiator principle provides that, in cases where the extrinsic evidence does not lead

to a single, commonly held understanding of a contract's meaning, a court may consider the

subjective understanding of one party that has been objectively manifested and is known or

should be known by the other party."); Restatement (Second) of Contracts §201(2).

466.    Upon learning of Guidant's provision of due diligence to Abbott, on January 9

Deyo and Hilton spoke with Kury.  Deyo claims that he communicated his concerns about a

breach to Kury at that time.  (PX0016 (Deyo Direct) ¶ 13).  But Deyo did not memorialize the

January 9 phone call or discuss the issue again with Guidant until January 23.  (Trial Tr. 126:18-

127:3 (Deyo Cross), 177:19-178:15 (Deyo Recross)).  Nor did anyone else at J&J communicate

with Guidant regarding a possible breach until January 23.  (Trial Tr. 177:19-178:15 (Deyo

Recross)).  Both Kury and Deyo agree that during the January 9 phone call Deyo and Hilton

"wanted to make sure that J&J received all the same due diligence that Abbott had received – in

particular with respect to Guidant's DES program."  (DX0166 (Kury Direct) ¶ 100; Trial Tr.

158:19-159:4 (Deyo Cross)).  Deyo and Hilton raised that issue in response to an analyst call that

same day in which Boston Scientific's CFO Best disclosed that Abbott had been provided with

due diligence material.  (JPS ¶ 37; Best Ex. 31).  But Kury's actions following the phone call reflect only steps to ensure that information given to Abbott was provided to J&J, and no steps or communications to address a purported breach.  (John Ex. 32; John Ex. 33).  As Kury testified at trial, "If I had had that message" about a breach, "I can assure you I would have been on the phone with Mr. Mulaney in five minutes."  (Trial Tr. 1160:2-11 (Kury Cross)).  Kury further testified that "[i]f they had told me, we think you can't do this, even if I thought they were crazy on that point, I would have immediately called Mr. Mulaney saying, hey, they've raised this, what do we do?"  (Trial Tr. 1233:11-14 (Kury Redirect)).  Meanwhile, Mulaney testified at trial that he did not hear about the January 9 phone call until January 23, when Deyo sent the letter raising concerns about the provision of information to Abbott and referred to a January 9 conversation.  (Trial Tr. 836:19-21 (Mulaney Cross); Kury Ex. 50).

467.    Upon learning of Guidant's provision of due diligence to Abbott on January 9, J&J continued to exercise its rights under the Merger Agreement.  J&J did not object to Guidant's provision of confidential materials to Abbott or caution Guidant during this time period that it may face a billion dollar lawsuit.  (Trial Tr. 57:11-15, 58:7-59:16, 60:4-63:21 (Weldon Cross)).  As Deyo testified at trial, J&J concealed its apparent intention to seek "damages down the road" by avoiding threats of "proactive litigation" during the negotiation process.  (Trial Tr. 131:2-17 (Deyo Cross)).  J&J's outside counsel Townsend similarly testified that J&J considered the possibility of seeking injunctive relief but ultimately did not pursue that option.  (Trial Tr. 329:3-9 (Townsend Cross)).  Townsend testified that he personally formed a belief around January 9, 2006 that Guidant had breached the merger agreement, but that he did not communicate that understanding to anyone at Skadden or Guidant.  (Trial Tr. 351:15-352:4 (Townsend Re-Cross)).

468.     J&J instead insisted on continued contractual performance.  First, J&J requested pursuant to Section 4.02(c) that Guidant provide J&J with all of the material Abbott had received.  Guidant complied.

469.     Second, J&J exercised its "last look" rights by evaluating its position and submitting its own competing bid.  Guidant seriously considered J&J's bids in Guidant's negotiations, which even J&J itself considered to be transparent and fair.  (Korbich Ex. 12 at JJH00037604).

470.     Third, J&J renegotiated the terms of the Merger Agreement by entering into two amendments and increasing the termination fee that would be due if Guidant chose to proceed with Boston Scientific's competing Takeover Proposal.  (Kury Ex. 43; Kury Ex. 47).  Guidant negotiated those agreements in good faith, even as J&J concealed its view that a breach had occurred.  J&J induced Guidant to reasonably believe no breach had occurred by treating Boston Scientific's bids as bona fide offers and negotiating for an increasing termination fee.  As J&J knew, the Merger Agreement could only have been terminated "in accordance with the terms and subject to the conditions of Section 4.02(b)," ), which in turn allowed for a termination only in response to a Takeover Proposal "that was unsolicited . . . and did not otherwise result from a breach of this Section 4.02."  (See Kury Ex. 9 § 7.01(f) at SA00026243).  In addition, no one at J&J uttered a single sentence between January 9 and January 23 to express concern over a breach of the Merger Agreement.  J&J's silence on the matter of the breach was in stark contrast to the ongoing, frequent conversations between the parties on other matters.  Deyo and Weldon attended meetings with Cornelius.  (Trial Tr. 60:5-10 (Weldon Cross)).  Not only was J&J silent about a breach of the Merger Agreement, but it affirmatively emphasized other risks inherent to the Boston Scientific offer, including the prospect of patent litigation.  (Trial Tr. 130:16-132:1,

150:13-153:5 (Deyo Cross)).  As Mulaney testified, he "would have expected him [Townsend] to raise an allegation of breach if he thought there had been one, or if he had any serious concern that there might have been one."  (Trial Tr. 920:23-921:2 (Mulaney Redirect)).  Indeed, had J&J raised such a concern before January 23, Mulaney testified that Guidant would have taken steps to address the issue of breach in the amendments to the Merger Agreement.  (Trial Tr. 920:13-18 (Mulaney Redirect)).  Kury similarly testified that he would have acted promptly on any indication from J&J that there had been a breach.  (Trial Tr. 1236:20-22 (Kury Redirect)).  J&J's equivocal statement on January 23 that it was "troubled" was insufficient to satisfy its duty to speak, and stands in stark contrast to Deyo's November 3, 2005 letter regarding the Initial Merger Agreement that J&J was "prepared to take all necessary action" in response to "breaches."  (Deyo. Ex. 10).  Moreover, by January 23, Guidant had already relied on J&J's silence to its detriment by negotiating and agreeing to two amendments to the Merger Agreement in which it otherwise could have sought a release from J&J for any claims under the prior Merger Agreement.

471.    Fourth, when it was clear that J&J would cease making further bids of its own, J&J invoked the Merger Agreement and insisted that Guidant was not permitted to "walk away . . . until the end of the fifth business day after a competing offer is deemed superior."  (Deyo Ex. 32).  Guidant complied.

472.    Fifth, J&J issued a press release declaring that "Guidant Corporation is required to pay Johnson & Johnson a fee of $705 million on or before January 26 as per the merger agreement."  (Hilton Ex. 25 at 1).  Guidant did so.

473.    After receiving its $705 million termination fee, J&J filed a Form 8-K with the SEC stating that the Merger Agreement had been "terminated in accordance with its terms by

Guidant in order for Guidant to enter into a merger agreement with Boston Scientific Corporation." (Rosenberg Ex. 31).  This statement was an admission that Guidant had complied with Section 4.02 of the Merger Agreement: as is stated in Section 7.01(f) of the Merger Agreement, termination can only occur if Section 4.02 has been satisfied.

474.    Had J&J notified Guidant, prior to its acceptance of the Boston Scientific offer, that it considered Guidant to have breached Section 4.02 of the Merger Agreement, Guidant could have pursued alternative courses of action, such as bargaining for a release, seeking a declaratory judgment, rejecting the Boston Scientific offer, or refusing to pay the $705 million termination fee.  Instead of seeking specific performance or terminating and seeking damages (but forgoing the termination fee), J&J treated the termination as completely in accord with Section 7.01(f), demanding and accepting Guidant's $705 million payment.  Eight months later, contrary to its actions under the Merger Agreement, J&J brought suit alleging that Section 4.02(a) had been breached.

475.    J&J had a duty to speak if it believed that Guidant had breached the Merger Agreement, and faced multi-billion dollar liability in pursing the deal with Boston Scientific. See In re The Sassi Corp., 51 B.R. at 544; see also L-7 Designs, Inc., 647 F.3d at 430.  It breached this duty by remaining silent and collecting the $705 million termination fee, as though no breach had occurred.  See Sheraton Com. of Am., 319 N.E.2d at 856; see also NLRB v. Truitt Mfg., 351 U.S. 149, 155 (1956) (Frankfurter, J., concurring in part and dissenting in part) ("A determination of good faith or want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind.  The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reaching such a determination.").  In so doing, J&J

induced Guidant to rely on its actions, and close its deal with Boston Scientific.  See MDG Int'l.

Inc., 606 F. Supp. 2d at 934.  J&J now adopts a position inconsistent with its conduct in January

2006.  See id.  Under Indiana law, J&J "ought not to be permitted to gainsay [its] previous

conduct," and should be estopped from alleging material breach.  See In re The Sassi Corp., 51

B.R. at 543.

Dated: January 16, 2015
New York, New York

SHEARMAN & STERLING LLP

By:  _____/s/ John Gueli_____
Stuart J. Baskin
sbaskin@shearman.com
John Gueli
jgueli@shearman.com
Daniel H.R. Laguardia
Daniel.Laguardia@shearman.com

599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4744 (telephone)
(212) 848-7179 (facsimile)

BOIES, SCHILLER & FLEXNER LLP

By:  _____/s/ Jack Wilson_____
David Boies
dboies@bsfllp.com
William S. Ohlemeyer
wohlemeyer@bsfllp.com
Jack Wilson
jwilson@bsfllp.com
Ian Dumain
idumain@bsfllp.com

333 Main Street
Armonk, New York 10504
(914) 749-8200 (telephone)
(914) 749-8300 (facsimile)

# EXHIBIT A

[*from* ~~Kury Ex. 9~~DX0215]

~~AMENDED AND RESTATED~~AGREEMENT AND PLAN OF MERGER

Dated as of November ~~14, 2005~~16, 2006,

Among

JOHNSON & JOHNSON,

~~SHELBY MERGER~~CYPRESS ACQUISITION SUB, INC.

And

~~GUIDANT CORPORATION~~

CONOR MEDSYSTEMS, INC.

. . . .

SECTION 4.02.  No Solicitation.  (a) The Company shall not, nor shall it authorize or permit any of its Subsidiaries or any of their respective directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative (collectively, "Representatives") retained by it or any of its ~~Subsidiaries~~Affiliates to, directly or indirectly through another person, (i) solicit, initiate or knowingly encourage, or take any other action designed to, or which ~~could~~would reasonably be expected to, facilitate, any Takeover Proposal or (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any person any information, or otherwise cooperate in any way with, any Takeover Proposal.  Without limiting the foregoing, it is agreed that any violation of the restrictions set forth in the preceding sentence by any Representative of the Company or any of its Subsidiaries shall be a breach of this Section 4.02(a) by the Company.  The Company shall, and shall cause its Subsidiaries to, (A) immediately cease and cause to be terminated all existing discussions or negotiations with any person conducted heretofore with respect to any Takeover Proposal and (B) promptly after the date hereof request the prompt return or destruction of all confidential information previously furnished to such person(s) within the last 12 months for the purpose of evaluating a possible Takeover Proposal.  Notwithstanding ~~the foregoing~~anything in this Agreement to the contrary, at any time prior to obtaining the ~~Shareholder~~Stockholder Approval, in response to a bona fide written Takeover Proposal that the Board of Directors of the Company ~~reasonably~~ determines in good faith (after consultation with outside counsel and a financial advisor of nationally recognized reputation) constitutes or ~~is~~would reasonably ~~likely~~be expected to lead to a Superior Proposal by such party, and which Takeover Proposal was not solicited after the date hereof and was made after the date hereof and did not otherwise result from a breach of this Section 4.02(a), the Company may, if its Board of Directors determines in good faith (after consultation with outside counsel) that it is required to do so in order to comply with its fiduciary duties to the stockholders of the Company under applicable law, and subject to

1

[*from* ~~Kury Ex. 9~~DX0215]

compliance with Section ~~4.02~~4.02(c), (x) furnish information with respect to the Company and its Subsidiaries to the person making such Takeover Proposal (and its Representatives) pursuant to a customary confidentiality agreement (which need not restrict such person from making an unsolicited Takeover Proposal) not less restrictive ~~to~~of such person than the ~~confidentiality provisions of the~~ Confidentiality Agreement~~,~~; provided that all such information has previously been provided to Parent or is provided to Parent prior to or substantially concurrent with the time it is provided to such person, and (y) participate in discussions or negotiations with the person making such Takeover Proposal (and its Representatives) regarding such Takeover Proposal.

The term "Takeover Proposal" means any inquiry, proposal or offer from any person relating to, or that ~~could~~would reasonably be expected to lead to, any direct or indirect acquisition or purchase, in one transaction or a series of transactions, of assets (including for the purpose of this definition the outstanding equity securities of ~~any Subsidiary~~the Subsidiaries of the Company) or businesses that constitute 15% or more of the revenues, net income or the assets of the Company and its Subsidiaries, taken as a whole, or 15% or more of any class of equity securities of the Company, any tender offer or exchange offer that if consummated would result in any person beneficially owning 15% or more of any class of equity securities of the Company, or any merger, consolidation, business combination, recapitalization, liquidation, dissolution, joint venture, binding share exchange or similar transaction involving the Company or any of its Subsidiaries pursuant to which any person or the ~~shareholders~~stockholders of any person would own 15% or more of any class of equity securities of the Company or of any resulting parent company of the Company~~, in each case~~ or businesses or assets that constitute 15% or more of the revenues, net income or the assets of the Company and its Subsidiaries, taken as a whole, other than the transactions contemplated by this Agreement.

The term "Superior Proposal" means any bona fide offer made by a third party that if consummated would result in such person (or its ~~shareholders~~stockholders) owning, directly or indirectly, ~~more than 80%~~all or substantially all of the shares of Company Common Stock then outstanding (or of the ~~shares of the~~ surviving entity in a merger or the direct or indirect parent of the surviving entity in a merger) or all or substantially all the assets of the Company, which the Board of Directors of the Company ~~reasonably~~ determines in good faith (after consultation with outside counsel and a financial advisor of nationally recognized reputation) to be (i) more favorable to the ~~shareholders~~stockholders of the Company from a financial point of view than the Merger (taking into account all the terms and conditions of such proposal and this Agreement (including any changes to the financial terms of this Agreement proposed by Parent in response to such offer or otherwise)) and (ii) reasonably capable of being completed, taking into account all financial, legal, regulatory and other aspects of such proposal.

(b) Neither the Board of Directors of the Company nor any committee thereof shall (i) (A) withdraw (or modify in a manner adverse to Parent), or publicly propose to withdraw (or modify in a manner adverse to Parent), the ~~adoption or~~approval, recommendation or declaration of advisability by such Board of Directors or any such committee thereof of this Agreement, the

Merger or the other transactions contemplated by this Agreement or (B) ~~adopt or~~ recommend, adopt or approve, or propose publicly to ~~adopt or~~ recommend, adopt or approve, any Takeover Proposal (any action described in this clause (i) being referred to as a "Company Adverse Recommendation Change") or (ii) ~~adopt~~approve or recommend, or ~~publicly~~ propose to ~~adopt~~approve or recommend, or allow the Company or any of its ~~Subsidiaries~~Affiliates to execute or enter into, any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement, option agreement, joint venture agreement, partnership agreement or other similar ~~Contract~~agreement constituting or related to, or that is intended to or ~~could~~would reasonably be expected to lead to, any Takeover Proposal (other than a confidentiality agreement referred to in Section 4.02(a)) (an "Acquisition Agreement"). Notwithstanding ~~the foregoing~~anything in this Agreement to the contrary, at any time prior to obtaining the ~~Shareholder~~Stockholder Approval ~~and subject to Section 4.02(e)~~, the Board of Directors of the Company may ~~(x) make a Company Adverse Recommendation Change:~~ (x) if the Board of Directors of the Company determines in good faith (after consultation with outside counsel and a financial advisor of nationally recognized reputation) that ~~(A) a Parent Material Adverse Effect has occurred and (B) as a result thereof such action is consistent with their~~it is required to do so in order to comply with its fiduciary duties to the stockholders of the Company under applicable ~~Laws or (y) in response to a Takeover Proposal that the Board reasonably determines (after consultation with outside counsel and a financial advisor of nationally recognized reputation) constitutes~~law, make a Company Adverse Recommendation Change and (y) in response to a Superior Proposal ~~and~~that was ~~unsolicited and made~~not solicited after the date hereof and ~~that~~did not otherwise result from a breach of this Section 4.02, ~~(1) make a Company Adverse Recommendation Change or (2)~~ cause the Company to terminate this Agreement and concurrently with or after such termination, cause the Company to enter into an Acquisition Agreement; provided, however, that ~~the Company shall not be entitled to exercise its right to make a~~(1) no Company Adverse Recommendation Change ~~or terminate~~may be made and (2) no termination of this Agreement pursuant to ~~clause (y)~~this Section 4.02(b) may be made, in each case until after the ~~fifth~~fourth business day following Parent's receipt of written notice ~~(a "Notice of Superior Proposal")~~from the Company advising Parent that the Board of Directors of the Company intends to ~~take such action~~make a Company Adverse Recommendation Change (a "Notice of Adverse Recommendation") or terminate this Agreement pursuant to this Section 4.02(b) (a "Notice of Superior Proposal") and specifying the reasons therefor, including ~~the terms and conditions of any Superior Proposal that is,~~ if the basis of the proposed action by the Board of Directors is a Superior Proposal, the terms and conditions of any such Superior Proposal (it being understood and agreed that any amendment to the financial terms or any other material term of such Superior Proposal shall require a new Notice of Adverse Recommendation or Notice of Superior Proposal and a new ~~five~~four business day period). In determining whether to make a Company Adverse Recommendation Change ~~or to cause the Company to so terminate this Agreement~~, the Board of Directors of the Company shall take into account any changes to the financial terms of this Agreement proposed by Parent in response to a Notice of Adverse Recommendation, a Notice of Superior Proposal or otherwise.

[*from* ~~Kury Ex. 9~~DX0215]

(c) In addition to the obligations of the Company set forth in paragraphs (a) and (b) of this Section 4.02, the Company shall promptly advise Parent orally and in writing ~~(i)~~ of any Takeover Proposal, the material terms and conditions of any such Takeover Proposal or inquiry (including any changes thereto) and the identity of the person making any such Takeover Proposal ~~and (ii) if the Board of Directors of the Company is considering, or has decided to consider, whether any change, effect, event, occurrence, state of facts or development constitutes a Parent Material Adverse Effect.  The Company shall (x) keep Parent fully~~or inquiry.  The Company shall (i) keep Parent informed ~~in all material respects~~ of the status and ~~details~~material terms and conditions (including any material change to the terms thereof) of any such Takeover Proposal~~, (y and any discussions and negotiations concerning the material terms and conditions thereof and (ii)~~ provide to Parent as soon as practicable after receipt or delivery thereof copies of all correspondence and other written material ~~sent or provided to~~(including draft agreements) relating to any such Takeover Proposal exchanged between the Company or any of its Subsidiaries ~~from any person that describes any of the terms or conditions of any~~(or their Representatives), on the one hand, and the person making a Takeover Proposal ~~and (z) keep Parent fully informed in all material respects of the status and details of any determination by the Company's Board of Directors with respect to a potential Parent Material Adverse Effect~~(or its Representatives), on the other hand.

(d) Nothing contained in this Section 4.02 or elsewhere in this Agreement shall prohibit the Company from (x) taking and disclosing to its ~~shareholders~~stockholders a position contemplated by Rule 14e-2(a) promulgated under the Exchange Act or making a statement required ~~under~~by Rule 14~~a~~d-9 promulgated under the Exchange Act, or (y) making any disclosure to the ~~shareholders of the Company that is required by applicable Law~~stockholders of the Company if, in the good faith judgment of the Board of Directors of the Company (after consultation with outside counsel) failure to so disclose would be inconsistent with its obligations under applicable law, including the Board of Directors' duty of candor to the stockholders of the Company; provided, however, that in no event shall the Company or its Board of Directors or any committee thereof take, or agree or resolve to take, any action prohibited by Section 4.02(b) (it being understood that any accurate disclosure of factual information to the ~~shareholders~~stockholders of the Company that is required to be made to such ~~shareholders~~stockholders under applicable federal securities ~~Laws~~laws or other Legal Provisions shall not be considered a modification prohibited by ~~clause (i)(A) of~~ Section ~~4.02~~4 .02(b)).